# In The Matter Of:

*Mancini  vs*

*City of Providence*

---

*Chief Hugh T. Clements, Jr.*

*June 10, 2015*

---



**ALLIED**

COURT REPORTERS, INC.

*and*

**VIDEO CONFERENCE CENTERS**

Phone:   401-946-5500          Toll Free: 888-443-3767
www.alliedcourtreporters.com     info@alliedcourtreporters.com

*Min-U-Script® with Word Index*

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


Mark Mancini            :
                        :
      VS.               :  C.A. NO:  13-092-S-PAS
                        :
City of Providence,     :
By and Through its      :
Treasurer, James J.     :
Lombardi, III, and      :
Hugh Clements, Jr.      :


          DEPOSITION OF CHIEF HUGH T. CLEMENTS, JR., a
Defendant in the above-entitled cause, taken on
behalf of the Plaintiff, before Elizabeth Greeley,
Notary Public, in and for the State of Rhode Island,
at the Law Office of Mark Gagliardi, 120 Wayland
Avenue, Providence, Rhode Island, on June 10, 2015 at
12:00 p.m.



PRESENT:

FOR THE PLAINTIFF......LAW OFFICE OF MARK GAGLIARDI
                       BY:  MARK GAGLIARDI, ESQUIRE
                              -AND-
                       GEOFF APTT, ESQUIRE

FOR THE DEFENDANT......CITY OF PROVIDENCE
                       DEPARTMENT OF LAW
                       BY:  KEVIN MCHUGH, ESQUIRE
                              -AND-
                       KATHRYN SABATINI

ALSO PRESENT:
MARK MANCINI
JENNAWE HUGHES

2

1                    I N D E X

2    WITNESS                                    PAGE

3    CHIEF HUGH T. CLEMENTS, JR.

4    EXAMINATION BY MR. GAGLIARDI.............   3

5

6

7

8

9                  E X H I B I T S

10   EXHIBIT         DESCRIPTION              PAGE

11   DEFENDANTS'
     1               TEXT ORDER (1 PG)........    5
12
     6               RESPONSES (9 PGS)........    6
13
     PLAINTIFF'S
14   A               EXCERPT (8 PGS)..........   65

15   B               SIGN-UP SHEET (3 PGS)....   86

16

17

18

19

20

21

22

23

24

25

Chief Hugh T. Clements, Jr. - June 10, 2015

3

 1              (DEPOSITION COMMENCED AT 12:10 P.M.)

 2                    CHIEF HUGH T. CLEMENTS, JR.

 3        Being duly sworn, deposes and testifies as

 4   follows:

 5                    THE REPORTER:  Would you state your name

 6   for the record, please?

 7                    THE WITNESS:  Hugh T. Clements, Jr.,

 8   C-L-E-M-E-N-T-S.

 9                    EXAMINATION BY MR. GAGLIARDI

10   Q.   Good afternoon, Chief Clements.  Is it okay if I

11   refer to you as Chief or Colonel Clements?

12        A.   That's fine.

13   Q.   Is your title Colonel?

14        A.   Colonel.  We're an old traditional

15   department, so technically Colonel, but Chief is fine.

16   Q.   We're here today for your deposition.  You know

17   why you're here?

18        A.   Yes.

19                    MR. GAGLIARDI:  Before we get going with

20   the deposition, we're going to put a few things on the

21   record.  One matter concerns our discussion about the

22   performance of police officers that are working for

23   the department.  We're under a court order that we're

24   only allowed to do so amongst the attorneys.

25        We can't share that information with Sergeant

4

1   Mancini, unless it's approved either by the Defendants

2   or The Court.  Is that correct, Kevin?

3               MR. MCHUGH:  Correct.

4               MR. GAGLIARDI:  Attorney McHugh, would

5   you like to put this document in the record?  It's a

6   text order from the Federal Court basically stating

7   what I just said.

8               MR. MCHUGH:  What I wanted to put on the

9   record was that on May 20, 2014 Magistrate Judge

10  Sullivan issued an order on a motion to compel that

11  the Plaintiff had filed.

12      I won't read the whole thing, but for the

13  documents that had to be produced, which were requests

14  for productions Numbers 24, 25, 26 -- I'll put a copy

15  of that in, too, so we have the actual request.  That

16  use of such material shall be limited to this case

17  only.  Access to such material shall be limited to

18  Plaintiff's attorneys, staff and experts.

19      Plaintiff, Sergeant Mancini, is prohibited from

20  access, except for compilations that contain no

21  information relating to specific individual, with one

22  exception.  If Plaintiff's counsel deems access by

23  Plaintiff necessary to obtain assistance in preparing

24  the case, the specific documents deemed necessary may

25  be redacted to cover up all personal identifiers and

5

1  show to Defendants' counsel.

2      I won't read the rest of it.  I think in addition

3  to this and what Mr. Gagliardi said, this complies

4  with that.  I think in addition to that, the problem

5  then is going to be that all this is going to be in

6  the record, in the deposition.

7      So I think in addition to the questions being

8  asked and answered while Sergeant Mancini is not

9  present, that Sergeant Mancini should not be allowed

10  to read those pages of the deposition that give the

11  answers to those questions.  It's really the same

12  thing.

13              MR. GAGLIARDI:  I agree.  In the event he

14  were to read it, we would redact the names.

15              MR. MCHUGH:  Right.  Yes, pursuant to the

16  order.  If I could put the order in as City's 1.

17              (EXHIBIT 1 DEFENDANTS' MARKED FOR ID)

18              MR. MCHUGH:  I thought we should, for the

19  sake of clarity in case there are any issues, we

20  should put in the document requests also.  I have an

21  e-mail form of document requests Numbers 24, 25, 26.

22  Those are the ones of the order.  I'll put that in as

23  Defendant's 2.  Well, we could put the actual -- I'll

24  withdraw this one then.

25              MS. SABATINI:  This is also our response.

Chief Hugh T. Clements, Jr. - June 10, 2015

6

 1            MR. MCHUGH:  So we'll put this in.  We're
 2   really talking about Requests 24, 25, 26.  That's what
 3   the order goes with.
 4            MR. GAGLIARDI:  I think it was 23, 24,
 5   25, 26.
 6            MR. MCHUGH:  What is 23?
 7            MR. APTT:  Performance reviews.
 8            MR. MCHUGH:  That's fine.  We'll add 23
 9   to that.
10        (DEFENDANTS' EXHIBIT 2 MARKED FOR ID)
11            MR. GAGLIARDI:  We have a lot of people
12   in the room today.  I think it's appropriate if
13   everybody introduce themselves for the record.  My
14   name is Mark Gagliardi.  I represent the Plaintiff,
15   Mark Mancini.
16            MR. APTT:  Jeff Aptt, associate attorney
17   here.
18            MR. MANCINI:  Mark Mancini, Sergeant with
19   the Providence Police Department.
20            MS. SABATINI:  Assistant City solicitor
21   Kate Sabatini representing the City and Colonel
22   Clements.
23            MS. HUGHES:  Jennewa Hughes, legal intern
24   at the City Solicitor's Office.
25            MR. MCHUGH:  Senior assistant solicitor

1    Kevin McHugh representing the Defendants, Hugh

2    Clements, Chief of the Providence Police Department.

3    Q.   Colonel Clements, have you ever been deposed

4    before?

5         A.  Yes.

6    Q.   When?

7         A.  Many years ago in a case with the performance

8    of my duties with Attorney Joe Penza and Mike

9    Collucci, on several occasions years ago.

10   Q.   How many years ago?

11        A.  More than ten.

12   Q.   So maybe your memory is a little rusty about what

13   the process is.  Let me take a minute to explain what

14   is going to happen.  I'm going to ask you questions.

15   The woman sitting to my right, her name is Elizabeth.

16   She is a court stenographer.  She is going to be

17   transcribing all my questions and all of your

18   responses verbatim.

19        So rule Number One is all your answers have to be

20   verbal.  No shaking the head, no nodding, no un-huhs,

21   because as capable as the court reporter is, she's not

22   going to be able to transcribe that, okay?

23        Rule Number Two, you must respond to all of my

24   questions, unless your attorneys instruct you not to.

25   From time to time they're going to be objecting.  So

Chief Hugh T. Clements, Jr. - June 10, 2015

8

1    rule Number Three is I ask that you wait to hear the

2    whole question before you respond.  Because sometimes

3    you might think I'm going in one direction and I'm

4    going in a different direction.  It's not because I'm

5    trying to trick you.  It's just the way our minds work

6    differently.  That's all.

7        Rule Number Four, you can leave the room at any

8    time.  You cannot leave while a question is pending.

9    So if you need to leave the room to use the men's

10    room, just ask.  Last rule is I ask that you not

11    guess.  If you don't know the answer, just say you

12    don't know the answer.  Okay?

13        A.  Understood.  Thank you.

14    Q.  The relevant time period is going to be from 1994

15    to the present time, which I'm going to represent to

16    you is Sergeant Mancini's tenure on the police

17    department.

18        A.  Okay.

19    Q.  Are you taking any medication, or do you have any

20    medical condition that might impact your ability, your

21    memory or your ability to testify today?

22        A.  No.

23    Q.  Have you ever been a party to a lawsuit?  I don't

24    mean as Police Chief.  You probably have been named

25    before, but in your personal life; have you ever been

Chief Hugh T. Clements, Jr. - June 10, 2015

9

1    a party to a lawsuit, plaintiff or defendant?

2          A.  Maybe many, many years ago.  I can't recall.

3    Maybe a car accident at best.  Beyond that, no.

4    Q.    Now, in this case you're being sued individually;

5    you're aware of that?

6          A.  Yes.

7    Q.    Have you ever been sued before in your capacity

8    as the, as an employee of the Providence Police

9    Department or City of Providence?

10         A.  Yes.

11   Q.    Can you tell us about that?

12         A.  That was with a vehicle pursuit many years

13   ago.  I was in the uniform task force represented by

14   the City's attorneys, Joe Penza and Mike Collucci.

15   There was a civil suit filed against the Providence

16   Police Department and me and some other police

17   officers individually.

18   Q.    Okay.  That was a motor vehicle pursuit?

19         A.  Correct.

20   Q.    Any other times that you were named as an

21   individual defendant during your line of duty?

22         A.  No.

23   Q.    What was the result of that lawsuit?

24         A.  We prevailed, the police department and the

25   City with no judgment whatsoever on me.

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 11 of 265 PageID #:
1147
Chief Hugh T. Clements, Jr. - June 10, 2015

10

1  Q.   Was there a trial?

2       A.  It was a trial, yes.

3  Q.   There was a judgment for --

4       A.  Federal Court.

5  Q.   It was a judgment for the City?

6       A.  Yes.

7  Q.   Okay.  Do you know how long ago that was?

8       A.  I'm going to say late '80s.  I was a

9  patrolman on the task force.

10 Q.   Did you have to testify at trial?

11      A.  Yes.

12 Q.   Did you discuss this lawsuit with anyone prior to

13 today, other than your attorneys?

14      A.  Maybe some of the command staff.  Not at

15 length.  Commander Tommy Oates.

16 Q.   Okay.  I want to caution you not to divulge the

17 substance of any conversation you had with the

18 attorneys.  I am interested in knowing what you talked

19 about with Tommy Oates before today.  When was the

20 last time you talked to Tommy Oates about this

21 lawsuit?

22      A.  Very general conversation this morning.  I

23 told him -- he didn't even know until this morning

24 that I had the deposition for the Mark Mancini case.

25 I told him I was coming over.  I would be in my office

Chief Hugh T. Clements, Jr. - June 10, 2015

1   with my door closed reviewing some notes.

2       I just gave him some general assignments I needed

3   completed while I was in the office, and he was

4   getting on with his day.

5   Q.   What is his current position?

6       A.   He is the Deputy Chief.  We call him the

7   Commander, but he is the Number Two on the Providence

8   Police Department, Deputy Chief.

9   Q.   So what are his job duties as Deputy Chief?

10      A.   He carries out under my command the overall

11  function and operational plan of the Providence Police

12  Department with the three major divisions,

13  administrative, uniform and investigative, as well as

14  all coordination with outside agencies pertaining to

15  the City of Providence and the community.

16  Q.   Did you and Commander Oates have any discussions

17  about the merits of Sergeant Mancini's lawsuit?

18          MR. MCHUGH:  Objection as to form.  You

19  can answer.

20      A.   No.

21  Q.   Okay.  Was the substance of your communication,

22  just to inform him you were coming to a deposition?

23      A.   Yes, correct.

24  Q.   Did you speak to the attorneys before this

25  deposition in preparation for this deposition?

12

1        A.   Yes.

2   Q.   Did you meet with them?

3        A.   Yes.

4   Q.   When and for how long?

5        A.   Today's Wednesday.   Monday for a little over

6   one hour, maybe an hour and-a-half.

7   Q.   Did you participate in responding to discovery in

8   this case?  Do you know what I mean by that?

9        A.   Yes, I did.

10  Q.   Well, let's make sure I understand, we're using

11  the same terminology.   So discovery is when the

12  parties request the other side to produce documents

13  and to answer interrogatories.   So Sergeant Mancini

14  requested documents, and the City produced some

15  documents.   Did you participate in collecting those

16  documents?

17       A.   Only in the one pertaining to me.   The ones

18  pertaining to the IOD status, no, I did not

19  participate in.   Or responses required from the City I

20  did not participate in.

21  Q.   All right.   I didn't follow the first part.   Can

22  you say that again?

23       A.   Only the responses required from me as Chief

24  of Police, not the ones required from Sergeant Grenada

25  with the Human Resources Department.

Chief Hugh T. Clements, Jr. - June 10, 2015

13

1   Q.   So which ones were required by you to respond to?

2   I'm sorry, are you talking about the interrogatories?

3        A.   Yes, yes.

4   Q.   So that was bad on my part.  We propounded

5   interrogatories, which were a list of questions that

6   had to be answered under oath.  We propounded a set to

7   the City and then a set to you.  Okay?  You responded

8   to your interrogatories, correct?

9        A.   Correct.

10  Q.   Then did you assist the City in formulating their

11  responses to the interrogatories?

12       A.   Just through my department.  Me, personally,

13  no.  Just through the sergeant.

14  Q.   Then we made several document requests where we

15  asked the City to produce documents.  Did you

16  participate in that?

17       A.   Minimally.  That would have been done mainly

18  through the human resources department.

19  Q.   Did anybody ask you to collect documents in

20  response to Sergeant Mancini's document request?

21       A.   The only documents I prepared for the City

22  were when I answered questions relative to my

23  interrogatories.

24  Q.   So you didn't, nobody asked you to go look for

25  documents?

Chief Hugh T. Clements, Jr. - June 10, 2015

14

1          A.   Not that I recall.

2     Q.   Okay.  Just some background information.  Your

3     date of birth?

4          A.   5/10/57.

5     Q.   Your marital status?

6          A.   Married.

7     Q.   Your highest level of education?

8          A.   A Master's degree from BU.

9     Q.   When did you start working at the Providence

10    Police Department?

11         A.   May of 1985.

12    Q.   Where did you work before Providence Police

13    Department?

14         A.   I worked at the Rhode Island Training School

15    in the youth correctional center.

16    Q.   What was your position there?

17         A.   I was a YCO, a youth correctional officer.

18    Q.   Do they call that now a JPW?

19         A.   I'm not sure.  I'm still familiar with the

20    administrator who was there when I was there.  I know

21    they changed the buildings.  I'm not sure what the

22    title of the staff is.

23    Q.   How long did you work there?

24         A.   Three years.

25    Q.   Where did you work before that?

Chief Hugh T. Clements, Jr. - June 10, 2015

15

1       A.   I had many jobs.  Almacs.  I did --

2   Q.   Was that your first full-time job?

3       A.   Yes, my first real full-time job.

4   Q.   First real job?

5       A.   Yes.  Many unreal jobs.

6   Q.   Then you went, you became a police officer after

7   you worked for the Rhode Island Training School,

8   correct?

9       A.   Correct.  The only other job I would mention

10  is I spent several seasonal years with DEM, Department

11  of Environmental Management, where I worked as a park

12  police officer, which gave me an interest in law

13  enforcement.  I spent probably five or six years

14  there.  Then I attained the full-time job with the

15  state as a YCO at the Training School.

16  Q.   When did you graduate from the -- you went to the

17  Providence Police Academy?

18      A.   Yes.

19  Q.   Tell me about that.

20      A.   So there's three academies in the State of

21  Rhode Island, Rhode Island State Police, Municipal

22  Academy where everybody goes to except Providence and

23  State Police.  So I, as Mark did, went to the

24  Providence Police Academy in January of 1985.  I was

25  sworn in in May of 1985.

Chief Hugh T. Clements, Jr. - June 10, 2015

16

1   Q.   So let's talk about your employment at the

2   Providence Police Department.  Why don't we start with

3   all the positions that you've held from the beginning

4   to the present time.  We'll start at the beginning.

5        A.   Okay.  I was sworn in as a night third grade

6   patrolman.  I worked wherever they had a need, in a

7   car post or a foot post in the City in the night

8   division for a couple of years.

9        The administration started a uniform task force,

10  a hand-picked unit.  I was chosen by one of the

11  sergeants to be on one of the eight-man teams.  So I

12  worked in a uniform capacity in the neighborhood

13  response team.  From there --

14  Q.   So those were two separate jobs?

15       A.   They're both within the Uniform Division

16  Patrol Bureau, but one is a separate task.

17  Specialized task force in uniform.

18  Q.   How long did you work at a night third grade

19  patrolman?

20       A.   Two years.

21  Q.   Okay.  What about the uniform task force; how

22  long were you there?

23       A.   Probably a year and-a-half to two years.

24  Q.   Okay.

25       A.   Then I went to, was chosen to go to a

Chief Hugh T. Clements, Jr. - June 10, 2015

17

1   plain-clothes assignment in the Narcotics Division,

2   Special Investigations Bureau, SIB.  That's what it

3   was called then.  Worked there for a little over a

4   year.

5        I took a test for, a formal written test for the

6   detectives.  I believe that was in 19, late 1990.  I

7   made detective.  I worked as a night detective.

8   Q.   Okay.

9        A.   They administered a sergeants test in -- I

10  was on the sergeants list, then I went to sergeant in

11  the Uniform Division Patrol Bureau from 1992 to 1995.

12  I basically worked the Central Station and Sub One,

13  which is South Providence and downtown, Broadway,

14  Hartford, Olneyville, Silver Lake, Cranston Street

15  section.

16  Q.   How long were you there?

17       A.   Three years.  Then there was an opening in

18  detectives for a sergeant.  There was a huge, a mass

19  bailout of senior employees who left due to a contract

20  situation.  Many older detectives left, and I went to

21  detectives as a Detective Sergeant.

22  Q.   How long were you there for?

23       A.   I want to say seven years, about.

24  Q.   Okay.  What was your next position after

25  detective?

Chief Hugh T. Clements, Jr. - June 10, 2015

18

1        A.   Then I made the lieutenants list, and I went

2    back to patrol.  I worked the midnight shift for a

3    little over a year.  We had a change of leadership in

4    the police department, and Colonel Esserman came and

5    he went to a decentralized police department.

6        We had lieutenants work as district commanders or

7    mini police chiefs in their respective areas.  I was

8    chosen to go to District 5 which was Olneyville,

9    Hartford, Silver Lake.  That's where I spent a couple

10   of years as the District Commander, Lieutenant

11   District Commander of District 5.

12   Q.   Okay.

13       A.   Then from there, there was some other

14   movement on the job.  There was an opening for a

15   lieutenant in detectives.  Major Campbell had asked if

16   I would be willing to come back to detectives.  Kind

17   of reluctantly I did.  I went back to detectives as a

18   Lieutenant.  Shortly thereafter, I made Captain while

19   I was in the detectives, and stayed there.

20   Q.   Okay.

21       A.   Then from there, I made Major and was moved

22   from detectives to the Homeland Security Division.

23   Stayed just about a year, maybe a little bit longer.

24   Then Deputy Chief and Chief.

25   Q.   Who were you Deputy Chief under?

Chief Hugh T. Clements, Jr. - June 10, 2015

19

1          A.   Colonel Esserman.

2    Q.    That was your predecessor?

3          A.   Yes.

4    Q.    What happened to Chief Esserman?

5          A.   Chief Esserman left under a little bit of a

6    scandal.  On his own, he retired and resigned from the

7    job.

8    Q.    When did you become Police Chief?

9          A.   They named me at that point -- I think it was

10   late June.  I want to say it was June 27 of 2011.  I

11   was formally named Acting Chief.  The department put

12   out a national search for a permanent chief, and late

13   December I went for my interview and they announced to

14   me that I was chosen as the Chief.  I started right

15   after the New Year of 2012.

16   Q.    How did you learn how to do your job as the

17   Police Chief?

18         A.   Through my administrative functions in

19   working in detectives as a Captain running several

20   bureaus, and when I moved over to Homeland Security, I

21   worked in an office directly next to Commander Paul

22   Kennedy, Colonel Dean Esserman.

23         We had countless meetings with the command staff,

24   both as a Major when I was assigned a major as well as

25   in my role as a Captain and Lieutenant.  I worked very

20

1    closely with Major Steve Campbell when he was my boss

2    when I was a Lieutenant and Captain in detectives.

3    Q.    How different is your job as the Chief of the

4    Providence Police Department as opposed to being a

5    Lieutenant?  I mean, there has to be a big difference?

6         A.   It is a big difference.  The Lieutenant in

7    the decentralized district approach was sort of a mini

8    police chief.  But certainly to take on the task of

9    the entire City and the entire job is an, obviously,

10   much more difficult task.

11   Q.    Did the City send you for any training anywhere?

12        A.   Yes.  I went to --

13             MR. MCHUGH:  Objection as to form.  Time

14   frame.

15   Q.    When you were named Acting Police Chief -- strike

16   that.  When you became the Police Chief in January of

17   2012, when you were named the official Police Chief,

18   did the City send you for any training so that you

19   could learn how to do your job?

20        A.   Then, no.  Prior to that when I was a

21   Captain, the City sent me to a leadership school put

22   on by PERF, Police Executive Research Forum, which is

23   a well-recognized police leadership school put on by

24   Boston University and the Harvard Kennedy School of

25   Government.  It's a three-week live-in program that I

Chief Hugh T. Clements, Jr. - June 10, 2015

21

1   went to when I was a Captain with the police

2   department.

3        Then later I ended up going to, actually, the

4   Kennedy School of Government at the state and local

5   government leaders flagship program at Harvard, the

6   Kennedy School of Government.

7   Q.   Did you ever, when you became the Police Chief

8   permanently, did you ever have a meeting with Chief

9   Esserman for the purposes of sort of learning the

10  ropes from him?

11       A.   Yes.

12  Q.   Tell me about that; when did you have that

13  meeting, or how many meetings were there?

14       A.   When I was at a low range of Captain, Major

15  and then certainly when he chose me through an

16  interview process to be the Deputy Chief, he talked to

17  me several times and told me he thought I had the

18  necessary skills and leadership ability to be the

19  Chief of Police some day.  He spoke to me at length

20  oftentimes.

21  Q.   But my question is, when he resigned and then you

22  became interim Chief and then at some point the

23  permanent Chief, did you ever sit down with Esserman

24  and say, Hey, I would like to, you know -- I have some

25  questions for you.  I would like to learn specifically

Chief Hugh T. Clements, Jr. - June 10, 2015

22

1  how to do this job?

2        A.  I did.  You know, he briefed me.

3  Q.   Okay.  When did that meeting take place?

4        A.  Shortly after he left.  I can remember

5  meeting him for lunch on Thayer Street, was one

6  occasion, at the Paragon Cafe.  We went to lunch.  The

7  lunch led into a meeting after that.  I had several

8  sessions with him.  I obviously don't recall exactly

9  where and when, but I spoke to him often.

10  Q.   Okay.  Tell me about some of the things you

11  talked about with him.

12        A.  He spoke about how difficult the task of

13  Chief of Police and the job of running a large agency

14  can be.  He coined it often, It's lonely at the top,

15  in that you end up making decisions that fall on your

16  lap, that, you know, are difficult at times, but you

17  do the right thing for the agency.  You do the right

18  thing for the City.

19        In the end it's a, you know, it's a big-picture

20  look.  You try to do the right thing for the agency to

21  move forward.

22  Q.   Did you and Chief Esserman talk about how police

23  officers are promoted within the police department?

24        A.  Yes.

25  Q.   Tell me about that discussion.

Chief Hugh T. Clements, Jr. - June 10, 2015

23

1        A.   There's been a movement afoot for at least
2    20 plus years.
3              MR. MCHUGH:   Objection as to form.   I
4    want to be clear about what time frame are you talking
5    about, because he was Deputy under Esserman.   So I
6    don't know if you're asking him about this Paragon and
7    subsequent meetings or --
8    Q.   Yes.  So at these meetings that you just
9    testified about where you met with Mr. Esserman at
10   Paragon, then you had some subsequent meetings, tell
11   me about your discussions about promoting police
12   officers within the police department within those
13   meetings.
14       A.   There have always been conversations with
15   Colonel Esserman and many in the command staff and
16   many on the job about the promotional process and what
17   is the best way compared to the way that we do it now.
18   He's kind of a global-type guy.   He's been around
19   nationally.
20       He would always discuss ways that other similar
21   size or even smaller departments promote their best
22   people and the way we do it here.   We're strictly
23   bound by a contract depending on the rank you're
24   studying for.
25   Q.   When you say you're bound by a contract, you mean

Chief Hugh T. Clements, Jr. - June 10, 2015

24

1    the collective bargaining agreement between the City

2    of Providence and the union?

3         A.  Yes.

4    Q.   We'll get to that in a minute.  We'll talk a

5    little bit more about that a little bit later, about

6    the promotional process.  Does the police department

7    currently administer performance evaluations to police

8    officers?

9         A.  Yes.

10   Q.   Tell me about that process.

11        A.  There's a formal evaluation form to be

12   completed at year's end by commanding officers with

13   their respective bureaus and divisions.

14   Q.   I noticed in reviewing the documents that were

15   produced in this case that there were not a lot of

16   performance evaluations in past years.  Do you know if

17   this, how long has this policy been in effect, to your

18   knowledge?

19        A.  I can't be sure.

20   Q.   Okay.  Did you and Chief Esserman discuss

21   administering performance evaluations during those

22   meetings you testified about earlier?

23        A.  Yes.

24   Q.   Tell me about your discussions about

25   administering performance evaluations.

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 26 of 265 PageID #:
1162
Chief Hugh T. Clements, Jr. - June 10, 2015

25

1        A.  He felt it was important to have a yearly

2    evaluation from bottom to top to assess the personnel.

3    This was bounced around the command staff many years

4    prior.

5        They came up with a formal document to be

6    completed by the respective supervisors, and as time

7    went on many in the agency felt that the evaluation

8    form was ineffective, that particular one.

9    Q.   Do you know how long the Providence Police

10   Department has been administering performance

11   evaluations to police officers?

12       A.   No.

13   Q.   Have you, since you became Chief in January 2012,

14   has the police department administered performance

15   evaluations to police officers?

16       A.   We did in the beginning, in 2012.  I believe,

17   again, there was quite a bit of conversation

18   surrounding the inequities of that particular process

19   and form.  So we abandoned the evaluation for one year

20   and re-devised a new evaluation form and process.

21   Q.   When did that go into effect?

22       A.   Last year.

23   Q.   2014?

24       A.   Yes.

25   Q.   So no evaluations of police officers were done in

26

1   2013?

2        A.   Can't be positive on the year, but I know

3   there was one year where there were no evaluations.

4   Q.   Okay.  Is it your intention that the police

5   department administered performance evaluations at the

6   end of this year?

7        A.   Yes.

8   Q.   What about during the times where you were --

9   strike that.  Before you became Police Chief, in your

10  capacity as a Lieutenant was it ever your

11  responsibility to administer performance evaluations

12  of subordinates, people that worked under you?

13       A.   Yes.

14  Q.   Do you recall how many years during your

15  employment as a supervisor that you were required to

16  administer performance evaluations?

17       A.   I can't be positive, but I know that it was a

18  mission of Colonel Esserman to make sure that was

19  done.  So I know shortly after he took over we started

20  administering those on a regular basis.

21  Q.   When did he become Police Chief?

22       A.   2002.

23  Q.   Do you know if the Providence Police Department

24  administered performance evaluations to police

25  officers during the time period 2002 to 2012?

Chief Hugh T. Clements, Jr. - June 10, 2015

27

1        A.   I don't know what years, to be positive.

2   Q.   It's your testimony that Chief Esserman desired

3   that to happen, correct?

4        A.   Correct.

5   Q.   But you don't know if it was actually done?

6        A.   I don't know if it was done right away.  I'm

7   not sure which year we began formally administering

8   the process.  I know when he first came he felt it was

9   important.  I'm not sure when he officially made that

10  a policy of the department.  I don't know what year.

11  Q.   What is the process right now as we speak for

12  administering a performance evaluation; how does that

13  work?

14       A.   So each employee, depending on their

15  respective rank, will be assessed by their

16  supervisors, then their sergeant they may work for on

17  their respective shift, the lieutenant they may work

18  for in the respective districts.  The lieutenant they

19  may work for in a respective shift, because we have

20  four shifts, actually.  Then the captains and majors

21  involved with the division will review it.

22  Q.   Why don't we do this?  Let's talk a little bit

23  about the chain of command at the Providence Police

24  Department.  I saw there was, it was called a Table of

25  Organization, I believe.  Do I have that correct?

28

1        A.   Organizational chart.

2   Q.    Something like that.  I didn't quite understand

3   it.  Maybe you could tell us how the chain of command

4   works at the Providence Police Department.  Let's talk

5   about, I'm more concerned with the police officers

6   than I am with people, the folks that work in the

7   administration.  So you have, patrolmen are at the

8   bottom; is that correct?

9        A.   Correct, uniform patrol.

10  Q.    To whom do they report?

11       A.   They're traditionally more junior.  They

12  report to and work for on a street level their

13  sergeants, uniform sergeants.

14  Q.    How many patrolmen are under a sergeant

15  typically?

16       A.   Typically in a district, four or five.  But

17  there are many sergeants who end up supervising more

18  than one district during the course of a day.  So they

19  could have as many as ten or fifteen that they cover.

20  Q.    To whom does the sergeant report?

21       A.   If it's a day sergeant, he would report to a

22  day lieutenant who's involved, whose title is the OIC,

23  officer in charge, for that shift.  So we have

24  lieutenants who are OIC.  Then as well, we have

25  lieutenants who are district commanders.  So in

Chief Hugh T. Clements, Jr. - June 10, 2015

29

1  essence, a sergeant could have two or more lieutenants

2  that he answers to, because he works in a district,

3  but he also works on a shift.

4        District lieutenants, again, act as a mini police

5  chief.  They may work days or nights.

6  Q.   What is the difference between a lieutenant who

7  is an officer in charge and a district commander?

8        A.   Before we went to a decentralized police

9  department, all lieutenants were, worked on a shift.

10  They worked by hours.  So you either worked 7 to 3,

11  3 to 11 P, or 11 P to 7 a.m.  When we decentralized,

12  several lieutenants were chosen to be district

13  commanders.  Their hours were flexible.

14        Being a large organization, we always need the

15  structure where we have someone in charge of the City

16  at all times.  So lieutenants are in charge of the

17  City.  They're shift commanders.  Presently today we

18  may have one or two lieutenants who are in charge of

19  the entire City, but as well we may have as many as

20  four or five district commanders working days.

21        Then maybe tonight at 3:00 we'll have a shift

22  commander, an OIC, a lieutenant.  We may even have a

23  captain, a night captain working tonight.  Then as

24  well there may be one, two, three or four district

25  commanders tonight.  Their hours are flexible.

Chief Hugh T. Clements, Jr. - June 10, 2015

30

1  Q.   Does a sergeant perform the same job duties as a
2  patrolman, other than just having a supervisory duty?
3              MR. MCHUGH:  Objection as to form.  You
4  can answer.
5       A.   No.  He performs a different job.  He
6  supervises and runs the operation on a street level
7  for that district and for those men and women.
8  Q.   But the sergeant's job duty is still to make sure
9  that there is no crime, right?
10      A.   Correct.
11  Q.   Okay.  What's the difference between a sergeant's
12  position and a lieutenant's position?
13      A.   Lieutenant's position is, involves more of
14  getting into the command staff, getting into the staff
15  level of the police department.  The main difference
16  is oftentimes because of the shifts they work, they
17  oftentimes act as the chief of police on their
18  respective OIC shift or their district commander
19  shift.
20  Q.   Are lieutenants, do lieutenants go out in the
21  street and prevent crime from happening; is that part
22  of their job duties?
23      A.   Not so much.  They're mainly more in a
24  supervisory role.
25  Q.   Do they wear uniforms?

Chief Hugh T. Clements, Jr. - June 10, 2015

1        A.   Yes, those who work in the uniform division.

2   We have lieutenants who work in plainclothes who

3   don't.

4   Q.   Are the lieutenants out, you know, in the field

5   driving police vehicles, police officer vehicles?

6        A.   Yes.

7   Q.   But their role is more just supervisory; is that

8   correct?

9        A.   Correct.

10  Q.   What's above lieutenant?

11       A.   Captain.

12  Q.   Captain.  What is a captain's role?

13       A.   The captain's role is to carry out the

14  mission, policies, protocol, impose discipline as well

15  as lieutenants, but everything is bumped up towards

16  the top.  The captain oversees.  There may be only one

17  captain in an entire division, but he oversees the

18  more global operations of his respective sphere of

19  influence, whether it be patrol, investigative or

20  administrative.

21  Q.   Then above the captain?

22       A.   Is a major.

23  Q.   Okay.

24       A.   There was one major in charge of each of the,

25  we used to have four divisions.  We now have three.

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 33 of 265 PageID #:
1169
Chief Hugh T. Clements, Jr. - June 10, 2015

32

1  So there is a major in charge of the administrative

2  division, one in charge of the uniform division, and

3  one in charge of the investigative division.

4  Q.    Okay.  Above the major?

5        A.   Is the deputy chief or commander.

6  Q.    Then above deputy chief commander?

7        A.   He reports directly to me, the Chief of

8  Police.  So the deputy chief reports to the chief of

9  police.

10 Q.    Okay.  Does the Providence Police Department

11 utilize progressive discipline?

12       A.   Yes.

13 Q.    Tell me, can you describe that practice or

14 policy?

15       A.   Sure.  We try to be as consistent as we can

16 in discipline.  It's always easy to argue back and

17 forth and compare acts of malfeasance on the part of

18 officers, but we do have progressive discipline,

19 whether it be car accidents, verbal abuse on the

20 street by police of somebody from the community, or

21 over-aggressiveness.

22       But by all accounts, we try to be reasonable and

23 make discipline progressive with verbal admonishment

24 and written, and day suspensions, and lengthy days

25 suspensions, and eventually, unfortunately, sometimes

Chief Hugh T. Clements, Jr. - June 10, 2015

33

1    termination or demotion.  Demotion would probably be

2    right before termination.  That's a pretty significant

3    imposition of penalty.

4    Q.   How did you learn about this progressive

5    discipline policy?

6         A.   Through my years on the police department and

7    through my years of studying leadership books for law

8    enforcement.

9    Q.   Is this set forth in the CBA?

10        A.   No.  Progressive, no.

11   Q.   Is it a written policy that the police department

12   has?

13        A.   Yes.

14   Q.   So who can discipline police officers; who has

15   the authority to discipline police officers at the

16   Providence Police Department?

17        A.   Again, ultimately the Chief of Police.  All

18   final acts of discipline pursuant to the City of

19   Providence Charter are covered through the

20   Commissioner of Public Safety.

21   Q.   How do you as the Providence, the Chief of the

22   Providence Police Department become aware when someone

23   is disciplined in the police department?

24        A.   Just to give you a little background and to

25   explain, we're a large department.  Many acts of

Chief Hugh T. Clements, Jr. - June 10, 2015

34

1    discipline, could be very minor in nature.  I may find

2    out from a lieutenant or captain in a respective

3    division verbally.  They could handle it.

4        They'll put something on paper and forward it to

5    the Internal Affairs Division, so it may be handled by

6    somebody in a respective division or bureau, or it may

7    be forwarded to Internal Affairs.

8    Q.   What are the super -- who is authorized to issue

9    discipline; is a sergeant authorized to issue

10   discipline?

11       A.   He has to bump it up his respective command.

12   He can informally impose discipline if it doesn't

13   reach a level where his supervisors need to be aware.

14   Q.   When you say informally, do you mean issue a

15   verbal warning?

16       A.   Yes.  If somebody missed a call or not

17   answering their radio, you know, putting you on notice

18   verbally, You need to pay attention to your radio.

19   Q.   Sergeants are required to document verbal

20   warnings?

21       A.   No, they're not required.

22   Q.   Okay.  Can a sergeant write a, issue a written

23   warning?

24       A.   No.  He can recommend.

25   Q.   Who can issue written warnings at the Providence

Chief Hugh T. Clements, Jr. - June 10, 2015

35

1  Police Department?

2       A.  Presently the way it's done, it's through the

3  captain or majors involved in those respective

4  divisions.

5  Q.   What about lieutenants; can they issue written

6  warnings?

7       A.  They can.  If the captain or major approve of

8  it, yes.  That certainly would be vetted through a

9  higher rank of captain or lieutenant.

10 Q.   So at what point do you as Chief of Police become

11 apprised of a written warning?

12      A.  When a formal document has to be signed and

13 forwarded to someone's 201 file, a personnel file.

14 Q.   Can you just explain what a 201 file is?

15      A.  It's basically a personnel file where we keep

16 all documents related to an individual's performance

17 over the years, whether it be acts of good deeds and

18 commendation and merits of, memorandum of merits as

19 well as other documents from the police department

20 pertaining to discipline, or any information about the

21 employee that could be relative to his status in the

22 agency.

23 Q.   Is a 201 just a fancy name for police officer's

24 personnel file?

25               MR. MCHUGH:  Objection as to the form,

1   use of the word fancy.  You can answer.

2        A.  Yes.

3   Q.   Yes?

4        A.  Yes.

5   Q.   So if someone is issued a verbal warning, that is

6   not something that necessarily will come to you,

7   correct, as Police Chief?

8        A.  Correct.

9   Q.   It may, it came up in conversation?

10       A.  Correct.

11  Q.   But every time a written warning is issued to a

12  police officer you become aware of that, or you should

13  become aware of that?

14       A.  I should become aware of that, yes.

15  Q.   Do you know where the 201 files are stored,

16  physically maintained?

17       A.  Yes.  In the Office of Human Resources with

18  Sergeant Grenada.

19  Q.   How do you communicate with the people that work

20  under you?

21       A.  Predominantly through the Deputy Chief,

22  Commander Oates.

23  Q.   What I mean is, do you use e-mail?

24       A.  Sometimes.

25  Q.   So how would you get apprised that a written

Chief Hugh T. Clements, Jr. - June 10, 2015

37

1  evaluation was issued; would you receive it in an

2  e-mail; would it be in your mailbox?

3        A.  Probably in person.  I mean, the command

4  staff and pretty much everybody in the whole building,

5  I have an open-door policy.  That door is open.

6  People come into the office all the time if they see

7  my office open.  They'll say, Good morning, Good

8  afternoon, I have one for you to take a look at and

9  review, and I'll hopefully sign.  So oftentimes in

10  person.

11  Q.   Is it your policy, is it the department's policy

12  that you, Chief Clements, has to sign off or approve

13  every written discipline action?

14        A.  Again, I should sign off on every single one,

15  yes.

16  Q.   What do you do with that written disciplinary

17  action after you sign it; do you maintain a copy for

18  yourself?

19        A.  I don't.  Human resources would, and

20  oftentimes the supervisor of their respective command

21  would keep a copy.

22  Q.   How often do you meet with your command staff?

23        A.  Three or four times a week.  Formally, we

24  have a formal meeting every Monday.

25  Q.   Tell me who is, who do you formally meet with

Chief Hugh T. Clements, Jr. - June 10, 2015

38

1   every Monday, the names of the people you meet with

2   and their positions.

3        A.  We meet with Deputy Chief Oates, three majors

4   presently are Major Tom Verdi, Major Frank Colon,

5   Major David Lapatin.  Then as well at these meetings

6   we have the captains.  That would be Captain Bill

7   Campbell, Bob Lepre, Oscar Perez, Anthony Sauro,

8   George Stamatakos.  I'm forgetting one.

9   Q.   Tell me about some of the discussions that you

10  would have at these -- strike that.  What would you

11  call these meetings?

12       A.  If I could add also at that meeting, Sergeant

13  Grenada does come to go over the board.  We keep an

14  updated list of the organizational chart of the police

15  department, which is, they have pins on the board,

16  magnet pins on the board to identify movement

17  throughout the agency.  So Sergeant Grenada also

18  attends.

19  Q.   Is he, my understanding is he's head of human

20  resources?

21       A.  Correct.

22  Q.   Okay.  What do you call these meetings?

23       A.  Command staff meeting.  Actually, staff

24  meeting.  The command staff would be majors and above,

25  but staff meeting.

Chief Hugh T. Clements, Jr. - June 10, 2015

39

1  Q.   Okay.  Tell us about some of the things that you

2  would discuss at these meetings, some of the topics of

3  discussion.

4       A.   One more addendum to my answer is we would

5  also have the finance person.  She has recently left

6  the public safety side.  Gina Costa would sit in on

7  all of these meetings.

8       What we would discuss at these meetings are the

9  finances from the previous week, overtime called back

10 expenditures, grant monies that we have available,

11 what their deadlines are to run out.  Pretty much a

12 financial update.

13      She would go first, and then Sergeant Grenada

14 would give an update on the status of the

15 organization, how many employees we're down to and how

16 many we have out sick, short term, long term, and IOD,

17 short term, long term.  After their presentations,

18 they would leave.

19      Then we would discuss basically crime the

20 previous week, crime and activities, meetings.

21 Q.   I'm sorry, you say after their presentations they

22 would leave, do you mean Grenada and Gina Costa?

23      A.   Correct.  Then the police officers would

24 discuss crime, community events, meetings, all

25 police-related activity.

Chief Hugh T. Clements, Jr. - June 10, 2015

40

1  Q.   When the department would administer promotional

2  exams, is that a topic that would be discussed at one

3  of these meetings?

4       A.   We would probably arrange, we would arrange a

5  separate meeting to discuss.  That may be discussed at

6  the meeting, but as far as points, that would be a

7  separate meeting.

8              MR. MCHUGH:  Could you read that question

9  back?

10             (QUESTION READ BACK)

11             MR. MCHUGH:  Thanks.

12             THE WITNESS:  Certainly, yes.

13  Q.   But then you testified that you would have a

14  separate meeting to discuss, and you said points.  Do

15  you mean chief or service points?

16       A.   Correct.

17  Q.   Who would be present at those meetings?

18             THE WITNESS:  For the service points,

19  chief points?

20             MR. GAGLIARDI:  Yes.

21       A.   That would be a mix.  It would certainly be

22  myself, the Deputy Chief, the majors, the captains,

23  whatever captains are available and whatever

24  lieutenants are available.

25  Q.   Okay.  The 201 files, do you know where they are

41

1    maintained?

2          A.   With Sergeant Grenada.

3    Q.    Physically in his office?

4          A.   I don't know exactly where he keeps them.   I

5    can't answer that accurately.

6    Q.    Do you know who has access to 201 files, other

7    than Sergeant Grenada?   Who is authorized to have

8    access to 201 files, other than Sergeant Grenada?

9          A.   The administrative division presently under

10   the command of Major Colon.

11   Q.    Anybody in that administrative division?

12         A.   Certainly, yes.

13   Q.    Do you know what the process is for reviewing

14   someone's 201 file --

15              MR. MCHUGH:   Objection as to form.   You

16   can answer.

17   Q.    -- or procedure?

18              THE WITNESS:   You mean for an individual

19   to request?

20              MR. GAGLIARDI:   No.   So if somebody -- I

21   want to know who has the authority to look at

22   someone's personnel file, other than the employee.

23         A.   Somebody from the command staff would,

24   somebody from Internal Affairs.

25   Q.    Do you know, does the department have a process

42

1    by which a person viewing someone's 201 has to sign

2    out for it, or sign something, or log in to show that

3    they have viewed it?

4        A.   They may in that division.  Not that I am

5    aware of.

6    Q.   Okay.  Who would know that information?

7        A.   Major Colon.

8    Q.   Do you ever have the opportunity or the occasion

9    to view a police officer's 201 file as Police Chief?

10       A.   I could.

11   Q.   When was the last time you reviewed someone's 201

12   file as Police Chief?

13       A.   It's been a long time.  I can't recall whose

14   it was, but it's been awhile.

15   Q.   Well, you've only been Police Chief for three

16   years, right?

17       A.   Three and-a-half, yes.

18   Q.   Do you know how many times you viewed someone's

19   201 file?

20       A.   I don't.

21   Q.   Was it more than ten or less than ten?

22       A.   More than ten.

23   Q.   Okay.  Can you recall the last time you viewed

24   someone's 201 file?

25       A.   I can't.

Chief Hugh T. Clements, Jr. - June 10, 2015

43

1   Q.    Do you know why you viewed these 201 files?

2         A.   For varying reasons.  It may be discipline.

3   Q.    Okay.

4         A.   Certainly could be for promotion.

5   Q.    All right.  So you said that you communicate with

6   your command staff.  You e-mail sometimes?

7         A.   Yes.

8   Q.    Run us through a day in the life of Hugh Clements

9   as Police Chief; tell us about your typical day.

10        A.   So my schedule is extremely busy.  Probably

11  putting in 60 or 70 hours a week.  Come in in the

12  morning, catch up on a couple of e-mails, prepare for

13  the day, whether it be meetings that I have, compiling

14  documents, or a speech I may have to give, or a press

15  conference or a news event.  Basically preparing for

16  meetings.

17        Also, there's a lot of conversation between

18  myself and the command staff.  So routinely during the

19  course of the day I may talk to Major Verdi five

20  times, six times.  Some in person, some on the phone.

21  Q.    How often do you get to go out in the field and

22  do police work?

23        A.   Not enough.

24  Q.    Okay.  You're wearing a suit today.  Do you wear

25  a suit to work?

Chief Hugh T. Clements, Jr. - June 10, 2015

44

1        A.   Hardly ever.

2    Q.   What do you wear?

3        A.   A uniform 98 percent of the time.

4    Q.   Okay.

5        A.   I have a wake to go to tonight.  I'm not sure

6    how long this is going to be; otherwise, I would have

7    been in uniform.

8    Q.   When was the last time you spent in the field

9    with police officers doing police work since you've

10   been chief?

11               MR. MCHUGH:  Objection as to form, doing

12   police work.  You can answer.

13               THE WITNESS:  Doing police work?

14               MR. GAGLIARDI:  Yes, doing the work, the

15   typical work of a police officer, preventing crime,

16   that sort of thing.

17       A.   It's rare, but every single time riding

18   around I have the radio on.  If there is a call and

19   I'm nearby, I follow in.  If I observe a motor vehicle

20   stop with Providence policemen involved, plainclothes

21   or uniform, I back them up.

22   Q.   How do you evaluate the work performance of a

23   police officer if you're not there observing them do

24   their jobs?

25       A.   I rely heavily on the critique assessment,

Chief Hugh T. Clements, Jr. - June 10, 2015

45

1    review of the people they work directly for.

2    Q.   Do you give performance evaluations to the

3    command staff?

4         A.   No.

5    Q.   Who doesn't get performance evaluations, other

6    than the command staff?

7         A.   As far as I know, everyone gets one except

8    the command staff.

9    Q.   The command staff would be the three majors and

10   all the captains?

11        A.   Correct.

12   Q.   But lieutenants get performance evaluations?

13        A.   I haven't seen them this year, so I'm not

14   positive on that.

15   Q.   If a lieutenant were to get a performance

16   evaluation, who would administer that?

17        A.   His captain and major.  It would have to be

18   approved by his major.

19   Q.   That's because they're in a better position to

20   evaluate the performance than you are, correct?

21        A.   Correct.

22   Q.   Do you keep your own documentation or records for

23   individual police officers; do you maintain anything

24   like that in your office?

25        A.   No.

Chief Hugh T. Clements, Jr. - June 10, 2015

46

1              (BRIEF RECESS)

2         (QUESTION AND ANSWER READ BACK)

3  Q.    Chief Clements, just a few follow-up questions.

4  You said, I believe you testified, you said the

5  ultimate decision to discipline somebody was with the

6  Commissioner of Public Safety; is that accurate?

7         A.   Correct.

8  Q.    Can you expand on that, please; what do you mean

9  by that?

10        A.   Again, respective of the Charter, if there

11  will be -- mostly it refers to heavy discipline.  So

12  the day-to-day discipline, the Commissioner would not

13  get involved in.  But the ultimate decision on major

14  discipline is the Commissioner of Public Safety,

15  certainly has to be.

16  Q.    Is that who you report to?

17        A.   Yes.

18  Q.    When you say heavy discipline or major

19  discipline, can you be more specific?

20        A.   That would be lengthy suspension of days,

21  weeks, months, demotion or termination.  But as far as

22  day-to-day stuff, no.

23  Q.    Do you mean that, do you mean that the

24  Commissioner of Public Safety would have to give his

25  or her final approval in order for someone to be

Chief Hugh T. Clements, Jr. - June 10, 2015

47

1    issued a heavy or a lengthy discipline?

2         A.   Yes.

3    Q.   Does that mean that you, Chief Clements, cannot

4    terminate someone unless the Commissioner of Public

5    Safety agrees that the person should be terminated?

6         A.   Yes.

7    Q.   Another follow-up question.  Did you review any

8    documents in preparation for today's deposition?

9         A.   Yes.

10   Q.   What did you review?

11        A.   A pile of paperwork that Kevin and Kate had,

12   we had gone over on Monday afternoon.  So the

13   interrogatories and the complaint.

14   Q.   So you reviewed Sergeant Mancini's complaint that

15   he filed in Federal Court, right?

16        A.   Yes.

17   Q.   You reviewed the answers to your interrogatories?

18        A.   Yes.

19   Q.   Did you review any other documents?

20        A.   No.

21   Q.   Did you review Sergeant Mancini's personnel file?

22        A.   No.

23   Q.   Did you review any other officers, police

24   officers' performance evaluations or discipline in

25   preparation for today's deposition?

1          A.   No.   The only thing I did ask for was the

2    performance evaluations of Sergeant Mancini.

3    Q.   Did you review those in preparation for today's

4    deposition?

5          A.   Yes.

6    Q.   In your opinion, what are some of the qualities

7    that one needs to be a good police officer?

8          A.   Needs to be strong-willed, ethically bound,

9    moral.

10   Q.   Isn't that the same as ethically bound?

11         A.   Yes.   Of strong character, and I think

12   today's police officer really needs to be a people

13   person.

14   Q.   What do you mean by strong-willed?

15         A.   To do the right thing.   To, you know, go out

16   in the field and make a decision based on what is

17   right for the community as a whole or the department

18   as a whole.

19   Q.   Anything else, other than what you just

20   mentioned?

21         A.   No.

22   Q.   In your experience and in your opinion, what are

23   some of the things that a police officer can do that

24   shows poor work performance?

25                    MR. MCHUGH:   Can you read back that

49

1  question?

2                 (QUESTION READ BACK)

3                 MR. MCHUGH:  Thank you.

4       A.  It's pretty general, but overall lack of

5  knowledge of policies, rules, regulations and

6  following those; being abusive to or disrespectful to

7  others in the workforce or members of the community.

8  Generally having a poor attitude.

9  Q.  I would assume that violating a citizen's rights

10  is at the top of the list, correct?

11      A.  Yes.

12  Q.  Reckless conduct?

13      A.  Yes.

14  Q.  Insubordination?

15      A.  Yes.

16  Q.  Poor attendance?

17      A.  Yes.

18  Q.  Stealing?

19      A.  Yes.

20  Q.  Let's talk about Sergeant Mancini.  When did you

21  first meet him?

22      A.  I don't know exactly when, but probably when

23  he first came on in 1994.  I was in the Uniform

24  Division, Patrol Bureau, so I'm sure I met him then.

25  Q.  So you've known him for a long time?

Chief Hugh T. Clements, Jr. - June 10, 2015

50

1        A.  Yes.

2   Q.   Before you became Chief of Police, did you have

3   the opportunity to work with him as a police officer?

4        A.  I was a sergeant at that point, so yes.  I

5   was a uniform sergeant.

6   Q.   When was that?

7        A.  1994.

8   Q.   Did you have an opportunity to supervise Sergeant

9   Mancini?

10       A.  Yes.

11  Q.   When, and for how long?

12       A.  That would have been about one year in 1994

13  before I went to, back to detectives as a Sergeant.

14  Q.   Did you, other than that one year in 1994, did

15  you have any other opportunities to supervise Sergeant

16  Mancini?

17       A.  Yes, later.

18  Q.   When?

19       A.  I believe when I became a Major involved in

20  the Homeland Security Division and then as well in the

21  Uniform Division.

22  Q.   How long did you supervise him when you were a

23  Major?

24       A.  Short time.  Maybe a little bit over a year.

25  Q.   Let's talk about when you supervised him in 1994.

Chief Hugh T. Clements, Jr. - June 10, 2015

51

1    You were a uniformed Sergeant, and he was a patrolman,

2    correct?

3         A.  Yes.

4    Q.   He just started out as a police officer, right?

5         A.  Yes.

6    Q.   Were you able to formulate an opinion about

7    Sergeant Mancini's work performance at that time?

8         A.  Generally, yes.

9    Q.   What was your opinion of his work performance at

10   the time?

11        A.  Decent.

12   Q.   Would you say he was at least average?

13        A.  Yes.

14   Q.   Above average?

15        A.  Yes.

16   Q.   All right.  So he was an above-average patrolman

17   in 1994, right?

18        A.  Yes.

19   Q.   Did you ever have any problems with him in 1994?

20        A.  No.

21   Q.   When were you the major in the Homeland Security

22   Division?

23        A.  Would have been, I believe -- don't hold me

24   to the date.  I believe 2008, 2009.

25   Q.   Okay.  Let's go back to 1994.  How often did you

Chief Hugh T. Clements, Jr. - June 10, 2015

1   interact with Sergeant Mancini during that one-year

2   period you were his supervisor?

3          A.   Not often.

4   Q.   Would it be once a week, twice a week?

5          A.   I really do not recall.

6   Q.   Enough times to be able to formulate an opinion

7   about his work performance, right?

8          A.   Yes.

9   Q.   When you became, when you were a Major in the

10  Homeland Security Division in 2008 and 2009, Sergeant

11  Mancini, he was a Sergeant at that point, correct?

12         A.   Yes.

13  Q.   How often did you work with him in your capacity

14  as Major and in his capacity as Sergeant?

15         A.   A little bit more often than the previous

16  round.  Probably, maybe once a week, once every other

17  week.

18  Q.   Were you able to formulate an opinion about

19  Sergeant Mancini's abilities as a Sergeant?

20         A.   Yes.

21  Q.   What was your opinion of his abilities as a

22  Sergeant?

23         A.   He had good abilities as a Sergeant.

24  However, I came into that division at a time when

25  there was a dispute over whether or not he belonged in

1    that unit, replacing a previous member of that unit.

2    Q.    Who did he replace?

3          A.    Sergeant Vinacco.

4    Q.    Who was the dispute between?

5          A.    I think between all parties involved.

6    Sergeant Vinacco, Sergeant Mancini and the

7    administration at the time, the Chief's office.

8    Q.    Who was that?

9          A.    Esserman.

10   Q.    You say that Sergeant Mancini replaced Sergeant

11   Vinacco?

12         A.    Yes.

13   Q.    How did that come about, to your knowledge?

14         A.    I don't have all the facts, but I know that

15   Sergeant Vinacco went away on military leave.

16   Q.    And Sergeant Mancini took his place?

17         A.    Yes.

18   Q.    There were some folks that were not happy about

19   that?

20         A.    I believe when Sergeant Vinacco came back, he

21   was not happy.

22   Q.    Okay.  Let's talk about Sergeant Mancini's

23   abilities to perform his duties as a Sergeant when you

24   were supervising him as a Major.  Would you say he

25   did, did his performance as a Sergeant meet your

Chief Hugh T. Clements, Jr. - June 10, 2015

54

1   legitimate expectations?

2        A.   Yes.

3   Q.   Did you ever have any problems with him?

4        A.   Again, I was only there a very short time

5   with him, but no major problems.

6   Q.   Did you ever have to discipline him?

7        A.   No.

8   Q.   Did you ever have to issue any discipline to him

9   in 1994?

10        A.   Not that I recall.

11   Q.   Do you ever recall a situation where Sergeant

12   Mancini violated a citizen's rights?

13        A.   Offhand, no.

14   Q.   Do you recall a situation where Sergeant Mancini

15   engaged in any reckless conduct on the job?

16        A.   I represented him when I was a member of the

17   union on a transgression.

18   Q.   Okay.  Did you ever have any problems with

19   Sergeant Mancini's attendance?

20        A.   Not that I recall.

21   Q.   Any problems with Sergeant Mancini engaging in

22   insubordination?

23        A.   I did notice when I was in Homeland Security

24   he was very upset by what had occurred with him being

25   removed from that assignment to a different

Chief Hugh T. Clements, Jr. - June 10, 2015

55

1    assignment.  He wasn't insubordinate to me, but he was

2    disrespectful to the administration.

3    Q.    Can you be more specific?

4          A.    In effect, he was badmouthing the

5    administration for his removal.

6    Q.    When you say his removal, that was when Vinacco

7    came back from military leave?

8          A.    Yes.

9    Q.    So Vinacco replaced Mancini; is that correct?

10         A.    Yes.  He took over his former assignment,

11   yes.

12   Q.    How do you know that Mancini was badmouthing the

13   administration?

14         A.    He came to me and asked me why he was being

15   removed.  He was upset.

16   Q.    Okay.  Is that what you mean when you say he was

17   badmouthing the administration?

18         A.    He wanted to know who was to blame, who was

19   responsible.  Then speaking about individuals, yes, he

20   was upset with Commander Kennedy, the Colonel.

21   Q.    Did he say why he came to you?

22         A.    Well, he was working for me.

23   Q.    Would that be unusual for a subordinate to go to

24   a supervisor when they weren't happy with a personnel

25   decision in your experience?

1     A.   No.

2   Q.   So how -- I don't understand how he's badmouthing

3   people.

4     A.   Well, he thought this was personal.  I don't

5   recall exactly what he said about the supervisors.  It

6   wasn't just questioning whether or not he was removed

7   from the unit; he was badmouthing.  I can't verbatim

8   recall what he said, but he was upset.

9   Q.   Okay.  I think I asked if he ever engaged in

10  insubordination.  You said yes, he was badmouthing

11  people.  Now you say that he came to his supervisor to

12  complain about being replaced.  Is it your testimony

13  that that constitutes insubordination?

14    A.   No.

15  Q.   Do you want to take that back?  Do you still

16  consider that to be insubordination?

17    A.   I would say it certainly could be perceived

18  to be insubordinate, to be badmouthing the Chief and

19  Deputy Chief.

20  Q.   Is it fair to say he was coming to you to vent

21  his frustrations?

22    A.   Yes.

23  Q.   You don't consider that to be insubordination, do

24  you?

25    A.   I could.  I didn't take it to the next level,

Chief Hugh T. Clements, Jr. - June 10, 2015

57

1    but I certainly could have.

2    Q.    You didn't discipline him for that?

3         A.   No.

4    Q.    Okay.  What does IOD status mean?

5         A.   Injured on duty.

6    Q.    Can you describe the process how that works?

7         A.   So somebody is injured in the performance, in

8    the proper performance of their duties.  They would

9    fill out paperwork and file a claim for that status,

10   injured on duty.

11   Q.    Okay.  Then what happens next?

12        A.   The paperwork would be forwarded through the

13   Human Resources Office.  The officer or the employee

14   would seek medical attention, and it would be covered

15   pursuant to the CBA.

16   Q.    Were you aware that Sergeant Mancini was on IOD

17   status in 2011, 2012?

18        A.   Yes.

19   Q.    So how did you become aware that he was on IOD

20   status?

21        A.   Basically by being in the command staff

22   conference room.  Several times during the week on the

23   board we have an updated status of all employees, what

24   division/unit they're in, as well as the IOD and sick

25   board.

Chief Hugh T. Clements, Jr. - June 10, 2015

58

1    Q.    That would be Sergeant Grenada's role, to discuss

2    employees that are on IOD status?

3         A.   Yes, and to update the board.

4    Q.    Do you recall any discussions amongst the folks

5    that were present at those meetings specifically about

6    Mark Mancini being on IOD status?

7         A.   Yes.  He would report who was on IOD status.

8    Q.    Do you recall if anybody made any negative or

9    disparaging comments about Sergeant Mancini, because

10   he was on IOD status?

11        A.   I don't.

12   Q.    Did anybody express to you any frustration

13   because he was on IOD status?

14        A.   I know that Sergeant Grenada was upset with

15   the process back and forth, identifying that it was

16   not as smooth as it should have been.

17   Q.    Can you be more specific?

18        A.   I just know that he was -- I can't.  I just

19   know that it wasn't a smooth process.  He was becoming

20   increasingly frustrated with Sergeant Mancini and the

21   back-and-forth with that work status.

22   Q.    Did Sergeant Grenada express to you or anyone

23   present at the meeting that he thought Mancini was

24   malingering or staying out for too long?

25        A.   He basically continued to express his

Chief Hugh T. Clements, Jr. - June 10, 2015

59

1    frustration with the process, the IOD process.

2    Q.   Did he think Mancini was not really injured that

3    badly?

4                MR. MCHUGH:   Objection as to form.   You

5    can answer.

6        A.   I'm not sure what he thought, but he never

7    indicated that to me.

8    Q.   Well, you said he expressed frustration.   Can you

9    be more specific?   That's sort of a vague statement.

10       A.   With setting up appointments and responding

11   back to the office.   There's a lot of paperwork and

12   documentation required from the Sergeant in Human

13   Resources.   He was becoming increasingly frustrated

14   with doing his job.

15   Q.   Did he express to you or anyone present at the

16   meeting that he thought Mancini wasn't participating

17   in good faith in the process?

18       A.   In particular, I don't know what he was

19   referring to.   Other than he was -- we're a big

20   agency.   We routinely have 20 to 40 people out on that

21   status.   It's important for the administration to know

22   how many people are out and how many people we expect

23   back short term or to be out long term.

24       So all I can testify to honestly is to say he was

25   becoming frustrated with that process, with Sergeant

Chief Hugh T. Clements, Jr. - June 10, 2015

60

1   Mancini.

2   Q.   Did Sergeant Grenada express any frustration

3   regarding the IOD process with any other police

4   officer, other than Sergeant Mancini, to your

5   knowledge?

6        A.   Yes.

7   Q.   Do you know who?

8        A.   Offhand, no.  That's part of what we do.  You

9   know, we'll routinely update the board.  Specific

10  names right here and now, no.  I would have to look at

11  the board and go back and research, but yes.

12  Q.   Did Sergeant Grenada express an opinion regarding

13  Mancini's specific injury, which was a knee injury?

14       A.   No.

15  Q.   Did Sergeant Grenada express an opinion that he

16  didn't think Mancini should be out this long, because

17  it was just a knee injury, or words to that effect?

18       A.   No.

19  Q.   Are you aware that Sergeant Mancini applied for

20  accidental disability benefits?

21       A.   Yes.

22  Q.   How did you become aware of that?

23       A.   Because Sergeant Grenada would update the

24  board and speak about that, what the status was of the

25  IOD people.

Chief Hugh T. Clements, Jr. - June 10, 2015

61

1  Q.   Would Sergeant Grenada regularly report the

2  status of applications for accidental disability

3  benefits?

4       A.  Yes.

5  Q.   How often does that happen, a police officer

6  applies for accidental disability benefits?

7       A.  Presently, a couple of times a year.

8  Q.   Okay.  So it's not that often; something that

9  would stick out in your mind, right?

10      A.  Maybe.

11 Q.   Okay.  Do you know if anyone at the Providence

12 Police Department directed Sergeant Mancini to submit

13 the paperwork for accidental disability benefits?

14      A.  I believe Sergeant Grenada or somebody in

15 administration did, yes.

16 Q.   They directed him to do so?

17      A.  What I think they did was followed the CBA.

18 Q.   Which is what?

19      A.  Which is when you're on light duty status a

20 certain amount of time, then the administration would

21 probably direct that person to file, correct.

22 Q.   I'm going to represent to you that Sergeant

23 Mancini testified at his deposition that Sergeant

24 Grenada told him if he didn't file the paperwork for

25 disability benefits that Sergeant Grenada would do so

Chief Hugh T. Clements, Jr. - June 10, 2015

62

1    for him.  Do you recall Sergeant Grenada stating that?

2          A.  I wasn't there, but I'm sure he did.

3    Q.    Okay.  Was it your understanding, when you say

4    that Sergeant Grenada was frustrated with Sergeant

5    Mancini through the IOD process, was it your

6    understanding, was he also frustrated with him because

7    he wouldn't submit the disability paperwork?

8          A.  I can't be sure.

9    Q.    I want it correct for the record.  It was

10   Sergeant Verdi that instructed Mancini to file the

11   paperwork, not Grenada.  I apologize for that.  Does

12   that change your testimony?

13         A.  No, he may have.  It's Major Verdi.

14   Q.    Major Verdi.  Sorry.  Did you have any

15   discussions with Major Verdi about Sergeant Mancini's

16   IOD status?

17         A.  Not that I can recall in specific, but we had

18   discussions on the time of majors and captains of

19   respective divisions about people under their command

20   out long-term sick or IOD.  It's constant

21   conversation.

22   Q.    Did anybody, other than Sergeant Grenada, express

23   frustration with Sergeant Mancini being out on IOD?

24         A.  Specifically that I can recall, no.

25   Q.    How about yourself; were you frustrated that he

63

1  was on IOD status?

2          THE WITNESS:  Was I frustrated?

3          MR. GAGLIARDI:  Yes.

4      A.  I was frustrated with the process that was

5  going on with Sergeant Grenada.

6  Q.  Did you communicate with anybody via e-mail

7  regarding Sergeant Mancini's IOD status?

8      A.  Not that I remember.

9  Q.  Since you've been Chief of Police, have you ever

10  communicated with anybody in the department regarding

11  someone's IOD status via e-mail?

12      A.  I don't know.

13  Q.  All right.  Let's talk about promotional exams.

14  I want to go back to something you testified earlier

15  about.  It pertains to your meeting with Chief

16  Esserman.  You said that there was a movement afoot to

17  promote differently within the department.  Did I

18  state that incorrectly?

19      A.  Yes.  Unfortunately, it's still afoot.

20  There's been conversations going on for 20 plus years

21  about open, open conversations about changing the

22  promotional process.

23  Q.  Changing it from what to what?

24      A.  We don't know.

25  Q.  Well, it's governed by the CBA, right?

Chief Hugh T. Clements, Jr. - June 10, 2015

64

1        A.   Correct.

2    Q.   So it's pretty straightforward, isn't it?

3        A.   No, not really.  It's changing it from the

4    process we have now to something different, which

5    could be like the Rhode Island State Police where they

6    handpick all of their appointments through the

7    respective rank.  That is on the far end of what we

8    do.

9        Or it could be something that a lot of

10   progressive police departments do around the country.

11   They do assessment centers.  It's complicated.  It

12   really is.  It could be one of many things, but it's

13   covered by the CBA.  Even when I was involved in the

14   union, we had three separate testing committees to

15   review what it should be.  It's just never changed.

16   Q.   What don't you like about the way the promotional

17   process is?

18       A.   It's not what I don't like.  It's what many

19   in the rank and file don't like.  It's too much is

20   weighted on the written exam.

21   Q.   Okay.  Is there concern that too high a

22   percentage is weighted, the 85 percent is weighted on

23   the written exam, or there should be no written exam

24   at all?

25                 MR. MCHUGH:  Objection as to from.  You

65

1    can answer.

2         A.   Again, I sat on some of these committees.

3    When the department was 480 or 490 strong, there are

4    480 different opinions as to what it should be.  So I

5    personally think there should be a written exam, and

6    it should be an important part of the process for the

7    respective ranks of sergeant and lieutenant.  But

8    there are many who feel that it really should not.

9    Q.   All right.  So let's talk about how police

10   officers are promoted within the Providence Police

11   Department.  Is there a different process for

12   promoting sergeants, lieutenants, detectives,

13   captains?

14        A.   Yes.

15   Q.   Okay.  Is there a different process for promoting

16   sergeants and lieutenants, or is that the same?

17        A.   The same.

18   Q.   When does the process change, what level?

19        A.   From lieutenant to captain.

20        (EXHIBIT A PLAINTIFF'S MARKED FOR ID)

21   Q.   Chief Clements, you've just been handed

22   Plaintiff's Exhibit A.  I'm going to represent for the

23   record that this is an excerpted portion of the

24   collective bargaining agreement, just to save paper

25   and time.  These are Pages 17 to 24.  Subpart A is

Chief Hugh T. Clements, Jr. - June 10, 2015

66

1  written procedure governing the administration of the

2  promotional exams?

3       A.  Correct.

4  Q.  Why don't you take a minute to review this?

5       A.  Okay.

6  Q.  Are you familiar with this?

7       A.  Yes.

8  Q.  Is this the procedure for promoting police

9  officers to the positions of sergeant and lieutenant?

10      A.  Yes.

11 Q.  Does it also include position, promotion to

12 detective?

13      A.  Yes.

14 Q.  In your own words, just explain to us the whole

15 procedure that is involved when the department decides

16 it wants to promote police officers from sergeant to

17 lieutenant; how does it all work?

18      A.  We'll set the process in play by notifying

19 the Human Resources Department that we're going to

20 notify the department that we will be promoting that

21 respective rank, detective or sergeant.

22 Q.  How does it come about; who makes the decision as

23 to, Okay, we're going to promote some police officers

24 this week?

25      A.  The administration does, once we have a

1    shortage pursuant to our organizational chart of

2    manpower.  If we become short in a particular rank,

3    we're supposed to maintain an ongoing list for that

4    respective rank.

5    Q.    Okay.  What happens next?

6         A.    Then the administration will start the

7    process of saying that we're going to announce, and we

8    need to put out to bid to a company that administers

9    the exam.

10        Once that's awarded, we will notify the rank and

11   file that we're doing a process for that respective

12   rank, and we'll set the time line for the study period

13   and the date of exam.

14   Q.    What is the notification -- I'm sorry, strike

15   that.  What is the time period from the notification

16   to the exam typically?

17        A.    Six to eight to ten weeks.  It's been

18   different for different processes.

19   Q.    How would the department notify the rank and file

20   that there is going to be a promotional exam?

21        A.    General order.  Through a general order.

22   Q.    How does the rank and file get that general

23   order?

24        A.    It's disseminated throughout the agency

25   presently by an intranet-powered DMS program, and as

1  well through the roll calls, and through the

2  respective commands.

3  Q.   Does each police officer have like a mailbox

4  where they get paper documents in?

5       A.   No.

6  Q.   Was that ever the case; did they ever do that?

7       A.   For the supervisors, yes.  For the

8  rank-and-file police officer, no.  Each police officer

9  does presently have access to this intranet

10  communication throughout the department.

11  Q.   Okay.  So the rank and file are notified that

12  there will be a promotional exam on such-and-such a

13  date.  Then what happens next?

14       A.   There is a sign-up process.  There is a

15  deadline to sign up.  The administration will make a

16  list of people who sign up and who have been deemed

17  eligible to take that test.

18  Q.   Under what circumstances is someone not eligible

19  to take a promotional exam?

20       A.   If they didn't have a year's worth of service

21  to be a detective, sergeant, or two years in rank.

22  You need to have two years in rank as a sergeant to

23  apply for lieutenant.

24       Some people, it happens on occasion where

25  somebody may think they qualify, because that deadline

1    is respective of the last lieutenant made from the

2    previous list.  So you need to have two years on at

3    that point that the vacancy became available.

4    Q.    Is being on IOD status a reason that someone

5    wouldn't be eligible to take a promotional exam?

6          A.    No.

7    Q.    Okay.  What happens next?

8          A.    Then the date for the test has been given.

9    There is a study period, and they administer the test

10   on the date identified.  Prior to that, the

11   administration will compile the education and

12   seniority points of the respective candidates, and

13   they will forward a list to the administration of the

14   people who are taking the test to administer the

15   service points.

16   Q.    That's done before the written exam is given?

17         A.    Yes.

18   Q.    How soon before the written exam are the service

19   points and educational points, seniority points

20   awarded?

21         A.    Before the exam.  There is no particular

22   deadline.  They need to be, the service points need to

23   be administered to the FOP pursuant to the contract

24   prior to the exam.

25   Q.    How are they administered to the FOP?

Chief Hugh T. Clements, Jr. - June 10, 2015

70

1       A.   Typically through fax, the fax.

2   Q.   From where to where?

3       A.   From the police department to the union hall

4   at 40 Sheridan Street.

5   Q.   Okay.  Where in the police department; whose job

6   is it to do that?

7       A.   The administration.  So it may be the major

8   in charge of administration.  It may be the lieutenant

9   who falls under the major, or it may be Sergeant

10  Grenada.  It's been those particular entities that

11  forward the information to the union on the service

12  points.

13      I can give you an example.  You know, if the

14  lieutenant is taking a test, he certainly cannot be

15  privy to the points.  So he wouldn't, he may send it

16  three times in a row.  Then he doesn't send it

17  because, you know, he is taking a test, or a sergeant.

18  Q.   Okay.  Then what happens after the exam is given?

19      A.   There's a review of the exam.  They're given

20  the scores.  The candidates are given their scores.

21  Q.   Who is reviewing the exam?

22      A.   The proctor.

23  Q.   The department hires a company to administer the

24  exam, right?

25      A.   Yes.

1   Q.    Third party?

2         A.   Yes.   They give the candidates an opportunity

3   to review their exam, and they'll go over it.

4   Q.    Okay.   Then what happens after the results are

5   given to the candidate?

6         A.   If somebody has a question, or a complaint,

7   or a grievance, there's a process for them to follow

8   through and formally file a grievance.

9   Q.    A grievance about what?

10        A.   An interpretation on a question and/or an

11  erasure.   Over the years there have been several

12  disputes about somebody may have indicated they wanted

13  to answer it with a certain letter and I erased it,

14  and it was B and not C.

15        So a neutral arbiter will make a determination,

16  or the test maker will make a determination, This is

17  the one that we're counting.   So there are a number of

18  circumstances that could rise to the level of a

19  grievance.

20  Q.    Okay.   My understanding from reading the CBA is

21  that 85 percent of a candidate's score is the written

22  exam; is that correct?

23        A.   Yes.

24  Q.    That the other 15 points are comprised of their

25  seniority, which is their length of service on the

1   job, correct?

2        A.  Yes.

3   Q.   Their level of education is five points?

4        A.  Yes.

5   Q.   Level of seniority is five points?

6        A.  Yes.

7   Q.   Then service points, or chief points, are five

8   points, correct?

9        A.  Correct.

10  Q.   I'm interested in knowing about the administering

11  of the 15 points that I just discussed.  How does that

12  happen?

13        A.  So after the exam, the test maker will make a

14  list of the scores.  So if 15 people took the test,

15  they'll administer a score for each of those

16  candidates.  Then we'll allow that grievance period to

17  process before we formally put out a final list.

18        The test needs to be fully adjudicated, and then,

19  in the meantime certainly the administration can be

20  plugging in what the respective points will be for the

21  candidates.  As far as education and seniority,

22  they'll already have the service points prior to the

23  exam.

24        Then the final list doesn't come out until that

25  period is over.  Then the department will put out a

Chief Hugh T. Clements, Jr. - June 10, 2015

73

1   general order indicating what the final list was, what

2   all the points include.

3   Q.   There is no discretion in awarding the seniority

4   points; either you've been on the job for a certain

5   amount of time or you haven't, right?

6        A.   Correct.

7   Q.   Same thing with level of education.  If you have

8   a Bachelor's degree, you have five points.  There is

9   no discretion in that?

10       A.   Correct.

11  Q.   With regard to the service points, my

12  understanding is that's at the Chief of Police's

13  discretion?

14       A.   Right, correct.

15  Q.   Let's talk about that.  You testified earlier

16  that you would hold a separate meeting?

17       A.   Yes.

18  Q.   With the command staff to discuss service points,

19  right?

20       A.   Correct.

21  Q.   Let's talk specifically about the June 16, 2013

22  lieutenants promotional exam, which is the reason

23  we're all here today.  I'm going to represent to you

24  on May 3, 2012, which is about six weeks prior to the

25  exam, Sergeant Mancini was informed that there was

Chief Hugh T. Clements, Jr. - June 10, 2015

74

1    going to be a promotional exam.  Does that comport

2    with your time frame of when candidates are notified?

3        A.  Yes.

4    Q.  Okay.  How soon before the exam do you meet with

5    the command staff to discuss chief points typically?

6        A.  Typically a week or so before the actual

7    exam.

8    Q.  Okay.  In your words, what are service points?

9        A.  It entails the overall performance of that

10   individual officer and what the agency feels that

11   officer should be recommended for pointwise.

12   Q.  When you say the overall performance, do you mean

13   their overall performance in their current job?

14       A.  In their current job and their ability to

15   work their prospective job.  So if they're, to see if

16   they have the ability to perform in that prospective

17   job as well.

18   Q.  So if someone is applying, if someone is a

19   sergeant, candidate is a sergeant and he's applying

20   for a lieutenant's position, your job, your

21   responsibility is to award him service points.  You're

22   considering his performance as a sergeant and how he

23   would perform as a lieutenant, correct?

24       A.  Well, we don't know how he would perform as a

25   lieutenant.  It's just his overall performance at that

1    rank.  Having in mind that he's attempting to ascend

2    to a higher rank.

3    Q.   Okay.  I don't think, I don't understand that.  I

4    understand you're evaluating him in his current job?

5         A.   Correct.

6    Q.   I don't understand the second part.

7         A.   Can you ask the question again?

8    Q.   Sure.  Well, let's read it from the CBA; let's do

9    it like that.  Page 22, Paragraph 3, I'm reading from

10   the bottom.  5 percent of said promotional examination

11   shall consist of so-called service points.  Said

12   service points are to be awarded by the Chief of

13   Police in his sole discretion.

14        The Chief of Police shall take into consideration

15   in awarding these points the member's overall

16   performance as a police officer, including but not

17   limited to, letters of commendation, letters of merit,

18   unused sick time, et cetera, et cetera.  I added one

19   extra et cetera.  Sorry.

20        Correct me if I'm wrong, we all have different

21   interpretations.  I interpret that to be the

22   performance of how they're doing in their current job,

23   and you can include letters of recommendation, letters

24   of commendation -- sorry, letters of commendation,

25   letters of merit, and unused sick time.  I don't see

Chief Hugh T. Clements, Jr. - June 10, 2015

76

1    any mention about how they might perform in a job

2    they're applying for.

3         A.   But certainly we're looking at the overall

4    performance.  Having in mind that they're applying for

5    a different rank.

6    Q.   Doesn't the written examination cover that, that

7    you're taking a written examination to be a

8    lieutenant?  Presumably wouldn't those questions test

9    your ability to be a lieutenant?

10        A.   Not all of those abilities.

11   Q.   Okay.  Would you agree with me at least that if

12   someone is a sergeant, and they're applying for a

13   lieutenant, you're not going to look at their work as

14   a patrolman?

15        A.   Correct.  We would want current data.

16   Q.   So when you're assessing service points for

17   someone and deciding what to award them, and you don't

18   think they will perform well in the position that

19   they're applying for, does that mean you would award

20   them less points?

21        A.   Not necessarily so.  I think what we're

22   looking for is, what is very important to me is what

23   the upper command staff views the overall performance

24   of that employee applying for that newer rank.

25   Q.   Okay.  In their current job?

Chief Hugh T. Clements, Jr. - June 10, 2015

77

1        A.   In their current job, but having in mind the

2   job they're applying for.

3   Q.   Which means how fit they are to be promoted to

4   that new position?

5        A.   It's different on everyone's level as far as,

6   you know, if I'm quizzing five, seven, ten, twelve

7   members of my command staff.  I don't know what is in

8   their minds.

9   Q.   How did you learn about how service points are

10  awarded?

11       A.   When I became part of the staff -- I mean,

12  previous to that, this contract has been in place for

13  a number of years.  So I always knew the contract and

14  knew service points were administered.  I think

15  they've been administered different ways by different

16  administrations.

17  Q.   Why do you feel that way?

18       A.   I don't know that.  All I can say is I only

19  became involved under Colonel Esserman.  Prior to

20  that, I was a Sergeant, and then there was some quick

21  movement in the department.  I was never part of

22  service points prior to Colonel Esserman being the

23  Chief.  So I came to learn under Colonel Esserman.

24  Q.   I mean, it's pretty black and white to me.  It

25  says it right there that they're your overall

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 79 of 265 PageID #: 1215
Chief Hugh T. Clements, Jr. - June 10, 2015

78

1    performance.  Why wouldn't it just be based on your

2    overall performance as a sergeant?

3                  MR. MCHUGH:  Objection as to form.  You

4    can answer.

5         A.  I think it is based on overall performance,

6    but not specifically just as sergeant.  I think it's

7    basic overall performance is the way I read it.

8    Q.   Okay.  So you said the administrations have

9    issued service points in different ways?

10        A.  I don't know that for a fact.  They may have

11   administered them in different ways.  The only

12   knowledge I have is under Colonel Esserman.  I never

13   was part of conversations on service points with

14   previous administrations.

15   Q.   Did you ever make any recommendations of service

16   points to those that were under you when they were

17   applying for promotional exams?

18                  THE WITNESS:  Prior to Colonel Esserman?

19                  MR. GAGLIARDI:  Prior to becoming a

20   Police Chief.

21        A.  Yes.

22   Q.   When was the last time you made a recommendation

23   of service points before you became Police Chief?

24        A.  When I was a Captain.

25   Q.   When you were a Captain; when was that?

Chief Hugh T. Clements, Jr. - June 10, 2015

1      A.   I forget the year.   I would have done it
2 every step of the way before that, Lieutenant, before
3 that.   Yes, it would have been Lieutenant, Captain up.
4 Q.    You've done it many times, right?
5      A.   Again, only under his administration.   So
6 from my time as District Commander on.
7 Q.    How long was Esserman Police Chief?
8      A.   I believe I was District Commander in the '03
9 area, 2003.
10 Q.    What's that about eight years?
11      A.   Yes.
12 Q.    So eight years during, when Chief Esserman was
13 the Providence Police Chief, how many promotional
14 exams would you say there were during that time
15 period?
16      A.   Several.
17 Q.    Several.   During each of those promotional exams
18 you had the opportunity to make recommendations for
19 chief points, right?
20      A.   Yes.
21 Q.    Do you recall a time where Chief Esserman ever
22 disagreed with you when you made a recommendation for
23 chief points?
24      A.   In specific, no.   But in general, yes.   I
25 know he disagreed oftentimes with people who gave a

80

1   certain point amount to a certain candidate.

2   Q.   When you say he disagreed, did he say, I'm not

3   giving, I'm not giving him or her those points; I'm

4   going to give him different points?

5        A.   Something more to the effect of, I disagree

6   with that assessment.  You need to take a hard look at

7   your unit and see that that's really deserving.

8   Q.   So in that case did Chief Esserman think the

9   points were too high or too low?

10       A.   Could have been either.

11  Q.   When you became the Chief of Police and you met

12  with Chief Esserman at Paragon and you had several

13  meetings after that, did you and Chief Esserman

14  discuss how to award chief points?

15       A.   No.

16  Q.   Just for the record, I just referred to them as

17  chief points; service points and chief points are the

18  same?

19       A.   Service points is the way it's written in the

20  contract, at the sole discretion of the Chief, so I

21  think it's --

22  Q.   I just want to make sure.

23       A.   Fair to say.

24  Q.   I want to make sure there is no difference

25  between the two.  It's just the terminology, right?

Chief Hugh T. Clements, Jr. - June 10, 2015

81

1        A.  Service points.

2  Q.    Okay.  What range can you award for service

3  points; what is the range?

4        A.  Zero through five.

5  Q.    Okay.  So what is the highest you can award for

6  chief points, service points?

7        A.  Five.

8  Q.    What is the lowest?

9        A.  Zero.

10  Q.   Is it possible for someone to be ineligible for

11  service points?

12        A.  No.

13  Q.   You have to give them a zero, a one, two, three,

14  four, or a five, right?

15        A.  Yes.

16  Q.   What does it mean when someone gets a five for

17  service points?

18              MR. MCHUGH:  Objection as to form.  You

19  can answer.

20        A.  Again, it could be many different things to

21  many different people.  That's been the conversation.

22  You may be a very strict judge of points in the

23  command staff, and I may be very lenient.  What it

24  means to you may be different than what it means to

25  me.

1    Q.    Okay.  Not all teachers give As, right?

2          A.  Right.

3    Q.    So what does it mean to Hugh Clements, Jr., when

4    somebody gets a five for service points?

5                THE WITNESS:  To me?

6                MR. GAGLIARDI:  Yes.

7          A.  It means outstanding, excellent.

8    Q.    They're performing at the highest level possible,

9    right?

10         A.  Yes.

11   Q.    What about when someone gets a zero; what does

12   that mean to Hugh Clements, Jr.?

13         A.   That means they're performing at a very low

14   level.

15   Q.    The lowest level possible, right?

16         A.  Yes.

17   Q.    Would you agree with me that a five is the

18   equivalent of an A, and a zero is the equivalent of an

19   F if we were talking about we were in grade school?

20                MR. MCHUGH:  Objection as to form.  You

21   can answer.

22         A.  You could, yes.

23   Q.    Would you agree with me if one candidate scored

24   higher than another candidate in service points that

25   means that the candidate to who scored higher is

1    performing at a higher level than the candidate who

2    scored lower?

3         A.  In the eyes of the administration, yes.

4    Q.   I mean in your eyes.

5         A.  Yes.

6    Q.   All right.  So let's talk about -- strike that.

7    You testified earlier that you rely heavily on your

8    command staff to give their opinions on police

9    officers' ability to do their job duties, right?

10        A.  Yes.

11   Q.   Because you're not out riding around with

12   sergeants on a daily basis, right?

13        A.  Correct.

14   Q.   Let's talk about these meetings that you have to

15   discuss service points.  How long do these meetings

16   last?

17        A.  Up to an hour.

18   Q.   Is the sole purpose of the meeting to discuss

19   service points?

20        A.  Yes.

21   Q.   I would assume that the more people that are

22   applying for a promotional exam, probably the longer

23   the meeting is going to take, right?

24        A.  Yes.

25   Q.   So a meeting for a sergeants promotional exam is

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 85 of 265 PageID #:
1221
Chief Hugh T. Clements, Jr. - June 10, 2015

84

1    probably going to take longer than a lieutenants

2    promotional exam?

3         A.  Correct.  It could potentially be broken up

4    into more than one meeting.

5    Q.   Okay.  Let's go back to the June 16, 2012

6    lieutenants promotional exam.  Did you have a meeting

7    with your command staff to discuss the award of

8    service points for that promotional exam?

9         A.  Yes.

10   Q.   Do you remember when it was?

11        A.  It was during that week.  I'm not sure

12   exactly which day.

13   Q.   During the week of the exam?

14        A.  I believe so.  The week or so before the

15   exam.  It's typically done on the Thursday or Friday

16   prior to the week of the exam, or the Monday and

17   Tuesday.

18   Q.   Is there anybody present at the meeting that

19   memorializes the discussion, takes minutes,

20   tape-records the conversations?

21        A.  No.

22   Q.   Is there any follow-up correspondence from the

23   meetings?

24        A.  Yes.

25   Q.   What is that?

Chief Hugh T. Clements, Jr. - June 10, 2015

85

1       A.  Certainly if there are some supervisors who

2  want to lobby in a strong way for one of their

3  employees, because, again, they work with them on a

4  daily basis and they're closer to them with the

5  activities on the street, we're always open for

6  conversation for that from a sergeant, lieutenant or

7  captain.

8       As well, other documentation could be officers

9  have the list of all the candidates going for that

10  rank.  They have the opportunity to fill out their

11  recommendation for that candidate and his points.

12  Q.  Do you recall who was present at the meeting

13  where a discussion of service points took place for

14  the June 16, 2012 lieutenants promotional exam?

15       A.  I believe I can name most of them.  I'm not

16  positive I can name all of them.  I do recall Deputy

17  Chief Oates, Majors Verdi, Tucker and Colon, Captains

18  Lepre, Stamatakos, Campbell, Lapatin.  I believe

19  Lieutenants Perez and Ready were there.  There may

20  have been other lieutenants there as well.  Captain

21  Sauro was there as well.

22  Q.  Is it typically just the person who directly

23  supervises the candidate, is it typically that person

24  that makes a recommendation of chief points, or do

25  other folks that are present at the meeting make

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 87 of 265 PageID #: 1223
Chief Hugh T. Clements, Jr. - June 10, 2015

86

1   recommendations?

2        A.   You're talking about a big department, but in

3   a sense a small department that over the years many of

4   the people at that table have been there 20, 25, 30

5   years.  Everybody knows each other and have crossed

6   paths somewhere along the line.  So it's everybody.

7   Q.   Are candidates awarded chief points simply for

8   signing up for the exam, or do they have to sit for

9   the exam?

10       A.   Just for signing up.

11  Q.   Okay.

12       A.   Because we won't know if they actually sit by

13  the time we give the points.

14            MR. GAGLIARDI:   Sure.   Okay.

15            (EXHIBIT B DEFENDANT'S MARKED FOR ID)

16  Q.   You've just been handed Plaintiff's Exhibit B.

17  This was a document that was produced during discovery

18  by the City of Providence.  It's entitled Lieutenants

19  Promotional Exam Sign Up, June 16, 2012.  Have you

20  ever seen this document before today?

21       A.   Yes.

22  Q.   There is also a fax transmittal sheet?

23       A.   Yes.

24  Q.   Based on this document, do you have any reason to

25  believe that this document is not a true and accurate

87

1    reflection of -- strike that.  Let's look at the last

2    two pages.  Have you ever seen these two pages before?

3         A.  Yes.

4    Q.   What are those?

5         A.  It's a fax cover sheet from the

6    administrative office, my office.

7    Q.   Let's look at the fax information at the top.

8    It's hard to read, but it looks like it says June 14,

9    2012, which is a Thursday, 17:01 hours.  The fax is

10   243-8448, I think.  Do you recognize that fax number?

11              THE WITNESS:  Where are you reading that?

12              MR. GAGLIARDI:  At the top.

13        A.  I'm not even sure if that is the actual fax

14   from the machine out in front of our office.  The

15   executive assistant, Annie, faxes most of the stuff.

16   It's a fax machine.  Yes, that should be it.

17   Q.   It looks like it was faxed to that phone number.

18   Do you have any reason to believe that this document

19   was not faxed to the Fraternal Order of Police

20   Executive Board?

21        A.  No.

22   Q.   On June 14, 2012?

23        A.  No.

24   Q.   That comports with your time frame when -- strike

25   that.  Do you know who created this document that's on

Chief Hugh T. Clements, Jr. - June 10, 2015

88

1    the front page of the exhibit, looks like an Excel

2    spreadsheet?

3         A.   I filled in the points manually.  That's my

4    handwriting.  I believe Sergeant Grenada compiled the

5    list.

6    Q.   It looks like some handwriting in the lower

7    right-hand corner?

8         A.   Yes.

9    Q.   Is that your handwriting?

10        A.   No.

11   Q.   Do you have, do you know when you wrote these

12   numbers in for service points in relation to the

13   meeting where you discussed what you were going to

14   give for service points?

15        A.   Not exactly.

16   Q.   Okay.  So you testified that the people that were

17   present at the meeting of the command staff, because

18   it's a relatively small department, there's a good

19   chance that, that not just the direct supervisor would

20   have knowledge of the candidates' abilities, but other

21   people would, too, right?

22        A.   Correct.

23   Q.   So let's go over the list of people that were

24   there.  So Hugh Clements, Jr., you had an opportunity

25   to work with Mark Mancini before, right?

89

1       A.   Yes.

2   Q.   Before he applied for this promotion?

3       A.   Yes.

4   Q.   In 1994, then 2008 and 2009?

5       A.   Yes.

6   Q.   You were able to formulate an opinion about his

7   work performance, right?

8       A.   Correct.

9   Q.   You testified earlier that at the very least it

10  met your expectations both times you supervised him,

11  right?

12      A.   Correct.

13  Q.   What about Commander Oates, had he had an

14  opportunity to work with Mark Mancini or supervise

15  him?

16      A.   Along the way, yes.

17  Q.   Was there anybody present at that meeting that

18  didn't know who Mark Mancini was?

19      A.   No.

20  Q.   Right.  He had been there a long time; everybody

21  knew who he was, right?

22      A.   Correct.

23  Q.   Was there anyone present at that meeting that had

24  the opportunity to work with Mark Mancini directly?

25      A.   Many of them.

Chief Hugh T. Clements, Jr. - June 10, 2015

90

1   Q.   Were there any people present at that meeting

2   that didn't have the opportunity to supervise Mark

3   Mancini?

4         A.   Can't be sure on that.

5   Q.   Do you know who Mark Mancini's direct supervisor

6   was as of June 14, 2012?

7         A.   On that date, I don't.

8   Q.   I'm sorry if I already asked this.  When did you

9   fill in the service points in relation to the meeting?

10         A.   I manually fill this in the date that this

11   was faxed.  So on the date on the back there, June 14,

12   would have been when I manually filled this in.

13   Q.   So you have a meeting with the command staff to

14   discuss the service points, right?

15         A.   Yes.

16   Q.   A discussion ensues about what each candidate

17   should get, right?

18         A.   Correct.

19   Q.   Various people express their opinions and make

20   recommendations as to what each candidate should get

21   for a service point, right?

22         A.   Correct.

23   Q.   Sergeant Grenada puts together a spreadsheet of

24   all the people that signed up for the promotional

25   exam, right?

Chief Hugh T. Clements, Jr. - June 10, 2015

91

1       A.   Correct.

2    Q.   He gives it to you.  You fill in the service

3    points, right?

4       A.   Yes.

5    Q.   Okay.  Are you filling in the service points out

6    of memory, or do you keep notes at the meeting?

7       A.   We keep notes at the meeting.  I kept notes

8    at the meeting with my sheet, as well other people

9    have a sheet in front of them.  The Deputy Chief would

10   keep notes where, you know, the meetings have been --

11   there's not a template for conducting these meetings.

12   They've been done different ways.

13       The Commander may start the meeting and talk

14   about, Okay, what did someone get previously?  What

15   are we thinking of now, and what are we going to

16   administer for points eventually?  Then we'll go down

17   the list.

18   Q.   When you say what someone got previously, you

19   mean the last promotional exam they took?

20       A.   Correct.  So there could be several notations

21   on people's sheets, because they want to put in their

22   mind, Okay, what were they given last time, what are

23   supervisors going to speak about them now, and in the

24   end what I'm going to recommend towards service

25   points.

Chief Hugh T. Clements, Jr. - June 10, 2015

92

1  Q.   When you say sheets, could you be more specific?

2       A.   This sheet, blank.

3  Q.   So everyone present at this meeting of the

4  command staff has a blank sheet?

5       A.   To go along.

6  Q.   I'm sorry, has a sheet that is identical to the

7  first page of Exhibit B, except service points are

8  blank, correct?

9       A.   Correct.

10 Q.   Before the meeting starts, Sergeant Grenada has

11 already compiled this list of people that signed up

12 for the promotional exam, and the service points are

13 left blank, right?

14      A.   Yes.

15 Q.   What happens to those sheets that are filled in

16 by each person present at the command staff meeting?

17      A.   They can take them with them.  We can discuss

18 candidates.  If they choose, they can forward that

19 list to the command staff, or to the Deputy Chief, or

20 to me, and turn in their sheet.  Some people do; some

21 people don't.

22      If they feel real strongly or negatively on a

23 candidate, they may.  Other times they'll let that

24 conversation be the, speak for itself, and let the

25 Chief make a determination on the discretionary

1    points.

2    Q.    When you say they submit their sheets, do they do

3    that at the meeting or after the meeting?

4         A.    After the meeting.   They're allowed to take

5    those sheets with them.   They can make a determination

6    on their own, what they want to administer.

7    Q.    How do they submit them to you typically?

8         A.    Personally, they'll come right up to the --

9    the door is wide open.   They'll come in, hand it to me

10   personally.   Or they may walk to Commander Oates, give

11   it to him to give to me.

12   Q.    What do you do with those sheets, of the sheets

13   that you do receive from people; what do you do with

14   those?

15        A.    Typically keep them.

16   Q.    Do you have the sheets -- strike that.   Of the

17   people that were present at this meeting, did anybody

18   submit filled-in sheets for that promotional exam?

19        A.    Yes.

20   Q.    Do you know who filled, who submitted a filled-in

21   sheet for this promotional exam?

22        A.    Commander Oates did.   Major Verdi, Major

23   Tucker, Major Colon, Captain Lapatin, Captain

24   Campbell, Captain Lepre and others spoke verbally.

25   Those are the ones I recall.

Chief Hugh T. Clements, Jr. - June 10, 2015

94

1   Q.   How do you remember that those specific people

2   submitted sheets?

3        A.   Because I looked at them.

4   Q.   When did you look at them?

5        A.   Recently.  Within the last couple of weeks.

6             MR. GAGLIARDI:  Okay.  Kevin, do you know

7   if those were produced during discovery?

8             MR. MCHUGH:  They were not.  If you want

9   to make a request to the Colonel, he has them.  We'll

10  give them to you.

11            MR. GAGLIARDI:  Well, I think we already

12  have made the request.  I think this would be your

13  duty to supplement.

14            MR. MCHUGH:  We'll give them to you in

15  any event.

16  Q.   When did you look at them most recently?

17       A.   Within the last week or two.  I didn't look

18  at them today.  I believe those are the ones who

19  formally turned in a sheet.

20  Q.   Do you recall what Deputy Chief Oates recommended

21  that Sergeant Mancini get for chief points?

22       A.   Yes.

23  Q.   What?

24       A.   Zero.

25  Q.   What about Major Verdi?

95

1        A.  One.

2   Q.    What about Major Tucker?

3        A.   Three.

4   Q.    What about Major Colon?

5        A.   Zero.

6   Q.    What about Captain Lepre?

7        A.   Zero.

8   Q.    What about Captain Lapatin?

9        A.   Two.  Captain Campbell turned one in, too.

10  Q.    What about Captain Campbell?

11       A.   Two.

12  Q.    Tell us about the discussion about what service

13  points should be awarded to Sergeant Mancini for the

14  June 16, 2012 promotional exam?

15       A.   With every candidate the discussion would be

16  a name would be thrown out, and some of the candidates

17  the discussion would go right to, somebody would blurt

18  out -- there was no formal process.  McHugh, he's a

19  five.  He's a five.  Yes, he's a five.  In unison

20  people would say, He's a five.

21       The commander might say, Does anyone think he's

22  less than a five?  Nobody.  Okay, so we can agree we

23  believe he's a five?  Yes.  That would happen when

24  some of the candidates who were at that particular

25  time considered to be outstanding.

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 97 of 265 PageID #:
1233
Chief Hugh T. Clements, Jr. - June 10, 2015

96

1        Then oftentimes we would start the meetings.  If
2    somebody, somebody's name was brought up and there was
3    no response, we would say, Okay, we want the points to
4    be meaningful.  Let's -- you know, there have been
5    tests where everybody gets a five.  That became a
6    point of contention with the command staff, Why give
7    everyone a five?  Why even have chief points if they
8    don't mean anything?  They should mean something.
9        It was important to many in the command staff to
10   say, You know, let's let those points mean something.
11   If there was no response from the room, okay, every
12   candidate where there was no response, we'll start it
13   at three.  Then we'll discuss it further.  We'll start
14   it at three, up, down, or stay the same.
15   Q.   Tell us about the discussion about Sergeant
16   Mancini; how did that go?
17        A.   Go down the list alphabetically.  I don't
18   recall verbatim.  There wasn't much of an initial
19   response.  So I think somebody said, There will be
20   further discussion on Sergeant Mancini, so we'll go to
21   the next person.
22        In the meantime, he's one that starts at a three.
23   We'll make a determination based on further discussion
24   and further influence from the command staff and the
25   people around the table what that number should be.

Chief Hugh T. Clements, Jr. - June 10, 2015

1   Q.   The people that didn't submit these filled-out

2   forms that were present at that meeting, Stamatakos,

3   Ready and Perez?

4       A.   Yes.   And Sauro, Captain Sauro.

5   Q.   And Sauro.   Did she respond verbally and make a

6   verbal recommendation for points for Mancini?

7       A.   Not that I recall as far as a number.   I can

8   tell you, it does, it pains me to sit here in front of

9   him and say that none of the verbal conversation at

10  that meeting that I recall was glowing or positive.

11  Q.   All right.   Since we're all here, let's talk

12  about that.   Let's talk about what everyone said about

13  Sergeant Mancini.   Why did the folks that recommended

14  he get a zero, Colon and Lepre, why did they say he

15  should get a zero?

16              MR. MCHUGH:   Objection as to form.   You

17  can answer, if you know.

18      A.   I don't really specifically know.   I know

19  there was much conversation about negative attitude,

20  not a team player.   I remember specifically George

21  Stamatakos saying that, just a poor attitude.

22      As the conversation goes on, and we want these

23  points to be meaningful, Is this what we want from a

24  lieutenant?   The service points, we want to award for

25  someone who has applied to a position that is, in

1    essence, a much different position than where they're
2    coming from.
3         In essence, I've testified to it before, you
4    know, if you're a District Commander, you're a mini
5    Chief of Police.  If you're an OIC, you're making
6    decisions on behalf of the agency as the Chief of
7    Police.
8    Q.   Did anybody point out any discipline that
9    Sergeant Mancini had received?
10        A.   That comes up with all the candidates.  I
11   don't recall specifically.  I am aware of some of it,
12   because I was involved, but it's, you know, it didn't
13   point to that reason for their low points.
14   Q.   You said you're aware of it because of what you
15   were involved in; what do you mean?
16        A.   What I mentioned earlier, when I was involved
17   in the union and I represented him on one of his
18   transgressions.  I know from reading these documents
19   some of the, I know he had minor incidents with car
20   accidents, written up for car accidents, detail abuse.
21   Q.   Wasn't that when he was a patrolman?
22        A.   Yes.
23   Q.   So you wouldn't consider that, right?
24        A.   No, no.
25   Q.   Did you?

Chief Hugh T. Clements, Jr. - June 10, 2015

99

1     A.  I would consider it overall.  I mean, if

2  somebody had a real bad record as a patrolman, we're

3  certainly looking for more up-to-date current

4  information.

5     I mean, people spend years here.  You know, they

6  may have had something in their past in their jacket,

7  in their 201 file from 10, 12 years ago.  That

8  certainly should be given less weight than where they

9  are now in their career.

10 Q.  You ultimately decided, you made the final call

11 to give Sergeant Mancini a zero, right?

12    A.  Yes, I did.  I do that and I'll say that,

13 you know, and I mean this.  Every decision I make in

14 the department I try to do for the best of the

15 organization, including when people are applying for

16 certain positions within the police department.

17    There may be a vacancy for a detective sergeant,

18 and 11 people put in for it.  In the end, I'm the one

19 who puts them there.  So I take the blame and credit

20 for putting that person there.

21    I hold an extremely high regard on what the

22 supervisors tell me.  In fact, I don't sit on the

23 interview process.  In the end, they forward a name to

24 me.  Since I've been Chief, not one person who has

25 been assigned to one of those preferred units have

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 101 of 265 PageID #:
1237
Chief Hugh T. Clements, Jr. - June 10, 2015

100

1   been picked specifically by me.  They've been

2   recommended to me.  I approve them.  I approve them.

3   I approve them.

4        I'll certainly, if a name came before me that I

5   disapproved of, I would -- but I think it's important

6   for the commanding officers of these respective units

7   to be responsible for who is going to run their units

8   and who they have under their command.  I hold that in

9   very high regard.

10  Q.   I believe you testified that in awarding the

11  service points one of the things you looked at is what

12  someone did previously, what they were awarded on a

13  previous promotional exam for service points, right?

14       A.   Yes.

15  Q.   Did you look into what Mancini was awarded on a

16  previous promotional exam?

17       A.   Yes.

18  Q.   What was he awarded?

19       A.   He was given five points on previous

20  administrations of promotional exams.

21  Q.   On how many of them?

22       A.   A couple.  At least two.  At least two.

23  Q.   When was the most recent one prior to June 16,

24  2012?

25       A.   I believe it was 2010.

Chief Hugh T. Clements, Jr. - June 10, 2015

101

1  Q.   So two years earlier he's a five.  He went from a

2  five to a zero?

3       A.   Correct.

4  Q.   What is your explanation for how he went from a

5  five to a zero in such a short period of time?

6       A.   It's a completely new police administration.

7  There have been conversations for a long time about

8  points being meaningful.  If you look at previous

9  examinations, you'll see the bulk of the list where

10 everybody gets a five.

11      It became a lengthy conversation with the command

12 staff.  This is wrong.  They're service points.

13 They're given at the sole discretion of the Chief.

14 They should be meaningful.  They should be given to

15 people who you want to, or who you believe should be

16 put in those positions, based on their overall

17 performance deserve it.

18      If you look at this particular list of the

19 sixteen people who signed up, almost half did not get

20 five points.  Seven, I believe, did not get five

21 points.  On previous lists for a lieutenant you may

22 see one person who got less than five.

23 Q.   Based on your previous testimony, though, you

24 would have to concede based on these service points

25 that your assessment is that Sergeant Mancini was the

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 103 of 265 PageID #:
1239
Chief Hugh T. Clements, Jr. - June 10, 2015

102

1    worst-performing officer out of these 16?

2         A.   Based on what I heard from my command staff,

3    his most recent supervisors who took part in these

4    conversations on service points were two captains who

5    gave him a two at the end of the day in the final

6    analysis.  His two present supervisors at the time

7    this test was administered -- let me step back.  He

8    was given two points apiece.  He had an opportunity to

9    get ten points, and he got four, which is low.

10        From his new supervisors that were going to be in

11   charge of him, a major and a captain, he was given one

12   out of a total of ten potential points.  A zero and a

13   one.  That's, I mean, I've been in many meetings.

14   That's pretty glaring, and that meant a lot to me.

15   Q.   Doesn't that suggest to you, though, there might

16   be some sort of, they may have had a personal problem

17   with Sergeant Mancini or some sort of animus against

18   him?

19        A.   It would if it were one.  It was present in

20   the conversation around the room.  That's why I think

21   it's important that we have that conversation.  If it

22   were one or two people -- it was me that administered

23   the points.  I hold no animus towards Mark Mancini.

24   When I heard that around the room, it was glaring.

25   Q.   Was there any discussion at this meeting about

Chief Hugh T. Clements, Jr. - June 10, 2015

1  Sergeant Mancini being on IOD status?

2      A.  That didn't come into play.

3  Q.  That's not the question.  Was there any

4  discussion among the people?

5      A.  Not that I recall.  Not that I recall.

6  Q.  Did anybody give Sergeant Mancini a low score,

7  recommend he have a low score because he was on IOD

8  status?

9      A.  Not that I know of.

10  Q.  Who said that Sergeant Mancini was not a team

11  player?

12      A.  Captain Stamatakos and others had mentioned

13  that verbiage.

14  Q.  Did you ask them for specifics?

15      A.  It was part of the conversation.  Again,

16  verbatim, I don't remember exactly what was said.  But

17  by a team player, I mean, we're looking for, as a

18  lieutenant you're an integral part of the operation

19  and directives of the day-to-day operation of a police

20  department.

21      You certainly want people in that role who are

22  going to be positive and not be negative about the

23  command staff and the administration.  Most

24  importantly, I think you want a team player.  That was

25  important to me to hear that, not a team player, from

Chief Hugh T. Clements, Jr. - June 10, 2015

104

1   other people around the room.

2   Q.   I'm not suggesting it's not an important quality.

3   I want to know whether or not someone gave you

4   specific details of why they thought he wasn't a team

5   player, or if it was a general statement not supported

6   by any evidence.

7       A.   Some discussion that he comes into work, does

8   the job and he leaves.  Certainly for, in the

9   decentralized police department we're in now, we're

10  looking for more than that.  We're looking for people

11  that become way more engaged with the work staff, with

12  the community, and to present a positive direction for

13  the people you're going to lead.

14  Q.   Did you review Sergeant Mancini's performance

15  evaluations before you decided to give him a zero?

16      A.   I did.

17  Q.   What did you find in those performance

18  evaluations?

19      A.   Mixed.  Again, you have different raters or

20  evaluators.  Some may be, have a tendency to be more

21  lenient than others.  I've seen that over my career.

22  There are certain bosses on this job, they're just

23  strict, strict raters.  They're real about it.  They

24  say, How can you give that person an excellent or

25  above average?

105

1        So to answer the question, they were mixed.  Some

2   were good.  A lot were, Meets standards, especially in

3   the area of attitude and cooperation.  I remember

4   reading one, everything was, Meets standards.  That's

5   certainly not what we're looking for.

6   Q.    Did you review the performance evaluations of the

7   other 15 candidates that applied for this promotion?

8        A.    I relied predominantly on the conversations

9   between the command staff, so no.

10  Q.    So of the 16 people that applied for this

11  promotional exam on June 16, 2012, Sergeant Mancini

12  was the only candidate you reviewed performance

13  evaluations for?

14       A.    I consider based upon the voices of the

15  command staff.  I did not review his prior to him

16  taking the test.  I did look at it in preparation for

17  this.

18  Q.    In preparation for this deposition?

19       A.    Yes.

20  Q.    So let's make sure we really nail this down.

21  When you decided to give Sergeant Mancini a zero, had

22  you reviewed his performance evaluation prior to

23  making the decision to give him a zero?

24       A.    I considered his performance evaluation based

25  on the command staff around me and was told that it

Chief Hugh T. Clements, Jr. - June 10, 2015

106

1    was average.

2    Q.    That doesn't answer my question.  It's a very

3    specific question.  Did you review his performance

4    evaluations --

5          A.  No, no.

6    Q.    -- before you made the decision to give him a

7    zero?

8          A.  No.

9    Q.    Did you review anyone's performance evaluations

10   before you issued them service points?

11         A.  Review, no.  Considered, yes.

12   Q.    How did you consider the performance evaluations?

13         A.  Based on conversations with members of the

14   command staff.

15   Q.    I'm talking about specific written performance

16   evaluations, right.  How many police officers are

17   under you?

18         A.  450.

19   Q.    You would concede you can't remember each

20   person's performance evaluations, right?

21         A.  Correct.

22   Q.    My question is, once the recommendations were

23   given that he should get these low scores, did you

24   then go to his personnel file and review his

25   performance evaluations?

Chief Hugh T. Clements, Jr. - June 10, 2015

1     A.   No.

2   Q.   Why not?

3     A.   I didn't.

4   Q.   Would you be surprised that his most recent

5   performance evaluations were above average?

6     A.   I can tell you that I reviewed many of the

7   evaluations previously.  I know from certain

8   lieutenants who rated certain people that they would

9   give, they would be more lenient.

10    I know when he, I believe I reviewed his

11   evaluations on a yearly basis as we went along.  I

12   know I signed one of them.  I know I reviewed it,

13   because I signed it.  And I know I reviewed many of

14   them that I didn't sign.  I would sit there

15   painstakingly and review evaluations, but did I review

16   it before the exam, no.

17   Q.   Sounds like what you're saying is all of Sergeant

18   Mancini's good performance evaluations really aren't

19   good; it's just the people that are evaluating him are

20   easy graders and give good performance evaluations?

21         MR. MCHUGH:   Objection as to form.

22    A.   I'm not saying that.  There are certainly

23   discrepancies in certain evaluation forms.  I would

24   attribute that to the raters.  Some are more lenient;

25   some are more strict.

Chief Hugh T. Clements, Jr. - June 10, 2015

108

1  Q.   Based on your discussions with the people at this
2  meeting, you came to the conclusion that Sergeant
3  Mancini was performing the worst of all 16 candidates,
4  right?

5        A.   Yes.

6  Q.   Did you issue him any discipline because it was
7  reported to you that he had a negative attitude, not a
8  team player, and a poor attitude?

9        A.   No.

10  Q.   Why not?

11        A.   I don't think we ever administered discipline
12  to anyone with negative attitude or, or attitude.

13  Q.   What did you say earlier, that a zero constituted
14  what?  You said a five was excellent, outstanding,
15  right?

16        A.   Yes.

17  Q.   What was zero?

18        A.   I believe I said a poor performer.

19             MR. GAGLIARDI:  Can we have that read
20  back, please?

21             (OFF THE RECORD)

22             MR. GAGLIARDI:  Let's go back on the
23  record.  So before we took our break, I asked the
24  court reporter to find in the transcript your
25  testimony.

Chief Hugh T. Clements, Jr. - June 10, 2015

 1                    (PORTION READ BACK)

 2    Q.   So you would agree with me that of the 16 people

 3    that sat for the June 16, 2012 lieutenants promotional

 4    exam that Sergeant Mancini was performing at the

 5    lowest level possible as compared to those other

 6    candidates, correct?

 7                    MR. MCHUGH:  Objection as to form.  You

 8    can answer.

 9         A.   Yes.  I would add, based on the

10    recommendations from the staff.

11    Q.   You gave Sergeant Mancini an F, right?

12                    MR. MCHUGH:  Objection.

13         A.   I gave him a zero.

14    Q.   Sergeant Mancini didn't get promoted?

15         A.   No.

16    Q.   Okay.  Yet he was still supervising police

17    officers, right?

18         A.   Yes.

19    Q.   How many police officers did he have under him?

20         A.   Depending on the day.  Again, going back

21    towards the initial portion, it could be 5, 10 or 15

22    depending on how many districts he was covering.

23    Q.   You chose not to discipline him, even after you

24    learned that he was performing at the lowest level

25    possible, right?

Chief Hugh T. Clements, Jr. - June 10, 2015

110

1        A.  Yes.

2    Q.   You allowed a sergeant with a bad attitude and

3    who was not a team player to go on to supervise 5 to

4    15 employees, right?

5        A.  Yes.

6               MR. GAGLIARDI:  All right.  So by

7    agreement of the parties, we're going to suspend the

8    deposition, because we have people that have to go

9    places.  We're going to reconvene at a later time.

10       I'm also going to ask, Chief Clements, that you

11   locate those documents that we were talking about

12   earlier, which are the notes from the command staff

13   meeting in which the chief points were awarded.  Those

14   would be the notes that several Commanders submitted.

15   Do you have those notes?

16              THE WITNESS:  I do.  I'll turn those over

17   ASAP.

18              MR. GAGLIARDI:  Can we get those

19   tomorrow?

20              THE WITNESS:  Yes.

21              MR. GAGLIARDI:  Great.  That's it.

22              MR. MCHUGH:  Transcript, please.

23              (DEPOSITION SUSPENDED AT 3:25 P.M.)

24

25

111

1                    C-E-R-T-I-F-I-C-A-T-E

2

     I, ELIZABETH GREELEY, a Notary Public, in and for the
3    State of Rhode Island, duly commissioned and qualified
     to administer oaths, do hereby certify that the
4    foregoing Deposition of Chief Hugh T. Clements, Jr.,,
     a Defendant in the above-entitled cause, was taken
5    before me on behalf of the Plaintiff, at the offices
     of Mark Gagliardi, 120 Wayland Avenue, Providence,
6    Rhode Island on June 10, 2015 at 12:00 P.M.; that
     previous to examination of said witness, who was of
7    lawful age, he was first sworn by me and duly
     cautioned to testify to the truth, the whole truth,
8    and nothing but the truth, and that he thereupon
     testified in the foregoing manner as set out in the
9    aforesaid transcript.

10   I further certify that the foregoing Deposition was
     taken down by me in machine shorthand and was later
11   transcribed by computer, and that the foregoing
     Deposition is a true and accurate record of the
12   testimony of said witness.

13   Pursuant to Rules 5(d) and 30(f) of the Federal Rules
     of Civil Procedure, original transcripts shall not be
14   filed in Court; therefore, the original is delivered
     to and retained by Plaintiff's Attorney, Mark
15   Gagliardi.

16

     Reading and singing of the Deposition was waived by
17   the Witness.

18   IN WITNESS WHEREOF, I have hereunto set my hand this
     14th day of June, 2015.

19

20

21

22   _____
     ELIZABETH GREELEY, NOTARY PUBLIC
23   CERTIFIED COURT REPORTER
     MY COMMISSION EXPIRES:  04/07/2018
24

25

Mancini vs
City of Providence

Chief Hugh T. Clements, Jr.
June 10, 2015

## A

**abandoned (1)**
25:19
**abilities (6)**
52:19,21,23;53:23;
76:10;88:20
**ability (7)**
8:20,21;21:18;
74:14,16;76:9;83:9
**able (5)**
7:22;51:6;52:6,18;
89:6
**above (8)**
31:10,21;32:4,6;
38:24;51:14;104:25;
107:5
**above-average (1)**
51:16
**abuse (2)**
32:19;98:20
**abusive (1)**
49:6
**academies (1)**
15:20
**Academy (3)**
15:17,22,24
**Access (6)**
4:17,20,22;41:6,8;
68:9
**accident (1)**
9:3
**accidental (4)**
60:20;61:2,6,13
**accidents (3)**
32:19;98:20,20
**accounts (1)**
32:22
**accurate (2)**
46:6;86:25
**accurately (1)**
41:5
**act (2)**
29:4;30:17
**Acting (2)**
19:11;20:15
**action (2)**
37:13,17
**activities (2)**
39:20;85:5
**activity (1)**
39:25
**acts (4)**
32:17;33:18,25;
35:17
**actual (4)**
4:15;5:23;74:6;
87:13
**actually (5)**
21:3;27:5,20;
38:23;86:12
**add (3)**

**6:8;38:12;109:9**
**added (1)**
75:18
**addendum (1)**
39:4
**addition (3)**
5:2,4,7
**adjudicated (1)**
72:18
**administer (11)**
24:7;26:11,16;
40:1;45:16;69:9,14;
70:23;72:15;91:16;
93:6
**administered (12)**
17:9;25:14;26:5,
24;69:23,25;77:14,
15;78:11;102:7,22;
108:11
**administering (7)**
24:21,25;25:10;
26:20;27:7,12;72:10
**administers (1)**
67:8
**administration (23)**
16:9;28:7;53:7;
55:2,5,13,17;59:21;
61:15,20;66:1,25;
67:6;68:15;69:11,13;
70:7,8;72:19;79:5;
83:3;101:6;103:23
**administrations (4)**
77:16;78:8,14;
100:20
**administrative (7)**
11:13;19:18;31:20;
32:1;41:9,11;87:6
**administrator (1)**
14:20
**admonishment (1)**
32:23
**Affairs (3)**
34:5,7;41:24
**afoot (3)**
23:1;63:16,19
**afternoon (3)**
3:10;37:8;47:12
**again (15)**
12:22;25:17;29:4;
33:17;37:14;46:10;
54:4;65:2;75:7;79:5;
81:20;85:3;103:15;
104:19;109:20
**against (2)**
9:15;102:17
**agencies (1)**
11:14
**agency (10)**
22:13,17,20;25:7;
35:22;38:17;59:20;
67:24;74:10;98:6
**ago (7)**
7:7,9,10;9:2,13;

**10:7;99:7**
**agree (6)**
5:13;76:11;82:17,
23;95:22;109:2
**agreement (3)**
24:1;65:24;110:7
**agrees (1)**
47:5
**allow (1)**
72:16
**allowed (4)**
3:24;5:9;93:4;
110:2
**Almacs (1)**
15:1
**almost (1)**
101:19
**along (4)**
86:6;89:16;92:5;
107:11
**alphabetically (1)**
96:17
**always (6)**
23:14,20;29:14;
32:16;77:13;85:5
**among (1)**
103:4
**amongst (2)**
3:24;58:4
**amount (3)**
61:20;73:5;80:1
**analysis (1)**
102:6
**and/or (1)**
71:10
**and-a-half (1)**
12:6;16:23;42:17
**animus (2)**
102:17,23
**Annie (1)**
87:15
**announce (1)**
67:7
**announced (1)**
19:13
**answered (3)**
5:8;13:6,22
**Anthony (1)**
38:7
**apiece (1)**
102:8
**apologize (1)**
62:11
**applications (1)**
61:2
**applied (5)**
60:19;89:2;97:25;
105:7,10
**applies (1)**
61:6
**apply (1)**
68:23
**applying (11)**

**74:18,19;76:2,4,12,**
**19,24;77:2;78:17;**
**83:22;99:15**
**appointments (1)**
59:10;64:6
**apprised (2)**
35:11;36:25
**approach (1)**
20:7
**appropriate (1)**
6:12
**approval (1)**
46:25
**approve (5)**
35:7;37:12;100:2,
2,3
**approved (2)**
4:1;45:18
**APTT (3)**
6:7,16,16
**arbiter (1)**
71:15
**area (2)**
79:9;105:3
**areas (1)**
18:7
**argue (1)**
32:16
**around (10)**
23:18;25:3;44:18;
64:10;83:11;96:25;
102:20,24;104:1;
105:25
**arrange (2)**
40:4,4
**ASAP (1)**
110:17
**ascend (1)**
75:1
**assess (1)**
25:2
**assessed (1)**
27:15
**assessing (1)**
76:16
**assessment (4)**
44:25;64:11;80:6;
101:25
**assigned (2)**
19:24;99:25
**assignment (4)**
17:1;54:25;55:1,10
**assignments (1)**
11:2
**assist (1)**
13:10
**assistance (1)**
4:23
**Assistant (3)**
6:20,25;87:15
**associate (1)**
6:16
**assume (2)**

**49:9;83:21**
**attained (1)**
15:14
**attempting (1)**
75:1
**attendance (2)**
49:16;54:19
**attends (1)**
38:18
**attention (2)**
34:18;57:14
**attitude (9)**
49:8;97:19,21;
105:3;108:7,8,12,12;
110:2
**Attorney (3)**
4:4;6:16;7:8
**attorneys (5)**
3:24;4:18;7:24;
9:14;10:13,18;11:24
**attribute (1)**
107:24
**authority (2)**
33:15;41:21
**authorized (3)**
34:8,9;41:7
**available (4)**
39:10;40:23,24;
69:3
**average (5)**
51:12,14;104:25;
106:1;107:5
**award (8)**
74:21;76:17,19;
80:14;81:2,5;84:7;
97:24
**awarded (10)**
67:10;69:20;75:12;
77:10;86:7;95:13;
100:12,15,18;110:13
**awarding (3)**
73:3;75:15;100:10
**aware (13)**
9:5;33:22;34:13;
36:12,13,14;42:5;
57:16,19;60:19,22;
98:11,14
**away (2)**
27:6;53:15
**awhile (1)**
42:14

## B

**Bachelor's (1)**
73:8
**back (28)**
18:2,16,17;32:16;
39:9;40:9,10;44:21;
46:2;48:25;49:2;
50:13;51:25;53:20;
55:7;56:15;58:15;
59:11,23;60:11;

63:14;84:5;90:11;
102:7;108:20,22;
109:1,20
**back-and-forth (1)**
58:21
**background (1)**
14:2;33:24
**bad (3)**
13:4;99:2;110:2
**badly (1)**
59:3
**badmouthing (7)**
55:4,12,17;56:2,7,
10,18
**bailout (1)**
17:19
**bargaining (2)**
24:1;65:24
**based (14)**
48:16;78:1,5;
86:24;96:23;101:16,
23,24;102:2;105:14,
24;106:13;108:1;
109:9
**basic (1)**
78:7
**basically (7)**
4:6;17:12;35:15;
39:19;43:15;57:21;
58:25
**basis (4)**
26:20;83:12;85:4;
107:11
**became (16)**
15:6;20:16;21:7,
22;25:13;26:9;50:2,
19;52:9;69:3;77:11,
19;78:23;80:11;96:5;
101:11
**become (11)**
19:8;26:21;33:22;
35:10;36:12,13,14;
57:19;60:22;67:2;
104:11
**becoming (4)**
58:19;59:13,25;
78:19
**began (1)**
27:7
**beginning (3)**
16:3,4;25:16
**behalf (1)**
98:6
**belonged (1)**
52:25
**benefits (5)**
60:20;61:3,6,13,25
**best (4)**
9:3;23:17,21;99:14
**better (1)**
45:19
**Beyond (1)**
9:3

**bid (1)**
67:8
**big (4)**
20:5,6;59:19;86:2
**big-picture (1)**
22:19
**Bill (1)**
38:6
**birth (1)**
14:3
**bit (8)**
18:23;19:5;24:5,5;
25:17;27:22;50:24;
52:15
**black (1)**
77:24
**blame (2)**
55:18;99:19
**blank (4)**
92:2,4,8,13
**blurt (1)**
95:17
**board (10)**
38:13,15,16;57:23,
25;58:3;60:9,11,24;
87:20
**Bob (1)**
38:7
**books (1)**
33:7
**boss (1)**
20:1
**bosses (1)**
104:22
**Boston (1)**
20:24
**both (3)**
16:15;19:24;89:10
**bottom (3)**
25:2;28:8;75:10
**bounced (1)**
25:3
**bound (4)**
23:23,25;48:8,10
**break (1)**
108:23
**BRIEF (1)**
46:1
**briefed (1)**
22:2
**Broadway (1)**
17:13
**broken (1)**
84:3
**brought (1)**
96:2
**BU (1)**
14:8
**building (1)**
37:4
**buildings (1)**
14:21
**bulk (1)**

101:9
**bump (1)**
34:11
**bumped (1)**
31:15
**Bureau (5)**
16:16;17:2,11;
34:6;49:24
**bureaus (2)**
19:20;24:13
**busy (1)**
43:10

---

# C

**Cafe (1)**
22:6
**call (7)**
11:6;14:18;34:16;
38:11,22;44:18;
99:10
**called (3)**
17:3;27:24;39:9
**calls (1)**
68:1
**came (14)**
18:4;25:5;27:8;
36:9;49:23;52:24;
53:20;55:7,14,21;
56:11;77:23;100:4;
108:2
**Campbell (7)**
18:15;20:1;38:7;
85:18;93:24;95:9,10
**can (58)**
8:7;9:11;11:19;
12:21;22:4,14;30:4;
32:13,15;33:14;
34:12,22,24,25;35:5,
7,14;36:1;41:16;
42:23;44:12;46:8,19;
48:23,25;55:3;57:6;
58:17;59:5,8,24;
62:17,24;65:1;70:13;
72:19;75:7,23;77:18;
78:4;81:2,5,19;
82:21;85:15,16;
92:17,17,18;93:5;
95:22;97:7,17;
104:24;107:6;
108:19;109:8;110:18
**candidate (15)**
71:5;74:19;80:1;
82:23,24,25;83:1;
85:11,23;90:16,20;
92:23;95:15;96:12;
105:12
**candidates (15)**
69:12;70:20;71:2;
72:16,21;74:2;85:9;
86:7;92:18;95:16,24;
98:10;105:7;108:3;
109:6

**candidates' (1)**
88:20
**candidate's (1)**
71:21
**capable (1)**
7:21
**capacity (5)**
9:7;16:12;26:10;
52:13,14
**Captain (36)**
18:18;19:19,25;
20:2,21;21:1,14;
29:23,23;31:11,12,
16,17,21;34:2;35:3,7,
9;38:6;45:17;65:19;
78:24,25;79:3;85:7,
20;93:23,23,24;95:6,
8,9,10;97:4;102:11;
103:12
**captains (9)**
27:20;38:6;40:22,
23;45:10;62:18;
65:13;85:17;102:4
**captain's (2)**
31:12,13
**car (5)**
9:3;16:7;32:19;
98:19,20
**career (2)**
99:9;104:21
**carries (1)**
11:10
**carry (1)**
31:13
**case (10)**
4:16,24;5:19;7:7;
9:4;10:24;12:8;
24:15;68:6;80:8
**catch (1)**
43:12
**caution (1)**
10:16
**CBA (7)**
33:9;57:15;61:17;
63:25;64:13;71:20;
75:8
**center (1)**
14:15
**centers (1)**
64:11
**Central (1)**
17:12
**certain (10)**
61:20;71:13;73:4;
80:1,1;99:16;104:22;
107:7,8,23
**certainly (21)**
20:8;21:15;35:8;
40:12,21;41:12;43:4;
46:15;56:17;57:1;
70:14;72:19;76:3;
85:1;99:3,8;100:4;
103:21;104:8;105:5;

107:22
**cetera (3)**
75:18,18,19
**chain (2)**
27:23;28:3
**chance (1)**
88:19
**change (3)**
18:3;62:12;65:18
**changed (2)**
14:21;64:15
**changing (3)**
63:21,23;64:3
**character (1)**
48:11
**charge (11)**
28:23;29:7,15,16,
18;31:24;32:1,2,3;
70:8;102:11
**chart (3)**
28:1;38:14;67:1
**Charter (2)**
33:19;46:10
**CHIEF (106)**
3:2,10,11,15;7:2;
8:24;11:6,8,9;12:23;
18:24,24,25;19:4,5,8,
11,12,14,17;20:3,8,
15,16,17;21:7,8,16,
19,22,23,22;13:22;
24:20;25:13;26:9,21;
27:2;29:5;30:17;
32:5,6,7,8,8;33:17,
21;35:10;36:7,21;
37:12;38:3;40:15,19,
22;42:9,12,15;43:9;
44:10;46:3;47:3;
50:2;56:18,19;63:9,
15;65:21;72:7;73:12;
74:5;75:12,14;77:23;
78:20,23;79:7,12,13,
19,21,23;80:8,11,12,
13,14,17,17,20;81:6;
85:17,24;86:7;91:9;
92:19,25;94:20,21;
96:7;98:5,6;99:24;
101:13;110:10,13
**chiefs (1)**
18:7
**Chief's (1)**
53:7
**choose (1)**
92:18
**chose (2)**
21:15;109:23
**chosen (5)**
16:10,25;18:8;
19:14;29:12
**circumstances (2)**
68:18;71:18
**citizen's (2)**
49:9;54:12
**City (25)**

6:20,21,24;9:9,25;
10:5;11:15;12:14,19;
13:7,10,15,21;16:7;
20:9,11,18,21;22:18;
24:1;29:15,17,19;
33:18;86:18
**City's (2)**
5:16;9:14
**civil (1)**
9:15
**claim (1)**
57:9
**clarity (1)**
5:19
**clear (1)**
23:4
**CLEMENTS (16)**
3:2,7,10,11;6:22;
7:2,3;37:12;43:8;
46:3;47:3;65:21;
82:3,12;88:24;
110:10
**C-L-E-M-E-N-T-S (1)**
3:8
**closed (1)**
11:1
**closely (1)**
20:1
**closer (1)**
85:4
**coined (1)**
22:14
**collect (1)**
13:19
**collecting (1)**
12:15
**collective (2)**
24:1;65:24
**Collucci (2)**
7:9;9:14
**Colon (7)**
38:4;41:10;42:7;
85:17;93:23;95:4;
97:14
**Colonel (18)**
3:11,13,14,15;
6:21;7:3;18:4;19:1,
22;23:15;26:18;
55:20;77:19,22,23;
78:12,18;94:9
**coming (4)**
10:25;11:22;56:20;
98:2
**command (48)**
10:14;11:10;19:23;
23:15;25:3;27:23;
28:3;30:14;34:11;
37:3,20,22;38:23,24;
41:10,23;43:6,18;
45:3,6,8,9;57:21;
62:19;73:18;74:5;
76:23;77:7;81:23;
83:8;84:7;88:17;

90:13;92:4,16,19;
96:6,9,24;100:8;
101:11;102:2;
103:23;105:9,15,25;
106:14;110:12
**Commander (21)**
10:15;11:7,16;
18:10,11;19:21;29:7,
22;30:18;32:5,6;
36:22;55:20;79:6,8;
89:13;91:13;93:10,
22;95:21;98:4
**commanders (7)**
18:6;28:25;29:13,
17,20,25;110:14
**commanding (2)**
24:12;100:6
**commands (1)**
68:2
**COMMENCED (1)**
3:1
**commendation (4)**
35:18;75:17,24,24
**comments (1)**
58:9
**Commissioner (6)**
33:20;46:6,12,14,
24;47:4
**committees (2)**
64:14;65:2
**communicate (3)**
36:19;43:5;63:6
**communicated (1)**
63:10
**communication (2)**
11:21;68:10
**community (6)**
11:15;32:20;39:24;
48:17;49:7;104:12
**company (2)**
67:8;70:23
**compare (1)**
32:17
**compared (2)**
23:17;109:5
**compel (1)**
4:10
**compilations (1)**
4:20
**compile (1)**
69:11
**compiled (2)**
88:4;92:11
**compiling (1)**
43:13
**complain (1)**
56:12
**complaint (3)**
47:13,14;71:6
**completed (3)**
11:3;24:12;25:6
**completely (1)**
101:6

**complicated (1)**
64:11
**complies (1)**
5:3
**comport (1)**
74:1
**comports (1)**
87:24
**comprised (1)**
71:24
**concede (2)**
101:24;106:19
**concern (1)**
64:21
**concerned (1)**
28:5
**concerns (1)**
3:21
**conclusion (1)**
108:2
**condition (1)**
8:20
**conduct (2)**
49:12;54:15
**conducting (1)**
91:11
**conference (2)**
43:15;57:22
**consider (2)**
56:16,23;98:23;
99:1;105:14;106:12
**consideration (1)**
75:14
**considered (3)**
95:25;105:24;
106:11
**considering (1)**
74:22
**consist (1)**
75:11
**consistent (1)**
32:15
**constant (1)**
62:20
**constituted (1)**
108:13
**constitutes (1)**
56:13
**contain (1)**
4:20
**contention (1)**
96:6
**continued (1)**
58:25
**contract (7)**
17:19;23:23,25;
69:23;77:12,13;
80:20
**conversation (16)**
10:17,22;25:17;
36:9;43:17;62:21;
81:21;85:6;92:24;
97:9,19,22;101:11;

102:20,21;103:15
**conversations (9)**
23:14;63:20,21;
78:13;84:20;101:7;
102:4;105:8;106:13
**cooperation (1)**
105:3
**coordination (1)**
11:14
**copy (3)**
4:14;37:17,21
**corner (1)**
88:7
**correctional (2)**
14:15,17
**correspondence (1)**
84:22
**Costa (2)**
39:6,22
**counsel (2)**
4:22;5:1
**counting (1)**
71:17
**countless (1)**
19:23
**country (1)**
64:10
**couple (6)**
16:8;18:9;43:12;
61:7;94:5;100:22
**course (2)**
28:18;43:19
**court (8)**
3:23;4:2,6;7:16,21;
10:4;47:15;108:24
**cover (4)**
4:25;28:19;76:6;
87:5
**covered (3)**
33:19;57:14;64:13
**covering (1)**
109:22
**Cranston (1)**
17:14
**created (1)**
87:25
**credit (1)**
99:19
**crime (6)**
30:9,21;39:19,20,
24;44:15
**critique (1)**
44:25
**crossed (1)**
86:5
**current (9)**
11:5;74:13,14;
75:4,22;76:15,25;
77:1;99:3
**currently (1)**
24:7

**D**

**daily (2)**
83:12;85:4
**data (1)**
76:15
**date (9)**
14:3;51:24;67:13;
68:13;69:8,10;90:7,
10,11
**David (1)**
38:5
**day (13)**
11:4;21:19;28:18,
21,22;32:24;43:8,9,
13,19;84:12;102:5;
109:20
**days (4)**
29:5,20;32:24;
46:20
**day-to-day (3)**
46:12,22;103:19
**deadline (3)**
68:15,25;69:22
**deadlines (1)**
39:11
**Dean (1)**
19:22
**December (1)**
19:13
**Decent (1)**
51:11
**decentralized (5)**
18:5;20:7;29:8,11;
104:9
**decided (3)**
99:10;104:15;
105:21
**decides (1)**
66:15
**deciding (1)**
76:17
**decision (8)**
46:5,13;48:16;
55:25;66:22;99:13;
105:23;106:6
**decisions (2)**
22:15;98:6
**deeds (1)**
35:17
**deemed (2)**
4:24;68:16
**deems (1)**
4:22
**defendant (2)**
9:1,21
**Defendants (2)**
4:1;7:1
**Defendants' (3)**
5:1,17;6:10
**Defendant's (2)**
5:23;86:15

**degree (2)**
14:8;73:8
**DEM (1)**
15:10
**demotion (3)**
33:1,1;46:21
**department (69)**
3:15,23;6:19;7:2;
8:17;9:9,16,24;11:8,
12;12:25;13:12,18;
14:10,13;15:10;16:2;
18:4,5;19:11;20:4;
21:2;22:23;23:12;
24:6;25:10,14;26:5,
23;27:10,24;28:4;
29:9;30:15;32:10;
33:6,11,16,22,23,25;
35:1,19;38:15;40:1;
41:25;48:17;61:12;
63:10,17;65:3,11;
66:15,19,20;67:19;
68:10;70:3,5,23;
72:25;77:21;86:2,3;
88:18;99:14,16;
103:20;104:9
**departments (2)**
23:21;64:10
**department's (1)**
37:11
**depending (4)**
23:23;27:14;
109:20,22
**deposed (1)**
7:3
**deposes (1)**
3:3
**DEPOSITION (16)**
3:1,16,20;5:6,10;
10:24;11:22,25,25;
47:8,25;48:4;61:23;
105:18;110:8,23
**Deputy (18)**
11:6,8,9;18:24,25;
21:16;23:5;32:5,6,8;
36:21;38:3;40:22;
56:19;85:16;91:9;
92:19;94:20
**describe (2)**
32:13;57:6
**deserve (1)**
101:17
**deserving (1)**
80:7
**desired (1)**
27:2
**detail (1)**
98:20
**details (1)**
104:4
**detective (8)**
17:7,7,21,25;66:12,
21;68:21;99:17
**detectives (13)**

17:6,18,20,21;
18:15,16,17,19,22;
19:19;20:2;50:13;
65:12
**determination (5)**
71:15,16;92:25;
93:5;96:23
**difference (6)**
20:5,6;29:6;30:11,
15;80:24
**different (24)**
8:4;20:3;30:5;
54:25;64:4;65:4,11,
15;67:18,18;75:20;
76:5;77:5,15,15;78:9,
11;80:4;81:20,21,24;
91:12;98:1;104:19
**differently (2)**
8:6;63:17
**difficult (3)**
20:10;22:12,16
**direct (3)**
61:21;88:19;90:5
**directed (2)**
61:12,16
**direction (3)**
8:3,4;104:12
**directives (1)**
103:19
**directly (5)**
19:21;32:7;45:1;
85:22;89:24
**disability (6)**
60:20;61:2,6,13,
25;62:7
**disagree (1)**
80:5
**disagreed (3)**
79:22,25;80:2
**disapproved (1)**
100:5
**disciplinary (1)**
37:16
**discipline (31)**
31:14;32:11,16,18,
23;33:5,14,15,18;
34:1,9,10,12;35:20;
37:13;43:2;46:5,11,
12,14,18,19;47:1,24;
54:6,8;57:2;98:8;
108:6,11;109:23
**disciplined (1)**
33:23
**discovery (4)**
12:7,11;86:17;94:7
**discrepancies (1)**
107:23
**discretion (6)**
73:3,9,13;75:13;
80:20;101:13
**discretionary (1)**
92:25
**discuss (19)**

10:12;23:20;24:20;
39:2,8,19,24;40:5,14;
58:1;73:18;74:5;
80:14;83:15,18;84:7;
90:14;92:17;96:13
**discussed (4)**
40:2,5;72:11;88:13
**discussion (15)**
3:21;22:25;39:3;
84:19;85:13;90:16;
95:12,15,17;96:15,
20,23;102:25;103:4;
104:7
**discussions (8)**
11:16;23:11;24:24;
38:9;58:4;62:15,18;
108:1
**disparaging (1)**
58:9
**dispute (2)**
52:25;53:4
**disputes (1)**
71:12
**disrespectful (2)**
49:6;55:2
**disseminated (1)**
67:24
**district (20)**
18:6,8,10,11,11;
20:7;28:16,18,25;
29:2,4,7,12,20,24;
30:7,18;79:6,8;98:4
**districts (2)**
27:18;109:22
**division (23)**
16:8,15;17:1,11;
18:22;27:21;31:1,17;
32:2,2,3;34:3,5,6;
41:9,11;42:4;49:24;
50:20,21;51:22;
52:10,24
**division/unit (1)**
57:24
**divisions (5)**
11:12;24:13;31:25;
35:4;62:19
**divulge (1)**
10:16
**DMS (1)**
67:25
**document (14)**
4:5;5:20,21;13:14,
20;25:5;34:19;35:12;
86:17,20,24,25;
87:18,25
**documentation (3)**
45:22;59:12;85:8
**documents (19)**
4:13,24;12:12,14,
15,16;13:15,19,21,
25;24:14;35:16,19;
43:14;47:8,19;68:4;
98:18;110:11

**done (11)**
13:17;25:25;26:19;
27:5,6;35:2;69:16;
79:1,4;84:15;91:12
**door (3)**
11:1;37:5;93:9
**down (6)**
21:23;39:15;91:16;
96:14,17;105:20
**downtown (1)**
17:13
**driving (1)**
31:5
**due (1)**
17:19
**duly (1)**
3:3
**during (16)**
9:21;24:21;26:8,
14,25;28:18;43:18;
52:1;57:22;79:12,14,
17;84:11,13;86:17;
94:7
**duties (7)**
7:8;11:9;30:1,22;
53:23;57:8;83:9
**duty (7)**
9:21;30:2,8;57:5,
10;61:19;94:13

## E

**earlier (9)**
24:22;63:14;73:15;
83:7;89:9;98:16;
101:1;108:13;110:12
**easy (2)**
32:16;107:20
**education (5)**
14:7;69:11;72:3,
21;73:7
**educational (1)**
69:19
**effect (5)**
24:17;25:21;55:4;
60:17;80:5
**eight (3)**
67:17;79:10,12
**eight-man (1)**
16:11
**either (4)**
4:1;29:10;73:4;
80:10
**eligible (3)**
68:17,18;69:5
**Elizabeth (1)**
7:15
**else (1)**
48:19
**e-mail (6)**
5:21;36:23;37:2;
43:6;63:6,11
**e-mails (1)**

43:12
**employee (6)**
9:8;27:14;35:21;
41:22;57:13;76:24
**employees (6)**
17:19;39:15;57:23;
58:2;85:3;110:4
**employment (2)**
16:1;26:15
**end (10)**
22:15,19;24:12;
26:6;28:17;64:7;
91:24;99:18,23;
102:5
**ended (1)**
21:3
**enforcement (2)**
15:13;33:8
**engaged (3)**
54:15;56:9;104:11
**engaging (1)**
54:21
**enough (2)**
43:23;52:6
**ensues (1)**
90:16
**entails (1)**
74:9
**entire (4)**
20:9;29:19;31:17
**entities (1)**
70:10
**entitled (1)**
86:18
**Environmental (1)**
15:11
**equivalent (2)**
82:18,18
**erased (1)**
71:13
**erasure (1)**
71:11
**especially (1)**
105:2
**essence (3)**
29:1;98:1,3
**Esserman (27)**
18:4;19:1,4,5,22;
21:9,23;22:22;23:5,9,
15;24:20;26:18;27:2;
53:9;63:16;77:19,22,
23;78:12,18;79:7,12,
21;80:8,12,13
**et (3)**
75:18,18,19
**ethically (2)**
48:8,10
**evaluate (2)**
44:22;45:20
**evaluating (2)**
75:4;107:19
**evaluation (11)**
24:11;25:2,7,19,

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 117 of 265 PageID #:
1253

Mancini  vs
City of Providence

Chief Hugh T. Clements, Jr.
June 10, 2015

20;27:12;37:1;45:16;
105:22,24;107:23
**evaluations (33)**
24:7,16,21,25;
25:11,15,25;26:3,5,
11,16,24;45:2,5,12;
47:24;48:2;104:15,
18;105:6,13;106:4,9,
12,16,20,25;107:5,7,
11,15,18,20
**evaluators (1)**
104:20
**even (7)**
10:23;23:21;29:22;
64:13;87:13;96:7;
109:23
**event (3)**
5:13;43:15;94:15
**events (1)**
39:24
**eventually (2)**
32:25;91:16
**everybody (8)**
6:13;15:22;37:4;
86:5,6;89:20;96:5;
101:10
**everyone (4)**
45:7;92:3;96:7;
97:12
**everyone's (1)**
77:5
**evidence (1)**
104:6
**exactly (7)**
22:8;41:4;49:22;
56:5;84:12;88:15;
103:16
**exam (51)**
64:20,23,23;65:5;
67:9,13,16,20;68:12,
19;69:5,16,18,21,24;
70:18,19,21,24;71:3,
22;72:13,23;73:22,
25;74:1,4,7;83:22,25;
84:2,6,8,13,15,16;
85:14;86:8,9,19;
90:25;91:19;92:12;
93:18,21;95:14;
100:13,16;105:11;
107:16;109:4
**EXAMINATION (4)**
3:9;75:10;76:6,7
**examinations (1)**
101:9
**example (1)**
70:13
**exams (7)**
40:2;63:13;66:2;
78:17;79:14,17;
100:20
**Excel (1)**
88:1
**excellent (3)**

82:7;104:24;
108:14
**except (4)**
4:20;15:22;45:7;
92:7
**exception (1)**
4:22
**excerpted (1)**
65:23
**Executive (3)**
20:22;87:15,20
**EXHIBIT (8)**
5:17;6:10;65:20,
22;86:15,16;88:1;
92:7
**expand (1)**
46:8
**expect (1)**
59:22
**expectations (2)**
54:1;89:10
**expenditures (1)**
39:10
**experience (2)**
48:22;55:25
**experts (1)**
4:18
**explain (4)**
7:13;33:25;35:14;
66:14
**explanation (1)**
101:4
**express (9)**
58:12,22,25;59:15;
60:2,12,15;62:22;
90:19
**expressed (1)**
59:8
**extra (1)**
75:19
**extremely (2)**
43:10;99:21
**eyes (2)**
83:3,4

**F**

**fact (2)**
78:10;99:22
**facts (1)**
53:14
**fair (2)**
56:20;80:23
**faith (1)**
59:17
**fall (1)**
22:15
**falls (1)**
70:9
**familiar (2)**
14:19;66:6
**fancy (2)**
35:23;36:1

**far (7)**
40:6;45:7;46:21;
64:7;72:21;77:5;97:7
**fax (9)**
70:1,1;86:22;87:5,
7,9,10,13,16
**faxed (3)**
87:17,19;90:11
**faxes (1)**
87:15
**Federal (3)**
4:6;10:4;47:15
**feel (3)**
65:8;77:17;92:22
**feels (1)**
74:10
**felt (3)**
25:1,7;27:8
**few (2)**
3:20;46:3
**field (4)**
31:4;43:21;44:8;
48:16
**fifteen (1)**
28:19
**file (24)**
35:13,13,14,15,24;
41:14,22;42:9,12,19,
24;47:21;57:9;61:21,
24;62:10;64:19;
67:11,19,22;68:11;
71:8;99:7;106:24
**filed (3)**
4:11;9:15;47:15
**files (5)**
36:15;40:25;41:6,
8;43:1
**fill (5)**
57:9;85:10;90:9,
10;91:2
**filled (4)**
88:3;90:12;92:15;
93:20
**filled-in (2)**
93:18,20
**filled-out (1)**
97:1
**filling (1)**
91:5
**final (7)**
33:18;46:25;72:17,
24;73:1;99:10;102:5
**finance (1)**
39:5
**finances (1)**
39:9
**financial (1)**
39:12
**find (3)**
34:1;104:17;
108:24
**fine (3)**
3:12,15;6:8

**first (9)**
12:21;15:2,3,4;
27:8;39:13;49:21,23;
92:7
**fit (1)**
77:3
**five (32)**
15:13;28:16;29:20;
43:19;72:3,5,7;73:8;
77:6;81:4,7,14,16;
82:4,17;95:19,19,19,
20,22,23;96:5,7;
100:19;101:1,2,5,10,
20,20,22;108:14
**flagship (1)**
21:5
**flexible (2)**
29:13,25
**folks (5)**
28:6;53:18;58:4;
85:25;97:13
**follow (3)**
12:21;44:19;71:7
**followed (1)**
61:17
**following (1)**
49:6
**follows (1)**
3:4
**follow-up (3)**
46:3;47:7;84:22
**foot (1)**
16:7
**FOP (2)**
69:23,25
**force (5)**
9:13;10:9;16:9,17,
21
**forget (1)**
79:1
**forgetting (1)**
38:8
**form (19)**
5:21;11:18;20:13;
23:3;24:11;25:8,19,
20;30:3,35:25;41:15;
44:11;59:4;78:3;
81:18;82:20;97:16;
107:21;109:7
**formal (6)**
17:5;24:11;25:5;
35:12;37:24;95:18
**formally (7)**
19:11;27:7;37:23,
25;71:8;72:17;94:19
**former (1)**
55:10
**forms (2)**
97:2;107:23
**formulate (4)**
51:6;52:6,18;89:6
**formulating (1)**
13:10

**forth (3)**
32:17;33:9;58:15
**Forum (1)**
20:22
**forward (6)**
22:21;34:4;69:13;
70:11;92:18;99:23
**forwarded (3)**
34:7;35:13;57:12
**Four (9)**
8:7;27:20;28:16;
29:20,24;31:25;
37:23;81:14;102:9
**frame (4)**
20:14;23:4;74:2;
87:24
**Frank (1)**
38:4
**Fraternal (1)**
87:19
**Friday (1)**
84:15
**front (4)**
87:14;88:1;91:9;
97:8
**frustrated (8)**
58:20;59:13,25;
62:4,6,25;63:2,4
**frustration (5)**
58:12;59:1,8;60:2;
62:23
**frustrations (1)**
56:21
**full-time (3)**
15:2,3,14
**fully (1)**
72:18
**function (1)**
11:11
**functions (1)**
19:18
**further (4)**
96:13,20,23,24

**G**

**GAGLIARDI (23)**
3:9,19;4:4;5:3,13;
6:4,11,14;40:20;
41:20;44:14;63:3;
78:19;82:6;86:14;
87:12;94:6,11;
108:19,22;110:6,18,
21
**gave (7)**
11:2;15:12;79:25;
102:5;104:3;109:11,
13
**general (9)**
10:22;11:2;49:4;
67:21,21,22;73:1;
79:24;104:5
**Generally (2)**

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 118 of 265 PageID #:
1254

Mancini  vs
City of Providence

Chief Hugh T. Clements, Jr.
June 10, 2015

49:8;51:8
**George (2)**
38:8;97:20
**gets (6)**
45:7;81:16;82:4,
11;96:5;101:10
**Gina (2)**
39:6,22
**given (14)**
69:8,16;70:18,19,
20;71:5;91:22;99:8;
100:19;101:13,14;
102:8,11;106:23
**gives (1)**
91:2
**giving (2)**
80:3,3
**glaring (2)**
102:14,24
**global (1)**
31:18
**global-type (1)**
23:18
**glowing (1)**
97:10
**goes (3)**
6:3;15:22;97:22
**Good (12)**
3:10;35:17;37:7,7;
48:7;52:23;59:17;
88:18;105:2;107:18,
19,20
**governed (1)**
63:25
**governing (1)**
66:1
**Government (4)**
20:25;21:4,5,6
**grade (3)**
16:5,18;82:19
**graders (1)**
107:20
**graduate (1)**
15:16
**grant (1)**
39:10
**Great (1)**
110:21
**Grenada (28)**
12:24;36:18;38:13,
17;39:13,22;41:2,7,8;
58:14,22;60:2,12,15,
23;61:1,14,24,25;
62:1,4,11,22;63:5;
70:10;88:4;90:23;
92:10
**Grenada's (1)**
58:1
**grievance (5)**
71:7,8,9,19;72:16
**guess (1)**
8:11
**guy (1)**

23:18

**H**

**half (1)**
101:19
**hall (1)**
70:3
**hand (1)**
93:9
**handed (2)**
65:21;86:16
**handle (1)**
34:3
**handled (1)**
34:5
**handpick (1)**
64:6
**hand-picked (1)**
16:10
**handwriting (3)**
88:4,6,9
**happen (3)**
7:14;27:3;61:5;
72:12;95:23
**happened (1)**
19:4
**happening (1)**
30:21
**happens (8)**
57:11;67:5;68:13,
24;69:7;70:18;71:4;
92:15
**happy (3)**
53:18,21;55:24
**hard (2)**
80:6;87:8
**Hardly (1)**
44:1
**Hartford (2)**
17:14;18:9
**Harvard (2)**
20:24;21:5
**head (2)**
7:20;38:19
**hear (2)**
8:1;103:25
**heard (2)**
102:2,24
**heavily (2)**
44:25;83:7
**heavy (3)**
46:11,18;47:1
**held (1)**
16:3
**Hey (1)**
21:24
**high (4)**
64:21;80:9;99:21;
100:9
**higher (5)**
35:9;75:2;82:24,
25;83:1

**highest (3)**
14:7;81:5;82:8
**hires (1)**
70:23
**hold (5)**
51:23;73:16;99:21;
100:8;102:23
**Homeland (6)**
18:22;19:20;50:20;
51:21;52:10;54:23
**honestly (1)**
59:24
**hopefully (1)**
37:9
**hour (3)**
12:6,6;83:17
**hours (5)**
29:10,13,25;43:11;
87:9
**huge (1)**
17:18
**HUGH (7)**
3:2,7;7:1;43:8;
82:3,12;88:24
**HUGHES (2)**
6:23,23
**Human (8)**
12:25;13:18;36:17;
37:19;38:19;57:13;
59:12;66:19

**I**

**ID (4)**
5:17;6:10;65:20;
86:15
**identical (1)**
92:6
**identified (1)**
69:10
**identifiers (1)**
4:25
**identify (1)**
38:16
**identifying (1)**
58:15
**impact (1)**
8:20
**important (10)**
25:1;27:9;59:21;
65:6;76:22;96:9;
100:5;102:21;
103:25;104:2
**importantly (1)**
103:24
**impose (2)**
31:14;34:12
**imposition (1)**
33:3
**incidents (1)**
98:19
**include (3)**
66:11;73:2;75:23

**including (2)**
75:16;99:15
**incorrectly (1)**
63:18
**increasingly (2)**
58:20;59:13
**indicated (2)**
59:7;71:12
**indicating (1)**
73:1
**individual (5)**
4:21;9:21;41:18;
45:23;74:10
**individually (2)**
9:4,17
**individuals (1)**
55:19
**individual's (1)**
35:16
**ineffective (1)**
25:8
**ineligible (1)**
81:10
**inequities (1)**
25:18
**influence (2)**
31:19;96:24
**inform (1)**
11:22
**informally (2)**
34:12,14
**information (8)**
3:25;4:21;14:2;
35:20;42:6;70:11;
87:7;99:4
**informed (1)**
73:25
**initial (2)**
96:18;109:21
**Injured (4)**
57:5,7,10;59:2
**injury (3)**
60:13,13,17
**instruct (1)**
7:24
**instructed (1)**
62:10
**insubordinate (2)**
55:1;56:18
**Insubordination (6)**
49:14;54:22;56:10,
13,16,23
**integral (1)**
103:18
**intention (1)**
26:4
**interact (1)**
52:1
**interest (1)**
15:12
**interested (2)**
10:18;72:10
**interim (1)**

21:22
**intern (1)**
6:23
**Internal (3)**
34:5,7;41:24
**interpret (1)**
75:21
**interpretation (1)**
71:10
**interpretations (1)**
75:21
**interrogatories (8)**
12:13;13:2,5,8,11,
23;47:13,17
**interview (3)**
19:13;21:16;99:23
**into (11)**
22:7;25:21;30:14,
14;37:6;52:24;75:14;
84:4;100:15;103:2;
104:7
**intranet (1)**
68:9
**intranet-powered (1)**
67:25
**introduce (1)**
6:13
**Investigations (1)**
17:2
**investigative (3)**
11:13;31:19;32:3
**involved (13)**
27:21;28:22;35:3;
44:20;46:13;50:19;
53:5;64:13;66:15;
77:19;98:12,15,16
**involves (1)**
30:13
**IOD (24)**
12:18;39:16;57:4,
16,19,24;58:2,6,7,10,
13;59:1;60:3,25;
62:5,16,20,23;63:1,7,
11;69:4;103:1,7
**Island (5)**
14:14;15:7,21,21;
64:5
**issue (8)**
34:8,9,14,22,25;
35:5;54:8;108:6
**issued (7)**
4:10;36:5,11;37:1;
47:1;78:9;106:10
**issues (1)**
5:19

**J**

**jacket (1)**
99:6
**January (3)**
15:24;20:16;25:13
**Jeff (1)**

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 119 of 265 PageID #:
1255

Mancini  vs
City of Providence

Chief Hugh T. Clements, Jr.
June 10, 2015

6:16
**Jennewa (1)**
   6:23
**job (38)**
   11:9;15:2,3,4,9,14;
   18:14;19:7,16;20:3,9,
   19;22:1,13;23:16;
   30:1,5,8,22;54:15;
   59:14;70:5;72:1;
   73:4;74:13,14,15,17,
   20;75:4,22;76:1,25;
   77:1,2;83:9;104:8,22
**jobs (4)**
   15:1,5;16:14;44:24
**Joe (2)**
   7:8;9:14
**JPW (1)**
   14:18
**JR (5)**
   3:2,7;82:3,12;
   88:24
**Judge (2)**
   4:9;81:22
**judgment (3)**
   9:25;10:3,5
**June (14)**
   19:10,10;73:21;
   84:5;85:14;86:19;
   87:8,22;90:6,11;
   95:14;100:23;
   105:11;109:3
**junior (1)**
   28:11

## K

**Kate (2)**
   6:21;47:11
**keep (8)**
   35:15;37:21;38:13;
   45:22;91:6,7,10;
   93:15
**keeps (1)**
   41:4
**Kennedy (5)**
   19:22;20:24;21:4,
   6;55:20
**kept (1)**
   91:7
**Kevin (4)**
   4:2;7:1;47:11;94:6
**Kind (2)**
   18:16;23:18
**knee (2)**
   60:13,17
**knew (3)**
   77:13,14;89:21
**knowing (2)**
   10:18;72:10
**knowledge (6)**
   24:18;49:5;53:13;
   60:5;78:12;88:20
**known (1)**

49:25
**knows (1)**
   86:5

## L

**lack (1)**
   49:4
**Lake (2)**
   17:14;18:9
**lap (1)**
   22:16
**Lapatin (4)**
   38:5;85:18;93:23;
   95:8
**large (1)**
   22:13;29:14;33:25
**Last (14)**
   8:10;10:20;25:22;
   42:11,23;44:8;69:1;
   78:22;83:16;87:1;
   91:19,22;94:5,17
**late (4)**
   10:8;17:6;19:10,12
**later (4)**
   21:3;24:5;50:17;
   110:9
**law (2)**
   15:12;33:7
**lawsuit (6)**
   8:23;9:1,23;10:12,
   21;11:17
**lead (1)**
   104:13
**leaders (1)**
   21:5
**leadership (5)**
   18:3;20:21,23;
   21:18;33:7
**learn (6)**
   19:16;20:19;21:25;
   33:4;77:9,23
**learned (1)**
   109:24
**learning (1)**
   21:9
**least (6)**
   23:1;51:12;76:11;
   89:9;100:22,22
**leave (7)**
   8:7,8,9;39:18,22;
   53:15;55:7
**leaves (1)**
   104:8
**led (1)**
   22:7
**left (6)**
   17:19,20;19:5;
   22:4;39:5;92:13
**legal (1)**
   6:23
**legitimate (1)**
   54:1

**length (3)**
   10:15;21:19;71:25
**lengthy (4)**
   32:24;46:20;47:1;
   101:11
**lenient (4)**
   81:23;104:21;
   107:9,24
**Lepre (5)**
   38:7;85:18;93:24;
   95:6;97:14
**less (5)**
   42:21;76:20;95:22;
   99:8;101:22
**letter (1)**
   71:13
**letters (6)**
   75:17,17,23,23,24,
   25
**level (18)**
   14:7;28:12;30:6,
   15;34:13;56:25;
   65:18;71:18;72:3,5;
   73:7;77:5;82:8,14,
   15;83:1;109:5,24
**Lieutenant (36)**
   18:10,15,18;19:25;
   20:2,5,6;26:10;27:17,
   18;28:22;29:6,22;
   31:10;34:2;35:9;
   45:15;65:7,19;66:9,
   17;68:23;69:1;70:8,
   14;74:23,25;76:8,9,
   13;79:2,3;85:6;
   97:24;101:21;103:18
**lieutenants (29)**
   18:1,6;28:24,25;
   29:1,4,9,12,16,18;
   30:20,20;31:2,4,15;
   35:5;40:24;45:12;
   65:12,16;73:22;84:1,
   6;85:14,19,20;86:18;
   107:8;109:3
**lieutenant's (3)**
   30:12,13;74:20
**life (2)**
   8:25;43:8
**light (1)**
   61:19
**limited (3)**
   4:16,17;75:17
**line (3)**
   9:21;67:12;86:6
**list (22)**
   13:5;17:10;18:1;
   38:14;49:10;67:3;
   68:16;69:2,13;72:14,
   17,24;73:1;85:9;
   88:5,23;91:17;92:11,
   19;96:17;101:9,18
**lists (1)**
   101:21
**little (12)**

7:12;12:5;17:3;
   18:3,23;19:5;24:5,5;
   27:22;33:24;50:24;
   52:15
**live-in (1)**
   20:25
**lobby (1)**
   85:2
**local (1)**
   21:4
**locate (1)**
   110:11
**log (1)**
   42:2
**lonely (1)**
   22:14
**long (23)**
   10:7;12:4;14:23;
   16:18,22;17:16,22;
   24:17;25:9;39:16,17;
   42:13;44:6;49:25;
   50:11,22;58:24;
   59:23;60:16;79:7;
   83:15;89:20;101:7
**longer (3)**
   18:23;83:22;84:1
**long-term (1)**
   62:20
**look (16)**
   13:24;22:20;37:8;
   41:21;60:10;76:13;
   80:6;87:1,7;94:4,16,
   17;100:15;101:8,18;
   105:16
**looked (2)**
   94:3;100:11
**looking (7)**
   76:3,22;99:3;
   103:17;104:10,10;
   105:5
**looks (4)**
   87:8,17;88:1,6
**lot (7)**
   6:11;24:15;43:17;
   59:11;64:9;102:14;
   105:2
**low (8)**
   21:14;80:9;82:13;
   98:13;102:9;103:6,7;
   106:23
**lower (2)**
   83:2;88:6
**lowest (4)**
   81:8;82:15;109:5,
   24
**lunch (3)**
   22:5,6,7

## M

**machine (2)**
   87:14,16
**Magistrate (1)**

4:9
**magnet (1)**
   38:16
**mailbox (2)**
   37:2;68:3
**main (1)**
   30:15
**mainly (2)**
   13:17;30:23
**maintain (3)**
   37:17;45:23;67:3
**maintained (2)**
   36:16;41:1
**major (41)**
   11:12;18:15,21;
   19:24,24;20:1;21:14;
   31:22,24;32:1,4;
   35:7;38:4,4,5;41:10;
   42:7;43:19;45:17,18;
   46:13,18;50:19,23;
   51:21;52:9,14;53:24;
   54:5;62:13,14,15;
   70:7,9;93:22,22,23;
   94:25;95:2,4;102:11
**majors (8)**
   27:20;35:3;38:3,
   24;40:22;45:9;62:18;
   85:17
**maker (2)**
   71:16;72:13
**makes (2)**
   66:22;85:24
**making (3)**
   22:15;98:5;105:23
**malfeasance (1)**
   32:17
**malingering (1)**
   58:24
**Management (1)**
   15:11
**Mancini (66)**
   4:1,19;5:8,9;6:15,
   18,18;10:24;12:13;
   48:2;49:20;50:9,16;
   52:1,11;53:6,10,16;
   54:12,14,21;55:9,12;
   57:16;58:6,9,20,23;
   59:2,16;60:1,4,16,19;
   61:12,23;62:5,10,23;
   73:25;88:25;89:14,
   18,24;90:3;94:21;
   95:13;96:16,20;97:6,
   13;98:9;99:11;
   100:15;101:25;
   102:17,23;103:1,6,
   10;105:11,21;108:3;
   109:4,11,14
**Mancini's (15)**
   8:16;11:17;13:20;
   47:14,21;51:7;52:19;
   53:22;54:19;60:13;
   62:15;63:7;90:5;
   104:14;107:18

**manpower (1)**
67:2
**manually (3)**
88:3;90:10,12
**Many (41)**
7:7,10;9:2,2,12;
15:1,5;17:20;21:13;
23:15,16;25:3,7;
26:14;28:14,17,19;
29:19;33:25;39:15,
16;42:18;59:22,22;
64:12,18;65:8;79:4,
13;81:20,21;86:3;
89:25;96:9;100:21;
102:13;106:16;
107:6,13;109:19,22
**marital (1)**
14:5
**Mark (13)**
6:14,15,18;10:24;
15:23;58:6;88:25;
89:14,18,24;90:2,5;
102:23
**MARKED (4)**
5:17;6:10;65:20;
86:15
**Married (1)**
14:6
**mass (1)**
17:18
**Master's (1)**
14:8
**material (2)**
4:16,17
**matter (1)**
3:21
**May (43)**
4:9,24;14:11;
15:25;27:16,17,19;
29:5,18,19,22,24;
31:16;34:1,5,6;36:9;
40:5;42:4;43:2,14,
19;62:13;68:25;70:7,
8,9,15;71:12;73:24;
78:10;81:22,23,24;
85:19;91:13;92:23;
93:10;99:6,17;
104:20
**maybe (11)**
7:12;9:2,3;10:14;
12:6;18:23;28:3;
29:21;50:24;52:16;
61:10
**MCHUGH (34)**
4:3,4,8;5:15,18;
6:1,6,8,25;7:1;11:18;
20:13;23:3;30:3;
35:25;40:8,11;41:15;
44:11;48:25;49:3;
59:4;64:25;78:3;
81:18;82:20;94:8,14;
95:18;97:16;107:21;

109:7,12;110:22
**mean (35)**
8:24;12:8;20:5;
23:25;34:14;36:23;
37:3;39:22;40:15;
41:18;46:8,23,23;
47:3;48:14;55:16;
57:4;74:12;76:19;
77:11,24;81:16;82:3,
12;83:4;91:19;96:8,
8,10;98:15;99:1,5,13;
102:13;103:17
**meaningful (4)**
96:4;97:23;101:8,
14
**means (6)**
77:3;81:24,24;
82:7,13,25
**meant (1)**
102:14
**meantime (2)**
72:19;96:22
**medical (2)**
8:20;57:14
**medication (1)**
8:19
**meet (8)**
12:2;37:22,25;
38:1,3;49:21;53:25;
74:4
**meeting (49)**
21:8,13;22:3,5,7;
37:24;38:12,23,24,
25;40:5,6,7,14;58:23;
59:16;63:15;73:16;
83:18,23,25;84:4,6,
18;85:12,25;88:13,
17;89:17,23;90:1,9,
13;91:6,7,8,13;92:3,
10,16;93:3,3,4,17;
97:2,10;102:25;
108:2;110:13
**meetings (28)**
19:23;21:13;23:7,
8,10,13;24:22;38:5,
11,22;39:2,7,8,20,24;
40:3,17;43:13,16;
58:5;80:13;83:14,15;
84:23;91:10,11;96:1;
102:13
**Meets (2)**
105:2,4
**member (2)**
53:1;54:16
**members (3)**
49:7;77:7;106:13
**member's (1)**
75:15
**memorandum (1)**
35:18
**memorializes (1)**
84:19
**memory (3)**

7:12;8:21;91:6
**men (1)**
30:7
**men's (1)**
8:9
**mention (2)**
15:9;76:1
**mentioned (3)**
48:20;98:16;
103:12
**merit (2)**
75:17,25
**merits (3)**
11:17;35:18,18
**met (4)**
23:9;49:24;80:11;
89:10
**midnight (1)**
18:2
**might (5)**
8:3,20;76:1;95:21;
102:15
**Mike (2)**
7:8;9:14
**military (2)**
53:15;55:7
**mind (5)**
61:9;75:1;76:4;
77:1;91:22
**minds (2)**
8:5;77:8
**mini (4)**
18:7;20:7;29:4;
98:4
**Minimally (1)**
13:17
**minor (2)**
34:1;98:19
**minute (3)**
7:13;24:4;66:4
**minutes (1)**
84:19
**missed (1)**
34:16
**mission (2)**
26:18;31:14
**mix (1)**
40:21
**Mixed (2)**
104:19;105:1
**Monday (5)**
12:5;37:24;38:1;
47:12;84:16
**monies (1)**
39:10
**months (1)**
46:21
**moral (1)**
48:9
**More (30)**
7:11;20:10;24:5;
28:5,11,17;29:1;
30:13,23;31:7,18;

7:12;8:21;91:6
**men (1)**
30:7
39:4;42:21,22;46:19;
52:15;55:3;58:17;
59:9;80:5;83:21;
84:4;92:1;99:3;
104:10,11,20;107:9,
24,25
**morning (4)**
10:22,23;37:7;
43:12
**most (7)**
85:15;87:15;94:16;
100:23;102:3;
103:23;107:4
**mostly (1)**
46:11
**motion (1)**
4:10
**motor (2)**
9:18;44:19
**move (1)**
22:21
**moved (2)**
18:21;19:20
**movement (3)**
18:14;23:1;38:16;
63:16;77:21
**much (8)**
20:10;30:23;37:4;
39:11;64:19;96:18;
97:19;98:1
**Municipal (1)**
15:21
**must (1)**
7:23
**myself (2)**
40:22;43:18

# N

**nail (1)**
105:20
**name (10)**
3:5;6:14;7:15;
35:23;85:15,16;
95:16;96:2;99:23;
100:4
**named (6)**
8:24;9:20;19:9,11;
20:15,17
**names (3)**
5:14;38:1;60:10
**Narcotics (1)**
17:1
**national (1)**
19:12
**nationally (1)**
23:19
**nature (1)**
34:1
**nearby (1)**
44:19
**necessarily (2)**
36:6;76:21

**necessary (1)**
4:23,24;21:18
**need (11)**
8:9;16:6;29:14;
34:13,18;67:8;68:22;
69:2,22,22;80:6
**needed (1)**
11:2
**needs (4)**
48:7,8,12;72:18
**negative (5)**
58:8;97:19;103:22;
108:7,12
**negatively (1)**
92:22
**neighborhood (1)**
16:12
**neutral (1)**
71:15
**New (5)**
19:15;25:20;77:4;
101:6;102:10
**newer (1)**
76:24
**news (1)**
43:15
**next (8)**
17:24;19:21;56:25;
57:11;67:5;68:13;
69:7;96:21
**night (5)**
16:5,7,18;17:7;
29:23
**nights (1)**
29:5
**nobody (2)**
13:24;95:22
**nodding (1)**
7:20
**none (1)**
97:9
**notations (1)**
91:20
**notes (8)**
11:1;91:6,7,7,10;
110:12,14,15
**notice (2)**
34:17;54:23
**noticed (1)**
24:14
**notification (2)**
67:14,15
**notified (2)**
68:11;74:2
**notify (3)**
66:20;67:10,19
**notifying (1)**
66:18
**Number (11)**
7:19,23;8:1,7;11:7;
71:17;77:13;87:10,
17;96:25;97:7
**Numbers (3)**

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 121 of 265 PageID #:
1257

Mancini  vs
City of Providence

Chief Hugh T. Clements, Jr.
June 10, 2015

4:14;5:21;88:12

## O

**Oates (11)**
10:15,19,20;11:16;
36:22;38:3;85:17;
89:13;93:10,22;
94:20

**oath (1)**
13:6

**objecting (1)**
7:25

**Objection (16)**
11:18;20:13;23:3;
30:3;35:25;41:15;
44:11;59:4;64:25;
78:3;81:18;82:20;
97:16;107:21;109:7,
12

**observe (1)**
44:19

**observing (1)**
44:23

**obtain (1)**
4:23

**obviously (2)**
20:9;22:8

**occasion (3)**
22:6;42:8;68:24

**occasions (1)**
7:9

**occurred (1)**
54:24

**off (3)**
37:12,14;108:21

**Offhand (2)**
54:13;60:8

**Office (15)**
6:24;10:25;11:3;
19:21;36:17;37:6,7;
41:3;45:24;53:7;
57:13;59:11;87:6,6,
14

**officer (24)**
14:17;15:6,12;
28:23;29:7;31:5;
36:12;44:15,23;48:7,
12,23;50:3;51:4;
57:13;60:4;61:5;
68:3,8,8;74:10,11;
75:16;102:1

**officers (27)**
3:22;9:17;22:23;
23:12;24:8,12;25:11,
15,25;26:25;28:5;
32:18;33:14,15;
39:23;44:9;45:23;
47:23;65:10;66:9,16,
23;85:8;100:6;
106:16;109:17,19

**officers' (2)**
47:24;83:9

**officer's (2)**
35:23;42:9

**official (1)**
20:17

**officially (1)**
27:9

**often (10)**
22:9,14;37:22;
43:21;51:25;52:3,13,
15;61:5,8

**oftentimes (7)**
21:20;30:16,17;
37:9,20;79:25;96:1

**OIC (5)**
28:22,24;29:22;
30:18;98:5

**old (1)**
3:14

**older (1)**
17:20

**Olneyville (2)**
17:14;18:8

**once (6)**
52:4,16,16;66:25;
67:10;106:22

**One (54)**
3:21;4:21;5:24;
7:19;8:3;12:6,17;
16:10,11,16;17:12;
22:5;25:8,19;26:3;
28:18;29:18,24;
31:16,24;32:2,3;37:8,
14;38:8;39:4;40:2;
45:7;48:7;50:12,14;
64:12;71:17;75:18;
81:13;82:23;84:4;
85:2;95:1,9;96:22;
98:17;99:18,24,25;
100:11,23;101:22;
102:11,13,19,22;
105:4;107:12

**ones (6)**
5:22;12:17,24;
13:1;93:25;94:18

**one-year (1)**
52:1

**ongoing (1)**
67:3

**only (14)**
3:24;4:17;12:17,
23;13:21;15:9;31:16;
42:15;48:1;54:4;
77:18;78:11;79:5;
105:12

**open (6)**
37:5,7;63:21,21;
85:5;93:9

**open-door (1)**
37:5

**opening (2)**
17:17;18:14

**operation (3)**
30:6;103:18,19

**operational (1)**
11:11

**operations (1)**
31:18

**opinion (10)**
48:6,22;51:6,9;
52:6,18,21;60:12,15;
89:6

**opinions (3)**
65:4;83:8;90:19

**opportunities (1)**
50:15

**opportunity (4)**
42:8;50:3,8;71:2;
79:18;85:10;88:24;
89:14,24;90:2;102:8

**opposed (1)**
20:4

**order (13)**
3:23;4:6,10;5:16,
16,22;6:3;46:25;
67:21,21,23;73:1;
87:19

**Organization (4)**
27:25;29:14;39:15;
99:15

**Organizational (3)**
28:1;38:14;67:1

**Oscar (1)**
38:7

**others (4)**
49:7;93:24;103:12;
104:21

**otherwise (1)**
44:6

**out (34)**
11:10;19:12;30:20;
31:4,13;34:2;39:11,
16;42:2;43:21;48:15;
51:4;57:9;58:24;
59:20,22,23;60:16;
61:9;62:20,23;67:8;
72:17,24,25;83:11;
85:10;87:14;91:5;
95:16,18;98:8;102:1,
12

**outside (1)**
11:14

**outstanding (3)**
82:7;95:25;108:14

**over (19)**
10:25;12:5;17:3;
18:3;19:20;26:19;
35:17;38:13;47:12;
50:24;52:25;55:10;
71:3,11;72:25;86:3;
88:23;104:21;110:16

**over-aggressiveness (1)**
32:21

**overall (15)**
11:10;49:4;74:9,
12,13,25;75:15;76:3,
23;77:25;78:2,5,7;

99:1;101:16

**oversees (2)**
31:16,17

**overtime (1)**
39:9

**own (4)**
19:6;45:22;66:14;
93:6

## P

**Page (3)**
75:9;88:1;92:7

**pages (4)**
5:10;65:25;87:2,2

**pains (1)**
97:8

**painstakingly (1)**
107:15

**paper (3)**
34:4;65:24;68:4

**paperwork (8)**
47:11;57:9,12;
59:11;61:13,24;62:7,
11

**Paragon (2)**
22:6;23:6,10;80:12

**Paragraph (1)**
75:9

**park (1)**
15:11

**part (13)**
12:21;13:4;30:21;
32:17;60:8;65:6;
75:6;77:11,21;78:13;
102:3;103:15,18

**participate (5)**
12:7,15,19,20;
13:16

**participating (1)**
59:16

**particular (8)**
25:8,18;59:18;
67:2;69:21;70:10;
95:24;101:18

**parties (3)**
12:12;53:5;110:7

**party (3)**
8:23;9:1;71:1

**past (2)**
24:16;99:6

**paths (1)**
86:6

**Patrol (6)**
16:16;17:11;18:2;
28:9;31:19;49:24

**patrolman (9)**
10:9;16:6,19;30:2;
51:1,16;76:14;98:21;
99:2

**patrolmen (2)**
28:7,14

**Paul (1)**

19:21

**pay (1)**
34:18

**penalty (1)**
33:3

**pending (1)**
8:8

**Penza (2)**
7:8;9:14

**people (57)**
6:11;23:22;26:12;
28:6;36:19;37:6;
38:1;45:1;48:12;
56:3,11;59:20,22,22;
60:25;62:19;68:16,
24;69:14;72:14;
79:25;81:21;83:21;
86:4;88:16,21,23;
90:1,19,24;91:8;
92:11,20,21;93:13,
17;94:1;95:20;96:25;
97:1;99:5,15,18;
101:15,19;102:22;
103:4,21;104:1,10,
13;105:10;107:8,19;
108:1;109:2;110:8

**people's (1)**
91:21

**perceived (1)**
56:17

**percent (3)**
44:3;64:22;71:21;
75:10

**percentage (1)**
64:22

**Perez (3)**
38:7;85:19;97:3

**PERF (1)**
20:22

**perform (7)**
30:1;53:23;74:16,
23,24;76:1,18

**performance (60)**
3:22;6:7;7:7;24:7,
16,21,25;25:10,14;
26:5,11,16,24;27:12;
35:16;44:22;45:2,5,
12,15,20;47:24;48:2,
24;51:7,9;52:7;
53:25;57:7,8;74:9,12,
13,22,25;75:16,22;
76:4,23;78:1,2,5,7;
89:7;101:17;104:14,
17;105:6,12,22,24;
106:3,9,12,15,20,25;
107:5,18,20

**performer (1)**
108:18

**performing (6)**
82:8,13;83:1;
108:3;109:4,24

**performs (1)**
30:5

**period (10)**
8:14;26:25;52:2;
67:12,15;69:9;72:16,
25;79:15;101:5
**permanent (2)**
19:12;21:23
**permanently (1)**
21:8
**person (16)**
37:3,10;39:5;42:1;
43:20;47:5;48:13;
61:21;85:22,23;
92:16;96:21;99:20,
24;101:22;104:24
**personal (4)**
4:25;8:25;56:4;
102:16
**personally (4)**
13:12;65:5;93:8,10
**personnel (8)**
25:2;35:13,15,24;
41:22;47:21;55:24;
106:24
**person's (1)**
106:20
**pertaining (4)**
11:14;12:17,18;
35:20
**pertains (1)**
63:15
**phone (2)**
43:20;87:17
**physically (2)**
36:16;41:3
**picked (1)**
100:1
**pile (1)**
47:11
**pins (2)**
38:15,16
**place (4)**
22:3;53:16;77:12;
85:13
**places (1)**
110:9
**plainclothes (2)**
31:2;44:20
**plain-clothes (1)**
17:1
**Plaintiff (5)**
4:11,19,23;6:14;
9:1
**Plaintiff's (5)**
4:18,22;65:20,22;
86:16
**plan (1)**
11:11
**play (2)**
66:18;103:2
**player (8)**
97:20;103:11,17,
24,25;104:5;108:8;
110:3

**please (4)**
3:6;46:8;108:20;
110:22
**plugging (1)**
72:20
**plus (2)**
23:2;63:20
**PM (2)**
3:1;110:23
**point (11)**
19:9;21:22;35:10;
50:4;52:11;69:3;
80:1;90:21;96:6;
98:8,13
**points (105)**
40:6,14,15,18,19;
69:12,15,19,19,19,
22;70:12,15;71:24;
72:3,5,7,7,8,11,20,22;
73:2,4,8,11,18;74:5,
8,21;75:11,12,15;
76:16,20;77:9,14,22;
78:9,13,16,23;79:19,
23;80:3,4,9,14,17,17,
17,19;81:1,3,6,6,11,
17,22;82:4,24;83:15,
19;84:8;85:11,13,24;
86:7,13;88:3,12,14;
90:9,14;91:3,5,16,25;
92:7,12;93:1;94:21;
95:13;96:3,7,10;97:6,
23,24;98:13;100:11,
13,19;101:8,12,20,
21,24;102:4,8,9,12,
23;106:10;110:13
**pointwise (1)**
74:11
**police (137)**
3:22;6:19;7:2;8:16,
24;9:8,16,16,24;11:8,
11;12:24;14:10,12;
15:6,12,17,21,23,24;
16:2;18:4,5,7;19:8,
17;20:4,8,15,16,17,
22,23;21:1,7,19;
22:13,22,23;23:11,
12;24:6,7;25:9,11,14,
15,25;26:4,9,21,23,
24;27:23;28:4,5;
29:4,8;30:15,17;31:5,
5;32:8,9,10,20;33:6,
11,14,15,16,17,22,23;
35:1,10,19,23;36:7,
12;38:14;39:23;42:9,
9,12,15;43:9,22;44:9,
9,12,13,15,23;45:23;
47:23;48:7,12,23;
50:2,3;51:4;60:3;
61:5,12;63:9;64:5,
10;65:9,10;66:8,16,
23;68:3,8,8;70:3,5;
75:13,14,16;78:20,
23;79:7,13;80:11;

83:8;87:19;98:5,7;
99:16;101:6;103:19;
104:9;106:16;
109:16,19
**policemen (1)**
44:20
**police-related (1)**
39:25
**Police's (1)**
73:12
**policies (2)**
31:14;49:5
**policy (8)**
24:17;27:10;32:14;
33:5,11;37:5,11,11
**poor (6)**
48:24;49:8,16;
97:21;108:8,18
**portion (3)**
65:23;109:1,21
**position (13)**
11:5;14:16;17:24;
30:12,12,13;45:19;
66:11;74:20;76:18;
77:4;97:25;98:1
**positions (5)**
16:3;38:2;66:9;
99:16;101:16
**positive (8)**
26:2,17;27:1;
45:14;85:16;97:10;
103:22;104:12
**possible (5)**
81:10;82:8,15;
109:5,25
**post (2)**
16:7,7
**potential (1)**
102:12
**potentially (1)**
84:3
**practice (1)**
32:13
**predecessor (1)**
19:2
**Predominantly (2)**
36:21;105:8
**preferred (1)**
99:25
**preparation (6)**
11:25;47:8,25;
48:3;105:16,18
**prepare (1)**
43:12
**prepared (1)**
13:21
**preparing (2)**
4:23;43:15
**present (21)**
5:9;8:15;16:4;
40:17;58:5,23;59:15;
84:18;85:12,25;
88:17;89:17,23;90:1;

92:3,16;93:17;97:2;
102:6,19;104:12
**presentations (2)**
39:17,21
**Presently (7)**
29:17;35:2;38:4;
41:9;61:7;67:25;68:9
**press (1)**
43:14
**Presumably (1)**
76:8
**pretty (7)**
33:2;37:4;39:11;
49:4;64:2;77:24;
102:14
**prevailed (1)**
9:24
**prevent (1)**
30:21
**preventing (1)**
44:15
**previous (13)**
39:9,20;52:15;
53:1;69:2;77:12;
78:14;100:13,16,19;
101:8,21,23
**previously (4)**
91:14,18;100:12;
107:7
**prior (15)**
10:12;20:20;25:4;
69:10,24;72:22;
73:24;77:19,22;
78:18,19;84:16;
100:23;105:15,22
**privy (1)**
70:15
**probably (12)**
8:24;15:13;16:23;
33:1;37:3;40:4;
43:10;49:22;52:16;
61:21;83:22;84:1
**problem (2)**
5:4;102:16
**problems (5)**
51:19;54:3,5,18,21
**procedure (4)**
41:17;66:1,8,15
**process (36)**
7:13;21:16;23:16;
24:6,10;25:18,20;
27:8,11;41:13,25;
57:6;58:15,19;59:1,1,
17,25;60:3;62:5;
63:4,22;64:4,17;65:6,
11,15,18;66:18;67:7,
11;68:14;71:7;72:17;
95:18;99:23
**processes (1)**
67:18
**proctor (1)**
70:22
**produce (2)**

12:12;13:15
**produced (5)**
4:13;12:14;24:15;
86:17;94:7
**productions (1)**
4:14
**program (3)**
20:25;21:5;67:25
**progressive (6)**
32:11,18,23;33:4,
10;64:10
**prohibited (1)**
4:19
**promote (4)**
23:21;63:17;66:16,
23
**promoted (4)**
22:23;65:10;77:3;
109:14
**promoting (5)**
23:11;65:12,15;
66:8,20
**promotion (4)**
43:4;66:11;89:2;
105:7
**promotional (35)**
23:16;24:6;40:1;
63:13,22;64:16;66:2;
67:20;68:12,19;69:5;
73:22;74:1;75:10;
78:17;79:13,17;
83:22,25;84:2,6,8;
85:14;86:19;90:24;
91:19;92:12;93:18,
21;95:14;100:13,16,
20;105:11;109:3
**proper (1)**
57:8
**propounded (2)**
13:4,6
**prospective (2)**
74:15,16
**protocol (1)**
31:14
**Providence (32)**
6:19;7:2;9:8,9,15;
11:7,11,15;14:9,12;
15:17,22,24;16:2;
17:13;20:4;24:2;
25:9;26:23;27:23;
28:4;32:10;33:16,19,
21,22;34:25;44:20;
61:11;65:10;79:13;
86:18
**Public (6)**
33:20;39:6;46:6,
14,24;47:4
**purpose (1)**
83:18
**purposes (1)**
21:9
**pursuant (5)**
5:15;33:18;57:15;

67:1;69:23

**pursuit (2)**
9:12,18

**put (19)**
3:20;4:5,8,14;5:16,
20,22,23;6:1;19:11;
20:21,23;34:4;67:8;
72:17,25;91:21;
99:18;101:16

**puts (2)**
90:23;99:19

**putting (3)**
34:17;43:11;99:20

## Q

**qualify (1)**
68:25

**qualities (1)**
48:6

**quality (1)**
104:2

**quick (1)**
77:20

**quite (2)**
25:17;28:2

**quizzing (1)**
77:6

## R

**radio (3)**
34:17,18;44:18

**range (3)**
21:14;81:2,3

**rank (20)**
23:23;27:15;35:9;
64:7,19;66:21;67:2,4,
10,12,19,22;68:11,
21,22;75:1,2;76:5,24;
85:10

**rank-and-file (1)**
68:8

**ranks (1)**
65:7

**rare (1)**
44:17

**rated (1)**
107:8

**raters (3)**
104:19,23;107:24

**reach (1)**
34:13

**read (14)**
4:12;5:2,10,14;
40:8,10;46:2;48:25;
49:2;75:8;78:7;87:8;
108:19;109:1

**reading (5)**
71:20;75:9;87:11;
98:18;105:4

**Ready (2)**
85:19;97:3

**real (5)**
15:3,4;92:22;99:2;
104:23

**really (12)**
5:11;6:2;48:12;
52:5;59:2;64:3,12;
65:8;80:7;97:18;
105:20;107:18

**reason (5)**
69:4;73:22;86:24;
87:18;98:13

**reasonable (1)**
32:22

**reasons (1)**
43:2

**recall (29)**
9:2;14:1;22:8;
26:14;42:13,23;52:5;
54:10,11,14,20;56:5,
8;58:4,8;62:1,17,24;
79:21;85:12,16;
93:25;94:20;96:18;
97:7,10;98:11;103:5,
5

**receive (2)**
37:1;93:13

**received (1)**
98:9

**recent (3)**
100:23;102:3;
107:4

**recently (3)**
39:5;94:5,16

**RECESS (1)**
46:1

**Reckless (2)**
49:12;54:15

**recognize (1)**
87:10

**recommend (3)**
34:24;91:24;103:7

**recommendation (6)**
75:23;78:22;79:22;
85:11,24;97:6

**recommendations (6)**
78:15;79:18;86:1;
90:20;106:22;109:10

**recommended (4)**
74:11;94:20;97:13;
100:2

**reconvene (1)**
110:9

**record (12)**
3:6,21;4:5,9;5:6;
6:13;62:9;65:23;
80:16;99:2;108:21,
23

**records (1)**
45:22

**redact (1)**
5:14

**redacted (1)**
4:25

**re-devised (1)**
25:20

**refer (1)**
3:11

**referred (1)**
80:16

**referring (1)**
59:19

**refers (1)**
46:11

**reflection (1)**
87:1

**regard (3)**
73:11;99:21;100:9

**regarding (4)**
60:3,12;63:7,10

**regular (1)**
26:20

**regularly (1)**
61:1

**regulations (1)**
49:5

**related (1)**
35:16

**relating (1)**
4:21

**relation (2)**
88:12;90:9

**relative (2)**
13:22;35:21

**relatively (1)**
88:18

**relevant (1)**
8:14

**relied (1)**
105:8

**reluctantly (1)**
18:17

**rely (2)**
44:25;83:7

**remember (8)**
22:4;63:8;84:10;
94:1;97:20;103:16;
105:3;106:19

**removal (1)**
55:5,6

**removed (3)**
54:25;55:15;56:6

**replace (1)**
53:2

**replaced (3)**
53:10;55:9;56:12

**replacing (1)**
53:1

**report (7)**
28:10,12,20,21;
46:16;58:7;61:1

**reported (1)**
108:7

**REPORTER (3)**
3:5;7:21;108:24

**reports (2)**
32:7,8

**represent (5)**
6:14;8:15;61:22;
65:22;73:23

**represented (3)**
9:13;54:16;98:17

**representing (2)**
6:21;7:1

**request (6)**
4:15;12:12;13:20;
41:19;94:9,12

**requested (1)**
12:14

**requests (5)**
4:13;5:20,21;6:2;
13:14

**required (8)**
12:19,23,24;13:1;
26:15;34:19,21;
59:12

**Research (2)**
20:22;60:11

**resigned (2)**
19:6;21:21

**Resources (8)**
12:25;13:18;36:17;
37:19;38:20;57:13;
59:13;66:19

**respective (26)**
18:7;24:13;25:6;
27:15,17,18,19;
30:18;31:18;34:2,6,
11;35:3;37:20;46:10;
62:19;64:7;65:7;
66:21;67:4,11;68:2;
69:1,12;72:20;100:6

**respond (4)**
7:23;8:2;13:1;97:5

**responded (1)**
13:7

**responding (2)**
12:7;59:10

**response (7)**
5:25;13:20;16:13;
96:3,11,12,19

**responses (4)**
7:18;12:19,23;
13:11

**responsibility (2)**
26:11;74:21

**responsible (2)**
55:19;100:7

**rest (1)**
5:2

**result (1)**
9:23

**results (1)**
71:4

**retired (1)**
19:6

**review (22)**
27:21;37:9;45:1;
47:7,10,19,21,23;
48:3;64:15;66:4;

70:19;71:3;104:14;
105:6,15;106:3,9,11,
24;107:15,15

**reviewed (9)**
42:11;47:14,17;
105:12,22;107:6,10,
12,13

**reviewing (4)**
11:1;24:14;41:13;
70:21

**reviews (1)**
6:7

**Rhode (5)**
14:14;15:7,21,21;
64:5

**riding (2)**
44:17;83:11

**Right (69)**
5:15;7:15;12:21;
19:14;22:17,17,20;
27:6,11;30:9;33:2;
42:16;43:5;47:15;
48:15,17;51:4,16,17;
52:7;60:10;61:9;
63:13,25;65:9;70:24;
73:5,14,19;77:25;
79:4,19;80:25;81:14;
82:1,2,9,15;83:6,9,
12,23;88:21,25;89:7,
11,20,21;90:14,17,
21,25;91:3;92:13;
93:8;95:17;97:11;
98:23;99:11;100:13;
106:16,20;108:4,15;
109:11,17,25;110:4,6

**right-hand (1)**
88:7

**rights (2)**
49:9;54:12

**rise (1)**
71:18

**role (7)**
19:25;30:24;31:7,
12,13;58:1;103:21

**roll (1)**
68:1

**room (9)**
6:12;8:7,9,10;
57:22;96:11;102:20,
24;104:1

**ropes (1)**
21:10

**round (1)**
52:16

**routinely (3)**
43:18;59:20;60:9

**row (1)**
70:16

**rule (5)**
7:19,23;8:1,7,10

**rules (1)**
49:5

**run (3)**

39:11;43:8;100:7
**running (2)**
19:19;22:13
**runs (1)**
30:6
**rusty (1)**
7:12

## S

**SABATINI (3)**
5:25;6:20,21
**Safety (6)**
33:20;39:6;46:6,
14,24;47:5
**sake (1)**
5:19
**same (9)**
5:11;12:11;30:1;
48:10;65:16,17;73:7;
80:18;96:14
**sat (2)**
65:2;109:3
**Sauro (5)**
38:7;85:21;97:4,4,
5
**save (1)**
65:24
**saw (1)**
27:24
**saying (4)**
67:7;97:21;107:17,
22
**scandal (1)**
19:6
**schedule (1)**
43:10
**School (9)**
14:14;15:7,15;
20:21,23,24;21:4,6;
82:19
**score (4)**
71:21;72:15;103:6,
7
**scored (3)**
82:23,25;83:2
**scores (4)**
70:20,20;72:14;
106:23
**search (1)**
19:12
**seasonal (1)**
15:10
**second (1)**
75:6
**section (1)**
17:15
**Security (6)**
18:22;19:20;50:20;
51:21;52:10;54:23
**seek (1)**
57:14
**send (4)**

20:11,18;70:15,16
**Senior (2)**
6:25;17:19
**seniority (6)**
69:12,19;71:25;
72:5,21;73:3
**sense (1)**
86:3
**sent (1)**
20:21
**separate (7)**
16:14,16;40:5,7,
14;64:14;73:16
**Sergeant (134)**
3:25;4:19;5:8,9;
6:18;8:16;11:17;
12:13,24;13:13,20;
17:10,18,21;27:16;
28:14,20,21;29:1;
30:1;34:9,22;36:18;
38:12,17;39:13;41:2,
7,8;47:14,21;48:2;
49:20;50:4,5,8,13,15;
51:1,7;52:1,10,11,14,
19,19,22,23;53:3,6,6,
10,10,15,16,20,22,23,
25;54:11,14,19,21;
57:16;58:1,9,14,20,
22;59:12,25;60:2,4,
12,15,19,23;61:1,12,
14,22,23,25;62:1,4,4,
10,15,22,23;63:5,7;
65:7;66:9,16,21;
68:21,22;70:9,17;
73:25;74:19,19,22;
76:12;77:20;78:2,6;
85:6;88:4;90:23;
92:10;94:21;95:13;
96:15,20;97:13;98:9;
99:11,17;101:25;
102:17;103:1,6,10;
104:14;105:11,21;
107:17;108:2;109:4,
11,14;110:2
**sergeants (11)**
16:11;17:9,10;
28:13,13,17;34:19;
65:12,16;83:12,25
**sergeant's (2)**
30:8,11
**service (55)**
40:15,18;68:20;
69:15,18,22;70:11;
71:25;72:7,22;73:11,
18;74:8,21;75:11,12;
76:16;77:9,14,22;
78:9,13,15,23;80:17,
19;81:1,2,6,11,17;
82:4,24;83:15,19;
84:8;85:13;88:12,14;
90:9,14,21;91:2,5,24;
92:7,12;95:12;97:24;
100:11,13;101:12,24;

102:4;106:10
**sessions (1)**
22:8
**set (5)**
13:6,7;33:9;66:18;
67:12
**setting (1)**
59:10
**seven (3)**
17:23;77:6;101:20
**several (14)**
7:9;13:14;15:10;
19:19;21:17;22:7;
29:12;57:22;71:11;
79:16,17;80:12;
91:20;110:14
**shaking (1)**
7:20
**shall (4)**
4:16,17;75:11,14
**share (1)**
3:25
**sheet (10)**
86:22;87:5;91:8,9;
92:2,4,6,20;93:21;
94:19
**sheets (10)**
91:21;92:1,15;
93:2,5,12,12,16,18;
94:2
**Sheridan (1)**
70:4
**shift (10)**
18:2;27:17,19;
28:23;29:3,9,17,21;
30:18,19
**shifts (2)**
27:20;30:16
**short (7)**
39:16,17;50:24;
54:4;59:23;67:2;
101:5
**shortage (1)**
67:1
**Shortly (3)**
18:18;22:4;26:19
**show (2)**
5:1;42:2
**shows (1)**
48:24
**SIB (1)**
17:2
**sick (5)**
39:16;57:24;62:20;
75:18,25
**side (2)**
12:12;39:6
**sign (10)**
37:9,12,14,17;42:1,
2;68:15,16;86:19;
107:14
**signed (6)**
35:12;90:24;92:11;

101:19;107:12,13
**significant (1)**
33:2
**signing (2)**
86:8,10
**sign-up (1)**
68:14
**Silver (2)**
17:14;18:9
**similar (1)**
23:20
**simply (1)**
86:7
**single (2)**
37:14;44:17
**sit (7)**
21:23;39:6;86:8,
12;97:8;99:22;
107:14
**sitting (1)**
7:15
**situation (3)**
17:20;54:11,14
**six (4)**
15:13;43:20;67:17;
73:24
**sixteen (1)**
101:19
**size (1)**
23:21
**skills (1)**
21:18
**small (2)**
86:3;88:18
**smaller (1)**
23:21
**smooth (2)**
58:16,19
**so-called (1)**
75:11
**sole (4)**
75:13;80:20;83:18;
101:13
**solicitor (2)**
6:20,25
**Solicitor's (1)**
6:24
**somebody (17)**
32:20;34:6,16;
41:20,23,24;46:5;
57:7;61:14;68:25;
71:6,12;82:4;95:17;
96:2,19;99:2
**somebody's (1)**
96:2
**someone (19)**
29:15;33:22;36:5;
46:25;47:4;68:18;
69:4;74:18,18;76:12,
17;81:10,16;82:11;
91:14,18;97:25;
100:12;104:3
**someone's (8)**

35:13;41:14,22;
42:1,11,18,24;63:11
**sometimes (4)**
8:2;32:25;36:24;
43:6
**somewhere (1)**
86:6
**soon (2)**
69:18;74:4
**sorry (8)**
13:2;39:21;62:14;
67:14;75:19,24;90:8;
92:6
**sort (6)**
20:7;21:9;44:16;
59:9;102:16,17
**Sounds (1)**
107:17
**South (1)**
17:13
**speak (5)**
11:24;27:11;60:24;
91:23;92:24
**speaking (1)**
55:19
**Special (1)**
17:2
**Specialized (1)**
16:17
**specific (15)**
4:21,24;46:19;
55:3;58:17;59:9;
60:9,13;62:17;79:24;
92:1;94:1;104:4;
106:3,15
**specifically (9)**
21:25;58:5;62:24;
73:21;78:6;97:18,20;
98:11;100:1
**specifics (1)**
103:14
**speech (1)**
43:14
**spend (1)**
99:5
**spent (4)**
15:10,13;18:9;44:8
**sphere (1)**
31:18
**spoke (4)**
21:19;22:9,12;
93:24
**spreadsheet (2)**
88:2;90:23
**staff (48)**
4:18;10:14;14:22;
19:23;23:15;25:3;
30:14,14;37:4,22;
38:23,23,24,25;
41:23;43:6,18;45:3,6,
8,9;57:21;73:18;
74:5;76:23;77:7,11;
81:23;83:8;84:7;

Case 1:13-cv-00092-WES-PAS    Document 84-2    Filed 05/26/17    Page 125 of 265 PageID #:
1261

Mancini  vs
City of Providence

Chief Hugh T. Clements, Jr.
June 10, 2015

88:17;90:13;92:4,16,
19;96:6,9,24;101:12;
102:2;103:23;
104:11;105:9,15,25;
106:14;109:10;
110:12
**Stamatakos (5)**
38:8;85:18;97:2,
21;103:12
**standards (2)**
105:2,4
**start (8)**
14:9;16:2,4;67:6;
91:13;96:1,12,13
**started (4)**
16:9;19:14;26:19;
51:4
**starts (2)**
92:10;96:22
**state (8)**
3:5;15:15,20,21,
23;21:4;63:18;64:5
**statement (2)**
59:9;104:5
**stating (2)**
4:6;62:1
**Station (1)**
17:12
**status (26)**
12:18;14:5;35:21;
39:14;57:4,9,17,20,
23;58:2,6,7,10,13,21;
59:21;60:24;61:2,19;
62:16;63:1,7,11;
69:4;103:1,8
**stay (1)**
96:14
**stayed (2)**
18:19,23
**staying (1)**
58:24
**Stealing (1)**
49:18
**stenographer (1)**
7:16
**step (2)**
79:2;102:7
**Steve (1)**
20:1
**stick (1)**
61:9
**still (5)**
14:19;30:8;56:15;
63:19;109:16
**stop (1)**
44:20
**stored (1)**
36:15
**straightforward (1)**
64:2
**Street (8)**
17:14;22:5;28:12;
30:6,21;32:20;70:4;

85:5
**strict (4)**
81:22;104:23,23;
107:25
**strictly (1)**
23:22
**strike (8)**
20:15;26:9;38:10;
67:14;83:6;87:1,24;
93:16
**strong (3)**
48:11;65:3;85:2
**strongly (1)**
92:22
**strong-willed (2)**
48:8,14
**structure (1)**
29:15
**study (2)**
67:12;69:9
**studying (2)**
23:24;33:7
**stuff (2)**
46:22;87:15
**Sub (1)**
17:12
**submit (6)**
61:12;62:7;93:2,7,
18;97:1
**submitted (3)**
93:20;94:2;110:14
**subordinate (1)**
55:23
**subordinates (1)**
26:12
**Subpart (1)**
65:25
**subsequent (2)**
23:7,10
**substance (2)**
10:17;11:21
**such-and-such (1)**
68:12
**sued (2)**
9:4,7
**suggest (1)**
102:15
**suggesting (1)**
104:2
**suit (3)**
9:15;43:24,25
**Sullivan (1)**
4:10
**super (1)**
34:8
**supervise (6)**
50:8,15,22;89:14;
90:2;110:3
**supervised (2)**
50:25;89:10
**supervises (2)**
30:6;85:23
**supervising (3)**

28:17;53:24;
109:16
**supervisor (7)**
26:15;37:20;52:2;
55:24;56:11;88:19;
90:5
**supervisors (11)**
25:6;27:16;34:13;
56:5;68:7;85:1;
91:23;99:22;102:3,6,
10
**supervisory (3)**
30:2,24;31:7
**supplement (1)**
94:13
**supported (1)**
104:5
**supposed (1)**
67:3
**sure (22)**
12:10;14:19,21;
24:19;26:18;27:7,9;
30:8;32:15;44:5;
49:24;59:6;62:2,8;
75:8;80:22,24;84:11;
86:14;87:13;90:4;
105:20
**surprised (1)**
107:4
**surrounding (1)**
25:18
**suspend (1)**
110:7
**SUSPENDED (1)**
110:23
**suspension (1)**
46:20
**suspensions (2)**
32:24,25
**sworn (3)**
3:3;15:25;16:5

---

## T

**Table (3)**
27:24;86:4;96:25
**talk (18)**
16:1;22:22;24:4;
27:22;28:4;43:19;
49:20;50:25;53:22;
63:13;65:9;73:15,21;
83:6,14;91:13;97:11,
12
**talked (4)**
10:18,20;21:16;
22:11
**talking (7)**
6:2;13:2;23:4;
82:19;86:2;106:15;
110:11
**tape-records (1)**
84:20
**task (9)**

9:13;10:9;16:9,16,
17,21;20:8,10;22:12
**teachers (1)**
82:1
**team (9)**
16:13;97:20;
103:10,17,24,25;
104:4;108:8;110:3
**teams (1)**
16:11
**technically (1)**
3:15
**template (1)**
91:11
**ten (9)**
7:11;28:19;42:21,
21,22;67:17;77:6;
102:9,12
**tendency (1)**
104:20
**tenure (1)**
8:16
**term (6)**
39:16,16,17,17;
59:23,23
**terminate (1)**
47:4
**terminated (1)**
47:5
**termination (3)**
33:1,2;46:21
**terminology (2)**
12:11;80:25
**test (16)**
17:5,5,9;68:17;
69:8,9,14;70:14,17;
71:16;72:13,14,18;
76:8;102:7;105:16
**testified (12)**
23:9;24:22;40:13;
46:4;61:23;63:14;
73:15;83:7;88:16;
89:9;98:3;100:10
**testifies (1)**
3:3
**testify (3)**
8:21;10:10;59:24
**testimony (5)**
27:2;56:12;62:12;
101:23;108:25
**testing (1)**
64:14
**tests (1)**
96:5
**Thanks (1)**
40:11
**Thayer (1)**
22:5
**thereafter (1)**
18:18
**thinking (1)**
91:15
**third (3)**

16:5,18;71:1
**though (2)**
101:23;102:15
**thought (7)**
5:18;21:17;56:4;
58:23;59:6,16;104:4
**Three (19)**
8:1;11:12;14:24;
15:20;17:17;29:24;
31:25;37:23;38:3;
42:15,17;45:9;64:14;
70:16;81:13;95:3;
96:13,14,22
**three-week (1)**
20:25
**throughout (3)**
38:17;67:24;68:10
**thrown (1)**
95:16
**Thursday (2)**
84:15;87:9
**times (16)**
9:20;21:17;22:16;
26:8;29:16;37:23;
42:18;43:20,20;52:6;
57:22;61:7;70:16;
79:4;89:10;92:23
**title (3)**
3:13;14:22;28:22
**today (10)**
3:16;6:12;8:21;
10:13,19;29:17;
43:24;73:23;86:20;
94:18
**Today's (5)**
12:5;47:8,25;48:3,
12
**together (1)**
90:23
**told (5)**
10:23,25;21:17;
61:24;105:25
**Tom (1)**
38:4
**Tommy (3)**
10:15,19,20
**tomorrow (1)**
110:19
**tonight (4)**
29:21,23,25;44:5
**took (5)**
17:5;26:19;53:16;
55:10;72:14;85:13;
91:19;102:3;108:23
**top (6)**
22:14;25:2;31:16;
49:10;87:7,12
**topic (1)**
40:2
**topics (1)**
39:2
**total (1)**
102:12

**towards (4)**
31:15;91:24;
102:23;109:21
**traditional (1)**
3:14
**traditionally (1)**
28:11
**Training (5)**
14:14;15:7,15;
20:11,18
**transcribe (1)**
7:22
**transcribing (1)**
7:17
**transcript (2)**
108:24;110:22
**transgression (1)**
54:17
**transgressions (1)**
98:18
**transmittal (1)**
86:22
**trial (3)**
10:1,2,10
**trick (1)**
8:5
**true (1)**
86:25
**try (4)**
22:20;32:15,22;
99:14
**trying (1)**
8:5
**Tucker (3)**
85:17;93:23;95:2
**Tuesday (1)**
84:17
**turn (2)**
92:20;110:16
**turned (2)**
94:19;95:9
**twelve (1)**
77:6
**twice (1)**
52:4
**Two (26)**
7:23;11:7;16:14,
20,23;29:1,18,24;
68:21,22;69:2;80:25;
81:13;87:2,2;94:17;
95:9,11;100:22,22;
101:1;102:4,5,6,8,22
**typical (2)**
43:9;44:15
**typically (11)**
28:15,16;67:16;
70:1;74:5,6;84:15;
85:22,23;93:7,15

**U**

**ultimate (2)**
46:5,13

**ultimately (2)**
33:17;99:10
**under (21)**
3:23;11:10;13:6;
18:25;19:5;23:5;
26:12;28:14;36:20;
41:9;62:19;68:18;
70:9;77:19,23;78:12,
16;79:5;100:8;
106:17;109:19
**Understood (1)**
8:13
**unfortunately (2)**
32:25;63:19
**un-huhs (1)**
7:20
**uniform (18)**
9:13;11:13;16:9,
12,15,17,21;17:11;
28:9,13;31:1;32:2;
44:3,7,21;49:23;50:5,
21
**uniformed (1)**
51:1
**uniforms (1)**
30:25
**union (6)**
24:2;54:17;64:14;
70:3,11;98:17
**unison (1)**
95:19
**unit (5)**
16:10;53:1,1;56:7;
80:7
**units (3)**
99:25;100:6,7
**University (1)**
20:24
**unless (3)**
4:1;7:24;47:4
**unreal (1)**
15:5
**unused (2)**
75:18,25
**unusual (1)**
55:23
**up (27)**
4:25;21:3;22:15;
25:5;28:17;31:15;
34:11;36:9;43:12;
44:21;59:10;68:15,
16;79:3;83:17;84:3;
86:8,10,19;90:24;
92:11;93:8;96:2,14;
98:10,20;101:19
**update (5)**
39:12,14;58:3;
60:9,23
**updated (2)**
38:14;57:23
**upon (1)**
105:14
**upper (1)**

76:23
**upset (5)**
54:24;55:15,20;
56:8;58:14
**up-to-date (1)**
99:3
**use (4)**
4:16;8:9;36:1,23
**used (1)**
31:25
**using (1)**
12:10
**utilize (1)**
32:11

**V**

**vacancy (2)**
69:3;99:17
**vague (1)**
59:9
**Various (1)**
90:19
**varying (1)**
43:2
**vehicle (3)**
9:12,18;44:19
**vehicles (2)**
31:5,5
**vent (1)**
56:20
**verbal (8)**
7:20;32:19,23;
34:15,19;36:5;97:6,9
**verbally (4)**
34:3,18;93:24;97:5
**verbatim (4)**
7:18;56:7;96:18;
103:16
**verbiage (1)**
103:13
**Verdi (9)**
38:4;43:19;62:10,
13,14,15;85:17;
93:22;94:25
**vetted (1)**
35:8
**via (2)**
63:6,11
**view (1)**
42:9
**viewed (4)**
42:3,18,23;43:1
**viewing (1)**
42:1
**views (1)**
76:23
**Vinacco (7)**
53:3,6,11,15,20;
55:6,9
**violated (1)**
54:12
**violating (1)**

49:9
**voices (1)**
105:14

**W**

**wait (1)**
8:1
**wake (1)**
44:5
**walk (1)**
93:10
**wants (1)**
66:16
**warning (5)**
34:15,23;35:11;
36:5,11
**warnings (1)**
34:20,25;35:6
**way (13)**
8:5;23:17,17,22;
35:2;64:16;77:17;
78:7;79:2;80:19;
85:2;89:16;104:11
**ways (5)**
23:20;77:15;78:9,
11;91:12
**wear (3)**
30:25;43:24;44:2
**wearing (1)**
43:24
**Wednesday (1)**
12:5
**week (16)**
37:23;39:9,20;
43:11;52:4,4,16,17;
57:22;66:24;74:6;
84:11,13,14,16;94:17
**weeks (4)**
46:21;67:17;73:24;
94:5
**weight (1)**
99:8
**weighted (3)**
64:20,22,22
**well-recognized (1)**
20:23
**weren't (1)**
55:24
**What's (3)**
30:11;31:10;79:10
**whatsoever (1)**
9:25
**wherever (1)**
16:6
**white (1)**
77:24
**whole (6)**
4:12;8:2;37:4;
48:17,18;66:14
**who's (1)**
28:22
**whose (3)**

28:22;42:13;70:5
**wide (1)**
93:9
**willing (1)**
18:16
**withdraw (1)**
5:24
**within (9)**
16:15;22:23;23:12,
12;63:17;65:10;94:5,
17;99:16
**WITNESS (11)**
3:7;40:12,18;
41:18;44:13;63:2;
78:18;82:5;87:11;
110:16,20
**woman (1)**
7:15
**women (1)**
30:7
**word (1)**
36:1
**words (3)**
60:17;66:14;74:8
**work (43)**
8:5;14:12,23,25;
16:18;18:6;27:13,16,
17,19;28:6,12;29:5;
30:16;31:1,2;36:19;
43:22,25;44:9,12,13,
14,15,22;45:1;48:24;
50:3;51:7,9;52:7,13;
58:21;66:17;74:15;
76:13;85:3;88:25;
89:7,14,24;104:7,11
**worked (15)**
14:14;15:7,11;
16:6,12;17:3,7,12;
18:2;19:21,25;26:12;
29:9,10,10
**workforce (1)**
49:7
**working (6)**
3:22;14:9;19:19;
29:20,23;55:22
**works (4)**
28:4;29:2,3;57:6
**worst (3)**
108:3
**worst-performing (1)**
102:1
**worth (1)**
68:20
**write (1)**
34:22
**written (24)**
17:5;32:24;33:11;
34:22,25;35:5,11;
36:11,25;37:13,16;
64:20,23,23;65:5;
66:1;69:16,18;71:21;
76:6,7;80:19;98:20;
106:15

**wrong (2)**
75:20;101:12
**wrote (1)**
88:11

## Y

**YCO (2)**
14:17;15:15
**year (18)**
16:23;17:4;18:3,
23;19:15;25:19,22;
26:2,3,6;27:7,10;
45:13;50:12,14,24;
61:7;79:1
**yearly (2)**
25:1;107:11
**years (36)**
7:7,9,10;9:2,12;
14:24;15:10,13;16:8,
20,23;17:17,23;
18:10;23:2;24:16;
25:3;26:14;27:1;
33:6,7;35:17;42:16;
63:20;68:21,22;69:2;
71:11;77:13;79:10,
12;86:3,5;99:5,7;
101:1
**year's (2)**
24:12;68:20
**youth (2)**
14:15,17

## Z

**Zero (21)**
81:4,9,13;82:11,
18;94:24;95:5,7;
97:14,15;99:11;
101:2,5;102:12;
104:15;105:21,23;
106:7;108:13,17;
109:13

## 0

**03 (1)**
79:8

## 1

**1 (2)**
5:16,17
**10 (2)**
99:7;109:21
**11 (3)**
29:11,11;99:18
**12 (1)**
99:7
**12:10 (1)**
3:1
**14 (4)**
87:8,22;90:6,11

**15 (6)**
71:24;72:11,14;
105:7;109:21;110:4
**16 (12)**
73:21;84:5;85:14;
86:19;95:14;100:23;
102:1;105:10,11;
108:3;109:2,3
**17 (1)**
65:25
**17:01 (1)**
87:9
**19 (1)**
17:6
**1985 (3)**
14:11;15:24,25
**1990 (1)**
17:6
**1992 (1)**
17:11
**1994 (11)**
8:14;49:23;50:7,
12,14,25;51:17,19,
25;54:9;89:4
**1995 (1)**
17:11

## 2

**2 (2)**
5:23;6:10
**20 (5)**
4:9;23:2;59:20;
63:20;86:4
**2002 (2)**
26:22,25
**2003 (1)**
79:9
**2008 (3)**
51:24;52:10;89:4
**2009 (3)**
51:24;52:10;89:4
**201 (15)**
35:13,14,23;36:15;
40:25;41:6,8,14;42:1,
9,11,19,24;43:1;99:7
**2010 (1)**
100:25
**2011 (2)**
19:10;57:17
**2012 (17)**
19:15;20:17;25:13,
16;26:25;57:17;
73:24;84:5;85:14;
86:19;87:9,22;90:6;
95:14;100:24;
105:11;109:3
**2013 (2)**
26:1;73:21
**2014 (2)**
4:9;25:23
**22 (1)**
75:9

**23 (3)**
6:4,6,8
**24 (5)**
4:14;5:21;6:2,4;
65:25
**243-8448 (1)**
87:10
**25 (5)**
4:14;5:21;6:2,5;
86:4
**26 (4)**
4:14;5:21;6:2,5
**27 (1)**
19:10

## 3

**3 (4)**
29:10,11;73:24;
75:9
**3:00 (1)**
29:21
**3:25 (1)**
110:23
**30 (1)**
86:4

## 4

**40 (2)**
59:20;70:4
**450 (1)**
106:18
**480 (2)**
65:3,4
**490 (1)**
65:3

## 5

**5 (5)**
18:8,11;75:10;
109:21;110:3
**5/10/57 (1)**
14:4

## 6

**60 (1)**
43:11

## 7

**7 (2)**
29:10,11
**70 (1)**
43:11

## 8

**80s (1)**
10:8
**85 (2)**

64:22;71:21

## 9

**98 (1)**
44:3

# In The Matter Of:

*Mancini  vs*

*City of Providence*

*Chief Hugh T. Clements, Jr.*

*Vol. II*

*June 17, 2015*



ALLIED COURT REPORTERS, INC.
and
VIDEO CONFERENCE CENTERS

Phone:   401-946-5500          Toll Free: 888-443-3767
www.alliedcourtreporters.com   info@alliedcourtreporters.com

*Min-U-Script® with Word Index*

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


Mark Mancini                 :
                             :
       VS.                   :  C.A. NO:  13-092-S-PAS
                             :  VOLUME II
City of Providence,          :
By and Through its           :
Treasurer, James J.          :
Lombardi, III, and           :
Hugh Clements, Jr.           :



         DEPOSITION OF CHIEF HUGH T. CLEMENTS, JR., a
Defendant in the above-entitled cause, taken on
behalf of the Plaintiff, before Elizabeth Greeley,
Notary Public, in and for the State of Rhode Island,
at the Law Office of Mark Gagliardi, 120 Wayland
Avenue, Providence, Rhode Island, on June 17, 2015 at
10:00 a.m.



PRESENT:

FOR THE PLAINTIFF......LAW OFFICE OF MARK GAGLIARDI
                       BY:  MARK GAGLIARDI, ESQUIRE
                               -AND-
                       GEOFF APTT, ESQUIRE

FOR THE DEFENDANT......CITY OF PROVIDENCE
                       DEPARTMENT OF LAW
                       BY:  KEVIN MCHUGH, ESQUIRE
                               -AND-
                       KATHRYN SABATINI, ESQUIRE

ALSO PRESENT:
MARK MANCINI
JENNEWA HUGHES

2

1                        I N D E X

2    WITNESS                              PAGE

3    CHIEF HUGH T. CLEMENTS, JR.

4    EXAMINATION BY MR. GAGLIARDI............  3

5

6

7

8

9                      E X H I B I T S

10   EXHIBIT          DESCRIPTION           PAGE

11   C                EXCERPT (2 PGS)..........   6

12   D                SING-UP SHEETS (7 PGS)...  38

13   E                MEMO #16 (3 PGS).........  98

14

15

16

17

18

19

20

21

22

23

24

25

1          (DEPOSITION COMMENCED AT 10:20 A.M.)

2                CHIEF HUGH T. CLEMENTS, JR.

3       Being duly sworn, deposes and testifies as

4    follows:

5                THE REPORTER:  Would you state your name

6    for the record, please?

7                THE WITNESS:  Hugh T. Clements, Jr.

8                EXAMINATION BY MR. GAGLIARDI

9    Q.   Good morning, Chief Clements.

10       A.   Good morning, Counsel.

11               MR. GAGLIARDI:  We're here to continue

12   the deposition that started last week on June 10.

13   Just for the record, I would like everyone in the room

14   to introduce themselves, and I'll start with myself.

15   My name is Mark Gagliardi, and I represent the

16   Plaintiff.

17               MR. APTT:  Geoff Aptt, associate here

18   with Mark's office.

19               MR. MANCINI:  Mark Mancini.

20               MS. SABATINI:  Kate Sabatini, Assistant

21   City Solicitor.

22               MR. MCHUGH:  Senior Assistant City

23   Solicitor, Kevin McHugh, representing Hugh Clements.

24               MS. HUGHES:  Jennewa Hughes, legal

25   intern.

4

1   Q.   Okay.  I will try my best not to ask any

2   questions that I previously asked, but it's inevitable

3   it might happen.  So the first topic I would like to

4   discuss is light-duty status.  What was the policy in

5   effect in May of 2011, which I'm going to represent to

6   you is the time that Sergeant Mancini returned to work

7   from his injury?

8        A.   I believe you could only work in light-duty

9   status for a year.

10  Q.   Okay.

11       A.   Prior to being put on some other sort of

12  status from Human Resources.

13  Q.   Why did you believe that?

14       A.   Well, the policy and the CBA.

15  Q.   Okay.  But what was, what was, what constitutes

16  light-duty status, or what did at the time, to your

17  knowledge?

18       A.   Somebody who, through medical documentation,

19  could not perform the duties of a police officer to

20  100 percent but to a lesser percentage, but still was

21  employable within the agency but in a lesser function

22  than on the street.

23  Q.   Okay.  For the position of sergeant, what would

24  light-duty status entail?

25       A.   It could be the same as patrolman or a higher

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

5

1   rank.  It could be an office function of answering the

2   phones, or working in a property room, or doing some

3   administrative-type work.

4   Q.   So a sergeant who is on light-duty status can't

5   go on patrol and chase suspects, correct?

6        A.   Correct.

7   Q.   For obvious reasons?

8        A.   Correct.

9   Q.   Okay.  Has that policy changed since you've

10  become Police Chief, to your knowledge?

11       A.   No.

12  Q.   I believe you testified last time and we

13  discussed at some point the person who is on

14  injured-on-duty status would be required to file for

15  accidental disability benefits; is that correct?

16       A.   Yes.

17  Q.   Where is that policy written?

18       A.   I believe it's in the contract.

19  Q.   The CBA?

20       A.   Yes.

21  Q.   At what point would they be required, how long

22  would they have to be on injured-on-duty status before

23  they were required to file for accidental disability

24  benefits?

25       A.   That is a function that is solely done

6

1    through Human Resources along with the Retirement

2    Board.  I'm not clear and certain on all the

3    particulars to that, but I believe it's one-year light

4    duty, and then they wait for medical documentation to

5    see if that employee is able to come back to work in a

6    full-time capacity or full-function capacity.

7                    MR. GAGLIARDI:  Okay.

8              (EXHIBIT C PLAINTIFF'S MARKED FOR ID)

9    Q.   Chief Clements, I just handed you what's been

10   marked as Plaintiff's Exhibit C, which I'm going to

11   represent to you are excerpted pages of the CBA

12   between the Providence Police Department and the

13   union, or the City of Providence and the union.  These

14   are Pages 60 and 61.  I want you to just take a minute

15   and review this document.

16        A.   Okay.

17   Q.   Does this refresh your recollection of the

18   light-duty status policy of the Providence Police

19   Department in or about May 2011?

20        A.   Yes.

21   Q.   You indicated that a member could not be assigned

22   light duty for more than 12 months, correct?

23        A.   Correct.

24   Q.   Does it say anywhere in here that if the member

25   exceeds light-duty status for more than 12 months they

7

1    would be forced to file for accidental disability

2    benefits?

3         A.   No.

4    Q.   Okay.  So according to this policy, if Sergeant

5    Mancini came back to work on light-duty status in May

6    of 2011, the collective bargaining agreement would

7    enable him to maintain light-duty status for one year,

8    up to May 2012?

9              MR. MCHUGH:  Objection as to form.  You

10   can answer.

11             THE WITNESS:  Could I have the question

12   again, please?

13             MR. GAGLIARDI:  Read that back, please.

14             (QUESTION READ BACK)

15        A.   Yes, according to this CBA.

16   Q.   Okay.  So I'm going to represent to you that

17   Sergeant Mancini claims that in August of 2011, only

18   three months later, that his employer terminated his

19   light-duty status and required him to file accidental

20   disability benefits.  Do you have any, can you

21   explain, do you have any knowledge of that?

22        A.   Only through this paperwork.  Again, that is

23   a function performed by Sergeant Grenada in the Human

24   Resource Office.  So I can't really speak to the

25   particulars on that.

8

1   Q.   Okay.  Did you direct anyone in the Human

2   Resources Department or anybody below you to terminate

3   Sergeant Mancini's light-duty status?

4        A.   No.

5   Q.   Do you recall what Sergeant Mancini was doing for

6   his light-duty status, what job he was doing?

7        A.   I don't.

8   Q.   We talked a little bit last time about the chain

9   of command at the Providence Police Department.  I'm

10  more interested this time in discussing how that, how

11  Sergeant Mancini fit into that chain of command.

12  Let's talk about that.

13       So Sergeant Mancini, this is, of course, during

14  the time period June 2012, at about the time he was

15  being awarded the service points, okay?

16       A.   Okay.

17  Q.   So Sergeant Mancini was a sergeant at the time.

18  He had patrolmen under him; is that correct?

19       A.   Yes.

20  Q.   In what district was Sergeant Mancini assigned

21  to?

22       A.   4, District 4.

23  Q.   Which is where?

24       A.   Which is the West End.  Elmwood Avenue going

25  up to the west all the way over to Broadway, Federal

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

9

1    Hill and the Eagle Square area and to the total west

2    side abutting Olneyville.

3    Q.   How many patrolmen was he supervising at the

4    time?

5         A.   On his particular shift there are four car

6    posts in District 4.  There may be as little as three

7    assigned to duty on his shift, or as many as four,

8    five or six, but traditionally around four or three.

9    But then he may be required to supervise abutting

10   districts, Districts 5 and 3.

11   Q.   When you say car posts, what does that mean?

12        A.   Geographical areas where patrol officers in

13   uniform are assigned to patrol.  So it's a block, it's

14   a geographical post.

15   Q.   How many police officers are assigned to each car

16   post?

17        A.   One.

18   Q.   What shift was he assigned to?  I understand

19   there are three shifts, correct?

20        A.   Yes, technically four.  It's a mid shift as

21   well.  He was the day shift, 7 A to 3 P.

22   Q.   My understanding from your testimony last week

23   was that above the sergeants were lieutenants,

24   correct?

25        A.   Correct.

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 138 of 265 PageID #:
1274
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

10

1  Q.   Who was the lieutenant assigned to District 4 in

2  June of 2012?

3       A.   I believe it was D'Andrade.

4  Q.   That would have been Sergeant Mancini's direct

5  supervisor, correct?

6       A.   Yes.

7  Q.   How many districts was Lieutenant D'Andrade

8  responsible for, other than District 4?

9       A.   None.  Just one, except if she's given an OIC

10 assignment, Officer in Charge, there will be assigned,

11 a district lieutenant may be the highest ranking

12 officer on a night shift.  They would be responsible

13 for the whole City.

14 Q.   How many sergeants, how many sergeants were

15 assigned to the District 4 shift, other than Sergeant

16 Mancini?

17      A.   Exactly, I don't know, but not more than

18 three.  It would have been one for each shift.  There

19 were some districts that did not have a sergeant

20 assigned on each shift.  I believe District 4 had

21 three assigned.

22 Q.   So Lieutenant D'Andrade was responsible for

23 supervising Sergeant Mancini and two other sergeants?

24      A.   Yes.

25 Q.   Then who was Lieutenant D'Andrade's immediate

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 139 of 265 PageID #:
1275
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

11

1    supervisor?  My understanding, it would be a major; is

2    that correct?

3         A.  Captains.

4    Q.   Oh, sorry, captains, then eventually the major?

5         A.  Yes.

6    Q.   So who was Lieutenant D'Andrade's captain at the

7    time, June 2012?

8         A.  It had changed.  In June 2012, Captains would

9    have been Lepre and Stamatakos, and the Major would

10   have been Verdi.

11   Q.   Then above Major Verdi would have been the Deputy

12   Chief and yourself, correct?

13        A.  Yes.

14   Q.   Tell me about the interplay between the

15   lieutenant and the sergeant; how does that

16   supervisor-subordinate relationship work?

17        A.  Lieutenant is responsible for the entire

18   operations in that community; in essence, the mini

19   police chief for that geographical area.  So the

20   dynamics between the lieutenant and the sergeant are

21   the lieutenant would take direction from above and

22   take information from the outside, the community, the

23   council, the community groups.

24        Then the lieutenant would direct the operations

25   of that geographical area on the respective shifts.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

12

1   So for the day shift if there were issues or

2   complaints about certain activity at certain car posts

3   or neighborhoods, the lieutenant would constantly

4   advise the sergeant what to pay attention to.

5   Q.   Where are all these folks working?  My

6   understanding is that the sergeants and the patrolmen

7   are in police vehicles out trying to prevent crime.

8   Where is the lieutenant when all of this is going on,

9   Lieutenant D'Andrade?

10        A.   More than likely she is in Central Station at

11   her substation, which is on Cranston Street, or she's

12   in meetings, or just on routine patrol herself.

13   Q.   Okay.  When she's on a routine patrol, is she

14   performing the same function as the sergeants and

15   patrolmen?

16        A.   No.  She's probably following up on

17   complaints she's had from outside or above.

18   Q.   Complaints, civilian complaints?

19        A.   Yes, neighborhood complaints and checking

20   locations.

21   Q.   What reasons does a lieutenant have for going out

22   into the -- strike that.  What reasons typically does

23   a lieutenant have for leaving their office and going

24   out into the field and dealing with sergeants and

25   patrolmen?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

1      A.   Just about anything.   They have almost

2  complete free latitude.

3  Q.   Well, give me some examples.

4      A.   Again, they could be out there checking on

5  complaints in the neighborhood.

6  Q.   Okay.  What else?

7      A.   They could be going to a meeting with a

8  council person.  They could be going to a meeting with

9  a representative from a community group.

10  Q.   What about arrests?

11      A.   Rare for a lieutenant to make an arrest, but

12  they could.  Some do.

13  Q.   If there is a shooting, is that something that

14  the lieutenant would go out and be a part of?

15      A.   Certainly any major incidents in that

16  geographical area, or anywhere in the City they would

17  respond to, oversee the operation.

18  Q.   What was Lieutenant D'Andrade's official title in

19  June of 2012?

20      A.   I believe it was Lieutenant/District

21  Commander.

22  Q.   How often does a Lieutenant/District Commander

23  meet with the sergeants in person?

24      A.   It depends who the lieutenant is or district

25  commander.  They all work in varying styles.

14

1   Q.   I mean, I can only go by what I see on TV.  Do

2   they have a meeting and say, Let's do it to them

3   before they do it to us?

4        A.   Some do, some do.  They have routine

5   meetings.  Others like to lead with the approach that

6   they pop in unexpectedly to roll calls, or to the

7   substation, or on dispatch calls themselves.  They're

8   pretty busy.  Depending on their, how full their plate

9   is, it may differ as to their style.  They're all

10  different.

11  Q.   Certainly they're available to communicate via

12  telephone or -- what do you call it, a walkie-talkie?

13       A.   Yes, the police radio.

14  Q.   Police radio?

15       A.   Yes, yes.

16  Q.   What about the captain, the captains?  There's

17  two captains, there were two captains that Lieutenant

18  D'Andrade reported to; that was Lepre and Stamatakos?

19       A.   Yes.

20  Q.   How many captains were there at the time?

21       A.   Six.  We're authorized for eight.  I believe

22  at that time -- it's fluctuated.  We've gone as low as

23  five.  At that particular time, I'm not sure.  It may

24  have been five or six.  I want to say six.

25  Q.   Lapatin and Sauro were both Captains in 2012,

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

15

1    correct?

2         A.   Yes.

3    Q.   Who else, and this is June of 2012, Lepre,

4    Stamatakos, Campbell, that's five?

5         A.   Yes.   We may have gone as low as five.

6    Q.   Why was Lieutenant D'Andrade reporting to two

7    captains?

8         A.   Well, the captains are assigned to the

9    Uniform Division Patrol Bureau.   One is predominantly

10   responsible for days, the other predominantly nights.

11   However, oftentimes they both work days.   One of them,

12   depending on the major's style of commanding his

13   division, one of them was mainly responsible for the

14   operational side of the entire division.   The other

15   one was more responsible for the community relations

16   end of the patrol function.

17   Q.   To your knowledge, in June of 2012 how did Lepre

18   and Stamatakos divide up their duties?

19        A.   Stamatakos was more the community relations

20   Captain.   Captain Lepre was more the operational,

21   boots-on-the-ground Captain.   Again, they would

22   fluctuate.   They wouldn't keep the same schedule.

23   They would, sometimes Lepre would work nights;

24   sometimes Stamatakos would work nights.

25   Q.   Okay.   How often in your experience does a

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

16

1    captain deal with sergeants?

2         A.   Often.

3    Q.   Tell me how that works.

4         A.   We're a busy, high-volume City, especially in

5    District 4, District 5.  Districts 2, 4, 5 and 7,

6    these are immensely busy areas.  There's a high volume

7    of calls or complaints, whether it be from the

8    dispatch, councillors from the community.

9         So the captains, upon receiving complaints or

10   information on respective issues in the City, if that

11   lieutenant was not working, they would definitely go

12   right to the sergeants or even the patrol people and

13   direct them.

14   Q.   This is just for civilian complaints?

15        A.   Everything.  Could be either a long-standing

16   complaint, or we deal with a lot of long-term issues,

17   like constant gangs on the corner, drug dealing at

18   certain houses.  Just constant nuisance complaints in

19   certain sections of the City that are complained about

20   oftentimes at the community meetings.

21        A caller may call, They're back out there again

22   in front of 142 Hanover Street.  Can you help us?  We

23   complain about this all the time.  That's

24   long-standing or a long-term complaint, or it could be

25   something that just happened.  Kids out there; they're

17

1    firing a gun into a house, or BB gun.  They're going

2    to hurt someone.  Can you get someone out here?

3    Q.    In terms of the day-to-day operations, is it fair

4    to say that the lieutenant would be more involved with

5    the sergeant than the captains?

6         A.   Yes.

7    Q.    How many districts were there in June of 2012?

8         A.   Nine.

9    Q.    Which districts were Lepre and Stamatakos

10   responsible for?

11        A.   All of them.

12   Q.    What about Lapatin, Sauro and Campbell?

13        A.   Again, this was a time of flux in the agency.

14   Lapatin and Campbell had been moved out of the

15   division.  I believe Sauro was in narcotics by then.

16   Q.    Do you know how long Lieutenant D'Andrade was

17   supervising Mark Mancini?

18        A.   I don't.

19   Q.    More than five years, less than five years?

20        A.   Less than five years.

21   Q.    Okay.  Do you know who was supervising Sergeant

22   Mancini before Lieutenant D'Andrade?

23        A.   Lieutenant San Lucas.

24   Q.    San Lucas?

25        A.   Yes.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

18

1    Q.    Is that a man or woman?

2          A.   Man.

3    Q.    Do you know his first name?

4          A.   Luis, Luis San Lucas.

5    Q.    Sorry?

6          A.   Luis.

7    Q.    Do you know how it came about that Luis San Lucas

8    no longer became Mark Mancini's direct supervisor?

9          A.   He got transferred and moved to the

10   commandant to run the police academy and training.

11   Q.    How often would a major, in your experience, how

12   often does a major have contact with a sergeant?

13         A.   Often.

14   Q.    How does that happen?

15         A.   Especially in patrol.  The major's office is

16   right on the corner.  When you walk in the office

17   going into the main lieutenant's office, you would

18   have to walk in the door of the Patrol Bureau and go

19   directly by the major's office to go into the

20   lieutenants, sergeants area, or the desk sergeant's

21   area.  So everyone who walks in the Patrol Bureau has

22   to walk by the major every single time.

23   Q.    All right.  That was a bad question.  What I

24   really meant was, how often does a major have the

25   opportunity to observe a sergeant perform his or her

19

1    job duties?

2         A.  Often.  I mean, sergeants are routinely in

3    the station supervising their patrol officers on

4    reports or a situation on the street.  So routinely

5    majors, unfortunately, spend a lot of time in the

6    office.  They're in the office a lot when a lot of

7    members of the Patrol Bureau are in there as well

8    dealing with a situation.

9         Certainly any incident on the street of note, a

10   major incident, the rank of major in the Patrol Bureau

11   would be on the scene.  He would be there to direct

12   and observe the activities of everyone, including

13   members who are not under his command who may be in

14   narcotics or detectives.

15   Q.   At the time the Majors, my understanding, were

16   Verdi, Tucker and Colon; is that correct?

17        A.  Yes, yes.

18   Q.   How often does the, would the Deputy Chief

19   interact with a sergeant?

20        A.  Same thing, often.  He's out there.  This

21   Deputy Chief, Tommy Oates, he's out there quite a bit

22   following the radio and following in on calls.  He's

23   pretty active.  Goes to roll calls.

24   Q.   At the meeting that you had before the June 16,

25   2012 promotional exam, the meeting in which chief

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 148 of 265 PageID #:
1284
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

20

1    points were recommended to you by the command staff

2    and supervisors, was Lieutenant D'Andrade present at

3    that meeting?

4        A.   I believe so, but I'm not positive.

5    Q.   Okay.  Before you became Police Chief, when you

6    were in a supervisory capacity as a Major, had you had

7    the opportunity to make a recommendation of chief

8    points to a candidate for promotion?

9        A.   Yes.

10   Q.   Did you attend a meeting similar to the one that

11   you described that happened prior to the June 16, 2012

12   lieutenants promotional exam?

13       A.   Yes.

14            MR. MCHUGH:  Could you read that question

15   back, please?

16            (QUESTION READ BACK)

17            MR. MCHUGH:  Thank you.

18   Q.   Was that meeting conducted by Chief Esserman?

19       A.   Yes.

20   Q.   How did that meeting differ from the one that you

21   presided over in June 2012, if at all?

22            MR. MCHUGH:  Objection as to form.  You

23   can answer.

24       A.   It was very similar.

25   Q.   Okay.  Did Chief Esserman hand out score sheets

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

21

1   like you did?

2        A.  Yes.

3   Q.   Were the score sheets blank with respect to

4   service points?

5        A.  Yes.

6   Q.   Is that how you, is that why you followed the

7   procedure you followed in June 2012?

8        A.  Correct.

9   Q.   So you learned it from Chief Esserman, right?

10       A.  Yes.

11  Q.   Did Chief Esserman have everybody give a

12  recommendation on points, even those people that did

13  not directly supervise the candidate?

14       A.  Yes.

15  Q.   I'm going to represent to you that Sergeant

16  Mancini claims that it's against the policy or the CBA

17  for someone, other than the direct supervisor, to

18  recommend chief points or service points; do you

19  disagree with that?

20       A.  It's not contained in the CBA.  At the time I

21  don't believe we had a policy relative to how the

22  points were given.

23  Q.   Last week I asked you a question, and you

24  responded to it.  I'm just going to read the question

25  and the answer from the transcript.  It's from

22

1   Page 42, Line 22 to Page 45, Line 1 -- Page 44,

2   Line 22 to Page 45, Line 1.  I'm just going to

3   represent to you this is the question and answer.  If

4   you want us to show the transcript, if you have any

5   reason to doubt that's accurate, I'd be happy to.

6        The question was, How do you evaluate the work

7   performance of a police officer if you're not there

8   observing them to do them do their job?  Remember I

9   asked that question?

10       A.  Yes.

11  Q.   Your answer was, I rely heavily on the critique

12  assessment review of the people they work directly

13  for?

14       A.  Yes.

15  Q.   Okay.  So in June of 2012 Sergeant Mancini worked

16  directly for Lieutenant D'Andrade, correct?

17       A.  Yes.

18  Q.   Okay.  So does that mean that in awarding him

19  chief points in June of 2012 that you relied heavily

20  on Lieutenant D'Andrade's recommendation?

21            MR. MCHUGH:  Objection as to form.  You

22  can answer.

23       A.  Along with, and more importantly, the

24  captains and major responsible for the entire

25  division.

23

1          MR. GAGLIARDI:  That doesn't answer the

2    question.  Could you read it back?  It's a yes-or-no

3    answer.

4               (QUESTION READ BACK)

5          MR. MCHUGH:  Objection as to form.  You

6    can answer.

7      A.  No.

8  Q.    Okay.  Why?

9      A.  I'm not trying to be smart.  It's, I rely

10   heavily on the command staff running the entire

11   division, the captains, the major, and everyone else

12   who has input with observing and overseeing all of the

13   sergeants, all of the lieutenants.

14  Q.   That's not what you said last week.  You said you

15   rely heavily on the people they work directly for.

16          MR. MCHUGH:  Objection as to form.  There

17   is no question pending.

18  Q.   Okay.  So you didn't rely heavily on Lieutenant

19   D'Andrade's recommendation, even though Mark Mancini

20   worked directly for her and she had the most knowledge

21   and experience regarding his work performance, right?

22          MR. MCHUGH:  Objection as to form.  You

23   can answer.

24      A.  Everyone in patrol works directly for a lot

25   of sergeants, a lot of lieutenants, some captains, and

24

1    most importantly, a major.

2    Q.    Would you agree with me that a lieutenant has the

3    most interaction and ability to observe a sergeant in

4    the performance of their duties?

5                    MR. MCHUGH:  Objection.

6    Q.    As opposed to the majors and captains above them?

7                    MR. MCHUGH:  Objection to form.  You can

8    answer.

9         A.   Yes.

10   Q.    Okay.  A lieutenant is in a better position to

11   evaluate the performance of a sergeant as opposed to a

12   captain or major, right?

13                   MR. MCHUGH:  Objection as to form.  You

14   can answer.

15        A.   Not necessarily.

16   Q.    Why not?

17        A.   Because of all the things I testified to.

18   It's a busy, high-volume place.  The captains are very

19   engaged.  The major is very engaged.  The high-ranking

20   officials in the respected bureau, whether it be

21   patrol, detectives, narcotics, they're very engaged.

22   They are working sergeants.  They are working majors.

23   They're engaged.

24   Q.    Lieutenant D'Andrade was Sergeant Mancini's

25   direct supervisor, right?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

25

1      A.  Yes.

2  Q.   What does that mean, direct supervisor?

3      A.  She was in charge of the district that he was

4  assigned to.

5  Q.   He was reporting directly to her, right?

6      A.  Yes.

7  Q.   She had the most interaction with Sergeant

8  Mancini; she was the supervisor with the most

9  interaction with Sergeant Mancini, wasn't she?

10     A.  Yes.

11  Q.   Do you remember what Lieutenant D'Andrade

12  recommended for service points for Sergeant Mancini in

13  June 2012?

14          MR. MCHUGH:  Objection as to form.  You

15  can answer.

16     A.  I don't.

17  Q.   Did you have her fill out one of those score

18  sheets?

19     A.  She had one if she came to the meeting, and

20  she did not turn one in.

21  Q.   Was she invited to the meeting?

22     A.  Yes.

23  Q.   What happens when a direct supervisor cannot

24  attend a meeting; do you postpone the meeting?

25     A.  Not for one particular lieutenant who could

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

26

1    not make it.  If several could not make it, probably.

2    Normally, no, we'd continue to have it.

3    Q.   Okay.  Let's talk a little bit more about how

4    service points are awarded.  We talked last time that

5    it's set forth in the collective bargaining agreement;

6    that it's based on their overall performance, right?

7         A.   Yes.

8    Q.   The CBA sets forth some examples; it includes

9    letters of commendation and sick days.  What is your

10   interpretation of how sick days come into play when

11   awarding service points?

12        A.   The command staff members of the respective

13   bureaus would certainly highlight and indicate to me

14   if somebody had a sick abuse problem.

15   Q.   You mean they took out too many sick days?

16        A.   Yes.

17   Q.   That would be indicative of somebody who is what;

18   what does that mean if they have too many sick days?

19        A.   That they may have abused their total

20   allotment of sick days, or they may have had a serious

21   off-duty illness.  It could mean one or the other.

22   Q.   How do you differentiate between the two?

23        A.   If they have medical documentation that their

24   absenteeism was covered medically.

25   Q.   Would you hold that against them; would you count

1   that as a negative in awarding chief points?

2       A.  No.

3   Q.   What if somebody didn't have medical

4   documentation and exceeded the allotted amount of sick

5   days; how would that affect the award of service

6   points?

7       A.  Yes.  It could affect the award of service

8   points, if we identified a pattern of sick abuse or

9   sick use that turned into abuse.

10  Q.   Okay.  That's easy to quantify, right, because

11  you keep track of that, right?

12      A.  Yes.

13  Q.   Letters of commendation, that's easy to quantify;

14  you keep track of that, right?

15      A.  Yes.

16  Q.   Tell me about some of the other quantitative data

17  that you consider in awarding chief points, things

18  that you can quantify?

19              MR. MCHUGH:  Objection as to form.  You

20  can answer.

21  Q.   You have letters of commendation; we have sick

22  days.  What else?

23      A.  As far as quantifying, that's about it.  It's

24  more the overall performance and the production within

25  the respective district.  If their respective

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

28

1   workforce is producing at a high level.

2   Q.   What does that mean, producing?

3        A.   A lot of activity.  I mean, there is no

4   quota.

5   Q.   Arrests?

6        A.   Arrests, summons.

7   Q.   So number of arrests.  What's the -- I have no

8   idea how many arrests is a good number or a bad

9   number.  How do you evaluate whether someone has an

10  above-average amount of arrests, or average, or below

11  that?

12            MR. MCHUGH:  Objection as to form.  You

13  can answer.

14       A.   You can't.  Some districts are busier than

15  others.  Some districts are busier during more

16  seasonal times than others.  It's not a set number.

17  Some districts are more active than others.

18  Q.   Sure, sure.  There's probably less arrests on the

19  East Side than there are in South Providence, right?

20       A.   Correct.

21  Q.   Is it fair to compare sergeants within the same

22  district as to the number of arrests?

23            MR. MCHUGH: Objection.

24  Q.   Is that a fair way to evaluate someone's

25  performance?

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 157 of 265 PageID #:
1293
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

29

1              MR. MCHUGH:  Objection to form.  You can

2   answer.

3        A.  No.

4   Q.   Why not?

5        A.  Because there is only one sergeant on each

6   shift.  So to compare a day sergeant with a

7   three-to-eleven or eleven sergeant is not fair,

8   because the volume of calls is higher on the night

9   shift.

10  Q.   Okay.  So you don't take into account the number

11  of arrests then when you're awarding service points?

12       A.  Again, there are other things considered in

13  the overall operations of a district.  It's really not

14  quantifiable.

15  Q.   What about civilian complaints; is that something

16  that you would consider in awarding chief points?

17       A.  Yes.

18              MR. MCHUGH:  Objection as to form.

19  Civilian complaints, vague, lack of foundation.

20  Q.   Do you understand the question?

21       A.  Yes.

22  Q.   It's only two, the only quantitative data you

23  would consider in awarding chief points would be

24  letters of commendation and sick days?

25       A.  Quantitative, yes.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

30

1    Q.    How does everybody prepare for these meetings;

2    what do they do, to your knowledge, to prepare?

3                    MR. MCHUGH:   Objection to form.  You can

4    answer.

5         A.   All different.  It's not set in writing, not

6    set in stone.  Many will look for abusive sick time,

7    look for activity and look for letters of commendation

8    or praise.  As well just identify their overall

9    performance of their day-to-day activities.

10   Q.    How does the command staff, how do the command

11   staff and the supervisors know all this information?

12        A.   Because they're actively engaged day to day,

13   shift by shift, community by community.

14   Q.    Is it just memory?

15        A.   Overall mindset, yes.

16   Q.    How can they remember how many sick days that an

17   applicant took?

18        A.   They cannot.  They don't have a number in

19   their head.  I think they just identify, I heard it.

20   They will just identify when there is a signal of

21   abuse or a lot of sickness.

22   Q.    Does anybody, whether it's -- I'm sorry, I can't

23   remember his title.  Sergeant Grenada, does Sergeant

24   Grenada provide information on sick days to people at

25   these meetings?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

31

1        A.   Yes.

2   Q.   He does?

3        A.   Yes.

4   Q.   How does he do that?

5        A.   Through a -- I don't know if he did for this

6   one.  I know on occasions he has through written

7   documentation for respective lieutenants or command

8   staff, members who inquire.

9   Q.   So someone has to ask Sergeant Grenada before he

10  will produce a number of sick days?

11       A.   Traditionally, yes.

12  Q.   It's not information that is provided on those

13  score sheets, is it?

14       A.   Correct.

15  Q.   Same thing with the letter of commendation and

16  arrests, that information is not put on the score

17  sheet, is it?

18       A.   That's correct.

19  Q.   Okay.  Are the folks present at these meetings,

20  the command staff and supervisors, are they allowed to

21  review personnel files, 201 files prior to these

22  meetings?

23       A.   Yes.

24  Q.   Is that a practice that they undertake, to your

25  knowledge?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

32

1           MR. MCHUGH:  Objection to form.

2      A.   Some do.

3 Q.   Do you know prior to this meeting in June 2012 if

4 any supervisors or the command staff reviewed any

5 applicant's personnel files?

6      A.   I don't.

7 Q.   Were personnel 201 files, or performance

8 evaluations, or any other documents present or made

9 available to the people present at this meeting in

10 June of 2012 for them to review?

11           MR. MCHUGH:  Objection to form.  You can

12 answer.

13      A.   At that meeting, no.

14 Q.   What about prior?  What about discipline; how do

15 you factor in an applicant's discipline in awarding

16 chief points?

17      A.   Certainly if they had an active, recent

18 discipline, that would be considered in the award of

19 service points.

20 Q.   Okay.  How recent, and what kind of discipline?

21      A.   There is no set time on how recent.  There

22 are acts of discipline from verbal, to written, to

23 days of suspension, to lengthy suspensions, to

24 demotion.  So certainly something more egregious would

25 be held in higher regard.

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 161 of 265 PageID #:
1297
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

33

1  Q.   I'm curious as to how far back you go with

2  discipline.  I believe you testified last week that

3  you only consider their overall performance in their

4  current position, right?

5              MR. MCHUGH:  Objection as to form.  If

6  you recall that independently without seeing the

7  deposition.

8      A.   I believe I testified I considered the

9  overall performance in their present position as well

10  as for the rank they're aspiring to it.  That

11  certainly comes into play in awarding points.  As

12  well, as far as discipline, again, there is no set

13  time limit going back.

14          There are certain acts that are so egregious

15  that, you know, they may never be forgotten by

16  somebody on the command staff.  Me, personally, if

17  there's been a transgression of some sort and time has

18  passed and they served their punishment, you know,

19  we're a big agency.  We have a lot of good employees.

20  I like to say we move on.

21  Q.   Okay.  You said there are certain people in the

22  command staff, that there are certain acts too

23  egregious that they'll never forget them.  Who are the

24  people in the command staff, and what are the acts

25  that are so egregious that they never forget them?

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 162 of 265 PageID #:
1298
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

34

1              MR. MCHUGH:  Objection.

2         A.  I don't know.  I can't speculate.

3    Q.   Hold on.  You just said there are certain people

4    in the command staff.  That's a very specific

5    statement, and there's not that many people in the

6    command staff.  Let's go through each of the people

7    and tell me which people it is.

8              MR. MCHUGH:  Before we do that, can she

9    read back the answer?  Can you read the question

10   before that somewhere?

11              (QUESTION AND ANSEWR READ BACK)

12              MR. MCHUGH:  I think that time was why I

13   was objecting.  I thought he said there may be some

14   people on the command staff.  I don't believe he said

15   there are some people.  That's why I objected.  Thank

16   you.

17        I'm going to need to get the transcript over

18   here.  We can keep going.  I need to call over to the

19   office.

20              MR. GAGLIARDI:  I'm not trying to impeach

21   him with his testimony.

22              MR. MCHUGH:  I didn't know we had it.  I

23   would have looked at it before today.

24   Q.   So who are those people on the command staff that

25   don't forget egregious acts?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

35

1       A.  So to clarify, when I speak about members of

2   the command staff, I've been at several of these

3   sessions where they award points from going back

4   several command staff administrations.  Who in

5   particular, I don't know.

6       We'll throw out a name for service points, and

7   somebody in the room may say an act he committed

8   several years ago.  Who in particular, I don't know.

9   I mean, that's how these meetings are conducted, and

10  they've always been that way.

11  Q.   Give me an example of the last time that happened

12  in your recollection.

13      A.   In general, I can think of like a Danny

14  McCarthy.  When his name is brought up, people in the

15  command staff may say the time that he was driving

16  intoxicated and he ran, he hid under a boat.

17  Everybody remembers that.  Or somebody will throw that

18  out there.  Years ago.

19  Q.   When did that happen?

20      A.   Several years ago.

21  Q.   More than ten?

22      A.   Yes.

23  Q.   Okay.  So was he ever promoted after that

24  incident?

25      A.   No.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

36

1  Q.   Do you remember what he received for chief points

2  in promotional exams?

3       A.   I don't.

4  Q.   To your knowledge, is the reason he wasn't

5  promoted because of that incident, or did he not score

6  well on the written exam?

7            MR. MCHUGH:  Objection as to form.  Lack

8  of foundation.  Do we know he applied?

9       A.   I don't know.

10  Q.   Do you know if Mr. McCarthy applied for a

11  promotional exam, took a promotional exam?

12       A.   He did.

13  Q.   Was he promoted, to your knowledge?

14       A.   I don't -- to sergeant, no.

15  Q.   Okay.  The bottom line, though, is you, Hugh

16  Clements, are willing to give people a second chance,

17  right?

18       A.   Yes.

19  Q.   You're the final decisionmaker in awarding the

20  service points, right?

21       A.   Yes.

22            MR. GAGLIARDI:  Obviously the incidents

23  you just mentioned with Mr. McCarthy, I just want to

24  state for the record, the witness opened up the door

25  to speak about this officer.

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 165 of 265 PageID #: 1301
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

37

1          MR. MCHUGH:  I understand.

2          MR. GAGLIARDI:  So it's not a violation

3    of the court order, in my opinion.

4          MR. MCHUGH:  I don't have any problem

5    with it.

6  Q.   That incident sounds like it was pretty

7    egregious, so that would stick out in everybody's

8    mind, right?

9       A.   Yes.

10  Q.   How does everybody at the command staff, on the

11    command staff and the supervisors present at these

12    meetings remember discipline that is less egregious

13    and more of the garden-variety type?

14          MR. MCHUGH:  Objection to form.  You can

15    answer.

16       A.   In general, some have better memories than

17    others.  They'll remember exactly what that person

18    got.  Others will just remember the act and not know

19    what the discipline was.

20  Q.   Okay.  I guess my question is, do the folks

21    present at these meetings review documented prior

22    discipline before they make a recommendation of

23    service points?

24          MR. MCHUGH:  Objection to form.  If you

25    know.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

38

1      A.  Some do; some don't.  There are a lot of
2  people in the room.
3  Q.    The ones that do, how do they go about doing
4  that?
5      A.  They can request through human resources to
6  review someone's personnel file or ask for information
7  from the sergeant in human resources.
8  Q.    Did that happen at the June 2012 meeting, to
9  discuss service points for the lieutenants promotional
10 exam?
11     A.  I don't know.
12 Q.    Who would know that information?
13     A.  The individual officers, if they asked.
14 Q.    What about Sergeant Grenada; would he, would he
15 know that?
16     A.  He would know.
17 Q.    When someone asks to review a personnel file,
18 does he document that, to your knowledge, that
19 request?
20     A.  I can't be positive on that.
21         MR. GAGLIARDI:  Okay.  All right.  Let's
22 take a look at this.
23         (EXHIBIT D PLAINTIFF'S MARKED FOR ID)
24         MR. GAGLIARDI:  You've just been handed
25 Plaintiff's Exhibit D, which I'm going to represent to

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 167 of 265 PageID #: 1303
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

39

1   you are the score sheets from the lieutenants

2   promotional exam of June 16, 2012.  These documents

3   were e-mailed to me by your attorneys.  Kevin, do you

4   have any objection if we number the pages?

5              MR. MCHUGH:  No.

6   Q.   If you don't mind, sir, if I could have the

7   exhibit, I'm going to number each page in the lower

8   right-hand corner one to seven.  All right, let's

9   start with Page 1.  It looks like there's someone's

10  name written in cursive in the upper right-hand

11  corner.  Do you know whose name that is?

12       A.   Yes.  Keith Tucker.

13  Q.   What was his position at the time?

14       A.   He was a Major in charge of the Investigative

15  Division.

16  Q.   What is the Investigative Division?

17       A.   Comprises several smaller bureaus.  Mainly

18  the Detective Bureau that investigates major crimes,

19  violent crimes, homicide, robbery, burglary, sex

20  assault.  As well, it has smaller units like the

21  bureau of criminal identification, special victims

22  unit, the robbery squad.  Narcotics and organized

23  crime will fall under the Investigative Division.

24       The Youth Service Bureau investigates youth crime

25  and falls under the Investigative Division.  So that

40

1    division comprises several bureaus.

2    Q.    To your knowledge, how much interaction did he

3    have with Sergeant Mancini and Sergeant Mancini's

4    capacity as a sergeant?

5         A.    Would have been generally limited, unless he

6    was up in detectives turning the case over.  Prior to

7    that, I don't know.

8    Q.    To your knowledge, is that the service points

9    that are written in the column entitled Service

10   Points, is that Major Tucker's handwriting, to your

11   knowledge?

12        A.    I can't say for sure.

13   Q.    Do you have any reason to believe that it's not

14   his handwriting?

15        A.    No.

16   Q.    Okay.  Did you hand Major Tucker one of these

17   blank score sheets?

18        A.    Yes.

19   Q.    Did Major Tucker hand this back to you at the

20   meeting or after the meeting?

21        A.    I believe it was after the meeting.

22   Q.    Did you write anywhere on this sheet?

23        A.    No.

24   Q.    Do you see Numbers 5 and 6, Officer Donnelly,

25   Officer Dwyer?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

41

1       A.  Yes.

2    Q.   There's two marks next to five and six?

3       A.  Yes.

4    Q.   Did you make those marks?

5       A.  No.

6    Q.   Do you have any explanation why those two names

7    are marked?

8       A.  No.

9    Q.   Well, let's look at their present jobs.  One is a

10   detective, Dwyer is a detective, and Donnelly is a

11   BCI?

12      A.  Yes.

13   Q.   Does that mean that those two officers report to

14   Tucker?

15      A.  Again, I can't be positive, but in all

16   probability, that's what that means.  Those two guys

17   were assigned to him.

18   Q.   He gave them both fives, right?

19      A.  Yes.

20   Q.   Who else on this list would have been assigned to

21   Major Tucker, other than Donnelly and Dwyer?

22      A.  Gannon.

23   Q.   What's YSB?

24      A.  Youth Service Bureau.

25   Q.   That came under Major Tucker's purview, right?

1       A.  Yes.

2  Q.  Who else on this list would have been assigned to

3  Tucker's command?

4       A.  Number 11, Kevin Lanni, narcotics and

5  organized crime.

6  Q.  Okay.

7       A.  Number 19, George Smith, Bureau of Criminal

8  Identification.

9  Q.  Okay.

10      A.  Number 21, Mike Wheeler, YSB.

11  Q.  All the people that you just mentioned were all

12  assigned to Keith Tucker's Investigative Division?

13      A.  Yes.

14  Q.  Would you agree with me that he gave them all

15  fives for service points?

16      A.  Yes.

17  Q.  Okay.  Let's look at Page 2.  Whose score sheet

18  is this?

19      A.  Tom Oates.

20  Q.  His position was at the time?

21      A.  Deputy Chief.

22  Q.  To your knowledge, how long has he known Mark

23  Mancini?

24      A.  I don't know.

25  Q.  To your knowledge, did Commander Oates, was he

43

1   ever Sergeant Mancini's direct supervisor?

2          A.   I'm not sure.

3   Q.   Whose handwriting is this on Tom Oates' score

4   sheet?

5          A.   That is his.

6   Q.   Do you recognize that to be his handwriting?

7          A.   Yes.

8   Q.   Does your handwriting appear anywhere on this

9   sheet?

10         A.   No.

11  Q.   Do you see Numbers 3, 4, 18 and 19 where it says

12  Service Points, and he has a line through them?

13         A.   Yes.

14  Q.   Do you know why he did that?

15         A.   No.

16  Q.   Would it have been because they didn't take a

17  promotional exam, and there were no previous service

18  points?

19         A.   Quite possibly.

20  Q.   All right.  Do you see where it's written Last

21  Test, and then there is an arrow?

22         A.   Yes.

23  Q.   Did you write that?

24         A.   No.

25  Q.   Do you have any reason to believe that Tom Oates

1   did not write that?

2        A.  No.

3   Q.   Okay.  So when you, when did Tom Oates give you

4   this sheet in relation to the meeting?

5        A.  After.

6   Q.   When you were given this sheet, you read it?

7        A.  Yes.

8   Q.   What was your understanding of that notation,

9   Last Test?

10       A.  Those were the points awarded on the previous

11  exam they took.

12  Q.   Mancini was given a five, correct?

13       A.  Yes.

14  Q.   Okay.  Then I'm going to represent for the record

15  that on Page 2 on Tom Oates' score sheet there's Xs

16  next to Number 12, Mark Mancini, Number 15, Elizabeth

17  Romano, and Number 16, Edward Ryan; did you make those

18  Xs yourself?

19       A.  No, no.

20  Q.   Did you have any reason to believe Tom Oates did

21  not make those Xs?

22       A.  No.

23  Q.   When you received this sheet, did you notice that

24  those names were X'd off?

25       A.  I don't recall if I noticed when he handed it

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

45

1   to me.

2   Q.   Do you have an opinion as to why those names are,

3   have an X next to them?

4        A.   I don't.

5   Q.   Then there's three columns of handwritten

6   numbers.  One has written next to it, Last Test, which

7   you testified those were the last chief points given

8   to these candidates.  Then there are two other

9   columns.  What is your understanding of what those two

10  columns represent, two columns of numbers?

11       A.   The final score is on the right-hand index

12  and the, I'm not quite sure why he has these numbers

13  here.  I would speculate as to why.  I don't know.

14  Q.   Well, would you agree with me that both columns

15  are identical, except for Sergeant Mancini who had a

16  three in one column and a zero in the other column?

17  Elizabeth Romano who had a five and then a 4.5, and

18  that Edward Ryan had a 4.5 and then a 4.  Would you

19  agree with that?

20       A.   Yes.

21  Q.   Are those, I'm going to represent to you, would

22  you agree that those are also the same people that had

23  Xs next to their names?

24       A.   Yes.

25  Q.   Okay.  Does that refresh your recollection as to

46

1   why he might have put an X next to those names?

2        A.   Again, I believe, I know the right-hand side

3   on the index is his final score.  I'd be speculating.

4   I believe that's a working column, middle column.

5   Q.   Is the middle column, does that represent what

6   everybody else in the room recommended for everybody?

7        A.  I don't know.

8   Q.   That the column to the right is his final tally?

9        A.  I don't know.

10  Q.   Okay.  Had you ever been present, before you were

11  Police Chief, had you ever been present with Tom Oates

12  in one of these meetings?

13       A.  Yes.

14  Q.   Did you have the occasion or the opportunity to

15  review any of his score sheets for previous

16  promotional exams?

17       A.  I'm not sure.

18  Q.   Okay.  Let's go back to Major Tucker.  He

19  recommended that Mancini get a three, right?

20       A.  Yes.

21  Q.   Do you recall if Major Tucker spoke about

22  Sergeant Mancini or offered an opinion about his

23  overall performance at that meeting?

24       A.  I don't.

25  Q.   Do you recall if Major Tucker made any negative

1  remarks about Sergeant Mancini's overall work

2  performance?

3        A.  I don't.  I don't recall.

4  Q.  Deputy Chief Oates recommended that Mancini get a

5  zero, correct?

6        A.  Yes.

7  Q.  Do you recall what Deputy Chief Oates said about

8  Sergeant Mancini's overall work performance?

9        A.  At that meeting, no.

10  Q.  What about after the meeting?

11        A.  Later, before he turned in the final scores,

12  he spoke about some of the negative things I spoke

13  about at the last session.

14  Q.  Well, tell me exactly what Deputy Chief Oates

15  said.  This is very important.

16            MR. MCHUGH:  Move to strike, This is very

17  important.  You can answer.  Objection as to form.

18        A.  I don't know exactly what Commander Oates

19  said.  I don't.

20  Q.  Okay.  He gave Sergeant Mancini a zero, right?

21        A.  Correct.

22  Q.  That was the lowest possible score you could have

23  given him, right?

24        A.  Yes.

25  Q.  So tell me about the discussion you had with Tom

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

48

1    Oates about why he is recommending the lowest possible

2    score to Sergeant Mancini?

3                    MR. MCHUGH:  Objection to form.  You can

4    answer.

5         A.  Before I turn the points in, he gave me his

6    sheet.  I asked him what he was giving all the

7    candidates.  He told me.  He turned this sheet into me

8    specifically.  I don't know what he said specifically.

9    I don't.

10   Q.   Did you ask him why he was giving Mancini a zero?

11        A.  In general, he spoke about some negative

12   attitude and not a team player.  In specifics, I can't

13   tell you.

14   Q.   Did you ask Tom Oates why you thought Mark

15   Mancini had a negative attitude?

16        A.  No.

17   Q.   Did you ask Tom Oates why he thought Mark Mancini

18   was not a team player?

19        A.  No.

20   Q.   Why not?

21        A.  I didn't.

22   Q.   I mean, were you surprised to see that he gave

23   Mancini a zero?

24        A.  Somewhat, yes.

25   Q.   Were you aware of any discipline that Sergeant

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

49

1    Mancini had received during the time that he had been

2    a sergeant?

3         A.  No.

4              MR. MCHUGH:  Objection.  Not objection,

5    but could you read that last question back, please?

6              (QUESTION READ BACK)

7              MR. MCHUGH:  Thank you.

8              THE WITNESS:  No.

9    Q.   Were you aware of any civilian complaints that

10   were lodged against Sergeant Mancini at the time that

11   this zero was recommended by Mr. Oates?

12        A.  No.  During that recent time frame or during

13   his career?

14   Q.   No, at the time that service points were

15   discussed for these candidates, were you aware of any

16   civilian complaints that had been lodged against

17   Sergeant Mancini?

18        A.  I'm just trying to be clear.  How far back?

19   In between that past year or in between tests?

20   Q.   Well, you tell me, how far back do you go?

21        A.  Traditionally, you know, in between tests or

22   a year or two.  You know --

23   Q.   You mean you go back a year or two or what, for

24   civilian complaints or all discipline?

25        A.  Civilian complaints.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

50

1   Q.   Okay.  So were you aware of any civilian

2   complaints against Sergeant Mancini?

3        A.   I was not.

4   Q.   Okay.  Did you have, were you aware -- strike

5   that.  Did you believe that his productivity was below

6   average as a police officer?

7        A.   His activity was nonapplicable.  He wasn't in

8   work for that period of time.

9   Q.   Because he was on IOD, right?

10       A.   Yes.

11  Q.   Did you hold that against him in terms of

12  awarding the chief points?

13       A.   No.

14  Q.   What about sick days; did Tom Oates state to you

15  or indicate that he was dissatisfied with Mancini's

16  number of sick days?

17       A.   I don't recall.

18  Q.   Did Tom  Oates tell you that he was giving

19  Mancini a zero because he was on IOD status?

20       A.   No.

21  Q.   Did Tom Oates express to you any negative remarks

22  or comments about Mancini being on IOD status?

23       A.   No.

24  Q.   Were you aware of any altercation that Mancini

25  had with Tom Oates that would have caused him to say

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 179 of 265 PageID #:
1315
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

51

1    that he had a negative attitude?

2         A.  No.

3    Q.  Okay.  So Tom Oates didn't give you any specific

4    details about why he thought Mancini had a negative

5    attitude and was not a team player, right?

6         A.  Correct.

7    Q.  You testified that you were somewhat surprised

8    that Mancini got a zero.  So my question is, why were

9    you somewhat surprised?

10              MR. MCHUGH:  Objection as to form.  I

11   think he said he was somewhat surprised that Oates

12   gave him a zero.

13   Q.  Okay.  Why were you somewhat surprised that Oates

14   gave him a zero?

15        A.  I'm surprised when anyone is given a zero.

16   That is a number that would be surprising.

17   Q.  Okay.  Do you think Deputy Chief Oates just has a

18   personalty, or had a personality conflict with

19   Mancini, just didn't like him?

20        A.  I have no reason to believe that.

21   Q.  Did you direct Tom Oates to recommend that

22   Mancini get a zero?

23        A.  No.

24   Q.  Do you know if someone else recommended that Tom

25   Oates give Mancini a zero?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

52

1        A.  I don't.

2   Q.   So you were surprised that he got a zero, but you

3   didn't try to find out why he got a zero, right?

4        A.  In specific, no.

5   Q.   Why not?

6        A.  That was his final assessment.  I ask for

7   their input, the members of the command staff in

8   particular.

9   Q.   Had you ever sat in on one of these meetings

10  before you became Police Chief where Tom Oates was

11  present and filling out a score sheet?

12       A.  Yes.

13  Q.   Do you recall another incident where Tom Oates

14  recommend that a candidate get a zero?

15       A.  I don't recall, but I would not be surprised

16  if he did.

17  Q.   Why?

18       A.  Because I think he rates people effectively,

19  how he feels.

20  Q.   Is he a tough grader, in your opinion?

21            MR. MCHUGH:  Objection to form.

22       A.  Yes.  I think he's fair.

23  Q.   Did you have any discussions with Tom Oates about

24  some of the scores that he recommended for other

25  candidates?

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 181 of 265 PageID #:
1317
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

53

1      A.   Yes.

2              MR. GAGLIARDI:  All right.  I'm just

3      going to caution you not to talk about, specifically

4      about a police officer's work performance.  I just

5      want to know which ones, then we can talk about that

6      later on, and we'll ask Sergeant Mancini to leave the

7      room.

8              MR. MCHUGH:  You know, I don't have a

9      problem with Sergeant Mancini being here for these

10     types of questions on the awarding of points.

11             MR. GAGLIARDI:  Well, what happens if we

12     have to get into specific discipline performance?

13             MR. MCHUGH:  What I was going to say,

14     yes, I would object to the specific disciplinary

15     matters.  If it's other than that, I don't have a

16     problem with his being here.

17             MR. GAGLIARDI:  Well, I don't know that

18     he's going to be able to give complete responses if

19     they're limited.

20             MR. MCHUGH:  You can do what you want.

21     I'm just saying --

22     Q.   I'm just going to ask you to identify which

23     people you spoke of, and then we can talk about it a

24     little bit later.

25         A.   The only one I really recall is Liz Romano.

1  Q.   Okay.  Did you ask him why he gave her a, looks

2  like he gave her a 4.5, or did he initiate the

3  discussion about her, the chief points he was

4  recommending?

5       A.   I'm not sure how it started, but I remember

6  asking him about Liz Romano.

7  Q.   Okay.  Why did you ask him about Liz Romano?

8       A.   I thought she was a five, considered a five.

9  I was just wondering why or what he may know to

10 consider her less than a five.

11 Q.   He only gave her a 4.5, right?

12      A.   Right.

13 Q.   But you didn't ask him why he thought Mancini was

14 a zero?

15      A.   I did.  In general, you know, he talked about

16 the negative aspects and not a team player.  In

17 specifics, no, I did not.

18 Q.   Let's go to Page 3.  Whose score sheet is this?

19      A.   Lapatin.

20 Q.   What was his title?

21      A.   He was a Captain.

22 Q.   I believe you testified earlier that he was not

23 in charge of Mancini's district, right?

24      A.   His district, no.

25 Q.   Do you have any reason to believe that this is

55

1   not Captain Lapatin's handwriting on this sheet?

2       A.  No.

3   Q.  All right.  Let's look at the column where it's

4   written last name, look at the candidates name, and

5   then there's checkmarks and numbers written right next

6   to the name in that column.  Then it looks like

7   there's numbers written in the column where it says

8   Seniority Points.  It looks like he just may have

9   written it in the wrong column?

10      A.  Yes.

11  Q.  Did Captain Lapatin give you this score sheet at

12  the end of the meeting or afterwards?

13      A.  Afterwards.

14  Q.  He recommended that Mancini get a two, right?

15      A.  Yes.

16  Q.  Do you recall if Captain Lapatin made any

17  comments about Sergeant Mancini's overall performance

18  at the meeting?

19      A.  At that meeting, no.

20  Q.  You do not recall, or he didn't?

21      A.  I don't recall.

22  Q.  When Captain Lapatin handed you this completed

23  sheet, did you review it?

24      A.  Yes.

25  Q.  Did you ask him about the points he recommended

1  for any of the candidates?

2        A.  I don't recall if I quizzed him on each of

3  the candidates.

4  Q.  Do you know why he has checkmarks next to some

5  names and numbers written next to others?

6        A.  No.

7  Q.  What division was Captain Lapatin in charge of at

8  the time?

9        A.  I'm not positive for that date.  He was, he

10  was in flux.  I'm not sure where he was.  He spent a

11  long time in patrol, then he moved to Internal

12  Affairs.  I believe he was in Internal Affairs.

13  Q.  Go to Page 4.  Whose score sheet is this?

14        A.  Verdi.

15  Q.  What is his first name?

16        A.  Tom.

17  Q.  What was his title at the time?

18        A.  He was a Major in the Uniform Division.

19  Q.  Okay.  Did you recognize the handwriting on this

20  document to be his?

21        A.  Yes.

22  Q.  Do you have any reason to believe it's not?

23        A.  No.

24  Q.  Do you see in the column to the far right where

25  it looks like there are numbers written?

57

1          A.  Yes.

2     Q.   Did Mr. Verdi give these score sheets to you at

3     the meeting or after the meeting?

4          A.   After.

5     Q.   Did you read it?

6          A.  Yes.

7     Q.   What did you interpret those numbers to be on the

8     far right-hand column?

9          A.   His recommendation for service points to me.

10    Q.   Do you see that there's, on five of the

11    candidates it looks like a number was written, or

12    something was written and scribbled out, and then a

13    number was written to the right of it; do you see

14    that?

15         A.  Yes.

16    Q.   Do you know who did that?

17         A.   No.

18    Q.   Did you do that?

19         A.   No.

20    Q.   Did you direct someone to do that?

21         A.   No.

22    Q.   Did anybody in your office do that?

23         A.   No.

24    Q.   Do you know if Mr. Verdi did that?

25         A.   I don't.  I believe he did, but I don't know

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

58

1    for sure.  That's the sheet he turned in to me.

2    Q.   Again, similar to Captain Lapatin, Mr. Verdi has

3    this time next to the, in the column for first name he

4    has numbers written and then checkmarks; do you see

5    that?

6         A.   Yes.

7    Q.   Then for Sergeant Mancini he has a three next to

8    his first name, but in the far right column he has

9    written a one.  Did you have any discussions with Tom

10   Verdi about why he recommended Sergeant Mancini get a

11   one?

12        A.   Not that I can recall specifically.

13   Q.   Were you surprised that Tom Verdi recommended

14   that Mancini get a one?

15        A.   Again, somewhat, yes.

16   Q.   So if you were surprised, why didn't you ask him

17   why he was giving him a one?

18        A.   I ask for the command staff's best

19   recommendation for, to forward me service points.  In

20   the end, that is his final assessment.  I don't recall

21   a specific conversation.

22   Q.   That doesn't answer my question.  Why didn't you

23   ask him?

24        A.   I may have.  I don't recall.

25   Q.   You asked Tom Oates why he gave Mancini a zero,

59

1  right?

2        A.  Right.

3  Q.    But you didn't ask Mr. Verdi why he gave Mancini

4  a one?

5        A.  I may have.  I don't recall.

6  Q.    Did Tom Verdi comment on Sergeant Mancini's work

7  performance at this meeting?

8        A.  I don't recall specifically what he said.

9  Everybody was involved in the conversation.  I don't

10 recall exactly what he said.

11 Q.    Do you know how -- strike that.  In June of 2012

12 was Mancini working in a district that ultimately

13 reported to Verdi?

14       A.  Yes.

15 Q.    Do you know how long he had been working under

16 Mr. Verdi?

17       A.  No.

18 Q.    Okay.  Do you know how long Mancini had been

19 working under Lapatin, or was he working under

20 Lapatin?

21       A.  He did for, previous to Verdi, yes.

22 Q.    What about Oates, had Mancini ever worked under

23 Oates?

24       A.  I'm not sure.

25 Q.    Wouldn't that be important information to know?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

60

1        A.   Again, we've all been around that building a

2    long time.  I'm sure at some point he did work for

3    Oates.  Oates was in patrol a very long time.  I know

4    at some point he did fall under his command.  I don't

5    know for how long and where.

6    Q.   Do you think that Tom Verdi had a personal

7    dislike for Mark Mancini, or a personality conflict,

8    or just didn't like him?

9        A.   I don't know.

10   Q.   During the time that you worked in the Providence

11   Police Department, do you remember a time where

12   somebody recommended low service points for someone

13   because they just didn't like them, and it had nothing

14   to do with their work performance?

15              MR. MCHUGH:  Objection to form.

16       A.   No.

17   Q.   No?

18       A.   No.

19   Q.   People can be petty sometimes.  You agree with

20   that, right?

21       A.   Yes.

22   Q.   You don't recall a time where somebody

23   recommended low service points because they just

24   didn't like the guy?

25       A.   No.  I can't say that.

1   Q.   Okay.  Did you ask, looks like Richard Fernandes,

2   looks like Tom Verdi recommended that Richard

3   Fernandes get a one?

4        A.   Yes.

5   Q.   And also Steven Courville, he recommended he get

6   a one?

7        A.   Yes.

8   Q.   Did you have discussions with Tom Verdi about why

9   he recommended those officers get ones?

10       A.   In particular, I don't recall.  I'm sure I

11  did, but I don't recall what was said.

12  Q.   Were you surprised that those police officers got

13  ones?

14       A.   Yes.  Again, it's a low number.

15  Q.   Okay.  Page 5, whose score sheet is this?

16       A.   Frank Colon.

17  Q.   What was his title?

18       A.   He was a Major.

19  Q.   Was he in charge of a division that Mancini

20  ultimately reported to at the time?

21       A.   No.

22  Q.   Do you know if he had any direct supervisory

23  experience with Mancini during his career?

24       A.   I'm not sure.

25  Q.   Did you ask him if he did?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

62

1      A.   I don't recall if I did.

2   Q.    Okay.   There's numbers, okay?   Do you know if,

3   there is a name, it looks like Frank Colon.   It's

4   written in maybe cursive in the upper left-hand

5   corner.   Is that Mr. Colon's handwriting, to your

6   knowledge?

7      A.   Yes.

8   Q.    Then there are some numbers written in the column

9   under service points; do you see those numbers?

10      A.   Yes.

11   Q.    Then look at, look at the, what is in the box for

12   candidate Numbers 2, 5, 6, 9, 11, 13, 14, 19 and 21;

13   do those look like handwritten numbers to you?

14      A.   No.

15   Q.    Okay.   My understanding is you gave blank sheets

16   to everybody before the meeting, right?

17      A.   Yes.

18   Q.    Do you have an explanation as to why those

19   numbers that I just referenced are not handwritten?

20      A.   No.

21   Q.    Okay.   Did Mr. Colon hand this sheet to you after

22   the meeting or during the meeting?

23      A.   After.

24   Q.    Do you know if somebody whited out or deleted

25   some of the other information that was on this sheet

1    and handwrote those numbers?

2         A.  I don't know.

3    Q.   Did you ask someone to do that?

4         A.  No.

5    Q.   Did you direct someone to do that?

6         A.  No.

7    Q.   Did someone else direct someone else to do that?

8         A.  Not that I'm aware of.

9    Q.   Okay.  Do you have an explanation as to why some

10   of the numbers are handwritten and others are typed?

11        A.  No.

12   Q.   Frank Colon recommended that Sergeant Mancini get

13   a zero, right?

14        A.  Yes.

15   Q.   Were you surprised that Major Colon recommended

16   Mancini get a zero?

17        A.  Yes.

18   Q.   Why?

19        A.  Because it's the lowest number.

20   Q.   Did you ask Major Colon why he gave Mancini a

21   zero?

22        A.  I don't recall the specifics and what the

23   conversation was, but I would say that I was

24   surprised, yes.

25   Q.   Do you recall if at the meeting Major Colon spoke

64

1    about Sergeant Mancini's work performance?

2         A.  In particular, I don't know if he did.

3    Again, this is a wide-open conversation, that the

4    meeting takes place for a very long time.  It's not

5    recorded.  I don't recall what he said.

6    Q.   Do you know if he spoke at all about Mancini?

7         A.  I'm not sure.

8    Q.   Let's look at Page 6.  Whose score sheet is this?

9         A.  Robert Lepre.

10   Q.   What was his position at the time?

11        A.  He was a Captain in the Uniform Division.

12   Q.   Okay.  Do you recognize his handwriting on this

13   sheet?

14        A.  Yes.

15   Q.   Do you recognize it to be his handwriting?

16        A.  Yes.

17   Q.   Did he give you this sheet at the meeting or

18   after the meeting?

19        A.  After.

20   Q.   He gave, he recommended Mancini get a zero,

21   right?

22        A.  Yes.

23   Q.   Were you surprised that he recommended Mancini

24   get a zero?

25        A.  Yes.

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 193 of 265 PageID #: 1329
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

65

1  Q.   Did you ask him why he recommended Mancini get a

2  zero?

3       A.   I'm sure I did.

4  Q.   What did he say?

5       A.   I don't recall specifically, but I'm sure I

6  did.

7  Q.   Do you recall if Captain Lepre spoke about

8  Mancini's work performance at this meeting?

9       A.   I don't recall specifically what Bobby Lepre

10 said, I don't.

11 Q.   Do you know how long, how long did Sergeant

12 Mancini work under Captain Lepre?

13      A.   I know he would have worked with him along

14 the way.  For how long, I don't know.

15 Q.   How come you don't know how long Mancini worked

16 with all of these supervisors?

17      A.   People move.  I mean, both, not only Mark

18 Mancini, but people underneath move.  People up top,

19 whether they're sergeants, lieutenants, captains, they

20 move to different divisions, different bureaus.  It

21 would be impossible to keep track of how long each

22 officer worked under each sergeant or lieutenant.

23 Q.   Well, did you ask anybody, Hey, how long have you

24 worked with this guy?

25      A.   I'm sure I did in conversation, and say, Did

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 194 of 265 PageID #:
1330
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

66

1  you ever work with him along the way; where did you

2  work together; how would you even know him?

3  Specifically, I don't recall what those conversations

4  were.

5  Q.   Do you know if Robert Lepre had a personal

6  dislike for Sergeant Mancini?

7       A.   No, I don't know.

8  Q.   Did he make any negative or disparaging remarks

9  about his work performance at this meeting?

10      A.   Specifically that I can recall, no.

11  Q.   Let's go to page 7.  Whose score sheet is this?

12      A.   William Campbell.

13  Q.   What was his position?

14      A.   He was a Captain.

15  Q.   Did Captain Campbell give you this score sheet at

16  the meeting or after the meeting?

17      A.   After.

18  Q.   So it sounds like nobody gave you the score

19  sheets at the meeting; is that correct?

20      A.   Correct.  That's pretty routine as well.

21  Q.   Okay.  Captain Campbell, similar to a few other

22  supervisors, has numbers written next to the

23  applicants' last name, then he has numbers written in

24  the column entitled Service Points?

25      A.   Yes.

67

1   Q.   Do you know why he did that?

2        A.   No.

3   Q.   A couple of candidates he's got, it looks like

4   there is something written and then scribbled out and

5   a number written next to it, candidate Number 4,

6   candidate Number 22.  Do you know who scribbled out

7   whatever was written there?

8        A.   No.

9   Q.   Did you do that?

10       A.   No.

11  Q.   He's recommending Mancini get a two, right?

12       A.   Yes.

13  Q.   How long had Captain Campbell been in a

14  supervisory capacity over Mark Mancini as of this

15  date?

16       A.   For awhile.  Specifically, I don't know how

17  long.

18  Q.   Well, what division was he in charge of?

19       A.   At this particular time I think he was in the

20  Youth Service Bureau out of the Uniform Division.

21  Previous to that, he was in patrol for a very long

22  extended period of time.

23  Q.   Were you surprised that Captain Campbell gave

24  Mancini a two?

25       A.   Yes.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

68

1    Q.    Did you ask him why he gave him a two?

2         A.   I'm sure I did.

3    Q.    Do you know what he said?

4         A.   I don't know exactly.

5    Q.    Do you see next to Mancini's name, if you follow

6    it down to the right where it says Educational Points

7    and Seniority Points, it looks like there are three

8    lines?

9         A.   Yes.

10   Q.    Did you write that, make those three lines?

11        A.   No.

12   Q.    Do you know who did?

13        A.   No.

14   Q.    So there are a few other candidates that received

15   low scores.  Candidate Number 4 and candidate Number

16   22 they both received twos?

17        A.   Yes.

18   Q.    Did you ask Captain Campbell why he gave those

19   candidates twos?

20        A.   I'm sure I did.

21   Q.    Do you remember what he said?

22        A.   I don't.

23              (OFF THE RECORD)

24              (LUNCH BREAK)

25   Q.    Chief Clements, I wanted to clear up a couple of

69

1    things from before we took lunch.  When I asked you at

2    what point did the people at the meeting to determine

3    chief points, at what point did they hand you in their

4    score sheets.  I asked you if they handed them in

5    before the meeting or after the meeting.  I believe

6    you testified that all seven people handed them to you

7    after the meeting, right?

8         A.   I believe so, yes.

9    Q.   Was it the same day, or was it the next day?

10        A.   It was not the same day.  I'm not sure which

11   day it was subsequent to the service points meeting,

12   but was it obviously prior to me turning them in.

13   Q.   There was a service points meeting that happened

14   on one day?

15        A.   Right.

16   Q.   The sheets were handed out, filled out by the

17   command staff and supervisors and handed to you, at

18   the very earliest, the following day, correct?

19        A.   Correct.

20   Q.   Okay.  You testified at length about each of the

21   command staff and supervisor's recommendations, and

22   Exhibit D contains the recommendations of seven

23   command staff and supervisors.  There were other

24   people present at the meeting that didn't hand in

25   sheets, correct?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

70

1        A.  Yes.

2   Q.   Do you remember what their recommendations were

3   for chief points for Sergeant Mancini?

4        A.  No.

5   Q.   Ultimately, you, Chief Clements, decided to award

6   Mancini a zero, right?

7        A.  Yes.

8   Q.   Okay.  So if you look at all the service points

9   that were recommended, it was a three, a zero, a two,

10  a one, a zero, a zero, and a two, that comes out to

11  eight total points from seven different people, which

12  is an average of about 1.14?

13       A.  Yes.

14  Q.   Why did you decide to give Sergeant Mancini a

15  zero?

16       A.  It's not an average of all the scores that

17  are turned in or talked about.  It's not totally

18  something by objectivity.  I was alarmed by some of

19  the low scores and the number of real low scores.  In

20  the end, I took the advice of the command staff and,

21  including our Deputy Chief, and gave him a zero.

22  Q.   Did you place more weight on any one person's

23  recommendation than another?

24       A.  I would say yes.

25  Q.   Whose?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

71

1      A.   The supervisors who were taking over the

2  Patrol Bureau/Uniform Division.

3  Q.   Who were they?

4      A.   Major Verdi, Captain Lepre, as well as the

5  people who had been there, Lapatin and Campbell, but

6  all of them.  You know, it's every single one of them

7  I gave some weight.  It's hard for me to identify and

8  break down the percentage of weight I gave each one.

9  I took it all into account, but no, it was all

10  important.

11  Q.   You didn't just take Tom Oates' recommendation,

12  because he's the Deputy Chief, right?

13      A.   No, but certainly that means a lot.

14  Q.   Okay.  All right.  So I want to know each and

15  every reason why Sergeant Mancini got a zero.  I don't

16  care if there is one reason or a hundred reasons.  I

17  don't care if the reason is because he's a Red Sox fan

18  and everybody else is a Yankees fan.  I don't really

19  care.  I want to know every reason he got a zero.

20          MR. MCHUGH:  Objection as to form.  You

21  can answer.

22  Q.   Do you under stand the question?

23      A.   Yes.

24  Q.   Okay.

25      A.   So the major reason that Mark got a zero is

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 200 of 265 PageID #: 1336
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

72

1    because I took so much into account is, the thought

2    process of the commanding officers who forwarded

3    recommendations for service points to me on the

4    overall performance of Mark Mancini.  Bearing in mind

5    that he is applying for a higher rank.

6    Q.   Okay.  What reasons, I want to know every single

7    reason that was stated at that meeting of why

8    Mancini's overall performance was below expectations.

9    I don't care how many things people said.  I want to

10   know every single thing they said.

11            MR. MCHUGH:  Objection as to form.  You

12   can answer.

13        A.   I can't recall everything that was stated.

14   It was an open conversation.  I didn't take notes.

15   Q.   At the last deposition you said that somebody

16   said he had a negative attitude?

17        A.   Yes.

18   Q.   Who said that?

19        A.   I'm not sure.

20   Q.   What evidence or examples did they point to

21   evidencing that Mark Mancini had a negative attitude?

22        A.   Specifically, I don't recall.  Other than, I

23   know in one of his evaluations, and it was brought up,

24   that he had difficulties working with his peers.  I

25   don't know who said that.  I don't know when it was

73

1   said.

2   Q.   Somebody at that meeting said that in Mark

3   Mancini's written performance evaluation it was

4   written that he had difficulty working with peers?

5        A.   I'm not saying they said it came from the

6   written evaluation, but it was mentioned.  I remember

7   George, I believe it was George Stamatakos, saying

8   that he was not a team player.  He didn't make that

9   other comment.  I don't know who made that comment.

10  Q.   Did George Stamatakos give you an example of why

11  he thought Mark Mancini -- strike that.  Did George

12  Stamatakos point to any specific conduct by Mark, Mark

13  Mancini that he thought was evidence that he wasn't a

14  team player?

15       A.   Not that I can recall.

16  Q.   In awarding the chief points for those who signed

17  up for the June 16, 2012 lieutenants promotional exam,

18  did you consider any of the other candidates prior

19  discipline in formulating or awarding chief points?

20       A.   Yes.  It's always a factor.

21            MR. MCHUGH:  Could you go back and read

22  that question?

23            (QUESTION READ BACK)

24            MR. MCHUGH:  Thank you.

25  Q.   Do you know which ones?

1      A.  Yes.  I know some people who had discipline

2  were Fernandes.  I'm not sure if Coreville did then.

3  Sion had a discipline issue.  On this list, that's all

4  I see.  Maybe Pow Yang, minor, Number 22.

5  Q.  Were these disciplinary actions discussed at the

6  meeting to award service points?

7      A.  In general, yes.

8  Q.  What about specific conduct by these police

9  officers, was that discussed at the meeting to award

10  service points?

11      A.  I don't recall.

12  Q.  Okay.  What about Sergeant Mancini, was any, you

13  said that there was a discussion that he had a bad

14  attitude, or a poor attitude, and wasn't a team

15  player.  Did anybody bring up any discipline that Mark

16  Mancini had received while he was a police officer?

17      A.  Not that I recall at that meeting.  They may

18  have.  I don't recall.

19  Q.  In your decision to award him zero points, did

20  you consider any prior disciplinary action taken

21  against Mark Mancini?

22      A.  Overall it's in my mind, but specifically,

23  no.  Most of it had happened a long time previous to

24  the awarding of these points.  Again, it had been way

25  in the past.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

75

1   Q.   When you say most of it, what are you referring

2   to?

3        A.   The discipline he has in his file.

4   Q.   Which is what?

5        A.   I believe it's a detail violation.  I believe

6   it's car accidents, and he had that transgression in

7   District 5 at a substation.

8   Q.   Didn't all those things happen when he was a

9   patrolman?

10       A.   Yes.

11  Q.   Okay.  Isn't it true that you only consider

12  someone's overall performance in their current job

13  when awarding chief points?

14       A.   No.  We consider their overall performance,

15  but certainly events that happened a long time ago or

16  many years ago are not held to the same weight.  But

17  for the most part, the way you coined the question,

18  yes, that's accurate.  Most of it happened while he

19  was a patrolman, if not all of it.

20       So it was known by me, and I'm not sure of others

21  in the room.  I'm sure it was discussed.  I don't

22  remember specifically what was said.

23  Q.   Let's talk about that transgression you referred

24  to a few times where you represented Sergeant Mancini.

25  You were his union representative, correct?

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 204 of 265 PageID #:
1340
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

76

1       A.  Yes.

2   Q.   I'm going to represent to you that that incident

3   happened in 2000.

4       A.  Okay.

5   Q.   What effect, if any, did that transgression have

6   on your decision to award him zero chief points?

7       A.  Minor.

8   Q.   Give me a percentage.

9              MR. MCHUGH:  Objection to form.  Answer,

10  if you can.

11      A.  I can't say.  Minor.  I can't put a --

12  Q.   Did it factor in at all?

13      A.  Yes.  Minor.  Just very low.  It happened so

14  far before that.  You have to understand, in our

15  agency people are going to get involved in issues.

16  Things that happened many, many years ago, they're

17  remembered.

18      Are they held into account?  They're known.  I

19  can't tell you to what degree it was held into

20  account.  Very, very low, I would say.

21  Q.   His detail violation, how much of a role did that

22  play in your decision to award him zero chief points?

23      A.  Minimal, if any.

24  Q.   What about the car accidents, what role, if any?

25      A.  No, none.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

77

1  Q.   So did you give him, Mark Mancini, a zero because

2  of that transgression in 2000?

3       A.   No.

4  Q.   When Stamatakos, Mr. Stamatakos said Mancini is

5  not a team player, did you ask him why he felt that

6  way?

7       A.   I don't recall how the conversation

8  continued, but I don't remember where the conversation

9  went from there.

10 Q.   What about the incident that happened in 2009 in

11 Homeland Security where you were Sergeant Mancini's

12 manager, and he came to you to complain about being

13 replaced by Mr. Vinacco?

14            MR. MCHUGH:  Objection to the form, use

15 of the word incident.  You can answer.

16 Q.   Do you remember talking about that last week?

17      A.   Yes.

18 Q.   Did you consider Mancini -- strike that.  I

19 believe you testified that Mancini was badmouthing the

20 administration because Officer Vinacco replaced him in

21 Homeland Security, right?

22      A.   Yes.  He was upset by being removed.

23 Q.   Did you consider the fact that Mancini was

24 badmouthing the administration, did you factor that

25 into your decision to award him zero chief points?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

78

1        A.  Yes.  With his overall attitude and

2   performance, yes.

3   Q.   Did you give him a zero because he complained

4   about the administration?

5        A.  No.

6   Q.   What role, if any, did that incident have in your

7   decision to award him zero?

8        A.  It had some.  I can't quantify an amount or

9   percentage.

10  Q.   Did you think he was being unreasonable for being

11  upset by being replaced by Vinacco?

12       A.  I did, because Vinacco was out on military

13  leave.  I didn't know the understanding before Vinacco

14  left.  I wasn't there when Vinacco went to military

15  service, but it would have been my understanding that

16  when he returned from his military assignment that he

17  would go back to his assignment.

18  Q.   What specifically did Mancini say about the

19  administration that you believed, that you believe

20  constituted badmouthing?

21       A.  Specifically, I don't know.  Just he was

22  upset with the administration.  I remember with the

23  Colonel and with, Colonel Esserman and Commander

24  Kennedy for removing him from that assignment.

25  Q.   Did he make insulting comments about Esserman and

79

1   Kennedy?

2         A.  I don't recall what he said.  He was just, he

3   was upset and speaking negative about them.  What he

4   said, I can't tell you.

5   Q.   Did he name-call?

6         A.  I don't know what he said.

7   Q.   I mean, is it fair to say he was just venting his

8   frustration to you, because you were his supervisor?

9         A.  That was certainly part of it.

10  Q.   So why is that a problem?

11              MR. MCHUGH:  Objection as to form.  You

12  can answer.

13        A.  I didn't know his full reasoning for being so

14  upset.  I can't tell you.

15  Q.   Did he make any threats about Esserman or

16  Kennedy, towards them?

17        A.  Not that I can recall, no.

18  Q.   Have you ever vented frustration during the time

19  you were a police officer to one of your supervisors

20  about something that happened at work?

21        A.  Yes.

22  Q.   Ever say anything negative about the

23  administration during the time you were a police

24  officer?

25        A.  I can't think of anything specifically, but

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

80

1   I'm sure I did.

2   Q.   Isn't that part of normal human behavior to do

3   that?

4             MR. MCHUGH:  Objection as to form.  You

5   can answer.

6        A.  Yes.

7   Q.   You didn't discipline Mancini at the time for his

8   comments, his negative comments about the

9   administration, did you?

10            MR. MCHUGH:  Objection as to form.

11       A.  No.

12  Q.   You could have, right?

13       A.  Yes.

14  Q.   Did you at all participate in awarding Mancini

15  service points before you became the Police Chief?

16       A.  Yes.

17  Q.   When was the last time you made a recommendation

18  of service points for Mancini before you became Police

19  Chief?

20       A.  I believe it was that 2010 test.

21  Q.   What did you recommend that he get?

22       A.  I don't have any form with me, but I believe

23  five.

24  Q.   Okay.  You thought at the time he was performing

25  at the highest possible level as a police officer,

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

81

1  right?

2      A.  Yes.

3  Q.   At that time you knew that he had made negative

4  comments about the administration, right?

5      A.  Yes.

6  Q.   You knew about the transgression in 2000 at the

7  time that you made a recommendation of five chief

8  points, right?

9      A.  Yes.

10 Q.   Did you think Mark Mancini had a negative

11 attitude in 2010 when you recommended he get five

12 chief points?

13     A.  Yes.

14 Q.   You did?

15     A.  Yes.

16 Q.   Why on earth did you recommend he get five

17 points?

18     A.  The points have been fodder for conversation

19 for years.  When they've gone on the list of several

20 names of people from different divisions and different

21 bureaus, there were points in time where the points

22 were given out like candy.  We all rate differently.

23     If I'm being judicious and I'm awarding somebody

24 in my, under my command a three, and I see somebody

25 from a different unit being given a five that I think

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

82

1    and believe is less than a five, then I would go back

2    and say my three now turns into a five.  Those types

3    of conversations went on all the time.

4         I can remember specifically giving someone a

5    three, and then I heard, you know, several other names

6    around the room were getting fives, so there were

7    different points in time where the points were just

8    given out very leniently.

9    Q.   That's why you gave him a five in 2010?

10        A.   Yes.

11   Q.   What did you want to give him?

12        A.   It depends on everyone else who is being

13   critiqued.  If I'm going to be difficult on my

14   people -- and this has always been the conversation.

15   There's several people rating individuals.  And some

16   supervisors have said, Do you know what?  Average is

17   three.  We should start at three.

18        Some supervisors believe everyone starts at five

19   and ends up at three.  Three is poor.

20   Q.   You testified that in 2010 when Mancini applied

21   for a promotional exam you recommend he get a five?

22        A.   I'm not positive.  I don't have my sheet from

23   that time.  I believe I did.  I can't be positive.

24   Q.   You thought he had a poor attitude at the time?

25        A.   He was developing a poor attitude based on

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 211 of 265 PageID #: 1347
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

83

1   that removal, yes.

2   Q.   Did you think he was not a team player at the

3   time?

4        A.   Yes.

5   Q.   Why?

6        A.   He was thinking about himself, that he got

7   removed from a unit, and not for the good of the

8   organization.  A guy that came back from military

9   leave, I mean, I can tell you, I have not been

10  satisfied with different assignments that I've had

11  along the way, but that's the way it is.

12  Q.   Okay.  Well, let's do it like this:  Aside from

13  Mancini's negative comments about the administration,

14  what conduct did he partake in that leads you, that

15  caused you to formulate the opinion he wasn't a team

16  player because of that incident?

17       A.   Just in general his overall attitude and

18  tone.

19  Q.   I understand a negative attitude and tone.  Let

20  me give you my definition or an example, hypothetical

21  situation of what I think is not a team player, okay?

22  You tell me if you agree or disagree.

23       Let's say my firm has a trial on a Monday, and I

24  want my whole staff to work the weekend to help me

25  prepare for trial, and my summer clerk goes to

84

1    Martha's Vineyard for the weekend with his girlfriend.

2    I would say that's someone that's not a team player;

3    would you agree with that?

4              MR. MCHUGH:  Objection to form.

5         A.  Yes.

6    Q.   What did Mark Mancini do, what was his conduct

7    that caused you to formulate the belief that in 2010

8    he wasn't a team player?

9         A.  I can't speak to any individual performance

10   of conduct to answer that.

11   Q.   So it sounds like you're lumping in negative

12   attitude and not being a team player with the negative

13   comments he made about the administration when he was

14   replaced by Vinacco, correct?

15             MR. MCHUGH:  Objection to form.

16        A.  Correct.

17   Q.   None of the folks that were present at that

18   meeting to award chief points in 2012 can give you any

19   specific examples of why they thought Mark Mancini was

20   not a team player, right?

21        A.  There were lengthy conversations.  I don't

22   recall specifically what was said.  These meetings

23   last an hour, hour and-a-half.  We're speaking about

24   22 names.  Again, there is a lot of conversation.

25   Specifically I don't recall what was said even on some

85

1    of the other candidates.

2    Q.   Did anyone who was present at that meeting

3    mention Mark Mancini's transgression that happened in

4    2000?

5         A.   Not that I recall.  They may have.

6    Q.   I believe last week you testified that somebody

7    said Mancini just comes to work and leaves; do you

8    remember that?

9         A.   Yes.

10   Q.   Who said that?

11        A.   I don't know who said that.

12   Q.   In what context did the person say it in?

13        A.   In the context that, you know, I believe the

14   general conversation is a lot of these guys will go to

15   community events on the weekend or will work overtime

16   for community events.  Others come to work, they do

17   their shift.  Unless forced for overtime, they're

18   gone.

19   Q.   Did Mark Mancini get a zero because he didn't

20   participate in community events?

21        A.   Specifically, no.

22   Q.   Did Mark Mancini get a zero because he didn't

23   request overtime?

24        A.   Specifically, no.

25   Q.   Would you agree with me that participating in

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

86

1    community events and requesting overtime should not be

2    factors in awarding service points that are set forth

3    by the CBA?

4              MR. MCHUGH:  Objection as to form.  You

5    can answer.

6         A.  As set forth by the CBA, yes.

7    Q.   It's not in the CBA, right; overall performance

8    doesn't include community service and requesting

9    overtime, right?

10             MR. MCHUGH:  Objection as to form.

11        A.  Correct.

12   Q.   Did you consider the fact that Mark Mancini

13   didn't do community events and request overtime in

14   your decision to give him a zero?

15        A.  I think as part of an overall performance

16   evaluation for the rank of lieutenant we're looking

17   for people who are more community-service oriented.

18   So somewhat, yes.

19   Q.   What about all the other candidates that signed

20   up for the exam, the other 22 people, did you consider

21   whether or not those candidates participated in

22   community events?

23        A.  Absolutely, yes.

24   Q.   How would the people at that meeting know if

25   candidates, or what extent the candidate participated

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

87

1    in community events?

2         A.  They would know, because they are there.  I

3    would know, because I'm at a lot of them.  I'm not at

4    all of them.  They would know because as district

5    commanders, or their respective assignment, they're at

6    many as well.

7    Q.   Okay.  Do you want to add that as another reason

8    why Mark Mancini got a zero, because he didn't

9    participate in community events?

10              MR. MCHUGH:  Objection as to form.

11   Q.   I asked you each and every reason, and you didn't

12   state that.

13        A.  I would say that was considered in overall

14   performance.  We're looking for officers who push a

15   certain level of esprit de corps in the organization

16   as well.

17   Q.   Some of these other candidates who got low

18   scores, do you know, for example, Officer Yang got a

19   three, I believe, pretty consistently from everybody.

20   A couple of twos, a four, and a bunch of threes.  Do

21   you know if those who evaluated him and made those

22   recommendations took into account his participation in

23   community events?

24        A.  I don't know if they did.

25   Q.   Okay.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

88

1        A.  I did.

2   Q.   What is every factor that you consider in overall

3   performance when awarding service points?

4               THE WITNESS:  Every factor?

5               MR. GAGLIARDI:  Yes.

6        A.  Overall work performance, the ability to

7   communicate, to motivate, to build a team within their

8   district, and to accomplish the overall mission of the

9   police department in a positive way.

10  Q.   You ultimately determined that Mark Mancini

11  didn't meet any of those criteria, right, because he

12  got a zero?

13       A.  I ultimately took into account the scores

14  provided to me by the command staff which led to my

15  giving Mark a zero.

16  Q.   Well, what did the command staff and supervisors,

17  what factors do they consider in assessing overall

18  performance?

19              MR. MCHUGH:  Objection as to form.  You

20  can answer.

21       A.  Not sure individually.

22  Q.   Did you ever have a discussion amongst the

23  command staff and supervisors at one of these

24  meetings, This is the criteria we need to evaluate

25  these candidates on when awarding service points, so

89

1    that there is a uniform way of awarding them?

2              MR. MCHUGH:  Objection as to form.  You

3    can answer.

4         A.  We had many conversations surrounding that

5    particular point.  We, at the time of this awarding of

6    service points, we had never nailed down exactly what

7    that was going to be.

8    Q.   Doesn't it say in the collective bargaining

9    agreement what overall performance is letters of

10   commendation, letters of recommendation, sick time?

11             MR. MCHUGH:  Objection as to form.  You

12   can answer.  You can look at the exhibit, too, if you

13   want.

14        A.  It says very vaguely what overall performance

15   is, yes.

16   Q.   Let's talk about the June 23, 2012 sergeants

17   promotional exam that happened a week later.  Did you

18   utilize the same procedure for awarding service points

19   for that exam as you did with the lieutenants

20   promotional exam?

21        A.  Yes.

22   Q.   Exactly the same procedure?

23             MR. MCHUGH:  Objection as to form.  You

24   can answer.

25        A.  As far as handing out the form and discussing

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 218 of 265 PageID #:
1354
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

90

1    the names?

2    Q.   Yes.  The procedure that we've been talking about

3    over the last two depositions.  Did you follow the

4    same procedure for that exam as the lieutenants exam?

5         A.  I just want to clear.  By procedure, you mean

6    having a roundtable discussion and handing out forms,

7    yes.

8    Q.   Okay.  Did you utilize the same criteria to

9    evaluate people as you did with the lieutenants exam?

10        A.  Yes and no.  No being a lesser rank.  It's a

11   different set of criteria to go from a patrol officer

12   to a street-level supervisor.  A sergeant is very

13   close to the ground level and not considered part of

14   the upper staff, so it's a different criteria.

15        I think there are some people who would make very

16   good sergeants, and some sergeants would not make very

17   good captains or majors.

18   Q.   Did you utilize the same criteria, though, in

19   evaluating their overall performance?

20        A.  Overall, yes, general conversations about

21   their overall performance.

22   Q.   You took into account their sick days, right?

23        A.  Yes.

24   Q.   You took into account their letters of

25   commendation, right?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

91

1        A.   Yes.

2   Q.   Their productivity, in terms of number of

3   arrests, right?

4        A.   Yes, not specifically with a quantified

5   number, but yes.

6   Q.   You took into account whether or not they had any

7   civilian complaints lodged against them, right?

8        A.   Yes.

9   Q.   You took into account whether or not they had any

10  disciplinary actions taken against them, right?

11       A.   Yes.

12  Q.   Okay.  The awarding of service points to the

13  sergeants applicants had the same meaning as the

14  awarding of service points to the lieutenants, right?

15       A.   Yes.

16  Q.   So a five awarded to a lieutenant in that

17  promotional exam is the same as a five awarded to a

18  sergeant, right?

19       A.   It counts towards 5 percent of the total

20  100 percent similar to a lieutenant, yes.

21  Q.   When you say that, you testified in the past they

22  had given fives out like candy.  Do you want to change

23  that?  You wanted to make sure that a five had a

24  meaning to it, right?

25            MR. MCHUGH:  Objection as to form.

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 220 of 265 PageID #:
1356
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

92

1    Misstates the testimony.  You can answer.

2         A.  Yes, but as well I would add that it's

3    different for a sergeant as well.  It's a lesser rank.

4    So not as much weight would be given to certain areas

5    of leadership ability, because it's a different type

6    of leadership.  It's a more confined leadership.  It's

7    slightly different.

8    Q.  But you weren't grading lieutenants more strictly

9    than you were grading sergeants with regard to service

10   points, were you?

11            MR. MCHUGH:  Objection to form.

12        A.  I think we were.  Because, again, the rank of

13   lieutenant in our department at that time and prior to

14   that when we decentralized and presently is a mini

15   police chief in the district role and in the OIC role.

16   Q.  So what is a five awarded to an applicant for a

17   lieutenant, how does that differ from a five awarded

18   to an applicant for a sergeant's position?  Is there

19   any difference between the two; I thought a five was a

20   five?

21        A.  A lieutenant with a five, we're counting on

22   someone ascending to the rank of lieutenant to carry

23   the ball and to speak for the Office of the Chief of

24   Police or the department when he's out there on a

25   shift when no one of higher rank is working with him.

1      That will never be the case for a sergeant.  They
2  will never be the highest rank on duty.
3  Q.   I understand the positions are different.  I want
4  to know why a five awarded to a candidate for
5  lieutenant is different than a five awarded to a
6  candidate for a sergeant position.
7      A.   Because he has more authority and more
8  responsibility.  His voice is greater.  His authority
9  is greater.  His responsibility is greater.  It's
10  different.
11  Q.   So you had testified previously that a five meant
12  that the officer was performing at the highest level
13  possible, right?
14      A.   Yes.
15  Q.   What does a five mean for a sergeant?
16      A.   He's driven, his passionate, he has the
17  ability to communicate.  He has the ability to
18  motivate people under his command.
19  Q.   Did you explain that there's a different, that a
20  rating of five for a lieutenant is different than a
21  rating of five for a sergeant; did you explain that to
22  people present at these meetings?
23           MR. MCHUGH:  Objection to form.
24      A.   Did I explain that?  Not that I recall.
25  During conversations, these types of conversations

1    would routinely take place.  Not on this process in

2    particular, but on several of them.

3    Q.   I don't think I understand your testimony, why a

4    five is different for one exam, and why it's not the

5    same for both exams.

6         A.   For the same rank?

7    Q.   Does it say that in the collective bargaining

8    agreement?  Doesn't it say in the CBA it's the same

9    process for sergeants and lieutenants, a five is a

10   five?

11              MR. MCHUGH:  Objection as to form.  You

12   can answer.

13        A.   It refers to service points being given from

14   zero to five for promotions.  That's --

15   Q.   Right.  It talks about the overall performance,

16   right?

17        A.   Yes.

18   Q.   So when you're evaluating a sergeant, are you

19   evaluating their overall performance in their current

20   job?

21        A.   Yes, as well, bearing in mind, the rank they

22   are applying for.  Me, personally.  It doesn't

23   identify that.  I don't know how others perceive it,

24   but yes, I certainly bear in mind the rank they're

25   applying for, whether it be sergeant, or lieutenant,

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

95

1   or captain.

2   Q.   So if somebody who is applying for a sergeant

3   position gets a five, are they performing their job

4   better than a lieutenant who's getting a five, or

5   worse?

6              MR. MCHUGH:  Objection as to form.  You

7   can answer.

8       A.   If somebody is performing their job as a

9   sergeant and they get a five, are they performing,

10  they're performing at a high level.

11  Q.   At the highest level possible?

12      A.   Yes, at the highest number of service points

13  available, yes.

14  Q.   Okay.  So is a zero bad for a sergeant who is

15  applying -- is a zero bad for a person who is applying

16  to be a sergeant?

17      A.   Yes.

18             MR. MCHUGH:  Objection as to form.  You

19  can answer.

20      A.   Yes.

21  Q.   Was it still your goal to make sure that an award

22  of a high score for service points had meaning with

23  regard to the sergeants promotional exam?

24             MR. MCHUGH:  Objection to form.  You can

25  answer.

1        A.   Yes.

2    Q.   You didn't want fives to be, to just be given out

3    like candy for people applying for sergeant, right?

4        A.   Yes.  Bearing in mind, it's a different rank

5    and somewhat a different criteria.

6    Q.   Okay.  So were you rating the applicants for

7    lieutenants stricter than those that were applying for

8    sergeants, or the same?

9             MR. MCHUGH:  Objection, asked and

10   answered.  You can answer.

11       A.   Not stricter, but I put more weight on the

12   position they were looking to attain, because of the

13   greater responsibility.

14   Q.   But you used score sheets; did you use score

15   sheets for the sergeants' evaluations?

16       A.   Yes.

17   Q.   Did you hand out blank score sheets to those

18   present who were evaluating the sergeants for service

19   points?

20       A.   Yes.

21   Q.   All right.  Let's talk about who was at that

22   meeting.  When did that meeting take place?

23       A.   Not exactly sure, but it would have been the

24   same time frame, probably within a week of the actual

25   exam.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

97

1  Q.    Who was present at that meeting?

2        A.    Not positive of the entire lineup, but in all

3  probability it would have been Deputy Chief Oates, the

4  Majors, Tom Verdi, Frank Colon, Keith Tucker and the

5  Captains, the five that we've identified.

6  Q.    The same people that were present at the meeting

7  the week before?

8        A.    Yes.  There would also be some lieutenants at

9  that meeting as well.  I don't know if all of them

10  came or if anyone missed.

11  Q.    Do you know who handed in completed score sheets

12  to you for that, for the sergeants, for the meeting to

13  award sergeants chief points?

14        A.    No, I don't.

15  Q.    Why don't you remember that?

16        A.    I don't know who handed them in.

17  Q.    Do you still have them?

18        A.    I believe so, yes.

19  Q.    If I asked you to produce them, could you get

20  them to your attorneys?

21        A.    If I have them, yes.

22              MR. GAGLIARDI:  I'm just going to state

23  for the record, Kevin, I believe that's also a duty to

24  supplement.

25              MR. MCHUGH:  Well, I mean, I'm going to

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

98

1   give them to you.  I don't believe, I don't see how

2   they're relevant.  I mean, I'm going to give them to

3   you.

4               MR. GAGLIARDI:  It's comparative

5   evidence.

6               MR. MCHUGH:  I don't agree with that,

7   but...

8   Q.   How is it you remember who handed in lieutenants

9   sheets, but you don't remember who handed in the

10  sergeants sheets?

11       A.   Because I have them in front of me.

12  Q.   No.  Well, you testified last week who handed in

13  the sheets before you had them in front of you.  You

14  have them in front of you today, but last week you

15  gave me the names.

16       A.   Preparing for the testimony.

17               MR. GAGLIARDI:  Okay.

18          (EXHIBIT E PLAINTIFF'S MARKED FOR ID)

19  Q.   You've just been handed Exhibit E which is a

20  document dated July 16, 2012.  It's the final order of

21  finish of the sergeants eligibility list.  Have you

22  ever seen this document before today?

23       A.   Yes.

24  Q.   This document on Page 3 is signed by you, right?

25       A.   Yes.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

99

1   Q.   And the Commissioner of Public Safety?

2        A.  Yes.

3   Q.   I want to direct your attention to the service

4   points.  You had 46 people who sat for the exam.  Do

5   you know how many people signed up but didn't actually

6   take the exam?

7        A.  On this one, no.

8   Q.   So there may have been additional service points

9   awarded that don't appear on this list, right?

10       A.  Yes.

11  Q.   It looks like everybody got a five except four

12  people.  The four people that didn't get fives, two

13  got four and-a-half and two got fours?

14       A.  Correct.

15  Q.   Was an award of service points for this exam, was

16  that consistent with your policy to not just, to have

17  the service points have meaning and to not give out

18  fives like candy, using your language?

19            MR. MCHUGH:  Objection as to form.  You

20  can answer.

21       A.  Yes.  Bearing in mind, it's a different rank.

22  Q.   How is it that 42 out of the 46 candidates for

23  the sergeants exam got fives?

24            MR. MCHUGH:  Objection as to form.  You

25  can answer, if you understand the question.

100

1  Q.   How can you explain that?

2       A.   Based on conversations around the room and

3  with the upper command staff and with the Deputy

4  Chief, we compiled this final list of service points.

5  Q.   Do you agree with me that of these 46 people that

6  sat for the exam every one of them was performing

7  their job better than Mark Mancini was performing his

8  job?

9            MR. MCHUGH:   Objection as to form.   You

10 can answer, if you can.

11      A.   Better than Mark Mancini, they were given

12 more service points for the rank they were going for.

13 I can't compare each one of them individually.   We

14 don't do that, say let's look at all the fives for

15 detective service bureau, sergeant, lieutenant,

16 captain.

17      So a captain who gets a five, I would think,

18 would have to be performing at a higher level than a

19 service bureau detective getting a five or a

20 detective.   It's a different position.

21 Q.   Is it your testimony that a five on a sergeants

22 exam is not a higher grade, a higher award of service

23 points -- strike that.   Would you agree with me that

24 the candidates who got fives on the sergeants exam

25 were performing at the highest level possible for

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

101

1    their current position?

2         A.   Yes.   Bearing in mind in respect to their

3    competition, yes.

4    Q.   Did you explain to the people that were present

5    at this meeting who were going to make recommendations

6    of chief points that a five for a sergeants exam is

7    different than a five for a lieutenants exam?

8         A.   That portion of a conversation came up by me

9    as well as many others around the room.   Yes, that was

10   always part of the conversation.

11   Q.   I have to say, that's very confusing.   I don't

12   know how, how people are supposed to rate someone's

13   overall performance on a scale of zero to five, and

14   it's different for each promotional exam.   How do you

15   keep track of that?

16             MR. MCHUGH:   Objection as to form.   You

17   can answer.

18        A.   Again, I think total objectivity is

19   unattainable, unobtainable.   There's some subjectivity

20   that comes into play, no doubt.   I can't speculate

21   what each person thinks, but I get your point.   I do.

22   Q.   I mean, an A is an A in grade school?

23             MR. MCHUGH:   Objection as to form.   You

24   can answer.

25        A.   Depends on the level of the course.   You're

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

102

1   taking an AP course, C plus might be an A.  B might be

2   an A.

3   Q.   You said something about, that a five was the

4   highest score they could get with respect to their

5   competition?

6        A.   Yes.

7   Q.   What does that mean?

8        A.   What I meant by that was where people who got

9   less than five for that particular score, we try to

10  keep somewhat consistent.

11  Q.   So when you went through this list at that

12  meeting and you said, Okay, Robert Firth, what are we

13  going to give Robert Firth?  Wouldn't a score be based

14  on Robert Firth's overall performance in his position,

15  whatever it was, without regard to who else is

16  applying for the exam; do you agree with that?

17       A.   Yes and no.  You have to see it.  Yes and no,

18  because there are different raters from different

19  divisions.  So whoever was in charge of Robert Firth

20  may have said, He's working for me; I say he's a five.

21  Then the conversation begins.

22       Somebody may say why they believe he's not a

23  five.  Then the conversation begins.  They'll say,

24  Well, if so-and-so is a four, then maybe that's what

25  he is.  To give someone a frame of reference like,

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 231 of 265 PageID #:
1367
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

103

1   Okay, you make a point.  Because he has similar work

2   tendencies or whatever.

3   Q.   I guess I would want to be the first one called

4   on the list, because then they could not compare me to

5   anybody else?

6        A.   Then we go back, and that's happened.  That's

7   happened several time where we start alphabetically.

8   Wait a minute, you gave so-and-so a five; we need to

9   go back.

10  Q.   That would be no different for the lieutenants

11  exam then, right?

12       A.   Correct.

13  Q.   Would you agree with me that on a sergeants

14  promotional exam five is the highest you can get, and

15  zero is the lowest you can get?

16       A.   Yes.

17  Q.   That a five is good, and a zero is bad; can we at

18  least agree on that?

19            MR. MCHUGH:   Objection to form.  You can

20  answer.

21       A.   Yes.

22  Q.   Because nobody got a zero on the sergeants exam

23  for service points that means, you, Hugh Clements,

24  didn't believe anybody's performance was at the lowest

25  level possible; is that correct?

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 232 of 265 PageID #:
1368
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

104

1      A.   Correct.

2   Q.   Is one of the reasons that 42 out of the 46

3   candidates on the sergeants exam got fives, it just so

4   happens that they were performing the job better than

5   lieutenants who applied for promotional exams?

6                MR. MCHUGH:   Objection to form.   You can

7   answer.

8      A.   Not really.

9   Q.   What about promotional exams for detectives; did

10  a five and a zero have the same meaning for service

11  points for detectives as it does for sergeants and

12  lieutenants, or is that a different rating system as

13  well?

14     A.   Probably more similar to sergeant, but it's

15  certainly different than lieutenant, yes.   There are I

16  think, I would certainly think, I would be rating it

17  differently if Kevin McHugh was applying to be a

18  detective or captain and I'm deciding whether to give

19  him five.   There is a difference in the rank he is

20  applying for.

21  Q.   You testified that in 2010 you recommended

22  Mancini get a five for a promotional exam, right?

23     A.   I believe I did.   I don't have a sheet.   I'm

24  not positive.

25  Q.   I will represent to you that he did, in fact,

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

105

1    receive a five from Colonel Esserman.

2         A.   Yes.

3    Q.   Are you aware of that?

4         A.   I am based upon recommendations from the

5    command staff, yes.

6    Q.   Then do you remember what those recommendations

7    were at the time --

8         A.   No.

9    Q.   -- for service points?

10        A.   No.

11   Q.   Did anybody recommend Mancini get a zero at that

12   time?

13        A.   I don't know.

14   Q.   Do you know who was present at that meeting to

15   recommend service points?

16        A.   Would have been the same upper command staff.

17   By name, I don't know exactly who, but it would have

18   been the Chief, Deputy Chief, Majors, Captains and

19   some Lieutenants.

20   Q.   Were the same people that were present at the

21   2012 meeting also present at that 2010 meeting?

22        A.   Some.  Some had changed.

23   Q.   Was Verdi there?

24        A.   I'm not sure.

25   Q.   Was Major Tucker there?

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

1      A.  He would have been there, yes.

2   Q.   So he recommended Mancini get a three in 2012.

3   Do you know what he recommended Mancini get for

4   service point in 2010?

5      A.  No.

6   Q.   Tom Oates, was he present at the 2010 meeting?

7      A.  Not positive.  I would think he would have

8   been.

9   Q.   Do you recall what he recommended Mancini get for

10  service points?

11     A.  No.

12  Q.   Captain Lapatin, was he present at the 2010

13  meeting?

14     A.  Not positive, but I would think he would have

15  been.

16  Q.   Do you remember what he recommended Mancini get?

17     A.  No.

18  Q.   Was Tom Verdi present at the 2010 meeting?

19     A.  I'm not positive.

20  Q.   Do you know what he recommended Mancini get for

21  service points?

22     A.  No.

23  Q.   What about Frank Colon, was he present at the

24  2010 meeting?

25     A.  Probably, but not positive.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

107

1  Q.   Do you remember what you recommended Mancini get

2  for service points?

3       A.   No.

4  Q.   What about Captain Lepre; was he present at the

5  2010 meeting?

6       A.   Not sure.

7  Q.   Do you know what he recommended Mancini get for

8  service points in 2010?

9       A.   No.

10  Q.   Do you recall if Colonel Esserman collected the

11  score sheets in the same manner that you did?

12       A.   I'm not sure if he, if he did.  We forwarded

13  them.  I'm not sure where, you know, if we gave them

14  to the Commander or to him.

15  Q.   Where is all the documentation for promotional

16  exams maintained at the police department?

17       A.   In the Human Resources Office of the points,

18  and sent to the union, obviously.

19  Q.   What about the score sheets; where are those

20  maintained?

21       A.   I keep them in a file.  I'm not sure where

22  Colonel Esserman, where the previous chiefs kept them.

23  They're not part of the formal documentation.

24  Q.   Where?  What did you do with all the files that

25  Colonel Esserman maintained -- strike that.  Did you

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 236 of 265 PageID #: 1372
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

108

1  move into his old office?

2       A.  No.  It was a different location.

3  Q.  What happened to all his paper files, filing

4  cabinets, if you know?

5       A.  Some were, some main files were kept in the

6  outer office, but his personal files, he took

7  everything.

8  Q.  Do you recall anybody at this 2010 meeting saying

9  that Mark Mancini had a negative attitude?

10       A.  I don't recall.

11  Q.  Do you recall if anybody at this 2010 meeting

12  said Mark Mancini was not a team player?

13       A.  I don't remember.

14  Q.  Do you recall if anybody at the 2010 meeting

15  recommended Mark Mancini get a zero?

16       A.  I don't remember.

17  Q.  Okay.  So in 2010 you recommended Mancini get a

18  five, and then two years later you believed he should

19  get a zero, correct?

20       A.  Yes.

21  Q.  What happened in that two-year period that caused

22  you to believe that his work performance went from the

23  highest level to the lowest level?

24       A.  Again, I don't have my sheet that I handed in

25  fom 2010.  I believe I gave him a five.  What happened

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

109

1    was there was a complete change in the command staff

2    of the police department.  The Chief was gone.  There

3    were different Majors, Captains.  The entire command

4    staff had changed.

5         There was always that feeling of it's only a

6    relatively small number of, it's only a small latitude

7    that the department has in promoting for rank,

8    5 percent.  We grade upon that.  The points should be

9    more meaningful, the service points.

10   Q.   Right, but how does that explain him going from a

11   five to a zero?  I understand you want it to be a

12   stricter grader.  I get that.  How do you go from a

13   five to a zero in two years?

14        A.   Again, I took highly the recommendations of

15   the command staff.  I don't know why they forwarded

16   certain points the way they did.  I think I've

17   indicated, you know, in my leadership over Mark, I

18   never had a problem with Mark.  He worked for me

19   several steps along the way.

20        Near the end, he was upset with that removal from

21   Homeland Security.  Then he didn't work for me, or he

22   did in patrol.  Then some of these other bosses did

23   have direct contact with him.  We ask for them to rate

24   the people under their command and the people on the

25   job to the best of their ability.  They feel fit to

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 238 of 265 PageID #:
1374
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

110

1    forward those scores to the office, so we can come up

2    with a final determination of the service points.

3    Q.    Okay.  Mancini signed up for a promotional exam

4    earlier this year, correct?

5         A.  Yes.

6    Q.    Do you remember what he got for chief points this

7    year?

8         A.  Yes.

9    Q.    What did he get?

10        A.  Four.

11   Q.    So he went from a five in 2010 to a zero in 2012

12   to a four in 2015, right?

13              MR. MCHUGH:  Objection to form.  You can

14   answer.

15        A.  Yes.

16   Q.    So what was it about Mark Mancini's work

17   performance that changed from 2012 to 2015 that caused

18   him to go, that caused you, Hugh Clements, to evaluate

19   him, change his overall performance evaluation from a

20   zero to a four?

21              MR. MCHUGH:  Objection to form.  You can

22   answer.

23        A.  The main reason was the supervisor in charge

24   of the Uniform Division, I rely heavily on what they

25   tell me, Major Verdi and the Captains in charge.  And

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 239 of 265 PageID #: 1375
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

111

1    if I could take a step back, there are several people

2    along the way who are given lesser scores on one exam

3    and do far better on future exams.

4         On this particular one for all the candidates I

5    asked the bosses down in patrol what they recommended

6    for their people.  And in specific, they recommended

7    four for Mark Mancini.

8    Q.   So when did this, when was the most recent

9    lieutenants promotional exam?

10        A.  I think it was February, I think.  I'm not

11   positive.

12   Q.   February 2015?

13        A.  I believe so.

14   Q.   Did you follow the same procedure for awarding

15   chief points that you followed in 2012 for the

16   sergeants and lieutenants exams?

17        A.  Pretty much forwarding the list out there and

18   waiting on the information to come back from the

19   respective supervisors.

20   Q.   Did you hold a meeting in February of 2015 to

21   discuss the award of chief points for those who were

22   going to sit for the February 2015 lieutenants exam?

23        A.  Yes.

24   Q.   Who was present at that meeting?

25        A.  It would have been the same command staff,

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

112

1   Deputy Chief Oates, Majors Verdi, Colon, Lapatin and

2   the Captains.

3   Q.   All the same people that were present at the

4   meeting in 2012?

5        A.   Except for Tucker; he retired.

6   Q.   Okay.

7        A.   I'm not sure which captains or lieutenants

8   would be there.

9   Q.   So Tucker wasn't there.  What did Commander Oates

10  give this time; what did he recommend Mancini get for

11  service points?

12       A.   I don't know.

13  Q.   Did those present at the meeting in February 2015

14  fill out score sheets?

15       A.   Yes.

16  Q.   Do you still have those?

17       A.   I believe so, yes.

18  Q.   Can you turn them over to your attorneys?

19       A.   Yes.

20  Q.   When can you do that?

21       A.   Today, tomorrow.

22  Q.   What did Captain Lapatin recommend Mancini get

23  for service points?

24       A.   I don't know.

25  Q.   What about Verdi?

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 241 of 265 PageID #:
1377
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

113

1        A.  Four.

2    Q.   What about Colon?

3        A.  Not sure.

4    Q.   What about Lepre?

5        A.  Not sure.

6    Q.   What about Campbell?

7        A.  Not sure.

8    Q.   Tell us how the conversation went at the February

9    2015 meeting to discuss Mark Mancini's service points?

10                MR. MCHUGH:  Objection to form.  You can

11   answer.

12        A.  Specifically, I don't know.  In general, I

13   mean, he had been doing a decent job of, a very decent

14   job.  In the absence of the lieutenant, he would come

15   to the command staff meetings.  So in general, he was

16   doing a good job.

17   Q.   Was there any discussion about Mark Mancini

18   having a negative or poor attitude at this meeting?

19        A.  At the meeting, I'm not sure.

20   Q.   Was there any discussion about Mark Mancini not

21   being a team player at the 2015 meeting?

22        A.  Specifically, I don't recall.

23   Q.   All right.  This meeting didn't, it only took

24   place about four months ago.  How is it that you

25   remember scores from 2012, but you don't remember the

1    scores from four months ago?

2                MR. MCHUGH:  Objection to form.  You can

3    answer.

4         A.  In preparing for this testimony.

5    Q.   Okay.  So you ultimately decided to give Mancini

6    a four in 2015, right, for service points?

7         A.  Correct.

8    Q.   Did you base it on the command staff and

9    supervisors' recommendations?

10        A.  Mainly the Uniform Division/Patrol Bureau

11   recommendations.

12   Q.   Did Mancini get a four because he is no longer on

13   IOD status?

14        A.  No.

15   Q.   Did Mancini get a four because of that lawsuit?

16        A.  No.

17   Q.   I mean, you have to concede, Chief Clements, he

18   went from a five to a zero to a four in five years.  I

19   mean, don't you agree with me that that's strange?

20                MR. MCHUGH:  Objection as to form.  You

21   can answer.

22        A.  Again, I highly, I highly regard the advice

23   from people who are in charge of those divisions.  He

24   had been doing a very good, a decent job in

25   Districts 2 and 3.

115

1    Q.   Why didn't you place a greater weight on the

2    recommendation of the Patrol Bureau supervisor back in

3    2012?

4         A.   I did.

5    Q.   Who was that?

6         A.   That was Major Verdi, Captain Lepre,

7    Captain Lapatin and Captain Campbell.

8    Q.   As you look back now, do you recall that maybe

9    some of these people that were recommending he get low

10   scores, do you think they maybe just didn't like, had

11   a personal problem with Mark, and it had nothing to do

12   with his work performance?

13              MR. MCHUGH:  Objection to form.  You can

14   answer.

15        A.   I don't know.

16   Q.   Do you think that some of the supervisors and

17   command staff that recommended low scores in 2012 were

18   trying to penalize Mark because he didn't want to file

19   for accidental disability benefits?

20        A.   No.

21   Q.   Do you think they wanted to send a message to the

22   rank and file that if you don't, you know, do what

23   you're told, we're going to penalize you and make it

24   harder for you to be promoted?

25              MR. MCHUGH:  Objection to form.

Case 1:13-cv-00092-WES-PAS  Document 84-2  Filed 05/26/17  Page 244 of 265 PageID #: 1380
Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

116

1       A.  I don't think so.

2   Q.  Did someone from up above direct you to give Mark

3   a zero in 2012, like the Mayor or the Commissioner?

4              MR. MCHUGH:  Objection to form.  You can

5   answer.

6       A.  No.

7   Q.  Did anybody direct you to give Mark a zero?

8       A.  No.

9              (BRIEF RECESS)

10  Q.  Okay, Colonel Clements, just a few more

11  questions.  You testified that in awarding Sergeant

12  Mancini four chief points in February 2015 you relied

13  heavily on the recommendations of the commanders for

14  the Patrol Bureau; is that correct?

15      A.  Yes.

16  Q.  Okay.  Who are those people?

17      A.  That was Major Verdi, Captain Stamatakos.

18  I'm not sure who else weighed in, but I know his

19  Lieutenant weighed in as well, Oscar Perez.

20  Q.  Who were the commanders of the Patrol Bureau,

21  though, in February 2015?

22      A.  Major Verdi, Captain Stamatakos.  Captain

23  Lepre had left.  I'm drawing a blank on the other

24  captains.  We had trimmed the number of district

25  lieutenants from nine to five.  So they took on added

117

 1  responsibilities.

 2  Q.   Was Major Tucker a commander in the Patrol

 3  Bureau?

 4       A.   No, no.

 5  Q.   What about Lapatin?

 6       A.   No.  I'm sorry, Captain Isabella.

 7  Q.   Captain Isabella?

 8       A.   Yes, but he was removed from patrol doing,

 9  working as an arm of the Chief's office doing special

10  projects.

11  Q.   Why did you rely heavily on the recommendation of

12  the Patrol Bureau in February of 2015?

13       A.   Because that's where Mark worked.  I relied

14  on the recommendations of everyone, but I think it's

15  important to rely on the recommendations of the people

16  who work in that division, who oversee that division.

17  Q.   Did you rely heavily on the commanders that

18  worked in the Patrol Bureau for their recommendations

19  for service points in 2012?

20       A.   Yes.

21  Q.   Who were those people?

22       A.   That was Major Verdi, Captain Lepre, Captain

23  Stamatakos.  Under them were Lieutenant D'Andrade who

24  oversaw that division.  Again, I'm not sure if she

25  filled out a sheet.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

118

1  Q.   What about Lapatin, wasn't he a commander in the

2  Patrol Bureau back in 2012?

3       A.   He just left.  He was a captain in the Patrol

4  Bureau prior to the administration of that exam.  He

5  had been there for awhile.

6  Q.   So at the time of the, the time that the

7  commanders and supervisors made recommendations for

8  chief points in 2012, was Captain Lapatin a commander

9  in the Patrol Bureau?

10      A.   I don't believe so.

11 Q.   I thought you just said at the time of the

12 administration of the exam he was?

13               THE WITNESS:  What year?

14               MR. GAGLIARDI:  2012.

15      A.   I could be wrong.  It was, I want to say he

16 was in Internal Affairs at that time.  I'm not

17 positive.  He had been there for quite some time.  I

18 think at the point of the exam -- I'm not positive.

19 Q.   When did he leave?

20      A.   I don't know.  It was within a couple-month

21 period of time.

22 Q.   He was present at that meeting, and he had, he

23 had in the past worked in Mark Mancini's bureau,

24 right?

25      A.   Yes.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

119

1    Q.    Did you rely heavily on his recommendation of

2    chief points in 2012?

3         A.    I took it into account, yes.

4    Q.    I mean, I was just curious.  I don't know if you

5    ever answered this question.  I'm curious while you

6    settled on a zero as opposed to a one or a two?

7              MR. MCHUGH:  Objection to form.

8         A.    I took into higher regard the people who are

9    going to be running the Uniform Division, their

10   recommendations.  We were moving forward.  We had just

11   made a lot of changes.  I took everything into

12   account.

13        I took into high regard the service points

14   forwarded from the major and the captains who were

15   going to be running the Uniform Division/Patrol

16   Bureau.  All of it, everyone's assessment.

17   Q.    You testified you relied heavily on the

18   commanders that work in the Patrol Bureau; those were

19   Verdi, Lepre, Stamatakos and Lapatin?

20        A.    Yes.

21   Q.    And only one of those recommended a zero.  Verdi

22   recommended a one, Lapatin a two.  Stamatakos, we

23   don't know.  Why did you settle on a zero if you

24   relied heavily on those four?

25        A.    I relied on all of them, all the

120

1   recommendations, all seven that were forwarded.  It

2   was alarming to me that there were many low scores.

3   In the seven assessments that were provided to me, it

4   was, it was alarming.  I was surprised.

5   Q.   Who was going to run the Patrol Bureau if

6   Sergeant Mancini got -- strike that.  Who was going to

7   be in charge of the Patrol Bureau following that

8   promotional exam, the lieutenants, in 2012?

9        A.   Major Verdi.

10  Q.   Anybody else?

11       A.   Captains Lepre and Stamatakos.

12  Q.   Do you have any reason to believe that Stamatakos

13  gave Mancini a zero?

14       A.   No.

15  Q.   He didn't give him a zero, did he?

16       A.   He didn't turn a sheet in.

17  Q.   As you sit here today, do you recall if he gave

18  him a zero or not?

19       A.   He didn't put a number on it, as far as I

20  know.  He spoke at the, I testified to what I believe

21  he said at the meeting, but I don't recall him, I know

22  he didn't turn a sheet in.

23  Q.   You said, I believe you testified you relied

24  heavily on the people who were going to be then

25  supervising Mancini, and that was Verdi, Lepre and

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

1    Stamatakos?

2          A.  Yes, yes.

3    Q.   Verdi was a one, Lepre was a zero, and we don't

4    know what Stamatakos was, correct?

5          A.  Correct.

6    Q.   Okay.  Just a final topic to discuss.  The final

7    service points that were faxed from HR to the union,

8    do you recall that?

9          A.  Yes.

10   Q.   That was a document that was an exhibit from the

11   last deposition?

12         A.  Yes.

13   Q.   Do you remember that?  Did you alter that

14   document in any way after it was faxed to the union?

15         A.  Absolutely not.

16   Q.   Did you direct anyone to alter that document in

17   any way after it was faxed to the union?

18         A.  No.

19   Q.   Do you know if the document was altered in any

20   way after it was faxed to the union?

21         A.  No.

22              MR. GAGLIARDI:  Okay.  That's all I've

23   got.

24              MR. MCHUGH:  Thank you.  No questions.

25   I'll take a transcript, please.

Chief Hugh T. Clements, Jr. - Vol. II - June 17, 2015

122

1              (DEPOSITION CLOSE AT 2:45 P.M.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

123

1                    C-E-R-T-I-F-I-C-A-T-E

2

I, ELIZABETH GREELEY, a Notary Public, in and for the
3    State of Rhode Island, duly commissioned and qualified
     to administer oaths, do hereby certify that the
4    foregoing Deposition of Chief Hugh T. Clements, Jr., a
     Defendant in the above-entitled cause, was taken
5    before me on behalf of the Plaintiff, at the offices
     of Mark Gagliardi, 120 Wayland Street, Providence,
6    Rhode Island on June 17, 2015 at 10:00 A.M.; that
     previous to examination of said witness, who was of
7    lawful age, he was first sworn by me and duly
     cautioned to testify to the truth, the whole truth,
8    and nothing but the truth, and that he thereupon
     testified in the foregoing manner as set out in the
9    aforesaid transcript.

10   I further certify that the foregoing Deposition was
     taken down by me in machine shorthand and was later
11   transcribed by computer, and that the foregoing
     Deposition is a true and accurate record of the
12   testimony of said witness.

13   Pursuant to Rules 5(d) and 30(f) of the Federal Rules
     of Civil Procedure, original transcripts shall not be
14   filed in Court; therefore, the original is delivered
     to and retained by Plaintiff's Attorney, Mark
15   Gagliardi.

16   Reading and signing of the Deposition was waived by
     the Witness.
17
     IN WITNESS WHEREOF, I have hereunto set my hand this
18   26th day of June, 2015.

19

20

21

22   _____
     ELIZABETH GREELEY, NOTARY PUBLIC
23   CERTIFIED COURT REPORTER
     MY COMMISSION EXPIRES:  04/07/2018
24

25

## A

**ability (6)**
24:3;88:6;92:5;
93:17,17;109:25
**able (2)**
6:5;53:18
**above (6)**
9:23;11:11,21;
12:17;24:6;116:2
**above-average (1)**
28:10
**absence (1)**
113:14
**absenteeism (1)**
26:24
**Absolutely (2)**
86:23;121:15
**abuse (4)**
26:14;27:8,9;30:21
**abused (1)**
26:19
**abusive (1)**
30:6
**abutting (2)**
9:2,9
**academy (1)**
18:10
**accidental (5)**
5:15,23;7:1,19;
115:19
**accidents (2)**
75:6;76:24
**accomplish (1)**
88:8
**according (2)**
7:4,15
**account (13)**
29:10;71:9;72:1;
76:18,20;87:22;
88:13;90:22,24;91:6,
9;119:3,12
**accurate (2)**
22:5;75:18
**act (2)**
35:7;37:18
**action (1)**
74:20
**actions (2)**
74:5;91:10
**active (3)**
19:23;28:17;32:17
**actively (1)**
30:12
**activities (2)**
19:12;30:9
**activity (4)**
12:2;28:3;30:7;
50:7
**acts (5)**
32:22;33:14,22,24;
34:25

**actual (1)**
96:24
**actually (1)**
99:5
**add (2)**
87:7;92:2
**added (1)**
116:25
**additional (1)**
99:8
**administration (12)**
77:20,24;78:4,19,
22;79:23;80:9;81:4;
83:13;84:13;118:4,
12
**administrations (1)**
35:4
**administrative-type (1)**
5:3
**advice (2)**
70:20;114:22
**advise (1)**
12:4
**Affairs (3)**
56:12,12;118:16
**affect (2)**
27:5,7
**afterwards (2)**
55:12,13
**again (23)**
7:12,22;13:4;
15:21;16:21;17:13;
29:12;33:12;41:15;
46:2;58:2,15;60:1;
61:14;64:3;74:24;
84:24;92:12;101:18;
108:24;109:14;
114:22;117:24
**against (9)**
21:16;26:25;49:10,
16;50:2,11;74:21;
91:7,10
**agency (4)**
4:21;17:13;33:19;
76:15
**ago (8)**
35:8,18,20;75:15,
16;76:16;113:24;
114:1
**agree (16)**
24:2;42:14;45:14,
19,22;60:19;83:22;
84:3;85:25;98:6;
100:5,23;102:16;
103:13,18;114:19
**agreement (4)**
7:6;26:5;89:9;94:8
**alarmed (1)**
70:18
**alarming (2)**
120:2,4
**allotment (1)**
26:20

**allotted (1)**
27:4
**allowed (1)**
31:20
**almost (1)**
13:1
**along (7)**
6:1;22:23;65:13;
66:1;83:11;109:19;
111:2
**alphabetically (1)**
103:7
**alter (2)**
121:13,16
**altercation (1)**
50:24
**altered (1)**
121:19
**always (5)**
35:10;73:20;82:14;
101:10;109:5
**amongst (1)**
88:22
**amount (3)**
27:4;28:10;78:8
**and-a-half (2)**
84:23;99:13
**ANSEWR (1)**
34:11
**answered (2)**
96:10;119:5
**AP (1)**
102:1
**appear (2)**
43:8;99:9
**applicant (3)**
30:17;92:16,18
**applicants (2)**
91:13;96:6
**applicants' (1)**
66:23
**applicant's (2)**
32:5,15
**applied (4)**
36:8,10;82:20;
104:5
**applying (11)**
72:5;94:22,25;
95:2,15,15;96:3,7;
102:16;104:17,20
**approach (1)**
14:5
**APTT (2)**
3:17,17
**area (6)**
9:1;11:19,25;
13:16;18:20,21
**areas (3)**
9:12;16:6;92:4
**arm (1)**
117:9
**around (5)**
9:8;60:1;82:6;

**100:2;101:9**
**arrest (1)**
13:11
**arrests (11)**
13:10;28:5,6,7,8,
10,18,22;29:11;
31:16;91:3
**arrow (1)**
43:21
**ascending (1)**
92:22
**Aside (1)**
83:12
**aspects (1)**
54:16
**aspiring (1)**
33:10
**assault (1)**
39:20
**assessing (1)**
88:17
**assessment (4)**
22:12;52:6;58:20;
119:16
**assessments (1)**
120:3
**assigned (17)**
6:21;8:20;9:7,13,
15,18;10:1,10,15,20,
21;15:8;25:4;41:17,
20;42:2,12
**assignment (5)**
10:10;78:16,17,24;
87:5
**assignments (1)**
83:10
**Assistant (2)**
3:20,22
**associate (1)**
3:17
**attain (1)**
96:12
**attend (2)**
20:10;25:24
**attention (2)**
12:4;99:3
**attitude (17)**
48:12,15;51:1,5;
72:16,21;74:14,14;
78:1;81:11;82:24,25;
83:17,19;84:12;
108:9;113:18
**attorneys (3)**
39:3;97:20;112:18
**August (1)**
7:17
**authority (2)**
93:7,8
**authorized (1)**
14:21
**available (3)**
14:11;32:9;95:13
**Avenue (1)**

**8:24**
**average (5)**
28:10;50:6;70:12,
16;82:16
**award (18)**
27:5,7;32:18;35:3;
70:5;74:6,9,19;76:6,
22;77:25;78:7;84:18;
95:21;97:13;99:15;
100:22;111:21
**awarded (10)**
8:15;26:4;44:10;
91:16,17;92:16,17;
93:4,5;99:9
**awarding (28)**
22:18;26:11;27:1,
17;29:11,16,23;
32:15;33:11;36:19;
50:12;53:10;73:16,
19;74:24;75:13;
80:14;81:23;86:2;
88:3,25;89:1,5,18;
91:12,14;111:14;
116:11
**aware (8)**
48:25;49:9,15;
50:1,4,24;63:8;105:3
**awhile (2)**
67:16;118:5

## B

**back (33)**
6:5;7:5,13,14;
16:21;20:15,16;23:2,
4;33:1,13;34:9,11;
35:3;40:19;46:18;
49:5,6,18,20,23;
73:21,23;78:17;82:1;
83:8;103:6,9;111:1,
18;115:2,8;118:2
**bad (6)**
18:23;28:8;74:13;
95:14,15;103:17
**badmouthing (3)**
77:19,24;78:20
**ball (1)**
92:23
**bargaining (4)**
7:6;26:5;89:8;94:7
**base (1)**
114:8
**based (5)**
26:6;82:25;100:2;
102:13;105:4
**BB (1)**
17:1
**BCI (1)**
41:11
**bear (1)**
94:24
**Bearing (5)**
72:4;94:21;96:4;

99:21;101:2
**became (5)**
  18:8;20:5;52:10;
  80:15,18
**become (1)**
  5:10
**begins (2)**
  102:21,23
**behavior (1)**
  80:2
**belief (1)**
  84:7
**below (4)**
  8:2;28:10;50:5;
  72:8
**benefits (5)**
  5:15,24;7:2,20;
  115:19
**best (3)**
  4:1;58:18;109:25
**better (7)**
  24:10;37:16;95:4;
  100:7,11;104:4;
  111:3
**big (1)**
  33:19
**bit (4)**
  8:8;19:21;26:3;
  53:24
**blank (5)**
  21:3;40:17;62:15;
  96:17;116:23
**block (1)**
  9:13
**Board (1)**
  6:2
**boat (1)**
  35:16
**Bobby (1)**
  65:9
**boots-on-the-ground (1)**
  15:21
**bosses (2)**
  109:22;111:5
**both (7)**
  14:25;15:11;41:18;
  45:14;65:17;68:16;
  94:5
**bottom (1)**
  36:15
**box (1)**
  62:11
**BREAK (2)**
  68:24;71:8
**BRIEF (1)**
  116:9
**bring (1)**
  74:15
**Broadway (1)**
  8:25
**brought (2)**
  35:14;72:23
**build (1)**

88:7
**building (1)**
  60:1
**bunch (1)**
  87:20
**Bureau (29)**
  15:9;18:18,21;
  19:7,10;24:20;39:18,
  21,24;41:24;42:7;
  67:20;100:15,19;
  114:10;115:2;
  116:14,20;117:3,12,
  18;118:2,4,9,23;
  119:16,18;120:5,7
**Bureau/Uniform (1)**
  71:2
**bureaus (5)**
  26:13;39:17;40:1;
  65:20;81:21
**burglary (1)**
  39:19
**busier (2)**
  28:14,15
**busy (4)**
  14:8;16:4,6;24:18

## C

**cabinets (1)**
  108:4
**call (3)**
  14:12;16:21;34:18
**called (1)**
  103:3
**caller (1)**
  16:21
**calls (6)**
  14:6,7;16:7;19:22,
  23;29:8
**came (9)**
  7:5;18:7;25:19;
  41:25;73:5;77:12;
  83:8;97:10;101:8
**Campbell (12)**
  15:4;17:12,14;
  66:12,15,21;67:13,
  23;68:18;71:5;113:6;
  115:7
**can (78)**
  7:10,20;14:1;
  16:22;17:2;20:23;
  22:22;23:6,23;24:7,
  14;25:15;27:18,20;
  28:13;29:1;30:3,16;
  32:11;34:8,9,18;
  35:13;37:14;38:5;
  47:17;48:3;53:5,20,
  23;58:12;60:19;
  66:10;71:21;72:12;
  73:15;76:10;77:15;
  79:12,17;80:5;82:4;
  83:9;84:18;86:5;
  88:20;89:3,12,12,24;

92:1;94:12;95:7,19,
  24;96:10;99:20,25;
  100:1,10,10;101:17,
  24;103:14,15,17,19;
  104:6;110:1,13,21;
  112:18,20;113:10;
  114:2,21;115:13;
  116:4
**candidate (11)**
  20:8;21:13;52:14;
  62:12;67:5,6;68:15,
  15;86:25;93:4,6
**candidates (12)**
  45:8;48:7;49:15;
  52:25;55:4;56:1,3;
  57:11;67:3;68:14,19;
  73:18;85:1;86:19,21,
  25;87:17;88:25;
  99:22;100:24;104:3;
  111:4
**candy (4)**
  81:22;91:22;96:3;
  99:18
**capacity (5)**
  6:6,6;20:6;40:4;
  67:14
**captain (43)**
  11:6;14:16;15:20,
  20,21;16:1;24:12;
  54:21;55:1,11,16,22;
  56:7;58:2;64:11;
  65:7,12;66:14,15,21;
  67:13,23;68:18;71:4;
  95:1;100:16,17;
  104:18;106:12;
  107:4;112:22;115:6,
  7,7;116:17,22,22;
  117:6,7,22,22;118:3,
  8
**Captains (28)**
  11:3,4,8;14:16,17,
  17,20,25;15:7,8;16:9;
  17:5;22:24;23:11,25;
  24:6,18;65:19;90:17;
  97:5;105:18;109:3;
  110:25;112:2,7;
  116:24;119:14;
  120:11
**car (6)**
  9:5,11,15;12:2;
  75:6;76:24
**care (4)**
  71:16,17,19;72:9
**career (2)**
  49:13;61:23
**carry (1)**
  92:22
**case (2)**
  40:6;93:1
**caused (6)**
  50:25;83:15;84:7;
  108:21;110:17,18
**caution (1)**

53:3
**CBA (11)**
  4:14;5:19;6:11;
  7:15;21:16,20;26:8;
  86:3,6,7;94:8
**Central (1)**
  12:10
**certain (12)**
  6:2;12:2,2;16:18,
  19;33:14,21,22;34:3;
  87:15;92:4;109:16
**Certainly (13)**
  13:15;14:11;19:9;
  26:13;32:17,24;
  33:11;71:13;75:15;
  79:9;94:24;104:15,
  16
**chain (2)**
  8:8,11
**chance (1)**
  36:16
**change (3)**
  91:22;109:1;
  110:19
**changed (5)**
  5:9;11:8;105:22;
  109:4;110:17
**changes (1)**
  119:11
**Charge (12)**
  10:10;25:3;39:14;
  54:23;56:7;61:19;
  67:18;102:19;
  110:23,25;114:23;
  120:7
**chase (1)**
  5:5
**checking (2)**
  12:19;13:4
**checkmarks (3)**
  55:5;56:4;58:4
**CHIEF (67)**
  3:2,9;5:10;6:9;
  11:12,19;19:18,21,
  25;20:5,7,18,25;21:9,
  11,18;22:19;27:1,17;
  29:16,23;32:16;36:1;
  42:21;45:7;46:11;
  47:4,7,14;50:12;
  51:17;52:10;54:3;
  68:25;69:3;70:3,5,
  21;71:12;73:16,19;
  75:13;76:6,22;77:25;
  80:15,19;81:7,12;
  84:18;92:15,23;97:3,
  13;100:4;101:6;
  105:18,18;109:2;
  110:6;111:15,21;
  112:1;114:17;
  116:12;118:8;119:2
**chiefs (1)**
  107:22
**Chief's (1)**

117:9
**City (8)**
  3:21,22;6:13;
  10:13;13:16;16:4,10,
  19
**civilian (10)**
  12:18;16:14;29:15,
  19;49:9,16,24,25;
  50:1;91:7
**claims (2)**
  7:17;21:16
**clarify (1)**
  35:1
**clear (4)**
  6:2;49:18;68:25;
  90:5
**CLEMENTS (12)**
  3:2,7,9,23;6:9;
  36:16;68:25;70:5;
  103:23;110:18;
  114:17;116:10
**clerk (1)**
  83:25
**close (2)**
  90:13;122:1
**coined (1)**
  75:17
**collected (1)**
  107:10
**collective (4)**
  7:6;26:5;89:8;94:7
**Colon (12)**
  19:16;61:16;62:3,
  21;63:12,15,20,25;
  97:4;106:23;112:1;
  113:2
**Colonel (7)**
  78:23,23;105:1;
  107:10,22,25;116:10
**Colon's (1)**
  62:5
**column (17)**
  40:9;45:16,16;
  46:4,4,5,8;55:3,6,7,9;
  56:24;57:8;58:3,8;
  62:8;66:24
**columns (5)**
  45:5,9,10,10,14
**command (47)**
  8:9,11;19:13;20:1;
  23:10;26:12;30:10,
  10;31:7,20;32:4;
  33:16,22,24;34:4,6,
  14,24;35:2,4,15;
  37:10,11;42:3;52:7;
  58:18;60:4;69:17,21,
  23;70:20;81:24;
  88:14,16,23;93:18;
  100:3;105:5,16;
  109:1,3,15,24;
  111:25;113:15;
  114:8;115:17
**commandant (1)**

18:10
**Commander (11)**
13:21,22,25;42:25;
47:18;78:23;107:14;
112:9;117:2;118:1,8
**commanders (6)**
87:5;116:13,20;
117:17;118:7;119:18
**commanding (2)**
15:12;72:2
**COMMENCED (1)**
3:1
**commendation (8)**
26:9;27:13,21;
29:24;30:7;31:15;
89:10;90:25
**comment (3)**
59:6;73:9,9
**comments (8)**
50:22;55:17;78:25;
80:8,8;81:4;83:13;
84:13
**Commissioner (2)**
99:1;116:3
**committed (1)**
35:7
**communicate (3)**
14:11;88:7;93:17
**community (20)**
11:18,22,23;13:9;
15:15,19;16:8,20;
30:13,13;85:15,16,
20;86:1,8,13,22;87:1,
9,23
**community-service (1)**
86:17
**comparative (1)**
98:4
**compare (4)**
28:21;29:6;100:13;
103:4
**competition (2)**
101:3;102:5
**compiled (1)**
100:4
**complain (2)**
16:23;77:12
**complained (2)**
16:19;78:3
**complaint (2)**
16:16,24
**complaints (18)**
12:2,17,18,18,19;
13:5;16:7,9,14,18;
29:15,19;49:9,16,24,
25;50:2;91:7
**complete (3)**
13:2;53:18;109:1
**completed (2)**
55:22;97:11
**Comprises (2)**
39:17;40:1
**concede (1)**

114:17
**conduct (5)**
73:12;74:8;83:14;
84:6,10
**conducted (2)**
20:18;35:9
**confined (1)**
92:6
**conflict (2)**
51:18;60:7
**confusing (1)**
101:11
**consider (15)**
27:17;29:16,23;
33:3;54:10;73:18;
74:20;75:11,14;
77:18,23;86:12,20;
88:2,17
**considered (6)**
29:12;32:18;33:8;
54:8;87:13;90:13
**consistent (2)**
99:16;102:10
**consistently (1)**
87:19
**constant (2)**
16:17,18
**constantly (1)**
12:3
**constituted (1)**
78:20
**constitutes (1)**
4:15
**contact (2)**
18:12;109:23
**contained (1)**
21:20
**contains (1)**
69:22
**context (2)**
85:12,13
**continue (2)**
3:11;26:2
**continued (1)**
77:8
**contract (1)**
5:18
**conversation (17)**
58:21;59:9;63:23;
64:3;65:25;72:14;
77:7,8;81:18;82:14;
84:24;85:14;101:8,
10;102:21,23;113:8
**conversations (8)**
66:3;82:3;84:21;
89:4;90:20;93:25,25;
100:2
**Coreville (1)**
74:2
**corner (5)**
16:17;18:16;39:8,
11;62:5
**corps (1)**

87:15
**council (2)**
11:23;13:8
**councillors (1)**
16:8
**Counsel (1)**
3:10
**count (1)**
26:25
**counting (1)**
92:21
**counts (1)**
91:19
**couple (3)**
67:3;68:25;87:20
**couple-month (1)**
118:20
**course (3)**
8:13;101:25;102:1
**court (1)**
37:3
**Courville (1)**
61:5
**covered (1)**
26:24
**Cranston (1)**
12:11
**crime (4)**
12:7;39:23,24;42:5
**crimes (2)**
39:18,19
**criminal (2)**
39:21;42:7
**criteria (7)**
88:11,24;90:8,11,
14,18;96:5
**critique (1)**
22:11
**critiqued (1)**
82:13
**curious (3)**
33:1;119:4,5
**current (4)**
33:4;75:12;94:19;
101:1
**cursive (2)**
39:10;62:4

## D

**D'Andrade (13)**
10:3,7,22;12:9;
14:18;15:6;17:16,22;
20:2;22:16;24:24;
25:11;117:23
**D'Andrade's (5)**
10:25;11:6;13:18;
22:20;23:19
**Danny (1)**
35:13
**data (2)**
27:16;29:22
**date (2)**

56:9;67:15
**dated (1)**
98:20
**day (11)**
9:21;12:1;29:6;
30:12,12;69:9,9,10,
11,14,18
**days (17)**
15:10,11;26:9,10,
15,18,20;27:5,22;
29:24;30:16,24;
31:10;32:23;50:14,
16;90:22
**day-to-day (2)**
17:3;30:9
**de (1)**
87:15
**deal (2)**
16:1,16
**dealing (3)**
12:24;16:17;19:8
**decent (3)**
113:13,13;114:24
**decentralized (1)**
92:14
**decide (1)**
70:14
**decided (2)**
70:5;114:5
**deciding (1)**
104:18
**decision (6)**
74:19;76:6,22;
77:25;78:7;86:14
**decisionmaker (1)**
36:19
**definitely (1)**
16:11
**definition (1)**
83:20
**degree (1)**
76:19
**deleted (1)**
62:24
**demotion (1)**
32:24
**Department (11)**
6:12,19;8:2,9;
60:11;88:9;92:13,24;
107:16;109:2,7
**Depending (2)**
14:8;15:12
**depends (3)**
13:24;82:12;
101:25
**deposes (1)**
3:3
**DEPOSITION (6)**
3:1,12;33:7;72:15;
121:11;122:1
**depositions (1)**
90:3
**Deputy (14)**

11:11;19:18,21;
42:21;47:4,7,14;
51:17;70:21;71:12;
97:3;100:3;105:18;
112:1
**described (1)**
20:11
**desk (1)**
18:20
**detail (2)**
75:5;76:21
**details (1)**
51:4
**Detective (7)**
39:18;41:10,10;
100:15,19,20;104:18
**detectives (5)**
19:14;24:21;40:6;
104:9,11
**determination (1)**
110:2
**determine (1)**
69:2
**determined (1)**
88:10
**developing (1)**
82:25
**differ (3)**
14:9;20:20;92:17
**difference (2)**
92:19;104:19
**different (34)**
14:10;30:5;65:20,
20;70:11;81:20,20,
25;82:7;83:10;90:11,
14;92:3,5,7;93:3,5,
10,19,20;94:4;96:4,5;
99:21;100:20;101:7,
14;102:18,18;
103:10;104:12,15;
108:2;109:3
**differentiate (1)**
26:22
**differently (2)**
81:22;104:17
**difficult (1)**
82:13
**difficulties (1)**
72:24
**difficulty (1)**
73:4
**direct (21)**
8:1;10:4;11:24;
16:13;18:8;19:11;
21:17;24:25;25:2,23;
43:1;51:21;57:20;
61:22;63:5,7;99:3;
109:23;116:2,7;
121:16
**direction (1)**
11:21
**directly (8)**
18:19;21:13;22:12,

Mancini  vs
City of Providence

Chief Hugh T. Clements, Jr. -   Vol. II
June 17, 2015

16;23:15,20,24;25:5
**disability (5)**
5:15,23;7:1,20;
115:19
**disagree (2)**
21:19;83:22
**disciplinary (4)**
53:14;74:5,20;
91:10
**discipline (19)**
32:14,15,18,20,22;
33:2,12;37:12,19,22;
48:25;49:24;53:12;
73:19;74:1,3,15;
75:3;80:7
**discuss (5)**
4:4;38:9;111:21;
113:9;121:6
**discussed (5)**
5:13;49:15;74:5,9;
75:21
**discussing (2)**
8:10;89:25
**discussion (7)**
47:25;54:3;74:13;
88:22;90:6;113:17,
20
**discussions (3)**
52:23;58:9;61:8
**dislike (2)**
60:7;66:6
**disparaging (1)**
66:8
**dispatch (2)**
14:7;16:8
**dissatisfied (1)**
50:15
**district (23)**
8:20,22;9:6;10:1,8,
11,15,20;13:24;16:5,
5;25:3;27:25;28:22;
29:13;54:23,24;
59:12;75:7;87:4;
88:8;92:15;116:24
**districts (11)**
9:10,10;10:7,19;
16:5;17:7,9;28:14,15,
17;114:25
**divide (1)**
15:18
**Division (24)**
15:9,13,14;17:15;
22:25;23:11;39:15,
16,23,25;40:1;42:12;
56:7,18;61:19;64:11;
67:18,20;71:2;
110:24;117:16,16,24;
119:9
**Division/Patrol (2)**
114:10;119:15
**divisions (4)**
65:20;81:20;
102:19;114:23

**document (10)**
6:15;38:18;56:20;
98:20,22,24;121:10,
14,16,19
**documentation (7)**
4:18;6:4;26:23;
27:4;31:7;107:15,23
**documented (1)**
37:21
**documents (2)**
32:8;39:2
**done (1)**
5:25
**Donnelly (3)**
40:24;41:10,21
**door (2)**
18:18;36:24
**doubt (2)**
22:5;101:20
**down (4)**
68:6;71:8;89:6;
111:5
**drawing (1)**
116:23
**driven (1)**
93:16
**driving (1)**
35:15
**drug (1)**
16:17
**duly (1)**
3:3
**during (11)**
8:13;28:15;49:1,
12,12;60:10;61:23;
62:22;79:18,23;
93:25
**duties (4)**
4:19;15:18;19:1;
24:4
**duty (5)**
6:4,22;9:7;93:2;
97:23
**Dwyer (3)**
40:25;41:10,21
**dynamics (1)**
11:20

**E**

**Eagle (1)**
9:1
**earlier (2)**
54:22;110:4
**earliest (1)**
69:18
**earth (1)**
81:16
**East (1)**
28:19
**easy (2)**
27:10,13
**Educational (1)**

68:6
**Edward (2)**
44:17;45:18
**effect (2)**
4:5;76:5
**effectively (1)**
52:18
**egregious (7)**
32:24;33:14,23,25;
34:25;37:7,12
**eight (2)**
14:21;70:11
**either (1)**
16:15
**eleven (1)**
29:7
**eligibility (1)**
98:21
**Elizabeth (2)**
44:16;45:17
**Elmwood (1)**
8:24
**else (16)**
13:6;15:3;23:11;
27:22;41:20;42:2;
46:6;51:24;63:7,7;
71:18;82:12;102:15;
103:5;116:18;120:10
**e-mailed (1)**
39:3
**employable (1)**
4:21
**employee (1)**
6:5
**employees (1)**
33:19
**employer (1)**
7:18
**enable (1)**
7:7
**End (1)**
8:24;15:16;55:12;
58:20;70:20;109:20
**ends (1)**
82:19
**engaged (5)**
24:19,19,21,23;
30:12
**entail (1)**
4:24
**entire (6)**
11:17;15:14;22:24;
23:10;97:2;109:3
**entitled (2)**
40:9;66:24
**especially (2)**
16:4;18:15
**esprit (1)**
87:15
**essence (1)**
11:18
**Esserman (11)**
20:18,25;21:9,11;

78:23,25;79:15;
105:1;107:10,22,25
**evaluate (7)**
22:6;24:11;28:9,
24;88:24;90:9;
110:18
**evaluated (1)**
87:21
**evaluating (4)**
90:19;94:18,19;
96:18
**evaluation (4)**
73:3,6;86:16;
110:19
**evaluations (3)**
32:8;72:23;96:15
**even (5)**
16:12;21:12;23:19;
66:2;84:25
**events (10)**
75:15;85:15,16,20;
86:1,13,22;87:1,9,23
**eventually (1)**
11:4
**everybody (11)**
21:11;30:1;35:17;
37:10;46:6,6;59:9;
62:16;71:18;87:19;
99:11
**everybody's (1)**
37:7
**everyone (8)**
3:13;18:21;19:12;
23:11,24;82:12,18;
117:14
**everyone's (1)**
119:16
**evidence (3)**
72:20;73:13;98:5
**evidencing (1)**
72:21
**Exactly (10)**
10:17;37:17;47:14,
18;59:10;68:4;89:6,
22;96:23;105:17
**exam (46)**
19:25;20:12;36:6,
11,11;38:10;39:2;
43:17;44:11;73:17;
82:21;86:20;89:17,
19,20;90:4,4,9;91:17;
94:4;95:23;96:25;
99:4,6,15,23;100:6,
22,24;101:6,7,14;
102:16;103:11,14,22;
104:3,22;110:3;
111:2,9,22;118:4,12,
18;120:8
**EXAMINATION (1)**
3:8
**example (4)**
35:11;73:10;83:20;
87:18

**examples (4)**
13:3;26:8;72:20;
84:19
**exams (8)**
36:2;46:16;94:5;
104:5,9;107:16;
111:3,16
**exceeded (1)**
27:4
**exceeds (1)**
6:25
**except (4)**
10:9;45:15;99:11;
112:5
**excerpted (1)**
6:11
**EXHIBIT (10)**
6:8,10;38:23,25;
39:7;69:22;89:12;
98:18,19;121:10
**expectations (1)**
72:8
**experience (4)**
15:25;18:11;23:21;
61:23
**explain (7)**
7:21;93:19,21,24;
100:1;101:4;109:10
**explanation (3)**
41:6;62:18;63:9
**express (1)**
50:21
**extended (1)**
67:22
**extent (1)**
86:25

**F**

**fact (3)**
77:23;86:12;
104:25
**factor (6)**
32:15;73:20;76:12;
77:24;88:2,4
**factors (2)**
86:2;88:17
**fair (6)**
17:3;28:21,24;
29:7;52:22;79:7
**fall (2)**
39:23;60:4
**falls (1)**
39:25
**fan (2)**
71:17,18
**far (12)**
27:23;33:1,12;
49:18,20;56:24;57:8;
58:8;76:14;89:25;
111:3;120:19
**faxed (4)**
121:7,14,17,20

Case 1:13-cv-00092-WES-PAS   Document 84-2   Filed 05/26/17   Page 256 of 265 PageID #:
1392

Mancini  vs
City of Providence

Chief Hugh T. Clements, Jr. -   Vol. II
June 17, 2015

**February (9)**
111:10,12,20,22;
112:13;113:8;
116:12,21;117:12
**Federal (1)**
8:25
**feel (1)**
109:25
**feeling (1)**
109:5
**feels (1)**
52:19
**felt (1)**
77:5
**Fernandes (3)**
61:1,3;74:2
**few (4)**
66:21;68:14;75:24;
116:10
**field (1)**
12:24
**file (10)**
5:14,23;7:1,19;
38:6,17;75:3;107:21;
115:18,22
**files (8)**
31:21,21;32:5,7;
107:24;108:3,5,6
**filing (1)**
108:3
**fill (2)**
25:17;112:14
**filled (2)**
69:16;117:25
**filling (1)**
52:11
**final (12)**
36:19;45:11;46:3,
8;47:11;52:6;58:20;
98:20;100:4;110:2;
121:6,6
**find (1)**
52:3
**finish (1)**
98:21
**firing (1)**
17:1
**firm (1)**
83:23
**first (6)**
4:3;18:3;56:15;
58:3,8;103:3
**Firth (3)**
102:12,13,19
**Firth's (1)**
102:14
**fit (2)**
8:11;109:25
**five (73)**
9:8;14:23,24;15:4,
5;17:19,19,20;41:2;
44:12;45:17;54:8,8,
10;57:10;80:23;81:7,

11,16,25;82:1,2,9,18,
21;91:16,17,23;
92:16,17,19,20,21;
93:4,5,11,15,20,21;
94:4,9,10,14;95:3,4,
9;97:5;99:11;100:17,
19,21;101:6,7,13;
102:3,9,20,23;103:8,
14,17;104:10,19,22;
105:1;108:18,25;
109:11,13;110:11;
114:18,18;116:25
**fives (81)**
41:18;42:15;82:6;
91:22;96:2;99:12,18,
23;100:14,24;104:3
**fluctuate (1)**
15:22
**fluctuated (1)**
14:22
**flux (2)**
17:13;56:10
**fodder (1)**
81:18
**folks (4)**
12:5;31:19;37:20;
84:17
**follow (3)**
68:5;90:3;111:14
**followed (3)**
21:6,7;111:15
**following (5)**
12:16;19:22,22;
69:18;120:7
**follows (1)**
3:4
**fom (1)**
108:25
**forced (2)**
7:1;85:17
**forget (3)**
33:23,25;34:25
**forgotten (1)**
33:15
**form (66)**
7:9;20:22;22:21;
23:5,16,22;24:7,13;
25:14;27:19;28:12;
29:1,18;30:3;32:1,
11;33:5;36:7;37:14,
24;47:17;48:3;51:10;
52:21;60:15;71:20;
72:11;76:9;77:14;
79:11;80:4,10,22;
84:4,15;86:4,10;
87:10;88:19;89:2,11,
23,25;91:25;92:11;
93:23;94:11;95:6,18,
24;99:19,24;100:9;
101:16,23;103:19;
104:6;110:13,21;
113:10;114:2,20;
115:13,25;116:4;

119:7
**formal (1)**
107:23
**forms (1)**
90:6
**formulate (2)**
83:15;84:7
**formulating (1)**
73:19
**forth (4)**
26:5,8;86:2,6
**forward (3)**
58:19;110:1;
119:10
**forwarded (5)**
72:2;107:12;
109:15;119:14;120:1
**forwarding (1)**
111:17
**foundation (2)**
29:19;36:8
**four (22)**
9:5,7,8,20;87:20;
99:11,12,13;102:24;
110:10,12,20;111:7;
113:1,24;114:1,6,12,
15,18;116:12;119:24
**fours (1)**
99:13
**frame (3)**
49:12;96:24;
102:25
**Frank (5)**
61:16;62:3;63:12;
97:4;106:23
**free (1)**
13:2
**front (4)**
16:22;98:11,13,14
**frustration (2)**
79:8,18
**full (2)**
14:8;79:13
**full-function (1)**
6:6
**full-time (1)**
6:6
**function (6)**
4:21;5:1,25;7:23;
12:14;15:16
**future (1)**
111:3

**G**

**GAGLIARDI (20)**
3:8,11,15;6:7;7:13;
23:1;34:20;36:22;
37:2;38:21,24;53:2,
11,17;88:5;97:22;
98:4,17;118:14;
121:22
**gangs (1)**

16:17
**Gannon (1)**
41:22
**garden-variety (1)**
37:13
**gave (29)**
41:18;42:14;47:20;
48:5,22;51:12,14;
54:1,2,11;58:25;
59:3;62:15;63:20;
64:20;66:18;67:23;
68:1,18;70:21;71:7,
8;82:9;98:15;103:8;
107:13;108:25;
120:13,17
**general (10)**
35:13;37:16;48:11;
54:15;74:7;83:17;
85:14;90:20;113:12,
15
**generally (1)**
40:5
**Geoff (1)**
3:17
**Geographical (5)**
9:12,14;11:19,25;
13:16
**George (5)**
42:7;73:7,7,10,11
**gets (2)**
95:3;100:17
**girlfriend (1)**
84:1
**given (16)**
10:9;21:22;44:6,
12;45:7;47:23;51:15;
81:22,25;82:8;91:22;
92:4;94:13;96:2;
100:11;111:2
**giving (6)**
48:6,10;50:18;
58:17;82:4;88:15
**goal (1)**
95:21
**Goes (2)**
19:23;83:25
**Good (10)**
3:9,10;28:8;33:19;
83:7;90:16,17;
103:17;113:16;
114:24
**grade (3)**
100:22;101:22;
109:8
**grader (2)**
52:20;109:12
**grading (2)**
92:8,9
**greater (5)**
93:8,9,9;96:13;
115:1
**Grenada (5)**
7:23;30:23,24;

16:17
**ground (1)**
90:13
**group (1)**
13:9
**groups (1)**
11:23
**guess (2)**
37:20;103:3
**gun (2)**
17:1,1
**guy (3)**
60:24;65:24;83:8
**guys (2)**
41:16;85:14

**H**

**hand (7)**
20:25;40:16,19;
62:21;69:3,24;96:17
**handed (15)**
6:9;38:24;44:25;
55:22;69:4,6,16,17;
97:11,16;98:8,9,12,
19;108:24
**handing (2)**
89:25;90:6
**handwriting (10)**
40:10,14;43:3,6,8;
55:1;56:19;62:5;
64:12,15
**handwritten (4)**
45:5;62:13,19;
63:10
**handwrote (1)**
63:1
**Hanover (1)**
16:22
**happen (5)**
4:3;18:14;35:19;
38:8;75:8
**happened (19)**
16:25;20:11;35:11;
69:13;74:23;75:15,
18;76:3,13,16;77:10;
79:20;85:3;89:17;
103:6,7;108:3,21,25
**happens (3)**
25:23;53:11;104:4
**happy (1)**
22:5
**hard (1)**
71:7
**harder (1)**
115:24
**head (1)**
30:19
**heard (2)**
30:19;82:5
**heavily (13)**
22:11,19;23:10,15,
18;110:24;116:13;

117:11,17;119:1,17,
24;120:24
**held (4)**
32:25;75:16;76:18,
19
**help (2)**
16:22;83:24
**herself (1)**
12:12
**Hey (1)**
65:23
**hid (1)**
35:16
**high (5)**
16:6;28:1;95:10,
22;119:13
**higher (9)**
4:25;29:8;32:25;
72:5;92:25;100:18,
22,22;119:8
**highest (10)**
10:11;80:25;93:2,
12;95:11,12;100:25;
102:4;103:14;108:23
**highlight (1)**
26:13
**highly (3)**
109:14;114:22,22
**high-ranking (1)**
24:19
**high-volume (2)**
16:4;24:18
**Hill (1)**
9:1
**himself (1)**
83:6
**hold (4)**
26:25;34:3;50:11;
111:20
**Homeland (3)**
77:11,21;109:21
**homicide (1)**
39:19
**hour (2)**
84:23,23
**house (1)**
17:1
**houses (1)**
16:18
**HR (1)**
121:7
**HUGH (6)**
3:2,7,23;36:15;
103:23;110:18
**Hughes (2)**
3:24,24
**Human (8)**
4:12;6:1;7:23;8:1;
38:5,7;80:2;107:17
**hundred (1)**
71:16
**hurt (1)**
17:2

**hypothetical (1)**
83:20

# I

**ID (3)**
6:8;38:23;98:18
**idea (1)**
28:8
**identical (1)**
45:15
**identification (2)**
39:21;42:8
**identified (2)**
27:8;97:5
**identify (6)**
30:8,19,20;53:22;
71:7;94:23
**illness (1)**
26:21
**immediate (1)**
10:25
**immensely (1)**
16:6
**impeach (1)**
34:20
**important (5)**
47:15,17;59:25;
71:10;117:15
**importantly (2)**
22:23;24:1
**impossible (1)**
65:21
**incident (11)**
19:9,10;35:24;
36:5;37:6;52:13;
76:2;77:10,15;78:6;
83:16
**incidents (2)**
13:15;36:22
**include (1)**
86:8
**includes (1)**
26:8
**including (2)**
19:12;70:21
**independently (1)**
33:6
**index (2)**
45:11;46:3
**indicate (2)**
26:13;50:15
**indicated (2)**
6:21;109:17
**indicative (1)**
26:17
**individual (2)**
38:13;84:9
**individually (2)**
88:21;100:13
**individuals (1)**
82:15
**inevitable (1)**

4:2
**information (11)**
11:22;16:10;30:11,
24;31:12,16;38:6,12;
59:25;62:25;111:18
**initiate (1)**
54:2
**injured-on-duty (2)**
5:14,22
**injury (1)**
4:7
**input (2)**
23:12;52:7
**inquire (1)**
31:8
**insulting (1)**
78:25
**interact (1)**
19:19
**interaction (4)**
24:3;25:7,9;40:2
**interested (1)**
8:10
**intern (1)**
3:25
**Internal (3)**
56:11,12;118:16
**interplay (1)**
11:14
**interpret (1)**
57:7
**interpretation (1)**
26:10
**into (30)**
8:11;12:22,24;
17:1;18:17,19;26:10;
27:9;29:10;33:11;
48:7;53:12;71:9;
72:1;76:18,19;77:25;
82:2;87:22;88:13;
90:22,24;91:6,9;
101:20;108:1;119:3,
8,11,13
**intoxicated (1)**
35:16
**introduce (1)**
3:14
**investigates (2)**
39:18,24
**Investigative (5)**
39:14,16,23,25;
42:12
**invited (1)**
25:21
**involved (3)**
17:4;59:9;76:15
**IOD (4)**
50:9,19,22;114:13
**Isabella (2)**
117:6,7
**issue (1)**
74:3
**issues (4)**

12:1;16:10,16;
76:15

# J

**Jennewa (1)**
3:24
**job (15)**
8:6;19:1;22:8;
75:12;94:20;95:3,8;
100:7,8;104:4;
109:25;113:13,14,16;
114:24
**jobs (1)**
41:9
**JR (2)**
3:2,7
**judicious (1)**
81:23
**July (1)**
98:20
**June (23)**
3:12;8:14;10:2;
11:7,8;13:19;15:3,
17;17:7;19:24;20:11,
21;21:7;22:15,19;
25:13;32:3,10;38:8;
39:2;59:11;73:17;
89:16

# K

**Kate (1)**
3:20
**keep (8)**
15:22;27:11,14;
34:18;65:21;101:15;
102:10;107:21
**Keith (3)**
39:12;42:12;97:4
**Kennedy (3)**
78:24;79:1,16
**kept (2)**
107:22;108:5
**Kevin (5)**
3:23;39:3;42:4;
97:23;104:17
**Kids (1)**
16:25
**kind (1)**
32:20
**knew (2)**
81:3,6
**knowledge (16)**
4:17;5:10;7:21;
15:17;23:20;30:2;
31:25;36:4,13;38:18;
40:2,8,11;42:22,25;
62:6
**known (3)**
42:22;75:20;76:18

# L

**lack (2)**
29:19;36:7
**language (1)**
99:18
**Lanni (1)**
42:4
**Lapatin (21)**
14:25;17:12,14;
54:19;55:11,16,22;
56:7;58:2;59:19,20;
71:5;106:12;112:1,
22;115:7;117:5;
118:1,8;119:19,22
**Lapatin's (1)**
55:1
**last (26)**
3:12;5:12;8:8;
9:22;21:23;23:14;
26:4;33:2;35:11;
43:20;44:9;45:6,7;
47:13;49:5;55:4;
66:23;72:15;77:16;
80:17;84:23;85:6;
90:3;98:12,14;
121:11
**later (6)**
7:18;47:11;53:6,
24;89:17;108:18
**latitude (2)**
13:2;109:6
**lawsuit (1)**
114:15
**lead (1)**
14:5
**leadership (4)**
92:5,6,6;109:17
**leads (1)**
83:14
**learned (1)**
21:9
**least (1)**
103:18
**leave (4)**
53:6;78:13;83:9;
118:19
**leaves (1)**
85:7
**leaving (1)**
12:23
**led (1)**
88:14
**left (3)**
78:14;116:23;
118:3
**left-hand (1)**
62:4
**legal (1)**
3:24
**length (1)**
69:20

**lengthy (2)**
32:23;84:21

**leniently (1)**
82:8

**Lepre (22)**
11:9;14:18;15:3,
17,20,23;17:9;64:9;
65:7,9,12;66:5;71:4;
107:4;113:4;115:6;
116:23;117:22;
119:19;120:11,25;
121:3

**less (7)**
17:19,20;28:18;
37:12;54:10;82:1;
102:9

**lesser (5)**
4:20,21;90:10;
92:3;111:2

**letter (1)**
31:15

**letters (8)**
26:9;27:13,21;
29:24;30:7;89:9,10;
90:24

**level (13)**
28:1;80:25;87:15;
90:13;93:12;95:10,
11;100:18,25;
101:25;103:25;
108:23,23

**lieutenant (53)**
10:1,7,11,22,25;
11:6,15,17,20,21,24;
12:3,8,9,21,23;13:11,
14,18,24;14:17;15:6;
16:11;17:4,16,22,23;
20:2;22:16,20;23:18;
24:2,10,24;25:11,25;
65:22;86:16;91:16,
20;92:13,17,21,22;
93:5,20;94:25;95:4;
100:15;104:15;
113:14;116:19;
117:23

**Lieutenant/District (2)**
13:20,22

**lieutenants (30)**
9:23;18:20;20:12;
23:13,25;31:7;38:9;
39:1;65:19;73:17;
89:19;90:4,9;91:14;
92:8;94:9;96:7;97:8;
98:8;101:7;103:10;
104:5,12;105:19;
111:9,16,22;112:7;
116:25;120:8

**lieutenant's (1)**
18:17

**light (2)**
6:3,22

**light-duty (12)**
4:4,8,16,24;5:4;

---

6:18,25;7:5,7,19;8:3,
6

**likely (1)**
12:10

**limit (1)**
33:13

**limited (2)**
40:5;53:19

**Line (6)**
22:1,1,2,2;36:15;
43:12

**lines (2)**
68:8,10

**lineup (1)**
97:2

**list (10)**
41:20;42:2;74:3;
81:19;98:21;99:9;
100:4;102:11;103:4;
111:17

**little (4)**
8:8;9:6;26:3;53:24

**Liz (3)**
53:25;54:6,7

**location (1)**
108:2

**locations (1)**
12:20

**lodged (3)**
49:10,16;91:7

**long (21)**
5:21;17:16;42:22;
56:11;59:15,18;60:2,
3,5;64:4;65:11,11,14,
15,21,23;67:13,17,
21;74:23;75:15

**longer (2)**
18:8;114:12

**long-standing (2)**
16:15,24

**long-term (2)**
16:16,24

**look (16)**
30:6,7,7;38:22;
41:9;42:17;55:3,4;
62:11,11,13;64:8;
70:8;89:12;100:14;
115:8

**looked (1)**
34:23

**looking (3)**
86:16;87:14;96:12

**looks (12)**
39:9;54:1;55:6,8;
56:25;57:11;61:1,2;
62:3;67:3;68:7;99:11

**lot (15)**
16:16;19:5,6,6;
23:24,25;28:3;30:21;
33:19;38:1;71:13;
84:24;85:14;87:3;
119:11

**low (14)**

---

14:22;15:5;60:12,
23;61:14;68:15;
70:19,19;76:13,20;
87:17;115:9,17;
120:2

**lower (1)**
39:7

**lowest (6)**
47:22;48:1;63:19;
103:15,24;108:23

**Lucas (4)**
17:23,24;18:4,7

**Luis (4)**
18:4,4,6,7

**lumping (1)**
84:11

**LUNCH (2)**
68:24;69:1

## M

**main (3)**
18:17;108:5;
110:23

**mainly (3)**
15:13;39:17;
114:10

**maintain (1)**
7:7

**maintained (3)**
107:16,20,25

**major (43)**
11:1,4,9,11;13:15;
18:11,12,22,24;
19:10,10;20:6;22:24;
23:11;24:1,12,19;
39:14,18;40:10,16,
19;41:21,25;46:18,
21,25;56:18;61:18;
63:15,20,25;71:4,25;
105:25;110:25;
115:6;116:17,22;
117:2,22;119:14;
120:9

**majors (9)**
19:5,15;24:6,22;
90:17;97:4;105:18;
109:3;112:1

**major's (3)**
15:12;18:15,19

**man (2)**
18:1,2

**manager (1)**
77:12

**MANCINI (134)**
3:19,19;4:6;7:5,17;
8:5,11,13,17,20;
10:16,23;17:17,22;
21:16,22;15:23;19;
25:8,9,12;40:3;
42:23;44:12,16;
45:15;46:19,22;47:4,
20;48:2,10,15,17,23;

---

49:1,10,17;50:2,19,
22,24;51:4,8,19,22,
25;53:6,9;54:13;
55:14;58:7,10,14,25;
59:3,12,18,22;60:7;
61:19,23;63:12,16,
20;64:6,20,23;65:1,
12,15,18;66:6;67:11,
14,24;70:3,6,14;
71:15;72:4,21;73:11,
13;74:12,16,21;
75:24;77:1,4,18,19,
23;78:18;80:7,14,18;
81:10;82:20;84:6,19;
85:7,19,22;86:12;
87:8;88:10;100:7,11;
104:22;105:11;
106:2,3,9,16,20;
107:1,7;108:9,12,15,
17;110:3;111:7;
112:10,22;113:17,20;
114:5,12,15;116:12;
120:6,13,25

**manner (1)**
107:11

**many (23)**
9:3,7,15;10:7,14,
14;14:20;17:7;26:15,
18;28:8;30:6,16;
34:5;72:9;75:16;
76:16,16;87:6;89:4;
99:5;101:9;120:2

**Mark (50)**
3:15,19;17:17;
18:8;23:19;42:22;
44:16;48:14,17;60:7;
65:17;67:14;71:25;
72:4,21;73:2,11,12,
12;74:15,21;77:1;
81:10;84:6,19;85:3,
19,22;86:12;87:8;
88:10,15;100:7,11;
108:9,12,15;109:17,
18;110:16;111:7;
113:9,17,20;115:11,
18;116:2,7;117:13;
118:23

**MARKED (5)**
6:8,10;38:23;41:7;
98:18

**marks (2)**
41:2,4

**Mark's (1)**
3:18

**Martha's (1)**

---

84:1

**matters (1)**
53:15

**May (27)**
4:5;6:19;7:5,8;9:6,
9;10:11;14:9,23;
15:5;16:21;19:13;
26:19,20;33:15;
34:13;35:7,15;54:9;
55:8;58:24;59:5;
74:17;85:5;99:8;
102:20,22

**maybe (5)**
62:4;74:4;102:24;
115:8,10

**Mayor (1)**
116:3

**McCarthy (3)**
35:14;36:10,23

**MCHUGH (89)**
3:22,23;7:9;20:14,
17,22;22:21;23:5,16,
22;24:5,7,13;25:14;
27:19;28:12,23;29:1,
18;30:3;32:1,11;
33:5;34:1,8,12,22;
36:7;37:1,4,14,24;
39:5;47:16;48:3;
49:4,7;51:10;52:21;
53:8,13,20;60:15;
71:20;72:11;73:21,
24;76:9;77:14;79:11;
80:4,10;84:4,15;86:4,
10;87:10;88:19;89:2,
11,23;91:25;92:11;
93:23;94:11;95:6,18,
24;96:9;97:25;98:6;
99:19,24;100:9;
101:16,23;103:19;
104:6,17;110:13,21;
113:10;114:2,20;
115:13,25;116:4;
119:7;121:24

**mean (27)**
9:11;14:1;19:2;
22:18;25:2;26:15,18,
21;28:2,3;35:9;
41:13;48:22;49:23;
65:17;79:7;83:9;
90:5;93:15;97:25;
98:2;101:22;102:7;
113:13;114:17,19;
119:4

**meaning (5)**
91:13,24;95:22;
99:17;104:10

**meaningful (1)**
109:9

**means (3)**
41:16;71:13;
103:23

**meant (3)**
18:24;93:11;102:8

---

**medical (4)**
4:18;6:4;26:23;
27:3
**medically (1)**
26:24
**meet (2)**
13:23;88:11
**meeting (87)**
13:7,8;14:2;19:24,
25;20:3,10,18,20;
25:19,21,24,24;32:3,
9,13;38:8;40:20,20,
21;44:4;46:23;47:9,
10;55:12,18,19;57:3,
3;59:7;62:16,22,22;
63:25;64:4,17,18;
65:8;66:9,16,16,19;
69:2,5,5,7,11,13,24;
72:7;73:2;74:6,9,17;
84:18;85:2;86:24;
96:22,22;97:1,6,9,12;
101:5;102:12;
105:14,21,21;106:6,
13,18,24;107:5;
108:8,11,14;111:20,
24;112:4,13;113:9,
18,19,21,23;118:22;
120:21
**meetings (16)**
12:12;14:5;16:20;
30:1,25;31:19,22;
35:9;37:12,21;46:12;
52:9;84:22;88:24;
93:22;113:15
**member (2)**
6:21,24
**members (6)**
19:7,13;26:12;
31:8;35:1;52:7
**memories (1)**
37:16
**memory (1)**
30:14
**mention (1)**
85:3
**mentioned (3)**
36:23;42:11;73:6
**message (1)**
115:21
**mid (1)**
9:20
**middle (2)**
46:4,5
**might (4)**
4:3;46:1;102:1,1
**Mike (1)**
42:10
**military (4)**
78:12,14,16;83:8
**mind (9)**
37:8;39:6;72:4;
74:22;94:21,24;96:4;
99:21;101:2

**mindset (1)**
30:15
**mini (2)**
11:18;92:14
**Minimal (1)**
76:23
**minor (4)**
74:4;76:7,11,13
**minute (2)**
6:14;103:8
**missed (1)**
97:10
**mission (1)**
88:8
**Misstates (1)**
92:1
**Monday (1)**
83:23
**months (5)**
6:22,25;7:18;
113:24;114:1
**more (29)**
6:22,25;8:10;
10:17;12:10;15:15,
19,20;17:4,19;22:23;
26:3;27:24;28:15,17;
32:24;35:21;37:13;
70:22;86:17;92:6,8;
93:7,7;96:11;100:12;
104:14;109:9;116:10
**morning (2)**
3:9,10
**most (10)**
23:20;24:1,3;25:7,
8;74:23;75:1,17,18;
111:8
**motivate (2)**
88:7;93:18
**move (6)**
33:20;47:16;65:17,
18,20;108:1
**moved (3)**
17:14;18:9;56:11
**moving (1)**
119:10
**much (5)**
40:2;72:1;76:21;
92:4;111:17
**myself (1)**
3:14

# N

**nailed (1)**
89:6
**name (17)**
3:5,15;18:3;35:6,
14;39:10,11;55:4,4,6;
56:15;58:3,8;62:3;
66:23;68:5;105:17
**name-call (1)**
79:5
**names (11)**

41:6;44:24;45:2,
23;46:1;56:5;81:20;
82:5;84:24;90:1;
98:15
**narcotics (5)**
17:15;19:14;24:21;
39:22;42:4
**Near (1)**
109:20
**necessarily (1)**
24:15
**need (4)**
34:17,18;88:24;
103:8
**negative (23)**
27:1;46:25;47:12;
48:11,15;50:21;51:1,
4;54:16;66:8;72:16,
21;79:3,22;80:8;
81:3,10;83:13,19;
84:11,12;108:9;
113:18
**neighborhood (2)**
12:19;13:5
**neighborhoods (1)**
12:3
**next (15)**
41:2;44:16;45:3,6,
23;46:1;55:5;56:4,5;
58:3,7;66:22;67:5;
68:5;69:9
**night (2)**
10:12;29:8
**nights (3)**
15:10,23,24
**Nine (2)**
17:8;116:25
**nobody (2)**
66:18;103:22
**nonapplicable (1)**
50:7
**None (3)**
10:9;76:25;84:17
**normal (1)**
80:2
**Normally (1)**
26:2
**notation (1)**
44:8
**note (1)**
19:9
**notes (1)**
72:14
**notice (1)**
44:23
**noticed (1)**
44:25
**nuisance (1)**
16:18
**number (35)**
28:7,8,9,16,22;
29:10;30:18;31:10;
39:4,7;42:4,7,10;

44:16,16,17;50:16;
51:16;57:11,13;
61:14;63:19;67:5,5,
6;68:15,15;70:19;
74:4;91:2,5;95:12;
109:6;116:24;120:19
**Numbers (21)**
40:24;43:11;45:6,
10,12;55:5,7;56:5,25;
57:7;58:4;62:2,8,9,
12,13,19;63:1,10;
66:22,23

## O

**Oates (37)**
19:21;42:19,25;
43:25;44:3,20;46:11;
47:4,7,14,18;48:1,14,
17;49:11;50:14,18,
21,25;51:3,11,13,17,
21,25;52:10,13,23;
58:25;59:22,23;60:3,
3;97:3;106:6;112:1,9
**Oates' (3)**
43:3;44:15;71:11
**object (1)**
53:14
**objected (1)**
34:15
**objecting (1)**
34:13
**Objection (71)**
7:9;20:22;22:21;
23:5,16,22;24:5,7,13;
25:14;27:19;28:12,
23;29:1,18;30:3;
32:1,11;33:5;34:1;
36:7;37:14,24;39:4;
47:17;48:3;49:4,4;
51:10;52:21;60:15;
71:20;72:11;76:9;
77:14;79:11;80:4,10;
84:4,15;86:4,10;
87:10;88:19;89:2,11,
23;91:25;92:11;
93:23;94:11;95:6,18,
24;96:9;99:19,24;
100:9;101:16,23;
103:19;104:6;
110:13,21;113:10;
114:2,20;115:13,25;
116:4;119:7
**objectivity (2)**
70:18;101:18
**observe (3)**
18:25;19:12;24:3
**observing (2)**
22:8;23:12
**obvious (1)**
5:7
**Obviously (3)**
36:22;69:12;

107:18
**occasion (1)**
46:14
**occasions (1)**
31:6
**off (2)**
44:24;68:23
**off-duty (1)**
26:21
**offered (1)**
46:22
**office (18)**
3:18;5:1;7:24;
12:23;18:15,16,17,
19;19:6,6;34:19;
57:22;92:23;107:17;
108:1,6;110:1;117:9
**officer (17)**
4:19;10:10,12;
22:7;36:25;40:24,25;
50:6;65:22;74:16;
77:20;79:19,24;
80:25;87:18;90:11;
93:12
**officers (10)**
9:12,15;19:3;
38:13;41:13;61:9,12;
72:2;74:9;87:14
**officer's (1)**
53:4
**official (1)**
13:18
**officials (1)**
24:20
**often (10)**
13:22;15:25;16:2;
18:11,12,13,24;19:2,
18,20
**oftentimes (2)**
15:11;16:20
**OIC (2)**
10:9;92:15
**old (1)**
108:1
**Olneyville (1)**
9:2
**one (54)**
7:7;9:17;10:9,18;
15:9,11,13,15;20:10,
20;25:17,19,20,25;
26:21;29:5;31:6;
39:8;40:16;41:9;
45:6,16;46:12;52:9;
53:25;58:9,11,14,17;
59:4;61:3,6;69:14;
70:10,22;71:6,8,16;
72:23;79:19;88:23;
92:25;94:4;99:7;
100:6,13;103:3;
104:2;111:2,4;119:6,
21,22;121:3
**ones (5)**
38:3;53:5;61:9,13;

73:25
**one-year (1)**
6:3
**only (16)**
4:8;7:17,22;14:1;
29:5,22,22;33:3;
53:25;54:11;65:17;
75:11;109:5,6;
113:23;119:21
**open (1)**
72:14
**opened (1)**
36:24
**operation (1)**
13:17
**operational (2)**
15:14,20
**operations (4)**
11:18,24;17:3;
29:13
**opinion (5)**
37:3;45:2;46:22;
52:20;83:15
**opportunity (3)**
18:25;20:7;46:14
**opposed (3)**
24:6,11;119:6
**order (2)**
37:3;98:20
**organization (2)**
83:8;87:15
**organized (2)**
39:22;42:5
**oriented (1)**
86:17
**Oscar (1)**
116:19
**Others (12)**
14:5;28:15,16,17;
37:17,18;56:5;63:10;
75:20;85:16;94:23;
101:9
**out (42)**
12:7,21,24;13:4,
14;16:21,25;17:2,14;
19:20,21;20:25;
25:17;26:15;35:6,18;
37:7;52:3,11;57:12;
62:24;67:4,6,20;
69:16,16;70:10;
78:12;81:22;82:8;
89:25;90:6;91:22;
92:24;96:2,17;99:17,
22;104:2;111:17;
112:14;117:25
**outer (1)**
108:6
**outside (2)**
11:22;12:17
**over (10)**
8:25;20:21;34:17,
18;40:6;67:14;71:1;
90:3;109:17;112:18

**overall (35)**
26:6;27:24;29:13;
30:8,15;33:3,9;
46:23;47:1,8;55:17;
72:4,8;74:22;75:12,
14;78:1;83:17;86:7,
15;87:13;88:2,6,8,17;
89:9,14;90:19,20,21;
94:15,19;101:13;
102:14;110:19
**oversaw (1)**
117:24
**oversee (2)**
13:17;117:16
**overseeing (1)**
23:12
**overtime (6)**
85:15,17,23;86:1,9,
13

**P**

**Page (14)**
22:1,1,1,2;39:7,9;
42:17;44:15;54:18;
56:13;61:15;64:8;
66:11;98:24
**pages (3)**
6:11,14;39:4
**paper (1)**
108:3
**paperwork (1)**
7:22
**part (8)**
13:14;75:17;79:9;
80:2;86:15;90:13;
101:10;107:23
**partake (1)**
83:14
**participate (3)**
80:14;85:20;87:9
**participated (2)**
86:21,25
**participating (1)**
85:25
**participation (1)**
87:22
**particular (13)**
9:5;14:23;25:25;
35:5,8;52:8;61:10;
64:2;67:19;89:5;
94:2;102:9;111:4
**particulars (2)**
6:3;7:25
**passed (1)**
33:18
**passionate (1)**
93:16
**past (4)**
49:19;74:25;91:21;
118:23
**patrol (36)**
5:5;9:12,13;12:12,

13;15:9,16;16:12;
18:15,18,21;19:3,7,
10;23:24;24:21;
56:11;60:3;67:21;
71:2;90:11;109:22;
111:5;115:2;116:14,
20;117:2,8,12,18;
118:2,3,9;119:18;
120:5,7
**patrolman (3)**
4:25;75:9,19
**patrolmen (5)**
8:18;9:3;12:6,15,
25
**pattern (1)**
27:8
**pay (1)**
12:4
**peers (2)**
72:24;73:4
**penalize (2)**
115:18,23
**pending (1)**
23:17
**people (67)**
16:12;21:12;22:12;
23:15;30:24;32:9;
33:21,24;34:3,5,6,7,
14,15,24;35:14;
36:16;38:2;42:11;
45:22;52:18;53:23;
60:19;65:17,18,18;
69:2,6,24;70:11;
71:5;72:9;74:1;
76:15;81:20;82:14,
15;86:17,20,24;90:9,
15;93:18,22;96:3;
97:6;99:4,5,12,12;
100:5;101:4,12;
102:8;105:20;
109:24,24;111:1,6;
112:3;114:23;115:9;
116:16;117:15,21;
119:8;120:24
**perceive (1)**
94:23
**percent (4)**
4:20;91:19,20;
109:8
**percentage (4)**
4:20;71:8;76:8;
78:9
**Perez (1)**
116:19
**perform (2)**
4:19;18:25
**performance (48)**
22:7;23:21;24:4,
11;26:6;27:24;28:25;
30:9;32:7;33:3,9;
46:23;47:2,8;53:4,
12;55:17;59:7;60:14;
64:1;65:8;66:9;72:4,

8;73:3;75:12,14;
78:2;84:9;86:7,15;
87:14;88:3,6,18;89:9,
14;90:19,21;94:15,
19;101:13;102:14;
103:24;108:22;
110:17,19;115:12
**performed (1)**
7:23
**performing (12)**
12:14;80:24;93:12;
95:3,8,9,10;100:6,7,
18,25;104:4
**period (5)**
8:14;50:8;67:22;
108:21;118:21
**person (7)**
5:13;13:8,23;
37:17;85:12;95:15;
101:21
**personal (4)**
60:6;66:5;108:6;
115:11
**personality (2)**
51:18;60:7
**personally (2)**
33:16;94:22
**personalty (1)**
51:18
**personnel (5)**
31:21;32:5,7;38:6,
17
**person's (1)**
70:22
**petty (1)**
60:19
**phones (1)**
5:2
**place (7)**
24:18;64:4;70:22;
94:1;96:22;113:24;
115:1
**Plaintiff (1)**
3:16
**PLAINTIFF'S (5)**
6:8,10;38:23,25;
98:18
**plate (1)**
14:8
**play (4)**
26:10;33:11;76:22;
101:20
**player (17)**
48:12,18;51:5;
54:16;73:8,14;74:15;
77:5;83:2,16,21;84:2,
8,12,20;108:12;
113:21
**please (6)**
3:6;7:12,13;20:15;
49:5;121:25
**plus (1)**
102:1

**PM (1)**
122:1
**point (13)**
5:13,21;60:2,4;
69:2,3;72:20;73:12;
89:5;101:21;103:1;
106:4;118:18
**points (125)**
8:15;20:1,8;21:4,
12,18,18,22;22:19;
25:12;26:4,11;27:1,6,
8,17;29:11,16,23;
32:16,19;33:11;35:3,
6;36:1,20;37:23;
38:9;40:8,10;42:15;
43:12,18,44:10;45:7;
48:5;49:14;50:12;
53:10;54:3;55:8,25;
57:9;58:19;60:12,23;
62:9;66:24;68:6,7;
69:3,11,13;70:3,8,11;
72:3;73:16,19;74:6,
10,19,24;75:13;76:6,
22;77:25;80:15,18;
81:8,12,17,18,21,21;
82:7,7;84:18;86:2;
88:3,25;89:6,18;
91:12,14;92:10;
94:13;95:12,22;
96:19;97:13;99:4,8,
15,17;100:4,12,23;
101:6;103:23;
104:11;105:9,15;
106:10,21;107:2,8,
17;109:8,9,16;110:2,
6;111:15,21;112:11,
23;113:9;114:6;
116:12;117:19;
118:8;119:2,13;
121:7
**police (31)**
4:19;5:10;6:12,18;
8:9;9:15;11:19;12:7;
14:13,14;18:10;20:5;
22:7;46:11;50:6;
52:10;53:4;60:11;
61:12;74:8,16;79:19,
23;80:15,18,25;88:9;
92:15,24;107:16;
109:2
**policy (9)**
4:4,14;5:9,17;6:18;
7:4;21:16,21;99:16
**poor (5)**
74:14;82:19,24,25;
113:18
**pop (1)**
14:6
**portion (1)**
101:8
**position (15)**
4:23;24:10;33:4,9;
39:13;42:20;64:10;

66:13;92:18;93:6;
95:3;96:12;100:20;
101:1;102:14
**positions (1)**
93:3
**positive (16)**
20:4;38:20;41:15;
56:9;82:22,23;88:9;
97:2;104:24;106:7,
14,19,25;111:11;
118:17,18
**possible (7)**
47:22;48:1;80:25;
93:13;95:11;100:25;
103:25
**possibly (1)**
43:19
**post (2)**
9:14,16
**postpone (1)**
25:24
**posts (3)**
9:6,11;12:2
**Pow (1)**
74:4
**practice (1)**
31:24
**praise (1)**
30:8
**predominantly (2)**
15:9,10
**prepare (3)**
30:1,2;83:25
**Preparing (2)**
98:16;114:4
**present (31)**
20:2;31:19;32:8,9;
33:9;37:11,21;41:9;
46:10,11;52:11;
69:24;84:17;85:2;
93:22;96:18;97:1,6;
101:4;105:14,20,21;
106:6,12,18,23;
107:4;111:24;112:3,
13;118:22
**presently (1)**
92:14
**presided (1)**
20:21
**pretty (6)**
14:8;19:23;37:6;
66:20;87:19;111:17
**prevent (1)**
12:7
**previous (7)**
43:17;44:10;46:15;
59:21;67:21;74:23;
107:22
**previously (2)**
4:2;93:11
**Prior (12)**
4:11;20:11;31:21;
32:3,14;37:21;40:6;

69:12;73:18;74:20;
92:13;118:4
**probability (2)**
41:16;97:3
**probably (6)**
12:16;26:1;28:18;
96:24;104:14;106:25
**problem (7)**
26:14;37:4;53:9,
16;79:10;109:18;
115:11
**procedure (7)**
21:7;89:18,22;
90:2,4,5;111:14
**process (3)**
72:2;94:1,9
**produce (2)**
31:10;97:19
**producing (2)**
28:1,2
**production (1)**
27:24
**productivity (2)**
50:5;91:2
**projects (1)**
117:10
**promoted (4)**
35:23;36:5,13;
115:24
**promoting (1)**
109:7
**promotion (1)**
20:8
**promotional (24)**
19:25;20:12;36:2,
11,11;38:9;39:2;
43:17;46:16;73:17;
82:21;89:17,20;
91:17;95:23;101:14;
103:14;104:5,9,22;
107:15;110:3;111:9;
120:8
**promotions (1)**
94:14
**property (1)**
5:2
**provide (1)**
30:24
**provided (3)**
31:12;88:14;120:3
**Providence (6)**
6:12,13,18;8:9;
28:19;60:10
**Public (1)**
99:1
**punishment (1)**
33:18
**purview (1)**
41:25
**push (1)**
87:14
**put (6)**
4:11;31:16;46:1;

76:11;96:11;120:19

## Q

**quantifiable (1)**
29:14
**quantified (1)**
91:4
**quantify (4)**
27:10,13,18;78:8
**quantifying (1)**
27:23
**quantitative (3)**
27:16;29:22,25
**quite (4)**
19:21;43:19;45:12;
118:17
**quizzed (1)**
56:2
**quota (1)**
28:4

## R

**radio (3)**
14:13,14;19:22
**ran (1)**
35:16
**rank (20)**
5:1;19:10;33:10;
72:5;86:16;90:10;
92:3,12,22,25;93:2;
94:6,21,24;96:4;
99:21;100:12;
104:19;109:7;115:22
**ranking (1)**
10:11
**Rare (1)**
13:11
**rate (3)**
81:22;101:12;
109:23
**raters (1)**
102:18
**rates (1)**
52:18
**rating (6)**
82:15;93:20,21;
96:6;104:12,16
**Read (16)**
7:13,14;20:14,16;
21:24;23:2,4;34:9,9,
11;44:6;49:5,6;57:5;
73:21,23
**real (1)**
70:19
**really (6)**
7:24;18:24;29:13;
53:25;71:18;104:8
**reason (18)**
22:5;36:4;40:13;
43:25;44:20;51:20;
54:25;56:22;71:15,

16,17,19,25;72:7;
87:7,11;110:23;
120:12
**reasoning (1)**
79:13
**reasons (6)**
5:7;12:21,22;
71:16;72:6;104:2
**recall (57)**
8:5;33:6;44:25;
46:21,25;47:3,7;
50:17;52:13,15;
53:25;55:16,20,21;
56:2;58:12,20,24;
59:5,8,10;60:22;
61:10,11;62:1;63:22,
25;64:5;65:5,7,9;
66:3,10;72:13,22;
73:15;74:11,17,18;
77:7;79:2,17;84:22,
25;85:5;93:24;106:9;
107:10;108:8,10,11,
14;113:22;115:8;
120:17,21;121:8
**receive (1)**
105:1
**received (6)**
36:1;44:23;49:1;
68:14,16;74:16
**receiving (1)**
16:9
**recent (5)**
32:17,20,21;49:12;
111:8
**RECESS (1)**
116:9
**recognize (4)**
43:6;56:19;64:12,
15
**recollection (3)**
6:17;35:12;45:25
**recommend (10)**
21:18;51:21;52:14;
80:21;81:16;82:21;
105:11,15;112:10,22
**recommendation (15)**
20:7;21:12;22:20;
23:19;37:22;57:9;
58:19;70:23;71:11;
80:17;81:7;89:10;
115:2;117:11;119:1
**recommendations (18)**
69:21,22;70:2;
72:3;87:22;101:5;
105:4,6;109:14;
114:9,11;116:13;
117:14,15,18;118:7;
119:10;120:1
**recommended (39)**
20:1;25:12;46:6,
19;47:4;49:11;51:24;
52:24;55:14,25;
58:10,13;60:12,23;

61:2,5,9;63:12,15;
64:20,23;65:1;70:9;
81:11;104:21;106:2,
3,9,16,20;107:1,7;
108:15,17;111:5,6;
115:17;119:21,22
**recommending (4)**
48:1;54:4;67:11;
115:9
**record (6)**
3:6,13;36:24;
44:14;68:23;97:23
**recorded (1)**
64:5
**Red (1)**
71:17
**reference (1)**
102:25
**referenced (1)**
62:19
**referred (1)**
75:23
**referring (1)**
75:1
**refers (1)**
94:13
**refresh (2)**
6:17;45:25
**regard (7)**
32:25;92:9;95:23;
102:15;114:22;
119:8,13
**regarding (1)**
23:21
**relation (1)**
44:4
**relations (2)**
15:15,19
**relationship (1)**
11:16
**relative (1)**
21:21
**relatively (1)**
109:6
**relevant (1)**
98:2
**relied (7)**
22:19;116:12;
117:13;119:17,24,25;
120:23
**rely (9)**
22:11;23:9,15,18;
110:24;117:11,15,17;
119:1
**remarks (3)**
47:1;50:21;66:8
**Remember (31)**
22:8;25:11;30:16,
23;36:1;37:12,17,18;
54:5;60:11;68:21;
70:2;73:6;75:22;
77:8,16;78:22;82:4;
85:8;97:15;98:8,9,

105:6;106:16;107:1;
108:13,16;110:6;
113:25,25;121:13
**remembered (1)**
76:17
**remembers (1)**
35:17
**removal (2)**
83:1;109:20
**removed (3)**
77:22;83:7;117:8
**removing (1)**
78:24
**replaced (4)**
77:13,20;78:11;
84:14
**report (1)**
41:13
**reported (3)**
14:18;59:13;61:20
**REPORTER (1)**
3:5
**reporting (2)**
15:6;25:5
**reports (1)**
19:4
**represent (13)**
3:15;4:5;6:11;
7:16;21:15;22:3;
38:25;44:14;45:10,
21;46:5;76:2;104:25
**representative (2)**
13:9;75:25
**represented (1)**
75:24
**representing (1)**
3:23
**request (4)**
38:5,19;85:23;
86:13
**requesting (2)**
86:1,8
**required (5)**
5:14,21,23;7:19;
9:9
**Resource (1)**
7:24
**Resources (6)**
4:12;6:1;8:2;38:5,
7;107:17
**respect (3)**
21:3;101:2;102:4
**respected (1)**
24:20
**respective (8)**
11:25;16:10;26:12;
27:25,25;31:7;87:5;
111:19
**respond (1)**
13:17
**responded (1)**
21:24
**responses (1)**

53:18
**responsibilities (1)**
117:1
**responsibility (3)**
93:8,9;96:13
**responsible (9)**
10:8,12,22;11:17;
15:10,13,15;17:10;
22:24
**retired (1)**
112:5
**Retirement (1)**
6:1
**returned (2)**
4:6;78:16
**review (9)**
6:15;22:12;31:21;
32:10;37:21;38:6,17;
46:15;55:23
**reviewed (1)**
32:4
**Richard (2)**
61:1,2
**right (83)**
16:12;18:16,23;
21:9;23:21;24:12,25;
25:5;26:6;27:10,11,
14;28:19;33:4;36:17,
20;37:8;38:21;39:8;
41:18,25;43:20;46:8,
19;47:20,23;50:9;
51:5;52:3;53:2;
54:11,12,23;55:3,5,
14;56:24;57:13;58:8;
59:1,2;60:20;62:16;
63:13;64:21;67:11;
68:6;69:7,15;70:6;
71:12,14;77:21;
80:12;81:1,4,8;
84:20;86:7,9;88:11;
90:22,25;91:3,7,10,
14,18,24;93:13;
94:15,16;96:3,21;
98:24;99:9;103:11;
104:22;109:10;
110:12;113:23;
114:6;118:24
**right-hand (5)**
39:8,10;45:11;
46:2;57:8
**robbery (2)**
39:19,22
**Robert (6)**
64:9;66:5;102:12,
13,14,19
**role (5)**
76:21,24;78:6;
92:15,15
**roll (2)**
14:6;19:23
**Romano (5)**
44:17;45:17;53:25;
54:6,7

**room (10)**
3:13;5:2;35:7;
38:2;46:6;53:7;
75:21;82:6;100:2;
101:9
**roundtable (1)**
90:6
**routine (4)**
12:12,13;14:4;
66:20
**routinely (3)**
19:2,4;94:1
**run (2)**
18:10;120:5
**running (3)**
23:10;119:9,15
**Ryan (2)**
44:17;45:18

## S

**SABATINI (2)**
3:20,20
**Safety (1)**
99:1
**same (30)**
4:25;12:14;15:22;
19:20;28:21;31:15;
45:22;69:9,10;75:16;
89:18,22;90:4,8,18;
91:13,17;94:5,6,8;
96:8,24;97:6;104:10;
105:16,20;107:11;
111:14,25;112:3
**San (4)**
17:23,24;18:4,7
**sat (3)**
52:9;99:4;100:6
**satisfied (1)**
83:10
**Sauro (3)**
14:25;17:12,15
**saying (4)**
53:21;73:5,7;108:8
**scale (1)**
101:13
**scene (1)**
19:11
**schedule (1)**
15:22
**school (1)**
101:22
**score (38)**
20:25;21:3;25:17;
31:13,16;36:5;39:1;
40:17;42:17;43:3;
44:15;45:11;46:3,15;
47:22;48:2;52:11;
54:18;55:11;56:13;
57:2;61:15;64:8;
66:11,15,18;69:4;
95:22;96:14,14,17;
97:11;102:4,9,13;

107:11,19;112:14
**scores (15)**
47:11;52:24;68:15;
70:16,19,19;87:18;
88:13;110:1;111:2;
113:25;114:1;
115:10,17;120:2
**scribbled (3)**
57:12;67:4,6
**seasonal (1)**
28:16
**second (1)**
36:16
**sections (1)**
16:19
**Security (3)**
77:11,21;109:21
**seeing (1)**
33:6
**send (1)**
115:21
**Senior (1)**
3:22
**Seniority (2)**
55:8;68:7
**sent (1)**
107:18
**Sergeant (92)**
4:6,23;5:4;7:4,17,
23;8:3,5,11,13,17,17,
20;10:4,15,19,23;
11:15,20;12:4;17:5,
21;18:12,25;19:19;
21:15;22:15;24:3,11,
24;25:7,9,12;29:5,6,
7;30:23,23;31:9;
36:14;38:7,14;40:3,3,
4;43:1;45:15;46:22;
47:1,8,20;48:2,25;
49:2,10,17;50:2;53:6,
9;55:17;58:7,10;
59:6;63:12;64:1;
65:11,22;66:6;70:3,
14;71:15;74:12;
75:24;77:11;90:12;
91:18;92:3;93:1,6,15,
21;94:18,25;95:2,9,
14,16;96:3;100:15;
104:14;116:11;120:6
**sergeants (39)**
9:23;10:14,14,23;
12:6,14,24;13:23;
16:1,12;18:20;19:2;
23:13,25;24:22;
28:21;65:19;89:16;
90:16,16;91:13;92:9;
94:9;95:23;96:8,18;
97:12,13;98:10,21;
99:23;100:21,24;
101:6;103:13,22;
104:3,11;111:16
**sergeants' (1)**
96:15

**sergeant's (2)**
18:20;92:18
**serious (1)**
26:20
**served (1)**
33:18
**service (78)**
8:15;21:4,18;
25:12;26:4,11;27:5,
7;29:11;32:19;35:6;
36:20;37:23;38:9;
39:24;40:8,9;41:24;
42:15;43:12,17;
49:14;57:9;58:19;
60:12,23;62:9;66:24;
67:20;69:11,13;70:8;
72:3;74:6,10;78:15;
80:15,18;86:2,8;88:3,
25;89:6,18;91:12,14;
92:9;94:13;95:12,22;
96:18;99:3,8,15,17;
100:4,12,15,19,22;
103:23;104:10;
105:9,15;106:4,10,
21;107:2,8;109:9;
110:2;112:11,23;
113:9;114:6;117:19;
119:13;121:7
**session (1)**
47:13
**sessions (1)**
35:3
**set (9)**
26:5;28:16;30:5,6;
32:21;33:12;86:2,6;
90:11
**sets (1)**
26:8
**settle (1)**
119:23
**settled (1)**
119:6
**seven (6)**
39:8;69:6,22;
70:11;120:1,3
**several (14)**
26:1;35:2,4,8,20;
39:17;40:1;81:19;
82:5,15;94:2;103:7;
109:19;111:1
**sex (1)**
39:19
**sheet (32)**
31:17;40:22;42:17;
43:4,9;44:4,6,15,23;
48:6,7;52:11;54:18;
55:1,11,23;56:13;
58:1;61:15;62:21,25;
64:8,13,17;66:11,15;
82:22;104:23;
108:24;117:25;
120:16,22
**sheets (23)**

20:25;21:3;25:18;
31:13;39:1;40:17;
46:15;57:2;62:15;
66:19;69:4,16,25;
96:14,15,17;97:11;
98:9,10,13;107:11,
19;112:14
**shift (16)**
9:5,7,18,20,21;
10:12,15,18,20;12:1;
29:6,9;30:13,13;
85:17;92:25
**shifts (2)**
9:19;11:25
**shooting (1)**
13:13
**show (1)**
22:4
**sick (19)**
26:9,10,14,15,18,
20;27:4,8,9,21;29:24;
30:6,16,24;31:10;
50:14,16;89:10;
90:22
**sickness (1)**
30:21
**side (4)**
9:2;15:14;28:19;
46:2
**signal (1)**
30:20
**signed (5)**
73:16;86:19;98:24;
99:5;110:3
**similar (7)**
20:10,24;58:2;
66:21;91:20;103:1;
104:14
**single (4)**
18:22;71:6;72:6,10
**Sion (1)**
74:3
**sit (2)**
111:22;120:17
**situation (3)**
19:4,8;83:21
**six (5)**
9:8;14:21,24,24;
41:2
**slightly (1)**
92:7
**small (2)**
109:6,6
**smaller (2)**
39:17,20
**smart (1)**
23:9
**Smith (1)**
42:7
**so-and-so (2)**
102:24;103:8
**solely (1)**
5:25

**Solicitor (2)**
3:21,23
**Somebody (18)**
4:18;26:14,17;
27:3;33:16;35:7,17;
60:12,22;62:24;
72:15;73:2;81:23,24;
85:6;95:2,8;102:22
**someone (18)**
17:2,2;21:17;28:9;
31:9;38:17;51:24;
57:20;60:12;63:3,5,7,
7;82:4;84:2;92:22;
102:25;116:2
**someone's (5)**
28:24;38:6;39:9;
75:12;101:12
**sometimes (1)**
15:23,24;60:19
**Somewhat (9)**
48:24;51:7,9,11,
13;58:15;86:18;96:5;
102:10
**somewhere (1)**
34:10
**sorry (4)**
11:4;18:5;30:22;
117:6
**sort (2)**
4:11;33:17
**sounds (3)**
37:6;66:18;84:11
**South (1)**
28:19
**Sox (1)**
71:17
**speak (5)**
7:24;35:1;36:25;
84:9;92:23
**speaking (2)**
79:3;84:23
**special (2)**
39:21;117:9
**specific (10)**
34:4;51:3;52:4;
53:12,14;58:21;
73:12;74:8;84:19;
111:6
**specifically (24)**
48:8,8;53:3;58:12;
59:8;65:5,9;66:3,10;
67:16;72:22;74:22;
75:22;78:18,21;
79:25;82:4;84:22,25;
85:21,24;91:4;
113:12,22
**specifics (3)**
48:12;54:17;63:22
**speculate (3)**
34:2;45:13;101:20
**speculating (1)**
46:3
**spend (1)**

19:5
**spent (1)**
56:10
**spoke (9)**
46:21;47:12,12;
48:11;53:23;63:25;
64:6;65:7;120:20
**squad (1)**
39:22
**Square (1)**
9:1
**staff (40)**
20:1;23:10;26:12;
30:10,11;31:8,20;
32:4;33:16,22,24;
34:4,6,14,24;35:2,4,
15;37:10,11;52:7;
69:17,21,23;70:20;
83:24;88:14,16,23;
90:14;100:3;105:5,
16;109:1,4,15;
111:25;113:15;
114:8;115:17
**staff's (1)**
58:18
**Stamatakos (21)**
11:9;14:18;15:4,
18,19,24;17:9;73:7,
10,12;77:4,4;116:17,
22;117:23;119:19,
22;120:11,12;121:1,4
**stand (1)**
71:22
**start (4)**
3:14;39:9;82:17;
103:7
**started (2)**
3:12;54:5
**starts (1)**
82:18
**state (5)**
3:5;36:24;50:14;
87:12;97:22
**stated (2)**
72:7,13
**statement (1)**
34:5
**Station (2)**
12:10;19:3
**status (18)**
4:4,9,12,16,24;5:4,
14,22;6:18,25;7:5,7,
19;8:3,6;50:19,22;
114:13
**step (1)**
111:1
**steps (1)**
109:19
**Steven (1)**
61:5
**stick (1)**
37:7
**still (4)**

4:20;95:21;97:17;
112:16
**stone (1)**
30:6
**strange (1)**
114:19
**street (5)**
4:22;12:11;16:22;
19:4,9
**street-level (1)**
90:12
**stricter (3)**
96:7,11;109:12
**strictly (1)**
92:8
**strike (9)**
12:22;47:16;50:4;
59:11;73:11;77:18;
100:23;107:25;120:6
**style (2)**
14:9;15:12
**styles (1)**
13:25
**subjectivity (1)**
101:19
**subsequent (1)**
69:11
**substation (3)**
12:11;14:7;75:7
**summer (1)**
83:25
**summons (1)**
28:6
**supervise (2)**
9:9;21:13
**supervising (6)**
9:3;10:23;17:17,
21;19:3;120:25
**supervisor (13)**
10:5;11:1;18:8;
21:17;24:25;25:2,8,
23;43:1;79:8;90:12;
110:23;115:2
**supervisors (18)**
20:2;30:11;31:20;
32:4;37:11;65:16;
66:22;69:17,23;71:1;
79:19;82:16,18;
88:16,23;111:19;
115:16;118:7
**supervisors' (1)**
114:9
**supervisor's (1)**
69:21
**supervisor-subordinate (1)**
11:16
**supervisory (3)**
20:6;61:22;67:14
**supplement (1)**
97:24
**supposed (1)**
101:12
**sure (42)**

14:23;28:18,18;
40:12;43:2;45:12;
46:17;54:5;56:10;
58:1;59:24;60:2;
61:10,24;64:7;65:3,5,
25;68:2,20;69:10;
72:19;74:2;75:20,21;
80:1;88:21;91:23;
95:21;96:23;105:24;
107:6,12,13,21;
112:7;113:3,5,7,19;
116:18;117:24
**surprised (14)**
48:22;51:7,9,11,13,
15;52:2,15;58:13,16;
61:12;63:15,24;
64:23;67:23;120:4
**surprising (1)**
51:16
**surrounding (1)**
89:4
**suspects (1)**
5:5
**suspension (1)**
32:23
**suspensions (1)**
32:23
**sworn (1)**
3:3
**system (1)**
104:12

**T**

**talk (8)**
8:12;26:3;53:3,5,
23;75:23;89:16;
96:21
**talked (4)**
8:8;26:4;54:15;
70:17
**talking (2)**
77:16;90:2
**talks (1)**
94:15
**tally (1)**
46:8
**team (18)**
48:12,18;51:5;
54:16;73:8,14;74:14;
77:5;83:2,15,21;84:2,
8,12,20;88:7;108:12;
113:21
**technically (1)**
9:20
**telephone (1)**
14:12
**ten (1)**
35:21
**tendencies (1)**
103:2
**terminate (1)**
8:2

**terminated (1)**
7:18
**terms (3)**
17:3;50:11;91:2
**Test (4)**
43:21;44:9;45:6;
80:20
**testified (20)**
5:12;24:17;33:2,8;
45:7;51:7;54:22;
69:6,20;77:19;82:20;
85:6;91:21;93:11;
98:12;104:21;
116:11;119:17;
120:20,23
**testifies (1)**
3:3
**testimony (7)**
9:22;34:21;92:1;
94:3;98:16;100:21;
114:4
**tests (2)**
49:19,21
**thinking (1)**
83:6
**though (4)**
23:19;36:15;90:18;
116:21
**thought (14)**
34:13;48:14,17;
51:4;54:8,13;72:1;
73:11,13;80:24;
82:24;84:19;92:19;
118:11
**threats (1)**
79:15
**three (22)**
7:18;9:6,8,19;
10:18,21;45:5,16;
46:19;58:7;68:7,10;
70:9;81:24;82:2,5,17,
17,19,19;87:19;106:2
**threes (1)**
87:20
**three-to-eleven (1)**
29:7
**throw (2)**
35:6,17
**times (2)**
28:16;75:24
**title (5)**
13:18;30:23;54:20;
56:17;61:17
**today (5)**
34:23;98:14,22;
112:21;120:17
**together (1)**
66:2
**told (2)**
48:7;115:23
**Tom (32)**
42:19;43:3,25;
44:3,15,20;46:11;

47:25;48:14,17;
50:14,18,21,25;51:3,
21,24;52:10,13,23;
56:16;58:9,13,25;
59:6;60:6;61:2,8;
71:11;97:4;106:6,18
**Tommy (1)**
19:21
**tomorrow (1)**
112:21
**tone (2)**
83:18,19
**took (22)**
26:15;30:17;36:11;
44:11;69:1;70:20;
71:9;72:1;87:22;
88:13;90:22,24;91:6,
9;108:6;109:14;
113:23;116:25;
119:3,8,11,13
**top (1)**
65:18
**topic (2)**
4:3;121:6
**total (5)**
9:1;26:19;70:11;
91:19;101:18
**totally (1)**
70:17
**tough (1)**
52:20
**towards (2)**
79:16;91:19
**track (4)**
27:11,14;65:21;
101:15
**traditionally (3)**
9:8;31:11;49:21
**training (1)**
18:10
**transcript (4)**
21:25;22:4;34:17;
121:25
**transferred (1)**
18:9
**transgression (7)**
33:17;75:6,23;
76:5;77:2;81:6;85:3
**trial (2)**
83:23,25
**trimmed (1)**
116:24
**true (1)**
75:11
**try (3)**
4:1;52:3;102:9
**trying (5)**
12:7;23:9;34:20;
49:18;115:18
**Tucker (14)**
19:16;39:12;40:16,
19;41:14,21;46:18,
21,25;97:4;105:25;

112:5,9;117:2
**Tucker's (4)**
40:10;41:25;42:3,
12
**turn (5)**
25:20;48:5;112:18;
120:16,22
**turned (5)**
27:9;47:11;48:7;
58:1;70:17
**turning (2)**
40:6;69:12
**turns (1)**
82:2
**TV (1)**
14:1
**two (29)**
10:23;14:17,17;
15:6;26:22;29:22;
41:2,6,13,16;45:8,9,
10;49:22,23;55:14;
67:11,24;68:1;70:9,
10;90:3;92:19;99:12,
13;108:18;109:13;
119:6,22
**twos (3)**
68:16,19;87:20
**two-year (1)**
108:21
**type (2)**
37:13;92:5
**typed (1)**
63:10
**types (3)**
53:10;82:2;93:25
**typically (1)**
12:22

## U

**ultimately (6)**
59:12;61:20;70:5;
88:10,13;114:5
**unattainable (1)**
101:19
**under (19)**
8:18;19:13;35:16;
39:23,25;41:25;
59:15,19,19,22;60:4;
62:9;65:12,22;71:22;
81:24;93:18;109:24;
117:23
**underneath (1)**
65:18
**undertake (1)**
31:24
**unexpectedly (1)**
14:6
**unfortunately (1)**
19:5
**uniform (10)**
9:13;15:9;56:18;
64:11;67:20;89:1;

110:24;114:10;
119:9,15
**union (8)**
6:13,13;75:25;
107:18;121:7,14,17,
20
**unit (3)**
39:22;81:25;83:7
**units (1)**
39:20
**unless (2)**
40:5;85:17
**unobtainable (1)**
101:19
**unreasonable (1)**
78:10
**up (19)**
7:8;8:25;12:16;
15:18;35:14;36:24;
40:6;65:18;68:25;
72:23;73:17;74:15;
82:19;86:20;99:5;
101:8;110:1,3;116:2
**upon (3)**
16:9;105:4;109:8
**upper (5)**
39:10;62:4;90:14;
100:3;105:16
**upset (6)**
77:22;78:11,22;
79:3,14;109:20
**use (3)**
27:9;77:14;96:14
**used (1)**
96:14
**using (1)**
99:18
**utilize (3)**
89:18;90:8,18

## V

**vague (1)**
29:19
**vaguely (1)**
89:14
**varying (1)**
13:25
**vehicles (1)**
12:7
**vented (1)**
79:18
**venting (1)**
79:7
**verbal (1)**
32:22
**Verdi (33)**
11:10,11;19:16;
56:14;57:2,24;58:2,
10,13;59:3,6,13,16,
21;60:6;61:2,8;71:4;
97:4;105:23;106:18;
110:25;112:1,25;

115:6;116:17,22;
117:22;119:19,21;
120:9,25;121:3
**via (1)**
14:11
**victims (1)**
39:21
**Vinacco (7)**
77:13,20;78:11,12,
13,14;84:14
**Vineyard (1)**
84:1
**violation (3)**
37:2;75:5;76:21
**violent (1)**
39:19
**voice (1)**
93:8
**volume (2)**
16:6;29:8

## W

**wait (2)**
6:4;103:8
**waiting (1)**
111:18
**walk (3)**
18:16,18,22
**walkie-talkie (1)**
14:12
**walks (1)**
18:21
**way (18)**
8:25;28:24;35:10;
65:14;66:1;74:24;
75:17;77:6;83:11,11;
88:9;89:1;109:16,19;
111:2;121:14,17,20
**week (12)**
3:12;9:22;21:23;
23:14;33:2;77:16;
85:6;89:17;96:24;
97:7;98:12,14
**weekend (3)**
83:24;84:1;85:15
**weighed (2)**
116:18,19
**weight (7)**
70:22;71:7,8;
75:16;92:4;96:11;
115:1
**weren't (1)**
92:8
**West (3)**
8:24,25;9:1
**what's (3)**
6:9;28:7;41:23
**Wheeler (1)**
42:10
**whited (1)**
62:24
**whole (2)**

10:13;83:24

**who's (1)**
95:4

**whose (9)**
39:11;42:17;43:3;
54:18;56:13;61:15;
64:8;66:11;70:25

**wide-open (1)**
64:3

**William (1)**
66:12

**willing (1)**
36:16

**within (6)**
4:21;27:24;28:21;
88:7;96:24;118:20

**without (2)**
33:6;102:15

**WITNESS (6)**
3:7;7:11;36:24;
49:8;88:4;118:13

**woman (1)**
18:1

**wondering (1)**
54:9

**word (1)**
77:15

**work (40)**
4:6,8;5:3;6:5;7:5;
11:16;13:25;15:11,
23,24;22:6,12;23:15,
21;47:1,8;50:8;53:4;
59:6;60:2,14;64:1;
65:8,12;66:1,2,9;
79:20;83:24;85:7,15,
16;88:6;103:1;
108:22;109:21;
110:16;115:12;
117:16;119:18

**worked (12)**
22:15;23:20;59:22;
60:10;65:13,15,22,
24;109:18;117:13,
18;118:23

**workforce (1)**
28:1

**working (15)**
5:2;12:5;16:11;
24:22,22;46:4;59:12,
15,19,19;72:24;73:4;
92:25;102:20;117:9

**works (2)**
16:3;23:24

**worse (1)**
95:5

**write (4)**
40:22;43:23;44:1;
68:10

**writing (1)**
30:5

**written (29)**
5:17;31:6;32:22;
36:6;39:10;40:9;
43:20;45:6;55:4,5,7,
9;56:5,25;57:11,12,
13;58:4,9;62:4,8;
66:22,23;67:4,5,7;
73:3,4,6

**wrong (2)**
55:9;118:15

---

## X

**X'd (1)**
44:24

**Xs (4)**
44:15,18,21;45:23

---

## Y

**Yang (2)**
74:4;87:18

**Yankees (1)**
71:18

**year (8)**
4:9;7:7;49:19,22,
23;110:4,7;118:13

**years (12)**
17:19,19,20;35:8,
18,20;75:16;76:16;
81:19;108:18;
109:13;114:18

**yes-or-no (1)**
23:2

**Youth (4)**
39:24,24;41:24;
67:20

**YSB (2)**
41:23;42:10

---

## Z

**zero (71)**
45:16;47:5,20;
48:10,23;49:11;
50:19;51:8,12,14,15,
22,25;52:2,3,14;
54:14;58:25;63:13,
16,21;64:20,24;65:2;
70:6,9,10,10,15,21;
71:15,19,25;74:19;
76:6,22;77:1,25;78:3,
7;85:19,22;86:14;
87:8;88:12,15;94:14;
95:14,15;101:13;
103:15,17,22;104:10;
105:11;108:15,19;
109:11,13;110:11,20;
114:18;116:3,7;
119:6,21,23;120:13,
15,18;121:3

---

## 1

**1 (3)**
22:1,2;39:9

**1.14 (1)**
70:12

**10 (1)**
3:12

**10:20 (1)**
3:1

**100 (2)**
4:20;91:20

**11 (2)**
42:4;62:12

**12 (3)**
6:22,25;44:16

**13 (1)**
62:12

**14 (1)**
62:12

**142 (1)**
16:22

**15 (1)**
44:16

**16 (6)**
19:24;20:11;39:2;
44:17;73:17;98:20

**18 (1)**
43:11

**19 (3)**
42:7;43:11;62:12

---

## 2

**2 (5)**
16:5;42:17;44:15;
62:12;114:25

**2:45 (1)**
122:1

**2000 (4)**
76:3;77:2;81:6;
85:4

**2009 (1)**
77:10

**201 (2)**
31:21;32:7

**2010 (20)**
80:20;81:11;82:9,
20;84:7;104:21;
105:21;106:4,6,12,
18,24;107:5,8;108:8,
11,14,17,25;110:11

**2011 (4)**
4:5;6:19;7:6,17

**2012 (42)**
7:8;8:14;10:2;11:7,
8;13:19;14:25;15:3,
17;17:7;19:25;20:11,
21;21:7;22:15,19;
25:13;32:3,10;38:8;
39:2;59:11;73:17;
84:18;89:16;98:20;
105:21;106:2;
110:11,17;111:15;
112:4;113:25;115:3,
17;116:3;117:19;
118:2,8,14;119:2;

---

120:8

**2015 (12)**
110:12,17;111:12,
20,22;112:13;113:9,
21;114:6;116:12,21;
117:12

**21 (2)**
42:10;62:12

**22 (7)**
22:1,2;67:6;68:16;
74:4;84:24;86:20

**23 (1)**
89:16

---

## 3

**3 (6)**
9:10,21;43:11;
54:18;98:24;114:25

---

## 4

**4 (14)**
8:22,22;9:6;10:1,8,
15,20;16:5,5;43:11;
45:18;56:13;67:5;
68:15

**4.5 (4)**
45:17,18;54:2,11

**42 (3)**
22:1;99:22;104:2

**44 (1)**
22:1

**45 (2)**
22:1,2

**46 (4)**
99:4,22;100:5;
104:2

---

## 5

**5 (9)**
9:10;16:5,5;40:24;
61:15;62:12;75:7;
91:19;109:8

---

## 6

**6 (3)**
40:24;62:12;64:8

**60 (1)**
6:14

**61 (1)**
6:14

---

## 7

**7 (3)**
9:21;16:5;66:11

---

## 9

**9 (1)**

---

62:12