## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

MARK MANCINI,                                          :
    *Plaintiff,*                            :
                                  :
    vs.                                     :         Civil Action No.  Ca 13-092S
                                  :
CITY OF PROVIDENCE, by and through its :
Treasurer, James J. Lombardi, III, and HUGH :
CLEMENTS, JR.,                                         :
    *Defendants*.                            :

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
### OF DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR
### SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S
### CROSS-MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

Now comes Defendant City of Providence and submits the within memorandum in support of its Objection to Plaintiff's Motion for Summary Judgment and in support of Defendant's Cross-Motion for Summary Judgment. As set forth more fully herein, because Defendant has more than met its minimal burden of producing nondiscriminatory reasons for the employment actions at issue, Plaintiff is not entitled to summary judgment in his favor. Furthermore, even if Defendant had not met its burden, the law is clear that such failure still does not entitle Plaintiff to summary judgment in its favor.

Furthermore, Defendant is entitled to summary judgment in its favor because Plaintiff has not established that he had a disability within the meaning of the law or that he was qualified for the position he sought. Moreover, even if he could establish a disability, Defendant would still be entitled to summary judgment in its favor because the evidentiary record is wholly devoid of any evidence that Plaintiff's alleged disability played any role in the Colonel's award of service points to Plaintiff.

## II.      Facts and Travel

On February 6, 2013, Plaintiff Mark Mancini ("Plaintiff") commenced an employment discrimination suit against Defendants City of Providence and Colonel Hugh Clements, Jr., arising out of an alleged failure to promote him from the rank of Sergeant to the rank of Lieutenant within the Providence Police Department.   (See Plaintiff's Complaint, February 6, 2013, attached hereto as **Exhibit A**.) (subsequently, Defendant elements was dismissed from the case)

The facts relevant to the instant cross-motions for summary judgment are few and are largely undisputed.

Plaintiff injured his right knee while chasing a suspect in the line of duty on or about November 15, 2010. (Mancini Depo. Tr. Vol. II 6:18-21, attached hereto as **Exhibit B**.) As a result, he was placed on "injured on duty" status, see R.I. Gen. Laws § 45-19-1 et seq., and was out of work until May 2011. He returned to work on "light duty" status until August 2011. On or about September 2, 2011, Plaintiff applied for an accidental disability pension, which was denied on June 27, 2012 because Plaintiff did not qualify. (Pl. Ex 4, Ex. 5.) Plaintiff alleges in his complaint that his physical impairment (i.e., knee injury) substantially limits one or more of his life's major activities including, but not limited to, working. (Ex. A ¶ 31.) As Plaintiff is now working for the PPD on full duty status without disability accommodation, he has abandoned that allegation to claim that he is not presently disabled, but that he was at one time. Plaintiff's only evidence in support of this proposition is his own affidavit, prepared for purposes of moving for summary judgment.

Plaintiff thereafter applied for a promotion from the rank of sergeant to the rank of lieutenant. (Pl. Ex. 8.) The promotional process is governed by the Collective Bargaining Agreement ("CBA") between the City and the police union, the Providence Fraternal Order of

Police Lodge 3 (the "Union"), the relevant portion of which was appended to Plaintiff's motion as Exhibit 3. The criteria for selecting a lieutenant is based upon a 100-point overall score whereby each candidate is awarded points as follows: (1) 0-85 points for his or her score on a 100-question written examination; (2) 0-5 points for his or her level of education; (3) 0-5 points for his or her level of seniority; and (4) 0-5 points for his or her service. (Pl. Ex. 3.) The service component pertains to the candidate's overall performance as a police officer. (Pl. Ex. 3.) The Chief of Police considers letters of commendation, memoranda of merit received, and other factors to determine a candidate's service points. (Pl. Ex. 3.) It is undisputed that service points are awarded at the Police Chief's sole discretion. (Pl. Ex. 3.) Pursuant to the CBA, the Chief of Police is to deliver his or her award of service points for all candidates to the Union *prior* to the administration of the written examination.  (Pl. Ex. 3.)

On June 16, 2012, Plaintiff completed the exam and received an overall score of 88.2: (1) 78.2 points for the written examination; (2) 5 points for education; (3) 5 points for seniority; and (4) 0 points for his service. (Pl. Ex. 8.) Plaintiff's 88.2 overall score ranked him seventh of the sixteen sergeants who took the exam; therefore, he did not receive a promotion to lieutenant. (Pl. Ex. 8.) Had Plaintiff received one more point overall, he would have tied with the fifth highest test taker and been eligible for promotion based on his seniority. (Pl. Ex. 3, Ex. 8.) Accordingly, it is the Colonel's decision to award Plaintiff 0 service points that is at the heart of this case.

Plaintiff has alleged that Defendants failed to promote Plaintiff because of his disability, or a record of a disability. Put another way, he has alleged that he received a 0 for service points because of his disability or a record of a disability.

Additional facts will be set forth as necessary, <u>infra</u>.

3

### III.     Standard of Review

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56; Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir.2009).  A genuine issue of material fact "must be built on a solid foundation—a foundation constructed from materials of evidentiary quality." García–González v. Puig–Morales, 761 F.3d 81, 87 (1st Cir.2014) (internal quotation marks omitted) (quoting Nieves–Romero v. United States, 715 F.3d 375, 378 (1st Cir.2013)).  Allegations based solely on a plaintiff's own self-serving allegations and no other evidence do not create genuine issues of material fact.  Reilly v. Cox Enterprises, Inc., C.A. No. 13-785 S, 2016 WL 843268, at *7 (D.R.I. Mar. 1, 2016).

### IV.     DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

#### a.  *The Applicable Legal Framework*

In employment discrimination cases based on disparate treatment, such as here, the parties engage in the three-part burden-shifting paradigm set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).[1]  See McGarry v.

---

[1]  While the Court would apply Rhode Island law to Plaintiff's state law claims, Rhode Island looks to the McDonnell Douglas paradigm because of its steadfast reliance on federal jurisprudence under Title VII of the Civil Rights Act of 1964 ("Title VII") for "enlightenment and guidance" in interpreting FEPA, the state analogue to Title VII. Weeks v. 735 Putnam Pike Operations, LLC, 85 A.3d 1147, 1156 (R.I. 2014) (noting that this Court historically has looked to federal precedent in the process of construing FEPA); see, e.g., Bucci v. Hurd Buick Pontiac GMC Truck, LLC, 85 A.3d 1160, 1169 (R.I. 2014) (observing that, to analyze FEPA, this Court has looked to analogous federal anti-discrimination law and applied the McDonnell Douglas Title VII framework). Defendants cite both federal and Rhode Island law throughout this memorandum.

Pielech, 47 A.3d 271, 280 (R.I. 2012).   First, plaintiff must establish a prima facie case of

discrimination.   Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004).   In the failure-to-

promote context, he must show that he (i) is a member of a protected class who (ii) was qualified

for an open position for which he applied, but (iii) was rejected, (iv) in favor of someone

possessing similar qualifications.   See id.; see also McGarry, 47 A.3d at 280 (recognizing that

"[t]he burden placed on the complainant at this stage is not especially onerous"). If the plaintiff

establishes a prima facie case, a presumption of discrimination arises, and "[t]he burden of

production, but not the burden of persuasion, then shifts to the defendant to offer a

nondiscriminatory reason" for its employment decision.   McGarry, 47 A.3d at 280.   An

"employer need only produce *competent evidence, taken as true*, to enable a rational factfinder

to conclude there existed a nondiscriminatory reason for the challenged employment action."

Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 6 (1st Cir. 2000)

(emphasis added); see Joseph v. Napolitano, 839 F. Supp. 2d 1324, 1334 (E.D. Fla. 2012)

(describing this burden as "slight").   If the defendant meets its burden of production, any

presumption of discrimination disappears.   McGarry, 47 A.3d at 281; see Rathbun, 361 F.3d at

71 ("[s]o long as the employer proffers such a reason, the inference raised by the plaintiff's

prima facie case vanishes"). At this juncture, "[t]he burdens of proof and production fall

squarely upon the plaintiff to demonstrate that the defendant's tendered explanation is only a

pretext and that discrimination was the true motive underlying the hiring decision."   Id. at 280-

81.   "The core inquiry in such disparate treatment cases is whether the defendant *intentionally*

*discriminated* against the plaintiff because of" his alleged disability.   Rathbun, 361 F.3d at 71

(emphasis added).

      **b.** ***Defendant Had Met its Burden of Production by Producing Competent Evidence of Nondiscriminatory Reasons for the Award of the Service Points***

Defendant has more met its "slight" burden of production by producing "***competent evidence, taken as true***, to enable a rational factfinder to conclude there existed a nondiscriminatory reason for the challenged employment action." See Feliciano de la Cruz, 218 F.3d at 6; Joseph, 839 F. Supp. 2d at 1334. The United States Supreme Court consistently has stated that an employer satisfies this burden if

> "the employer articulates lawful reasons for the action; ***that is, to satisfy this intermediate burden, the employer need only produce admissible evidence*** which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 257 (1981) (emphasis added). To satisfy the burden of production, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id. at 254-55. Further, the "burden is one of production, not persuasion: ***it can involve no credibility assessment***." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (emphasis added) (quoting St. Mar y's Hono r C enter v. Hicks , 509 U.S 502, 509 (1993) ("the burden of production necessarily

*precedes* the credibility-assessment stage") (emphasis in original)).

      Defendant has developed ample evidence of nondiscriminatory reasons for Mancini's award of service points. Taken as true, this evidence is more than enough to satisfy Defendant's burden of production and certainly more than enough to create genuine issues of material fact sufficient to overcome Plaintiff's motion for summary judgment.

      As a preliminary matter, it is undisputed that, pursuant to the parties' CBA, the award of service points lies within the sole discretion of the Chief of Police. (Pl. Ex. 3.) As Chief of Police, Colonel Clements testified at length during his deposition over the course of two days as

to the nondiscriminatory reasons he awarded Plaintiff Mancini 0 service points for the 2012 Lieutenant's promotional exam. It was the Colonel's testimony that, by using a process to seek input from his command staff, he arrived at an award of service points for Mancini based on the following reasons: (1) he relied heavily on the recommendations of his command staff to arrive at his determination of the points to award; (2) the Colonel and his command staff assigned significant weight to the fact that Plaintiff was applying for a promotion to the position of Lieutenant—a position entailing far greater leadership, responsibility, and external engagement; and (3) the Colonel and his command staff were looking to make the award of service points more meaningful.

First, the Colonel testified that the award of service points to Mancini was consistent with, and the product of, a well-established process that he employs when awarding services points to promotional candidates. It was the Colonel's testimony that, prior to the administration of every promotional examination, he typically meets with the members of his command staff to discuss the award of service points. (Clements Depo. Tr. Vol. I 73:11-20, attached hereto as **Exhibit C**.) Consistent with this process, the Colonel had a meeting with his command staff to discuss the award of service points for the June 2012 Lieutenant's Promotional Exam. (Id. Vol. I 84:5-9.) At this meeting, there is discussion among members of the command staff as to the points each candidate should receive, in which various individuals express their opinions and make recommendations. (Id. Vol. I 90:16-22.) Everyone who attends these meetings is handed a blank sheet with the name of each candidate for the exam, with space to recommend service points that is left blank. (Id. Vol. I 92:3-14.) Some of the individuals who attend the meeting choose to give the Colonel their sheets, filled out with their recommendations, some do not. (Id. Vol. I 92:15-24.)

As to the discussion of the candidates, it was the Colonel's testimony that "a name would be thrown out," and sometimes the discussion would be brief because there was broad agreement regarding the points this candidate should receive.  (Id. Vol. I 95:15-25.)  On the other hand, the names of other candidates would not prompt any discussion.  (Id. Vol. I 96:2-3)  For those candidates, the Colonel's practice was to start those candidates at a three for further discussion. (Id. Vol. I 96:11-13.)

Plaintiff Mancini was one of the candidates whose name did not prompt much of an initial response, so he was started at a three.  (Id. Vol. I 96:18-22.)  From there, the Colonel's recollection of the conversation was that others thought Plaintiff Mancini had a negative or poor attitude and that he was not a team player.  (Id. Vol. I 97:18-21.)  The discussion then turned to whether those are the kinds of attributes the command staff wants to see in a Lieutenant, and in light of the fact that the leadership of the department was looking to make the award of service points more meaningful.  (Id. Vol. I 97:22—98:7.)

Consistent with the above-referenced process, the Colonel described how he received feedback from members of the command staff both during the meeting, and following the meeting when some of the members chose to hand in completed score sheets with their recommendations for each candidate. As the Colonel explained, the "major reason that Mark got a zero is because I took so much into account . . . the thought process of the commanding officers who forwarded recommendations for service points to me on the overall performance of Mark Mancini.  Bearing in mind that he is applying for a higher rank."  (Id. Vol. II 71:25 – 72:5.)  It was the Colonel's testimony that the conversation around the room, combined with the actual recommendations that he received from various members of the command staff, was glaring: "I've been in many meetings.  That's pretty glaring, and that meant a lot to me."  (Id. Vol. I

8

102:2-14.)

The Colonel received score sheets with recommendations from seven (7) members of the command staff who attended the meeting. (Pl. Ex. 7.) Major Keith Tucker recommended that Mancini receive a three. (Clements Depo. Tr. Vol. II 46:18-20.) Deputy Chief Oates Thomas Oates recommended that Mancini receive a zero.  (Id. Vol. II 47:4-6.)  Captain David Lapatin recommended that Mancini receive a two.  (Id. Vol. II 55:14-15.)  Major Tom Verdi recommended that Mancini receive a one.  (Id. Vol. II 58:13-15.)  Major Frank Colon recommended that Mancini receive a zero.  (Id. Vol. II 63:12-14.)  Captain Robert Lepre recommended that Mancini receive a zero.  (Id. Vol. II 64:17-19.)  Captain William Campbell recommended that Mancini receive a two.  (Id. Vol. II 67:11-12.)  As the Colonel explained:  "I relied on all of them, all of the recommendations, all seven that were forwarded. It was alarming to me that there were so many low scores. In the seven assessments that were provided to me, it was alarming.  I was surprised."  (Id. Vol. II 119:25 – 120:4.)

The Colonel had also experienced a specific situation with Mancini in which the impressions of others that he was not a team player and had a bad attitude were confirmed: Mancini's displeasure with being transferred out of homeland security when an officer returned from military service.  (Id. Vol. II 82:24 – 83:11.)  As the Colonel explained: "He was thinking about himself, that he got removed from the unit, and not for the good of the organization. A guy that came back from military leave, I mean, I can tell you, that I have not been satisfied with different assignments that I have along the way, but that's the way it is."  (Id. Vol. II 83:6-11.)

Because service points are awarded based on a candidate's overall performance, the Colonel explained that he looks both at a candidate's performance "[i]n their current job and their ability to work their prospective job. . . .  to see if they have the ability to perform in that

prospective job as well." (Id. Vol. I 74:14-17.)   He further explained that "what is very important to me is what the upper command staff views the overall performance of that employee applying for that newer rank." (Id. Vol. I 76:21-24.)  Despite Plaintiff's attorney's suggestion to the contrary, the Colonel is not of the view that the written examination is the only test of one's abilities to serve in that higher rank, in this case as a lieutenant. (Id. Vol. I 76:6-10.) Moreover, it is undisputed that these are the only five (5) points out of 100 in which the Colonel is able to apply any subjective considerations to the promotional process—the only aspect of the process in which he can consider a candidate's overall performance to determine whether he or she has the leadership qualities the Colonel and the Department seek. (Pl. Ex. 3.) Accordingly, as the Colonel made clear, he awards service points based upon an officer's overall performance, but he evaluates that officer's performance in light of the promotion the officer is seeking.

Colonel Clements also opined at length regarding the difference between a sergeant's position and a lieutenant's position, in order to demonstrate the qualities he would have been seeking in a lieutenant and why he was stricter in his award of service points for that position: "Lieutenant's position is, involves more of getting into the command staff, getting into the staff level of the police department. The main difference is oftentimes because of the shifts they work, they oftentimes act as the chief of police on their respective OIC shift or their district commander shift." (Clements Depo. Tr. Vol. I 30:13-19.) The Colonel's view of the difference between a sergeant and a lieutenant was also developed at length when asked about how they work together:

> Q: Tell me about the interplay between the lieutenant and the sergeant; how does that relationship work?
>
> A: Lieutenant is responsible for the entire operations in that community; in essence, the mini police chief for that geographical area. So the  dynamics between the lieutenant and the sergeant are the lieutenant would take direction

from above and take information from the outside, the community, the council, the community groups.

Then the lieutenant would direct the operations of that geographical area on the respective shifts. So for the day shift if there were issues or complaints about certain activity at certain car posts or neighborhoods, the lieutenant would constantly advise the sergeant what to pay attention to.  (Id. Vol. II 11:14 – 12:4.)

Connecting the conversation back to the discussion around the table regarding Mancini, the Colonel described at length why, when he is looking for a lieutenant, being a team player and having a positive attitude are very important characteristics.  (Id. Vol. I 103:15—104:1.)  When pressed for details, the Colonel recalled "discussion that [Mancini] comes into work, does the job and he leaves."  (Id. Vol. I 104:7-8.)  The Colonel then connected that discussion and what he heard back to the Department and its needs: "in the decentralized police department we're in now, we're looking for more than that. We're looking for people that become way more engaged with the work staff, with the community, and to present a positive direction for the people you're going to lead."  (Id. Vol. I 104:7-13.)  As he further explained: "the general conversation is a lot of these guys will go to community events on the weekend or will work overtime for community events. Others come to work, they do their shift. Unless forced for overtime, they're gone."  (Id. Vol. II 85:13-18.)  The Colonel also stated: "[A]s part of an overall performance evaluation for the rank of lieutenant we're looking for people who are more community-service oriented."  (Id. Vol. II 86:15-17.)  He also explained: "We're looking for officers who push a certain level of esprit de corps in the organization as well."  (Id. Vol. II 87:14-16.)

Colonel Clements also testified that Mancini received a 0 because he and the command staff were looking to make the award of service points stricter and more meaningful. He further testified that this change in approach is what may account for the difference in points that he received since the previous exam:

Q: What is your explanation for how he went from a five to a zero in such a short period of time?

A: It's a completely new police administration. There have been conversations for a long time about points being meaningful. If you look at previous examinations, you'll see the bulk of the list where everybody gets a five.

It became a lengthy conversation with the command staff. This is wrong. They're service points. They're given at the sole discretion of the Chief. They should be meaningful. They should be given to people who you want to, or who you believe should be put in those positions, based on their overall performance deserve it.  (Id. Vol. I 101:4-17.)

It was also the Colonel's testimony that he also thought Mancini had a poor attitude and was not a team player in 2010, the last time that he participated in the process of awarding service points, in which he recalls awarding him a five. As the Colonel explained, the difference between 2010 and 2012 was the change in philosophy regarding the award of service points—making them stricter, more meaningful.  (Id. Vol. II 81:10 – 82:10.)

The Colonel also described why he would be stricter in awarding service points to candidates for lieutenant than candidates for sergeant: "It's a lesser rank. So not as much weight would be given to certain areas of leadership ability, because it's a different type of leadership. It's a more confined leadership." (Id. Vol. II 92:3-6)  As he further explained: "The rank of lieutenant in our department at that time and prior to that when we decentralized and presently is a mini police chief in the district role and in the OIC role." (Id. Vol. II 92:12-15.)  He also added: "[W]e're counting on someone ascending to the rank of lieutenant to carry the ball and to speak for the Office of the Chief of Police or the department when he's out there on a shift when no one of higher rank is working with him. That will never be the case for a sergeant. They will never be the highest rank on duty." (Id. Vol. II 92:21 – 93:2.)  In the Colonel's view, a lieutenant "has more authority and more responsibility.  His voice is greater.  His authority is greater.  It's different." (Id. Vol. II 93:7-10.)  Contrary to Plaintiff's counsel's suggestions that, in the same way an A is always an A, a 5 should always be a 5, the Colonel was of the view that

it "[d]epends on the level of the course.  You're taking an AP course, C plus might be an A.  B might be an A." (Id. Vol. II 101:25 – 102:2.)

Plaintiff makes much of language quoted from the Sixth Circuit's decision in Tye v. Board of Educ. of Polaris Joint Vocational School Dist., 811 F.2d 315 (6th Cir. 1987), in which the court states that, with respect to the burden of production, "it is elementary that the evidence produced must be clear, reasonably specific, and legally sufficient to justify a judgment for the defendant if not disproved by the plaintiff."  See id. at 318 (citing Burdine, 450 U.S. at 254). Plaintiff relies on Tye for the proposition that the reasons articulated in this case thus far are insufficient because they are not "reasonably specific."  As a preliminary matter, Burdine, upon which the Tye court relies, does not use the "reasonably specific" language.  Rather, the Burdine court describes the burden as follows: "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant." Burdine, 450 U.S. at 255 (emphases added).

Perhaps more importantly, the decision of the Tye court makes clear that, despite whatever language that court may have chosen, the nature and extent of the burden remains the same.  Accordingly, in Tye, the following reasons articulated by the employer were deemed sufficient by the Sixth Circuit:

"4. Fiscal cutbacks;

5. Multiple certification of staff;

6. Staff diversity and complement;

7. Employee demeanor and attitude;

8. Employee interaction with other faculty;

9. Program changes at the school;

10.  Superintendent Richard Mueller's subjective feelings and impressions."

Id. at 318-19 ("Accordingly, we find that defendants' intermediate burden was met when reasons four through nine were admitted into evidence.").

If the reasons articulated in Tye were sufficient to meet the defendants' burden of production, it is hard to fathom how the reasons articulated by Defendants and specifically by Colonel Clements are not.

### c.  *Plaintiff's Memorandum in Support of his Motion for Summary Judgment Does Nothing More than Underscore the Extent to Which Defendant Met Its Burden of Production*

Courts frequently have explained that an employer should "articulate" its legitimate, non-discriminatory reason, as part of the burden-shifting paradigm, in order to "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext."  Burdine, 450 U.S. at 255-56.  Here, the nondiscriminatory reasons that have been provided by Providence and Colonel Clements were clearly understood by Plaintiff. Plaintiff devoted 21 pages out of a 37-page brief to rebutting the very clearly articulated reasons provided by the Colonel as to why he awarded Mancini a 0 for service points. (Pl. Mem. at 16-37.) These arguments are nothing more than grist for the trial mill, raising credibility questions that are expressly reserved for the jury.

Because the "burden is one of production, not persuasion: ***it 'can involve no credibility assessment*.'"   Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (emphasis added). As mentioned above, an "employer need only produce competent evidence, ***taken as true***, to enable a rational factfinder to conclude there existed a nondiscriminatory reason for the challenged employment action."  Feliciano de la Cruz, 218 F.3d at 6 (emphasis added);

see also Hicks, 509 U.S. at 509 ("By producing *evidence* (**whether ultimately persuasive or not**) of nondiscriminatory reasons, petitioners sustained their burden of production, and thus placed themselves in a 'better position than if they had remained silent.'") (italics in original; bold emphasis added).

> ### d. *Regardless of Whether Defendant Can Meet Its Burden of Production, Plaintiff Ultimately Bears the Burden of Proof and is Not Entitled to Summary Judgment in His Favor*

Accepting, for the purpose of argument only, that Defendant did not meet its burden of production, the *McDonnell Douglas* burden-shifting paradigm still does not warrant judgment for Plaintiff. Although employment discrimination law imposes a burden of production on employers, the *burden of persuasion* remains always with the employee.  Burdine, 450 U.S. at 256 ("The plaintiff retains the burden of persuasion."). The United States Supreme Court has made clear that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Id. at 253; see also Casey v. Town of Portsmouth, 861 A.2d 1032, 1036 (R.I. 2004) (the plaintiff "bears the ultimate burden of proof on the issue of discrimination"). Indeed, this third prong of the *McDonnell Douglas* framework "constitutes the crux of proving a discrimination case." McGarry, 47 A.3d at 281; see Hicks 509 U.S. at 518 ("the ultimate question [is] discrimination *vel non*").

Employment discrimination statutes, like Title VII and FEPA, do "not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of (in the context of the present case) [disability]."  Hicks, 509 U.S at 523-24.  As the United States Supreme Court has explained, even "[i]f the defendant has failed to sustain its burden but

15

reasonable minds could *differ* as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact *does* remain, which the trier of fact will be called upon to answer." Hicks, 450 U.S. at 509-10 (emphasis in original).[2] Even more clearly, the Supreme Court has stated that "[q]uite obviously … ***what is required to establish the*** **McDonnell Douglas** ***prima facie case is infinitely less than what a directed verdict demands***." Id. at 515 (emphasis added); see also Reeves, 430 U.S. at 148 ("Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.").

In other words, the *McDonnell Douglas* burden-shifting paradigm does not simply provide for judgment as a matter of law for plaintiffs in instances where employers do not meet their burden of production (which, again, is not the case here). As has been oft repeated, "[t]he *McDonnell Douglas* methodology was 'never intended to be rigid, mechanized, or ritualistic.'" Hicks, 509 U.S. at 519 (citing U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)).

If this Court were to conclude that Defendant did not meet its burden of production, the result is not judgment for Plaintiff, the result is that Plaintiff receives the benefit at trial of the presumption of discrimination that arises from his prima facie case. See McGarry, 47 A.3d at 281; cf. Rathbun, 361 F.3d at 71 ("[s]o long as the employer proffers such a reason, the inference raised by the plaintiff's prima facie case vanishes").

---

[2]     Hicks held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff. Hicks, 509 U.S. at 511; see Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146, 148 (2000) ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.").

### e. *If anything, the <u>Alvarado</u> case demonstrates that Plaintiff Mancini is Not Entitled to Summary Judgment*

In his memorandum in support of his motion for summary judgment, Plaintiff describes <u>Alvarado v. Texas Rangers</u>, 492 F.3d 605 (5th Cir. 2007), as "a case eerily on point to this one." (Pl. Mem. at 24.)  Apart from the fact that <u>Alvarado</u> involves a law enforcement promotional process and claims of discrimination arising out of the denial of a promotion, it is hard to see how the case is eerily on point.  While <u>Alvardo</u> may provide useful guidance to this Court as it considers Plaintiff's motion for summary judgment, it supports neither proposition Plaintiff advances.  Applying <u>Alvarado</u> to the instant case compels two conclusions:  (1) Defendants have met their minimal, slight burden of production and (2) even if they did not, Plaintiff would not be entitled to summary judgment.

With respect to the burden of production, the reason proffered by the employer in <u>Alvarado</u> was the candidate's "failure to score among the top ten candidates in the promotion and selection process."  <u>Id.</u> at 616.  That was it.  <u>See id.</u>  The employer "offered neither an explanation nor evidence of how or why the interviewers arrived at those scores."  <u>Id.</u> at 617. Furthermore, the employer did not point "to any deposition testimony by the Board members that would shed light on why they scored Alvarado and the other candidates the way they did."  <u>Id.</u>

The dearth of evidence in <u>Alvarado</u> stands in stark contrast to the evidence developed in the instant case.  The <u>Alvarado</u> equivalent in the instant case would be for the City of Providence to simply state that Plaintiff Mancini was denied his promotion because he did not score among the top five candidates in the promotion and selection process. <u>See id.</u> at 616 (describing "DPS's proffered reason for her non-selection" as "her failure to score among the top ten candidates in the promotion and selection process."). By contrast, Defendants City of Providence and Colonel Clements have proffered precisely the extent and type of evidence that the <u>Alvarado</u> court

sought—explanations and evidence of how and why the Colonel arrived at Mancini's award of service points, as well as deposition testimony from Colonel Clements and other members on the command staff as to how and why 0 service points were awarded to Plaintiff.  See id. at 617 ("DPS has offered neither an explanation nor evidence of how or why the interviewers arrived at those scores. . . . DPS has not pointed to any deposition testimony by the Board members that would shed light on why they scored Alvarado and the other candidates the way they did."). Applying the reasoning in Alvarado to the instant case compels the conclusion that Defendants have met their burden.

Moreover, as the Alvarado court correctly determined, a defendant's failure to satisfy its burden of production does not entitle the plaintiff to summary judgment.  Despite Plaintiff's erroneous suggestion to the contrary, the Alvarado court reversed a grant of summary judgment in the defendants' favor on the basis that the lower court erred in determining that the plaintiff had not made a prima facie showing of sex discrimination.  See id. at 615 ("Accordingly, the district court erred in granting summary judgment to DPS on the ground that Alvarado failed to make a *prima facie* showing of sex discrimination."). Having thereafter determined that defendants did not satisfy their burden of production, the Alvarado court held that the plaintiff still had the ultimate burden of proving discrimination:

> "Because DPS has not satisfied its burden of producing evidence tending to show that it had a legitimate, nondiscriminatory reason for not appointing Alvarado to the Rangers, we do not reach the question of whether Alvarado could demonstrate pretext of otherwise show that her failure to receive an appointment to the Rangers was actually motivated by sex discrimination. Alvarado's *prima facie* case pretermits summary judgment dismissal of her action, leaving the ultimate question of discriminatory animus to be determined by the trier of fact."

Id. at 618 (internal citation and quotation marks omitted).

Just as in <u>Alvarado</u>, if this Court were to determine that the Defendant has not met their burden of production, it is still Plaintiff's burden to prove his case, and the "ultimate question of discriminatory animus [is] to be determined by the trier of fact." <u>See id.</u>

## V.   DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

### a. *Defendant Is Entitled to Summary Judgment in Its Favor Because Plaintiff Cannot Establish that he Was Disabled within the Meaning of the Law*

Because Plaintiff cannot establish one of the requisite elements of his prima facie case, that he was a member of a protected class, Defendant is entitled to summary judgment in its favor. <u>See Rathbun</u>, 361 F.3d at 71. Plaintiff Mancini alleges that he was a member of a protected class because he was disabled within the meaning of the law.

The Americans with Disabilities Act (ADA) defines disability as follows:

> The term "disability" means, with respect to an individual--
> **(A)** a physical or mental impairment that substantially limits one or more major life activities of such individual;
> **(B)** a record of such an impairment; or
> **(C)** being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).

Plaintiff first argues that he has satisfied the requirements of the first definition of disability set forth in subsection (A)—" a physical or mental impairment that substantially limits one or more major life activities of such individual." However, in order to meet that definition, he must first establish a physical or mental impairment. <u>Id.</u> Equal Employment Opportunity Commission ("EEOC") regulations define a physical or mental impairment as follows:

> (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

Plaintiff has offered no evidence to establish that he had a physical impairment consistent with this definition.

Second, even if Plaintiff can prove that he had a physical or mental impairment, he must then establish that the physical impairment substantially limited one or more major life activities. The statute defines major life activities as follows:

[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

42 U.S.C.A. § 12102(2)(A).  "Substantially limits" is defined by EEOC regulation as follows:

(ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added).

The only evidence Mancini presents to this Court to establish that his purported physical impairment substantially limits one or more major life activities is his own affidavit, prepared for purposes of moving for summary judgment.  (See Pl. Mem. at 14.)  In his affidavit, Mancini avers the following: "At the time I sat for the June 2012 Lieutenants Exam, my physical impairment substantially limited by ability to stand, walk, bend, lift, and work as compared to the average member in society."  (Mancini Aff. ¶ 12.)  This is the extent of his evidence with

respect to this requisite element of his claims.  He has offered no medical evidence, expert or otherwise, to establish his disability.

A genuine issue of material fact "must be built on a solid foundation—a foundation constructed from materials of evidentiary quality." García–González v. Puig–Morales, 761 F.3d 81, 87 (1st Cir.2014) (internal quotation marks omitted) (quoting Nieves–Romero v. United States, 715 F.3d 375, 378 (1st Cir.2013)).  Plaintiff's affidavit sets forth precisely the type of self-serving allegations which, absent other evidence, do not create a genuine issue of material fact.  Reilly v. Cox Enterprises, Inc., C.A. No. 13-785 S, 2016 WL 843268, at *7 (D.R.I. Mar. 1, 2016). It is respectfully submitted that Plaintiff's eleventh hour affidavit with conclusory statements is not of the evidentiary quality that the First Circuit requires to create a genuine issue of material fact.

In the alternative, Plaintiff submits that he was disabled within the meaning of the law because he had a record of a physical impairment.  See 42 U.S.C. § 12102(1)(B).  Pursuant to EEOC regulation, "[a]n individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). To support this proposition, Plaintiff points to two pieces of evidence, presumably to support the proposition that he was misclassified: (1) the fact that he was on IOD status at the time of the promotional exam; and (2) that he had a pending application for a disability retirement at the time of the promotional exam. (Pl. Mem. at 14.) However, as Plaintiff accurately observes, "what matters is what they actually believed." (Id.)

Knowledge that Plaintiff was on IOD or that he sought a disability retirement is not sufficient to establish that Defendants misclassified Plaintiff as having a physical impairment

that substantially limits one or more major life activities.  See 29 C.F.R. § 1630.2(k)(1).  Rather,

the only conclusion that Defendants could properly draw from his retirement application was that

he was no longer capable of performing the duties of his particular job—that of a police officer.

(See Pl. Ex. 4.)  For example, an officer could seek and obtain a disability retirement because he

or she has trigger finger or bowler's thumb and can no longer discharge a firearm. While such

an injury may qualify the officer for a disability pension, it would not mean that the officer had a

disability within the meaning of the ADA.

> **b.** ***If Plaintiff's Knee Injury Substantially Limited His Ability to Stand, Walk, Bend, Lift, and Work at the Time of the 2012 Lieutenant's Examination, then He Was Not Qualified for the Position to Which He Applied***

If Plaintiff was disabled at the time of the 2012 Lieutenant's examination, then he fails to

meet another element of his prima facie case: that he was qualified for an open position for

which he applied.  See Rathbun, 361 F.3d at 71.  Plaintiff makes much of the fact that his light

duty status was terminated and that he was allegedly forced to seek a disability retirement.

Pursuant to the CBA, light duty status is reserved for those officers who are "expected to fully

recover and return to his/her full police duties or other normal duties." (Article X, Section 10 of

the CBA, attached hereto as **Exhibit D**.) Plaintiff's application for disability retirement was

based on his own doctor's determination that he was not going to fully recover and be able to

perform his full duties.

It is respectfully submitted that Plaintiff cannot have it both ways – he wants to be able to

claim that he was disabled at the time of the test, but he also wants to claim that he was capable

of performing the full duties of a police officer and therefore qualified for the position he was

seeking.  If Plaintiff was disabled, as he describes in his affidavit, at the time of the test, and had

been so disabled since November of 2010, then it is hard to see how he was also qualified for the position he was seeking.

      **c.** ***Even if Plaintiff Could Establish that He Was Disabled within the Meaning of the Law, Defendant Is Still Entitled to Summary Judgment As He Can Point to No Evidence that Plaintiff's Alleged Disability Played Any Role in the Colonel's Decision to Award Him Zero Service Points.***

Even if Plaintiff were able to establish that he has a disability within the meaning of the law, the evidentiary record is utterly devoid of any evidence that Plaintiff's knee injury played any role in the Colonel's decision to award him zero (0) service points for the 2012 Lieutenant's examination. The discovery in this case has been extensive and, frankly, excessive. Defendants have produced a mountain of discovery in response to Plaintiff's requests for production. Fifteen (15) depositions have been conducted. While Plaintiff has done a thorough job of exploring myriad conspiracy theories, including an alleged doctoring of the service points after the exam on the part of the Department, the FOP, or both in concert (which theory is conspicuously absent from his motion for summary judgment), he has done very little to elicit evidence or testimony regarding his alleged disability or any discriminatory animus arising from it. What little efforts he has undertaken in that regard have come up empty. He cannot point to any evidence that Plaintiff's alleged disability had anything to do with the Colonel's award of service points.

By contrast, Defendants can point to concrete evidence that Plaintiff's alleged disability and IOD status had nothing to do with the award of service points because it did not factor into his award of service points for any other promotional candidates. Eleven (11) candidates for the 2012 Sergeant's promotional examination were also on injured on duty status at the time that

they signed up to take that examination. (Pl. Ex. 6.)[3] Colonel Clements awarded those candidates the following service points for that 2012 Sergeant's examination:

> John Abatiello – 5
> John Black – 5
> Sean Carroll – 4
> Miguel Castillo – 5
> William Dickie – N/A[4]
> Fausto Garcia – 5
> Trent Hastings – 5
> Leonel Pichs – 5
> Cynthia Rodriguez – 5
> David Schiavulli, Jr. – 5
> Michael Troia – 5

(Award of Service Points for the 2012 Sergeant's Exam, attached hereto as **Exhibit E**; Pl. Ex. 6.) Every candidate on IOD status at the time of the Sergeant's examination received a five (5) for service points, other than Sean Carroll who received a four (4), and William Dickie, who did not meet the criteria for eligibility. It is inconceivable that the Colonel would penalize Plaintiff Mancini for his alleged disability, while simultaneously rewarding these other officers.

## VI.    CONCLUSION

Wherefore, for the reasons set forth herein, Defendant respectfully requests that Plaintiff's Motion for Summary Judgment be denied and that Defendant's Cross-Motion for Summary Judgment be granted.

---

[3]    Plaintiff Mancini was the only candidate for the 2012 Lieutenant's examination on IOD status at the time.

[4]    Although William Dickie signed up to take the examination, it was later determined that he did not meet the eligibility criteria to take the exam and therefore was not awarded service points.

DEFENDANT,
By Its Attorney,

JEFFREY DANA
CITY SOLICITOR

/s/Kevin F. McHugh
Kevin F. McHugh (#3927)
Senior Assistant City Solicitor
Steven B. Nelson (#8142)
Assistant City Solicitor
City of Providence Solicitor's Office
444 Westminster Street, Suite 220
Providence, RI 02903
(401) 680-5333
(401) 680-5520 (Fax)
kmchugh@providenceri.gov
snelson@providenceri.gov

**<u>CERTIFICATION</u>**

I hereby certify that I have filed the within with the United States District Court on this 26th day of May, 2017, that a copy is available for viewing and downloading via the ECF system, and that I have caused a copy to be sent to:

Mark P. Gagliardi
120 Wayland Avenue, Suite 7
Providence, RI 02906

/s/ Karen A. Keevers