UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARK MANCINI,
   PLAINTIFF

      v.

CITY OF PROVIDENCE, by and Through Its
Treasurer, James J. Lombardi, III, and
HUGH CLEMENTS, JR.,
   DEFENDANTS.

:
:
:
:
:
:
:
:
:
:
:
:

C.A. No. 13-092-S-PAS

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT CITY OF PROVIDENCE ON THE ISSUE OF LIABILITY ON COUNTS I, II, III, AND IV OF THE COMPLAINT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, LR cv 56 of the Local Rules of the United States District Court for the District of Rhode Island, and this Honorable Court's Order dated May 10, 2017 (Doc. No.81), Plaintiff Mark Mancini hereby submits this Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment Against Defendant City of Providence on the Issue of Liability on Counts I, II, III, and IV of the Complaint.

For the reason stated herein, the Court should grant Plaintiff's motion.

### INTRODUCTION

This is a case about how the Providence Police Department manipulated the promotional examination process to discriminate against a disabled police officer whom it bullied into applying for accidental disability benefits.  In June 2012, the Providence Police Department denied Sergeant Mark Mancini ("Mancini") a promotion to the position of Lieutenant because he went on Injured-on-Duty Status for a year and then had the audacity to refuse to file for an accidental disability pension after being instructed to do so by his superiors.  Mancini was given an ultimatum — either file the disability retirement papers or the Department would do it for him.  Mancini's lack of

cooperation did not go un-noticed by Colonel Hugh T. Clements, Jr. ("Clements"), the Chief of the Providence Police Department, who rewarded Mancini's conduct by giving him a rating of zero "0" for "service points" — a rating of a promotional candidate's overall work performance — on the June 2012 Lieutenants Promotional Examination (the "June 2012 Lieutenants Exam"), a shockingly low score that is virtually unheard of for a police officer to receive absent glaring misconduct. Several members of the Police Department command staff also assisted Clements in punishing Mancini by recommending shockingly low scores.  Indeed, of the twenty-two (22) police officers who signed up for the June 2012 Lieutenants Exam, Mancini was the only police officer who was on IOD status at the time and also the only candidate who received a "0" for service points.   While Mancini received a whopping zero "0" for service points, 15 candidates received a "5;" 2 candidates received a "4.5;" 2 candidates received a "4;" and 2 candidates received a "3.5."  Adding insult to injury for Mancini was that had Mancini received a one ("1") for service points — a mere pittance of a score — he would have been promoted to Lieutenant.  Not surprisingly, Mancini's award of a "0" came ten (10) days after the City of Providence Retirement Board denied his application of accidental disability benefits.

According to the Collective Bargaining Agreement between the City of Providence and Mancini's union (the "CBA"), service points are awarded at the Chief of Police's sole discretion and like any performance evaluation in the workplace, it involves a degree of subjectivity by the evaluator.  However, Mancini is not just a run-of-the-mill police officer.  He is one of the best police officers in the Providence Police Department with an impeccable service record.  Indeed, Mancini has received no significant discipline in his twenty-two (22) year career.  In fact, Mancini has only been disciplined twice in his entire twenty-two (22) year career, and for only minor infractions — in 1997 for getting into a preventable auto accident and in 2000 for trading assigned details in excess of three times in a six week period.

Furthermore, Mancini's track record for superior work performance as a police officer is undeniable. On a previous promotional exam in 2010, Colonel Dean Esserman, the Chief of Police at the time, awarded Mancini a "5," which was based on a recommendation by Clements, a Major at the time — the same evaluator who awarded Mancini a "0" a mere two years later. On March 28, 2011, fourteen (14) months before the 2012 Promotional exam, Mancini received a stellar performance evaluation from his immediate supervisor, Lieutenant Alyssa DeAndrade — a rating of "Exceptional" — the highest possible rating the Department can give. This performance evaluation was signed by Chief Clements, the same evaluator who gave Mancini a "0" fourteen (14) months later and claims he was the worst performing police officer of all the police officer who sat for the exam. Chief Clements award of a "0" defies logic and there is only one possible explanation — disability discrimination.

To further illustrate, Mancini took the same Lieutenants Exam again in 2015 and 2017, three (3) and five (5) years after the 2012 debacle, and each time, Chief Clements awarded Mancini a "4" for service points. Thus, over a seven (7) year period, Chief Clements' recommendations and awards for service points for Mancini went from a "5" in 2010 to a "0" in 2012 to a "4" in 2015 and a "4" in 2017, yet the only noteworthy event that occurred during this time period is that Mancini became disabled because of an injury suffered in the line-of-duty and refused to file for accidental disability. Nothing else happened. No discipline. No misconduct. No bad performance reviews. No civilian complaints. No abuse of sick time.

There was at least on police officer, Gregory Sion ("Sion") who sat for the June 2012 Promotional Exam and whom received a substantially higher score than Mancini, a 4.5, despite having received severe discipline nine (9) months earlier. Sion also received a lower overall performance rating than Mancini — an "Above Average" as opposed to "Exceptional." And while it is true that the CBA allows Clements the discretion to award a candidate whatever service points

he sees fit, when a candidate who is denied a promotion alleges discrimination, the ball game changes. Here, Clements must do more than simply play lip service to Mancini's allegations of disability discrimination — he must provide evidence of an explanation that is specific, clear, and legally sufficient as to why his subjective assessment of Mancini resulted in a "0." Put simply, if the law allowed an alleged discriminator to remain silent, he could easily hide his illegal conduct, while at the same time, stonewalling the employee from rebutting any possible explanation. Indeed, the employee cannot shoot down reasons that the employer does not provide.

Here, Defendant City of Providence has utterly failed to meet its burden of producing evidence of a legitimate, non-discriminatory reason for awarding Mancini a "0" for service points and, therefore, summary judgment must enter in Mancini's favor because no reasonable jury could find for the Defendant.

## FACTS AND TRAVEL OF THE CASE

Mancini has been working as a police officer for the City of Providence since 1994 (Aff. Mark Mancini at ¶1). Mancini has received discipline only twice in his twenty-two (22) year career and both times occurred when he was a Patrolman (Aff. Mark Mancini at ¶ 3). On May 19, 1997, Mancini received a written warning for getting into a preventable auto accident (Ex. 1: Memo re: Police Car Collision, dated 5-19-97). On April 14, 2000, Mancini was grounded for three tours of duty for trading assigned details in excess of three times in a six week period (Ex. 2: Detail Warning, dated April 14, 2000). In 2004, Mancini was promoted from Patrolman to Sergeant (Aff. Mark Mancini at ¶ 4). Since being promoted to Sergeant, Mancini has not been disciplined (Id. at 4). Furthermore, Mancini has received letters of commendation and memoranda of merit throughout his career (Aff. Mark Mancini at ¶ 6).

### The Promotional Process Within the Providence Police Department

Mancini has made four (4) attempts at promotion to the position of Lieutenant — in 2010, 2012, 2015, and 2017. The Collective Bargaining Agreement (the "CBA") between Defendant City of Providence and Mancini's union, the Fraternal Order of Police, Providence Lodge No. 3 (the "Union"), governs how police officers are promoted within the Providence Police Department (Ex. 3: CBA, Article IV at 15-36). The promotional process consists of a scoring system based on a 100 overall points where each candidate is awarded points as follows: (1) 0-85 points for his or her score on a 100 question, written examination; (2) 0-5 points for his or her level of education; (3) 0-5 points for his or her level of seniority; and (4) 0-5 points for his or her service points (Id.). To arrive at a candidate's overall score, the candidate's raw score on his written examination on a scale of 0 to 100 points is multiplied by eighty-five percent (85%) and added to the points awarded for level of education, level of seniority, and service points (Id.).

For the level of education category, a candidate is awarded points as follows: (a) five (5) points for attaining a bachelor's degree; (b) four (4) points for attaining an associate's degree; (c) three (3) points for attaining 31 to 45 credits; (d) two (2) points for attaining 16 to 30 credits; and (e) one (1) point for attaining up to 15 credits (Id.).

For the level of seniority category, a candidate is awarded points as follows: (a) five (5) points for 15 years of seniority; (b) four (4) points for 13-15 years of seniority; (c) three (3) points for 10-13 years of seniority; (d) two (2) points for 7-10 years of seniority; and (e) one (1) point for 4-7 years of seniority (Id.).

The service category pertains to the candidate's overall performance as a police officer (Id.). Letters of commendation, letters of merit received, and unused sick time may be considered (Id.). Service points are awarded at the Police Chief's sole discretion (Id.).

A candidate's score for service points is determined prior to the administration of the written examination, and the score for service points is forwarded by the Police Chief to the President of the Union (Id.). Each candidate who signs up for a promotional exam receives a score for service points even if the candidate does not actually take the written examination (Id.). After the written examinations are graded, the candidates' examination points are added to the points for education, seniority, and service to arrive at an overall score (Id.). The candidates are then ranked by their overall scores from highest to lowest, and depending on how many positions are to be filled, the candidates with the highest overall scores receive a promotion (Id.).

### The 2010 Lieutenant's Promotional Exam

In 2010, Mancini sat for the Lieutenant's Promotional Exam (Mancini Depo. Tr. Vol. I at 37:13-17). Mancini received a "5" for seniority because he had been on the police force for 16 years; a "5" for education because he had attained a bachelor's degree; and a "5" for service points (Id. at 38:3-11). Mancini was awarded a "5" for service points by Colonel Dean Esserman, the Chief of the Police at the time (Id. at 37:18-19). Ironically, it was Clements, a Major at the time, who recommended to Chief Esserman that Mancini receive a "5." (Clements Depos. Tr. Vol. II at 80:14-23). Mancini did well on the written exam, but did not score high enough to receive a promotion (Mancini Depo. Tr. Vol. I at 37:20-22).

### Mancini's Disability

On November 15, 2010, Mancini injured his right knee while chasing a suspect in the line of duty (Answer at ¶15). On November 17, 2010, Mancini sought medical treatment for his injured right knee (Answer at ¶16). On February 3, 2011, Mancini underwent arthroscopic surgery of his right knee (Answer at ¶17). As a result of his injured right knee, Mancini was placed on "Injured on Duty Status" ("IOD") (Answer at ¶19). In or about May 2011, Mancini returned to work and was placed on "light duty" status (Answer at ¶22). In or about August 2011, Mancini's employer terminated his light duty

status and required him to file with the City of Providence for accidental disability benefits on the grounds that he was incapacitated from his duties as a police officer and should be retired from service (Mancini Depo. Tr. Vol. II at 25:2-5; 25:21-25; 26:1-25; 27:1-15; 32:4-22).  On September 2, 2011, against Sergeant Mancini's wishes and as a direct result of a directive from his employer, Mancini reluctantly filed for accidental disability benefits with the City of Providence Employees' Retirement System (Id. at 26:16-27:15); (Mancini Aff. at ¶16); (Ex. 4:  Mark Mancini's Application for Accidental Disability Retirement, dated September 2, 2011).  Pursuant to his application for accidental disability benefits, Mancini underwent three (3) independent medical examinations ("IMEs") by three (3) physicians engaged by the City of Providence (Answer at ¶25).

On June 27, 2012, the City of Providence denied Mancini's application for accidental disability benefits (Answer at ¶28). (Ex. 5: Letter of Denial of Mark Mancini' Application for Accidental Disability Benefits, dated June 28, 2012).  After Mancini was denied an accidental disability pension, Defendant City of Providence refused to allow him to return to work on light duty status (Mancini Aff. at ¶ 17).

### The June 16, 2012 Lieutenant's Promotional Exam

In 2012, the Defendant sought to fill five (5) Lieutenants positions (Answer at ¶36).  Twenty-two (22) police officers, including Mancini, signed up to take the June 16, 2012 Lieutenants Promotional Examination (the "June 2012 Lieutenants Exam") (Answer at ¶47).  Mancini was the only promotional candidate of the twenty-two (22) police officers who was on IOD Status at the time of the exam (Ex. 6:  Def. City of Providence's Suppl. Answer to Pl.'s Second Set of Ints.)

### Chief Clements Meets With Members of the Command Staff to Hear Recommendations of Service Points for Promotional Candidates.

Approximately one week prior to the June 2012 Lieutenants Exam, Chief Clements met with member of his command staff to discuss recommendations for service points for all candidates who

signed up to take the exam (the "June 2012 Command Staff Meeting"); (Clements Depo. Tr. Vol. I at

84:5-17).  Present at the meeting were:  Deputy Chief Thomas Oates ("Oates"), Major Thomas Verdi

("Verdi"), Major Keith Tucker ("Tucker"), Major Francisco Colon ("Colon"), Captain Robert Lepre

("Lepre"), Captain George Stamatakos ("Stamatakos"), Captain David Lapatin ("Lapatin"), Captain

Anthony Sauro ("Sauro"), Captain William Campbell ("Campbell"), Lieutenant Perez ("Perez"), and

Lieutenant Ready ("Ready") (Id. 85:12-21).  When a list of the candidates' names were called, a

recommendation was made for each candidate (Id. at 95:12-25; 96:1-25).  When Mancini's name was

called, Chief Clements claims a discussion ensued and negative comments were made about Mancini

such as he had a "bad attitude" and he was "not a team player." (Id. at 97:7-10; 97:18-21; 103:10-13);

(Clements Depo. Tr. Vol. II at 48:10-12, 54:13-17, 73:2-15).  Also, many present at the meeting filled

out score sheets containing their recommendations for service points for each candidate (Ex. 7:  Score

Sheets for June 16, 2012 Lieutenant's Exam).

On June 16, 2012, sixteen (16) police officers, including Mancini, took the written portion of

the June 2012 Lieutenants Exam (Answer at ¶48).  On July 7, 2012, ten (10) days after Mancini's

application for accidental disability benefits was denied, Defendant released the results of the June 2012

Lieutenants Exam (Ex. 8:  Lieutenant's Order of Finish, Lieutenant's Promotional Examination Results,

dated 7-6-12).  Mancini received an overall score of 88.2 on the June 2012 Lieutenants Exam (Id.).

Mancini received 78.2 points for the written examination because his raw score was 92 (92 *

85% = 78.2) (Answer at ¶52).  Because Mancini had attained a bachelor's degree, he was awarded five

(5) points for the level of education category (Answer at ¶53).  Because Mancini had 18 years of

seniority at the time of the exam, he was awarded five (5) points for the level of seniority category

(Answer at ¶54).  Mancini received a "0" for service points (Answer at ¶55).  It was Clements, now the

Chief of Police, who awarded Mancini the "0" for service points based on the recommendations of

various members of the command staff (Clements Depo. Tr. Vol. I at 99:10-100:9); (Ex. 9).

Mancini's 88.2 overall score ranked him seventh of the sixteen Sergeants who took the June 2012 Lieutenants Exam and, therefore, he did not receive a promotion to Lieutenant since the Department was only seeking to fill five (5) positions (Id.).

### Mancini's Disability Discrimination Claims

On August 2, 2012, Mancini filed a Charge of Discrimination with the Rhode Island Commission for Human Rights ("RICHR") for violation of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et. seq. ("RI FEPA") and the Civil Rights of Peoples With Disabilities Act, R.I. Gen. Laws § 42-87-1 et. seq. ("CRPWDA"), which was simultaneously filed with the Equal Employment Opportunity Commission (the "EEOC") for violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 et. seq. in which he alleged a failure-to-promote on the basis of a disability and a failure to provide a reasonable accommodation of a disability (Ex. 9: Mancini's RICHR Charge of Discrimination).

On December 4, 2012, the RICHR issued Mancini a Notice of Right to Sue Letter (Answer at ¶ 9).

On December 11, 2012, prior to instituting this suit, Mancini served via certified mail a Notice of Claim upon the Providence City Council pursuant to R.I. Gen. Laws § 45-15-5 (Answer at ¶ 10).

On December 27, 2012, the EEOC issued Mancini a Notice of Right to Sue Letter (Answer at ¶ 11).

On February 6, 2013, Mancini filed the instant lawsuit (Doc. No. 1).

### The 2015 Lieutenant's Promotional Exam

In February 2015, Mancini took the Lieutenant's Exam a third time. This time, Chief Clements awarded Mancini a "4" for service points (Clements Depo. Tr. Vol. II at 114:5-7).

On June 27, 2016, Mancini moved for partial summary judgment, (Doc. No. 63), which the Court denied on November 1, 2016 without prejudice subject to refiling following the Rhode Island Supreme Court's ruling on the issue of individual liability (Doc. No. 77),.

On May 26, 2017, Mancini filed the instant motion.

### LEGAL STANDARD

A motion for summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a rational factfinder could find for either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). The moving party carries the burden of demonstrating that no genuine issue of material fact exists. Id.

In considering whether a genuine triable issue exists, the Court views the record and draws all reasonable inferences in the light most favorable to the nonmoving party. Cont'l Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). The party seeking summary judgment must show that there is "'an absence of evidence to support the nonmoving party's case.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Summary judgment will be denied if "there is enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1985)).

### ARGUMENT

For the reasons stated herein, the Court should grant summary judgment for Mancini on the issue of liability. First, Defendant has not met its burden of production under the second prong of

the McDonnell-Douglas burden-shifting analysis because it has not clearly set forth, through the introduction of admissible evidence, the reasons for the "0" that are clear, reasonably specific, and legally sufficient and, therefore, Mancini has not had a full and fair opportunity to demonstrate pretext. Second, no reasonable jury could find that Mancini's performance of his assigned duties justify an award of a "0" for service points. Third, no reasonable jury could find that Mancini was the least qualified for the position of Lieutenant as compared to the other twenty-two candidates who signed up for the Lieutenant's Exam. Fourth, no reasonable jury could find that in 2012, Defendant had legitimate, non-discriminatory reasons to award Mancini the lowest possible number of service points, a "0," when two years earlier in 2010, it had awarded Mancini the highest possible number of service points, a "5," for the same promotional exam, and three years later in 2015 it awarded him a "4."

I.      **DEFENDANT HAS NOT MET ITS BURDEN OF PRODUCTION UNDER THE SECOND PRONG OF THE McDONNELL-DOUGLAS BURDEN-SHIFTING ANALYSIS BECAUSE IT HAS NOT CLEARLY SET FORTH, THROUGH THE INTRODUCTION OF ADMISSIBLE EVIDENCE, THE REASONS FOR THE "0" THAT ARE CLEAR, REASONABLY SPECIFIC, AND LEGALLY SUFFICIENT AND, THEREFORE, MANCINI HAS NOT HAD A FULL AND FAIR OPPORTUNITY TO DEMONSTRATE PRETEXT.**

When a Title VII plaintiff establishes a prima facie case of unlawful discrimination, the burden of production shifts to the defendant-employer to produce evidence sufficient to rebut the presumption of discrimination. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). The defendant-employer must "articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Once a plaintiff has established a prima facie case of discrimination, "the employer must respond or lose." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 528 (1993) (Souter, J., dissenting on other grounds).

To establish a legitimate, nondiscriminatory reason, ". . . the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The

explanation must be legally sufficient to justify a judgment for the defendant." Burdine, 450 U.S. at 255 (emphasis added). That offered reason must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Id. at 255–56. While the defendant's burden ". . . is only one of production and not persuasion, it is elementary that the evidence produced must be clear, reasonably specific, and legally sufficient . . . . " Tye v. Board of Education, 811 F.2d 315, 318 (6th Cir.); cert. denied, 484 U.S. 924, 108 S.Ct. 285, 98 L.Ed.2d 246 (1987), overruling on other grounds by Kline v. Tennessee Valley Authority, 128 F.3d 337 (6th Cir.1997). See also, St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510 n.3 (1993) (stating that if an employer fails to show a nondiscriminatory reason at trial the plaintiff will win unless his or her prima facie case does not convince the fact finder to infer a discriminatory motive).

While a grant of summary judgment for a plaintiff in a discrimination case is not as common as it is for a defendant, as illustrated in the cases cited infra, courts have routinely rejected an employer's proffered legitimate, non-discriminatory reason where the employer has not meet its burden of production under the second prong of the McDonnell-Douglas burden-shifting analysis. These courts have based their rulings on the grounds that when an employer has failed to provide a factual basis or specific reasons for taking an adverse employment action against an employer two problems arise: (1) a discriminatory animus cannot be ruled out; and (2) the employee cannot prove the employer's reasons are pretext since the employer has not provided specific evidence that can be challenged. Indeed, "[g]eneral and non-time specific testimony does not satisfy the [U.S.] Supreme Court's mandate that the employer articulate in a clear and reasonably specific manner the legitimate, non-discriminatory reasons for its employment decision." Crawford v. Western Elec. Co., Inc., 745 F.2d 1373 (11th Cir. 1984); Burdine, 450 U.S. at 258.

In Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999), the court rejected the defendant's proffered explanation that the plaintiff was not promoted because he was not "the right person for the job." The Court wrote:

> [A]n employer cannot successfully defend a hiring decision against a Title VII challenge merely by asserting that the responsible hiring official selected the man or woman who was "the right person for the job." The problematic nature of such an explanation is most easily seen in the context of discrimination against a minority or female applicant. Such an applicant may never be the "right person for the job" in the eyes of one who feels that the job can only be filled by a White male. The biased decision maker may sincerely believe that the White male who was offered the job was the right person, and minority and female candidates who were rejected were simply wrong for the job. The mere fact that one who discriminates harbors a sincere belief that he hired the "right person" cannot masquerade as a race-neutral explanation for a challenged hiring decision. Such a belief, without more, is not a race-neutral explanation at all, and allowing it to suffice to rebut a prima facie case of discriminatory animus is tantamount to a judicial repeal of the very protections Congress intended under Title VII.

Id. at 166-67.

Patrick v. Ridge, 394 F.3d 311, (5th Cir. 2004), involved a failure-to-promote case based an age where the defendant's assertion for rejecting the plaintiff was that she was "not sufficiently suited" for the position.   The Court wrote:

> Fatal to the INS's position here is the well-established rule that, to meet its burden of production under McDonnell Douglas, an employer must articulate a nondiscriminatory reason with "sufficient clarity" to afford the employee a realistic opportunity to show that the reason is pretextual.   This does not mean that an employer may not rely on subjective reasons for its personnel decisions.   It does mean, though, that to rebut an employee's prima facie case, a defendant employer must articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee. The Eleventh Circuit illustrated this point by contrasting hypothetically legitimate reasons with illegitimate reasons for an employer's refusal to hire a waiter:
>
> > [I]t might not be sufficient for a defendant employer to say it did not hire the plaintiff applicant simply because "I did not like his appearance" with no further explanation. However, if the defendant employer said, "I did not like his appearance because his hair was uncombed and he had dandruff all over his shoulders," or "because he had his nose pierced," or "because his fingernails were dirty," or "because he came to the interview wearing short pants and a T-shirt," the defendant would have articulated a "clear and reasonably

specific" basis for its subjective opinion—the applicant's bad (in the employer's view) appearance.

If the INS believed—and had verbalized—that Patrick was not "sufficiently suited" to fill the SRS position because of her experience, credentials, attitude, or some other such articulable characteristic, the agency's reason might have provided enough detail to enable Patrick to attempt to show pretext. In the face of the INS's bald and amorphous statement that Patrick simply was "not sufficiently suited," however, neither we nor Patrick can identify the kind of evidence needed to demonstrate that such a rank generalization is or is not pretextual.

In fact, the explanation given by the INS, i.e., that Patrick was not "sufficiently suited" for the position—even including Pomplun's belief that she would not "fit in"—does not necessarily qualify as a "nondiscriminatory" reason. After all, a hiring official's subjective belief that an individual would not "fit in" or was "not sufficiently suited" for a job is at least as consistent with discriminatory intent as it is with nondiscriminatory intent: The employer just might have found the candidate "not sufficiently suited" because of a protected trait such as age, race, or engaging in a protected activity. We hold as a matter of law that justifying an adverse employment decision by offering a content-less and nonspecific statement, such as that a candidate is not "sufficiently suited" for the position, is not specific enough to meet a defendant employer's burden of production under McDonnell Douglas. It is, at bottom, a non-reason.

Id. at 317.

In Prudencio v. Runyon, 986 F.Supp. 343 (W.D.Va. 1997), the defendant speculated that the plaintiff was not hired because her name was inadvertently removed from the applicant list because of an administrative or computer error. Id. at 348–49. The court rejected the reason as speculative. Id. at 350. The Court wrote:

the [employer's] concession that it does not know the reason for the exclusion of the plaintiffs from the employment candidates' list, is the logical and legal equivalent of proffering no reason for the omission. Because, as a matter of law, "no reason" cannot serve as a "legitimate, nondiscriminatory reason," the plaintiffs' prima facie showing of national origin discrimination remains unrebutted. Under the McDonnell Douglas framework, then the [plaintiffs] are entitled to judgment as a matter of law.

Id.

In U.S. E.E.O.C. v. Target Corp., the Court held that the employer's proffered reason for not hiring plaintiff did not constitute a legitimate, nondiscriminatory reason for failing to hire plaintiff. 460 F.3d 946, 958 (7th Cir. 2006). Target stated: "[b]ased upon [his] interview, Target

decided that [Daniels] did not meet the requirements for an ETL position, and therefore elected not

to hire him as an ETL." The Court noted that "[t]he employer must explain its claimed reason for

rejecting the applicant clearly enough to allow the court to focus its inquiry on whether the employer

honestly believed that reason and to allow the plaintiff to identify the kind of evidence it must

present to demonstrate that the reason is a pretext. Id. at 957. Accordingly, "Target should have

articulated what requirements [plaintiff] failed to meet; Target presented an ostensibly objective

nondiscriminatory reason but failed to articulate what criteria informed this reason. Target's

proffered reason is insufficient to satisfy its burden to frame an issue of fact so that the court and

the EEOC can identify what evidence might rebut that reason." Id. at 958.

In Alvarado v. Texas Rangers, 492 F.3d 605 (5th Cir. 2007), a case factually on point to this

one, a police officer claiming a discriminatory denial of a promotion, the Firth Circuit reversed the

lower court's grant of summary judgment for the employer on the grounds that the employer had

not met its burden of production under the second prong of the McDonnell-Douglas burden-

shifting analysis because the employer had not explained specifically the reasons behind the

plaintiff's low scores on an oral interview portion of a promotional exam.

Alvarado involved a female police officer who applied for a Sergeant position with the Texas

Rangers.[1] The promotional process consisted of a written examination and an oral interview before

a six member Board. The Board members were instructed to evaluate each candidate on a scale of 0

to 500, with the "objective being to identify those who are the best qualified and to distinguish them

by the rating" given. Alvarado received scores of 300, 390, 345, 345, 325, 375, for an average of

347.5 after eliminating the high and low scores. When the candidates were ranked according to their

cumulative scores, Alvarado placed twenty-ninth. The top ten candidates, all of whom were male,

---

[1] The Texas Ranger Division commonly called the Texas Rangers, is a law enforcement agency with statewide jurisdiction in Texas.

were then offered the Ranger Sergeant positions.  Alvarado brought a Title VII claim for gender

discrimination and the lower court granted summary judgment for the employer.

In reversing the district court's grant of summary judgment, the Alvarado court wrote:

> An employer's subjective reason for not selecting a candidate, such as a
> subjective assessment of the candidate's performance in an interview, may serve as a
> legitimate, nondiscriminatory reason for the candidate's non-selection. See id. at 317
> (recognizing that McDonnell Douglas does not preclude an employer from relying
> on subjective reasons for its personnel decisions); see also Chapman v. AI Transport,
> 229 F.3d 1012, 1034 (11th Cir. 2000) ("It is inconceivable that Congress intended
> anti-discrimination statutes to deprive an employer of the ability to rely on important
> criteria in its employment decisions merely because those criteria are only capable of
> subjective evaluation."). Such a reason will satisfy the employer's burden of
> production, however, only if the employer articulates a clear and reasonably specific
> basis for its subjective assessment. See Burdine, 450 U.S. at 258, 101 S.Ct. 1089;
> Patrick, 394 F.3d at 316-17; see also Chapman, 229 F.3d at 1034 ("A subjective
> reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant
> articulates a clear and reasonably specific factual basis upon which it based its
> subjective opinion."); EEOC v. Target Corp., 460 F.3d 946, 957-58 (7th Cir. 2006)
> (agreeing with the Eleventh Circuit that "an employer must articulate reasonably
> specific facts that explain how it formed its [subjective] opinion of the applicant in
> order to meet its burden under Burdine"). DPS has failed to do so here.
>
> Although the evidence shows that Alvarado received interview scores of 300,
> 325, 345, 345, 375, and 390, for a cumulative score of 347.5, DPS has offered neither
> an explanation nor evidence of how or why the interviewers arrived at those scores.
> Nor has DPS provided any evidence of why the Board rated the other candidates,
> particularly the ten men who were selected for the Rangers, higher than Alvarado.
> Alvarado's score sheets contain no notes or comments on her interview
> performance, and DPS has not pointed to any deposition testimony by the Board
> members that would shed light on why they scored Alvarado and the other
> candidates the way they did. Without some indication of the factual basis or specific
> reasons for Alvarado's interview score, the score says nothing about whether her
> non-selection for the Rangers was the product of intentional sex discrimination.
> Instead, the score "is at least as consistent with discriminatory intent as it is with
> nondiscriminatory intent" because Alvarado may well have received the relatively
> low interview score on account of her sex. See Patrick, 394 F.3d at 317. Because
> DPS has pointed to no evidence in the summary judgment record that clarifies or
> expands upon why Alvarado received the relatively low interview score, DPS's
> ostensibly legitimate, nondiscriminatory reason for Alvarado's non-selection--her
> performance in the promotion and selection process--is insufficient to satisfy DPS's
> burden of production. See, e.g., Target, 460 F.3d at 958-59 (holding that the
> company's stated reason for not hiring one of the plaintiffs--its determination, based
> upon the plaintiff's interview, that he did not meet the requirements for the position-
> -was insufficient to satisfy its burden of production because the company failed to
> articulate what criteria informed its decision and what requirements the plaintiff did

not meet); cf. Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1106 (11th Cir. 2001) (holding that the employer met its burden of production because its proffered reason for not hiring the plaintiff--his poor interview--was supported by reasonably clear and specific explanations from the interviewers as to what made the plaintiff's interview "poor"); Chapman, 229 F.3d at 1035 (same).

> . . . We simply hold that, given DPS's failure to evidence the grounds for the Board's scoring of Alvarado and the other candidates in the second, subjective stage of the promotion and selection process, DPS has failed to proffer a reason for Alvarado's non-selection that, if believed, would allow the jury to conclude that Alvarado's non-selection was not the result of intentional sex discrimination.

Id. at 616-617.

Here, Mancini is able to establish a prima facie case of disability discrimination and Defendant has failed to provide any evidence of an explanation for Mancini's "0" that is clear, reasonably specific, and legally sufficient. As the above cases illustrate and as explained below, the reasons Clements and members of the command staff have provided for why Mancini received such low recommendations are either too vague or unsupported by any evidence-on-the-record such that they constitute "non-reasons" for the adverse employment decision. Therefore, there is no need for a trial and the Court should grant summary judgment for Mancini on the issue of liability.

### A.    MANCINI IS ABLE TO ESTABLISH A PRIMA FACIE CASE OF A FAILURE-TO-PROMOTE ON THE BASIS OF A DISABILITY.

To establish a prima facie of discrimination in a failure-to-promote case, a plaintiff must produce evidence that: (1) he is a member of a protected class; (2) he was qualified for an open position for which he applied; (3) he was rejected; and (4) someone possessing similar qualifications filled the position instead. Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004).

Here, Mancini is able to establish all of the elements of a prima facie case. First, at the time of the 2012 Lieutenant's Exam, Mancini was disabled within the meaning of the law. Second, Mancini was qualified to be a Lieutenant, and he applied for on open position in June 2012. Third, Mancini did not receive a promotion. Fourth, five (5) police officers with similar qualifications to Mancini were promoted.

1. **At time of the 2012 Lieutenant's Exam, Mancini was disabled within the meaning of the law.**

A person has a disability, and therefore qualifies for protection under state and federal law, if that person has: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) is regarded as having such an impairment. 42 U.S.C. §§ 12102(2), 12112; R.I. Gen. Laws § 28-5-6(5); R.I. Gen. Laws § 42-87-1(1); R.I. Gen. Laws § 42-112-1 et seq.

A "qualified individual" means a person who, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds or desires. R.I. Gen. Laws § 42-87-1(6).

(a) **At the time of the June 2012 Lieutenant's Exam, Mancini had a physical impairment that substantially limited one or more of his major life's activities.**

To prove he was disabled, Mancini must establish that he had: (1) a physical or mental impairment; (2) that substantially limits; (3) one or more of his major life activities. R.I. Gen. Laws § 42-87-1(1).[2] "Major life activities" include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working. Id. § 42-87-1(5). "Substantially limits" includes an impairment that substantially limits one major life activity, but need not limit other major life activities in order to be considered a disability. Id. § 42-87-1(7)(i). An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. Id. § 42-87-1(7)(ii). The EEOC defines substantially limits as "unable to perform a major life activity that the average person in the general population can perform" or [s]ignificantly restricted as to the condition, manner or duration under which an individual can

---

[2] An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity. R.I. Gen. Laws § 42-87-1(4).

perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). Moreover, the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as [m]edication . . . ." Id. § 42-87-1(7)(iii). Finally, there is no rule or requirement that a plaintiff alleging disability discrimination must utilize medical testimony to prove his case. Katz v. City Metal Co., Inc., 687 F.3d 26, 32 (1st Cir. 1996) ("There is certainly no general rule that medical testimony is always necessary to establish disability. Some long-term impairments would be obvious to a lay jury (e.g., a missing arm) and it is certainly within the realm of possibility that a plaintiff himself in a disabilities case might offer a description of treatments and symptoms over a substantial period that would put the jury in a position where it could determine that he did suffer from a disability within the meaning of the ADA.").

Here, Mancini suffered from a physical impairment when he injured his right knee on November 15, 2010 in the line of duty chasing a suspect. (Answer at ¶15). Mancini's physician, Michael D. Feldman, diagnosed him with *chondromalacia* of the right knee (Mancini Aff. at ¶ 8). Mancini's injury required physical therapy and eventually surgery on February 3, 2011 (Mancini Aff. At ¶¶ 9-10). Mancini's knee injury substantially limited his ability to stand, walk, bend, lift, and work such that he could not perform the essential functions of the Sergeant's position and, therefore, he was placed on IOD Status (Mancini Aff. ¶14). Eventually, Mancini's knee injury improved, and he returned to work on light duty status in May 2011 (Mancini Aff. ¶12). If Mancini did not undergo mitigating measures such as taking anti-inflammatory and pain medication, he would not have been able to return to work when he did (Mancini Aff. ¶15).

**(b) At the time of the June 2012 Lieutenant's Exam, Mancini had a record of a physical impairment.**

At the time of the June 2012 Lieutenant's Exam, Mancini was on IOD Status as a result of his injured knee (Ex. 6). Furthermore, Defendants directed Mancini to apply for retirement on accidental disability benefits on September 2, 2011 (Ex. 4). It is undisputed that Plaintiff's superiors completed a disability retirement application for his forced retirement because he was unwilling to seek retirement (Pasquale Granata Depos. Tr. at 91:19-25). For all purposes, it must be assumed and the defendants must be charged with the contemporaneous belief that both plaintiff had a disability and that his disability was so severe that it was sufficient to warrant seeking a disability retirement. While plaintiff's superiors were factually mistaken that plaintiff's disability warranted a disability retirement, what matters is what they actually believed. See generally, Heffernan v. City of Paterson, 136 S. Ct. 1412 (2016).

**(c) At the time of the June 2012 Lieutenant's Exam, Mancini was a "qualified individual" within the meaning of state and federal law.**

Mancini was able to perform the essential functions of the Sergeant's position with reasonable accommodations. Mancini's first reasonable accommodation was a leave-of-absence — he was placed on IOD Status — to allow him to recover fully from his workplace injury. Mancini's second accommodation was being placed on light duty status at the Records Bureau until he could fully recover from his workplace injury and resume his full duties.

**2. Mancini was qualified to be a Lieutenant when he applied for the June 2012 Lieutenant's exam.**

Mancini's most recent overall performance evaluation prior to going on IOD status rated his work performance as "Exceptional," and his direct supervisor wrote: "Mark is an exceptional supervisor." (Ex. 10: Providence Police Department, Supervisor Performance Evaluation, Mark Mancini, dated March 28, 2011). Mancini's two most recent supervisors, Monte Monteiro and Alyssa

DeAndrade raved about his work performance. See infra, Part II, subparts A and B.  As of June 2012, there is no evidence-on-the-record that Mancini had abused sick time or that any civilian complaints had been made against him.  In fact, Mancini's most recent discipline as of June 2012 occurred in 2000 twelve (12) years earlier, and it was minor discipline (Ex. 2).  Finally, Mancini tied for the second highest score on the written examination out of the sixteen (16) police officers who sat for the exam with a raw score of 92 (Ex. 8), which is further irrefutable evidence that Mancini was more than qualified to be promoted to the position of Lieutenant.

### 3.   Mancini did not receive a promotion.

This fact is not in dispute.

### 4.   Five (5) police officers with similar qualifications to Mancini were promoted.

The five (5) officers who received promotions ahead of Mancini were:  (1) Kevin Lanni; (2) Joseph Donnelly; (3) Richard Fernandes; (4) Joseph Acampora; and (5) George Smith (Id.).  There is no evidence-on-the-record that any of these officers had any unique qualifications that Mancini did not possess.  In fact, Donnelly, Fernandes, and Acampora scored lower than Mancini on the written exam, while Smith scored the same as Mancini (Id.).  Furthermore, Mancini had more seniority than Lanni, Acampora, and Smith and a higher level of education than Donnelly and Smith (Id.).  Finally, as of June 2012, Mancini's most recent overall performance evaluation of "Exceptional" (Ex. 10) exceeded both Donnelly's (Ex. 11:  Providence Police Department, Supervisor Performance Evaluation, Joseph Donnelly, dated January 5, 2012) and Fernandes' (Ex. 12: Providence Police Department, Supervisor Performance Evaluation, Richard Fernandes, dated January 11, 2012) most recent overall performance evaluations, both of whom received a rating of "Above Average."

**B.**     **DEFENDANT CITY OF PROVIDENCE HAS FAILED TO PROVIDE ANY EVIDENCE OF AN EXPLANATION FOR MANCINI'S ZERO THAT IS CLEAR, REASONABLY SPECIFIC, AND LEGALLY SUFFICIENT AND, THEREFORE, THE COURT MUST GRANT SUMMARY JUDGMENT FOR MANCINI ON THE ISSUE OF LIABILITY.**

Clements has been given several opportunities to explain his irrational, head-scratching decision to award Mancini the lowest score for service points of all twenty-two (22) police officers who signed up for the 2012 Lieutenants Exam.  Yet Clements has blown every opportunity to explain himself.  And the reasons Clements did not explain in detail why he awarded Mancini a "0" is either because he does not have a legal reason or he does not want to allow Mancini an opportunity to prove his reasons are bogus.  As such, because Clements has not provided reasons for the "0" that are clear, reasonably specific, and legally sufficient as referenced by the cases cite to in Section I <u>supra</u>, the Court must grant summary judgment for Mancini on the issue of liability.

<u>Clements' Response to Mancini's Interrogatory</u>

On September 30, 2014, Mancini propounded a single interrogatory to Defendant Clements:

> Fully describe the reason(s) behind and the circumstances of the decision to award Plaintiff zero ("0") "Chief Points" or "Service Points" on the June 16, 2012 Lieutenants' Promotional Examination and include:

a.     each and every reason why Defendant made the decision;
b.     the criteria, policy or rule relied upon by Defendant in making the decision;
c.     every fact that Defendant relied upon when making the decision;
d.     every individual with knowledge of the fact(s) which were relied by Defendant in making its decision;
e.     all documents that were consulted by Defendant in making its decision;
f.     any inquiry, communication or investigation, that was conducted by Defendant for the purpose of arriving at its decision;
g.     each and every individual who participated in any way in the decision-making process;
h.     the role each identified individual had in the Defendant's decision;
i.     the date on which the decision was made; and
j.     the individual(s) with final authority to make the decision.

(<u>Ex.</u> 13:  Pl.'s First Set of Ints. Def. Clements).

Chief Clements responded to interrogatory as follows:

a.    I took into account the following:
  ·   Sergeant Mancini's work performance.
  ·   The recommendations of the command staff and high ranking supervisors of the uniformed division, patrol bureau.
  ·   Sergeant Mancini's personnel file.
  ·   Sergeant Mancini's performance evaluations

b.    Article IV, Section 3 of the Collective Bargaining Contract

c.    I relied upon his work performance from the last Sergeant's examination he took up until June of 2012.  In addition I relied upon the opinion of my command staff and high ranking supervisors in the uniformed division, patrol bureau.

d.    In addition to me, Major Verdi, Ret. Major Tucker, and Commander Oates have knowledge of what facts I relied upon in my decision.

e.    I consulted Sergeant Mancini's personnel file, the score sheets of the command staff and other supervisors. Sergeant Mancini's performance evaluation and Article IV Section 3 of the collective bargaining contract.

f.    I consulted with my command staff and other officers above the rank of Captain as well as the bosses in the uniformed division patrol bureau.

g.    Commander Oates, Major Verdi, Major Colon, Retired Major Tucker, Captain Campbell, Lieutenant Perez, Captain Stamatakos, Captain Lapatin, and Captain Lepre participated in the decision making process.

h.    Except for me, the role of the aforementioned officers was to advise me of their opinion of Sergeant Mancini.

i.    June 14, 2012
j.    Colonel Hugh Clements.
(Ex. 14:  Def. Clements Answers Pl.'s First Set of Ints).

Clements' response fully described nothing.  Rather, he gave a description of the process he followed in arriving at his decision to award Mancini a "0" for service points — the documents he examined (personnel file, scores sheets, and evaluations) and people with whom he consulted (various commanding officer), but Clements never answered "The $64,000 Question," which is why he made the decision to award Mancini a "0."  Furthermore, Clements never provided the underlying facts on which he relied in awarding the zero.  Respectfully, this ends the ballgame for the Defendant.  By way of example, suppose a plaintiff alleging race discrimination did what Defendant has done here — respond to an interrogatory seeking the factual basis for his claims by

stating: "because they treated me differently than whites," without explaining the specific details that formulate the basis of his allegation. Such a case would never make it to a trial, nor should it. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir.1991) ("summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation.").

Here, this Court should hold the employer to the same standard it has done routinely to employees who bring weak claims of employment discrimination before this Court — by utilizing Rule 56 for its intended purpose which is to weed out claims where there is only one likely outcome at trial so as not to waste the Court's valuable resources and time with an unnecessary jury trial. Indeed, an employer who cannot produce specific evidence to support its actions should be treated the same as an employee who cannot provide specific evidence of discrimination of how he was discriminated against — with summary judgment.

**Clements' Deposition Testimony**

On June 10, 2015 and June 17, 2015, Mancini took the deposition of Clements. Clements testimony offered little clarification over his interrogatory response that was really a non-response. Clements gave broad reasons for the "0," but never explained them in any specific detail such that a jury could find that the employer's decision was not motivated by discrimination or in a way that would allow Mancini an opportunity to prove the reasons were pre-textual.

When Clements was asked to explain why Mancini was awarded a "0" for service points, he desperately tried to formulate a laundry list of reasons:

(1)  he relied heavily on the recommended scores of his command staff, particularly the people who were going to be supervising Mancini: Verdi, Lepre, Lapatin, and Campbell;
(2)  Mancini had a bad attitude;
(3)  Mancini was not a team player;
(4)  Mancini did not get along with his peers;
(5)  Mancini just comes to work and leaves;
(6)  Mancini did not request overtime; and
(7)  Mancini did not involve himself in community service

However, when Clements was pressed repeatedly for specific details and for clarification, he was either unable to do so or he was forced to concede that his proffered reasons were not the actual reasons Mancini received a "0." Importantly, Clements could not explain how or why some members of the command staff arrived at their low score recommendations for Mancini. Clements did not even know the criteria that these commanders utilized in formulating their scores for Mancini, nor did Clements know which commanders ever had first-hand experience working with or supervising Mancini. Finally, Clements could not explain why he settled on awarding Mancini a "0" as opposed to adopting some of the other recommended scores — a 1, 2, or a 3.

**1.  Clements has failed to articulate a clear and reasonably specific basis for his subjective assessment of Mancini because he does not know the reasons, nor can he explain the reasons, why the command staff gave recommendations of low scores for Mancini**

Clements testified that the main reason he gave Mancini a "0" is because he relied heavily on the recommendations of the command staff, specifically scores sheets that were completed during the June 2012 Command Staff Meeting and handed to Clements sometime thereafter. (Ex. 7). However, Clements does not know the factual basis on which these scores are based.

The recommendation for service points from the scores sheets for Mancini were as follows:

1.  Tucker          3
2.  Oates           0
3.  Lapatin         2
4.  Verdi           1
5.  Colon           0
6.  Lepre           0
7.  Campbell        2

(Id.)

Indeed, Clements did not explain specifically how or why any members of the command staff gave Mancini low scores, nor did he ask them the specific reasons for their low recommendations. As such, Clements has not explained in specific detail his subjective evaluation of Mancini resulting is a "0" for service points.

### Deputy Chief Thomas Oates' Recommendation of a "0" for Service Points

Deputy Chief Thomas Oates recommended Mancini receive a zero for service points.

Clements was unsure if Oates had ever observed Mancini perform his job duties (Clements Depos.

Tr. II at 59:22-24) ("Q. What about Oates, had Mancini ever worked under Oates? A. I'm not

sure.").

Clements testified regarding the basis for Deputy Chief Oates' recommendation:

Q. Deputy Chief Oates recommended that Mancini get a zero, correct?
**A. Yes.**

Q. Do you recall what Deputy Chief Oates said about Sergeant Mancini's overall work performance?
**A. At that meeting, no.**

Q. What about after the meeting?
**A. Later, before he turned in the final scores, he spoke about some of the negative things I spoke about at the last session.**

Q. Well, tell me exactly what Deputy Chief Oates said. This is very important.
MR. MCHUGH: Move to strike, This is very important. You can answer. Objection as to form.
**A. I don't know exactly what Commander Oates said. I don't.**

Q. Okay. He gave Sergeant Mancini a zero, right?
**A. Correct.**

Q. That was the lowest possible score you could have given him, right?
**A. Yes.**

Q. So tell me about the discussion you had with Tom Oates about why he is recommending the lowest possible score to Sergeant Mancini?
MR. MCHUGH: Objection to form. You can answer.

**A. Before I turn the points in, he gave me his sheet. I asked him what he was giving all the candidates. He told me. He turned this sheet into me specifically. I don't know what he said specifically. I don't.**

Q. Did you ask him why he was giving Mancini a zero?
**A. In general, he spoke about some negative attitude and not a team player. In specifics, I can't tell you.**

Q. Did you ask Tom Oates why you thought Mark Mancini had a negative attitude?
**A. No.**

Q. Did you ask Tom Oates why he thought Mark Mancini was not a team player?
**A. No.**

Q. Why not?
**A. I didn't.**

Q. I mean, were you surprised to see that he gave Mancini a zero?
**A. Somewhat, yes.**

Q. Were you aware of any altercation that Mancini had with Tom Oates that would
have caused him to say that he had a negative attitude?
**A. No.**

Q. Okay. So Tom Oates didn't give you any specific details about why he thought
Mancini had a negative attitude and was not a team player, right?
**A. Correct.**

Q. Okay. Do you think Deputy Chief Oates just has a personalty, or had a
personality conflict with Mancini, just didn't like him?
**A. I have no reason to believe that.**

Q. So you were surprised that he got a zero, but you didn't try to find out why he got
a zero, right?
**A. In specific, no.**

Q. Why not?
**A. That was his final assessment. I ask for their input, the members of the
command staff in particular.**

(Id. at 47:4-52:8).

### Oates' Deposition Testimony

Oates' deposition testimony sheds little light on the reason for Mancini's "0." Oates

originally recommended Mancini get a "3" for service points, but then later changed his

recommendation to a "0" after Clements told him he had spoken to individuals in the command

staff who did not recommend Mancini for a promotion (Oates Depos. Tr. at 37:5-19). Oates

further testified that he "might have" heard that Mancini had a bad attitude and was not a team

player, but could not identify the individuals who made these claims or when they were made. (Id.

67:24-68:20).

### Deputy Chief Thomas Verdi's Recommendation of a "1" for Service Points

Thomas Verdi recommended Mancini receive a one for service points.  Clements testified

regarding the basis for Deputy Chief Oates' recommendation:

> Q. Were you surprised that Tom Verdi recommended that Mancini get a one?
> **A. Again, somewhat, yes.**
>
> Q. So if you were surprised, why didn't you ask him why he was giving him a one?
> **A. I ask for the command staff's best recommendation for, to forward me service points. In the end, that is his final assessment. I don't recall a specific conversation.**
>
> Q. That doesn't answer my question. Why didn't you ask him?
> **A. I may have. I don't recall**
>
> Q. You asked Tom Oates why he gave Mancini a zero, right?
> **A. Right.**
>
> Q. But you didn't ask Mr. Verdi why he gave Mancini a one?
> **A. I may have. I don't recall.**
>
> Q. Did Tom Verdi comment on Sergeant Mancini's work performance at this meeting?
> **A. I don't recall specifically what he said. Everybody was involved in the conversation. I don't recall exactly what he said.**

(Id. at 58:13-59:10).

### Verdi's Deposition Testimony

Verdi also did not provide any specifics on why Mancini received a "0."  Verdi testified that

no one had anything redeeming to say about Mancini at the meeting, but could not provide any

specifics details (Verdi Depos. Tr. 68:24-69:4).

### Francisco Colon's Recommendation of a "0" for Service Points

Francisco Colon recommended Mancini receive a zero for service points.  Clements testified

regarding the basis for Colon's recommendation:

> Q . Frank Colon recommended that Sergeant Mancini get a zero, right?
> **A. Yes.**
>
> Q. Were you surprised that Major Colon recommended Mancini get a zero?
> **A. Yes.**

Q. Why?
**A. Because it's the lowest**

Q. Did you ask Major Colon why he gave Mancini a zero?
**A. I don't recall the specifics and what the conversation was, but I would say that 1 was surprised, yes.**

Q. Do you recall if at the meeting Major Colon spoke about Sergeant Mancini's work performance?
**A. In particular, I don't know if he did.   Again, this is a wide-open conversation, that the meeting takes place for a very long time**

Q. Do you know if he spoke at all about Mancini?
**A. I'm not sure.**
(Id. at 63:12-64:7).

### Colon's Deposition Testimony

Colon testified that he thought Mancini was a "negative police officer" and that he was "less than responsive" with Sergeant Granata regarding the paperwork he was required to provide in connection with being out on IOD (Colon Depos. Tr. at 20:4-23).  Colon could not provide any examples of Mancini being a negative officer and claims that his opinion was based on communications with other officers who supervised Mancini and believed he was "not the best performer." (Id. at 23:2-22).  Colon recommended Mancini receive a "0" based on his lack of responsiveness with Granata and based on conversations with supervisors (Id. at 43:18-44:1). Importantly, Colon could not explain why he recommended a "4.5" for an officer who was demoted due to using excessive force, but recommended Mancini get a "0" for not turning in paperwork, which he conceded was not as serious an offense. (Id. at 63:8-22; 71:13-24).

### Robert Lepre's Recommendation of a "0" for Service Points

Robert Lepre recommended Mancini receive a zero for service points.  Clements testified regarding the basis for Lepre's recommendation:

Q.     He gave, he recommended Mancini get a zero, right?
A.     Yes.

Q.   Were you surprised that he recommended Mancini get a zero?
**A.   Yes.**

**Q.**   Did you ask him why he recommended Mancini get a zero?
**A.   I'm sure I did.**

Q.   What did he say?
**A.   I don't recall specifically, but I'm sure I did.**

Q.   Do you recall if Captain Lepre spoke about Mancini's work performance at this meeting?
**A.   I don't recall specifically what Bobby Lepre Said, I don't.**

(Id. at 64:8-65:10).

Here, because Clements cannot articulate a clear and reasonably specific basis for his subjective assessment of Mancini in awarding the "0," the employer has not met its burden of production. And while some of the commanders may have had been able to come up with a "reason" when pressed at a deposition for why they recommended low scores for Mancini, these reasons were not clear and reasonably specific enough to rule out disability discrimination as a motivating factor for the low scores or to allow Mancini an opportunity to prove pretext. Ironically, the most specific reason provided by a commander for a low recommendation was by Colon, whose reason for a "0" was directly related to Mancini's disability (IOD status). Not surprisingly, every member of the command staff who recommended low scores for Mancini had constructive knowledge of Mancini's IOD status at the time of the June 2012 Exam because the identity of office on IOD status were posted in plain view on a bulletin board in the Command Staff Meeting Room (Granata Depo. Tr. at 37:9-38:10). Furthermore, every member of the command staff who recommended low scores for Mancini knew he had filed for accidental disability benefits.

Importantly, Clements never knew these commanders' reasons for recommending low scores when he made his final subjective assessment of Mancini in awarding him a "0," nor could Clements explain his reason(s) or the commanding officers' reason(s) in an interrogatory or at a deposition. Indeed, awarding Mancini a zero <u>primarily because someone else recommended he get a</u>

zero is not a reasonably clear and specific explanation as required under the law. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).  Rather, it only explains how Mancini got a "0," not why he got a "0."  It would be no different than if Clements stated "Mancini got a "0" because I wrote down a "0" in the service point column next to his name on a list of candidates and faxed it to the union."

### a.  Clements did not know whom among the Command Staff ever observed Mancini perform his duties as a police officer.

Major Francisco Colon, who recommended Mancini receive a "0," admitted that he never had the opportunity to observe Mancini perform his duties as a police officer (Colon Depo. Tr. at 19:1-18).  Likewise, Deputy Chief Thomas Oates, who also recommended Mancini receive a "0," admitted that he never had the opportunity to observe Mancini perform his duties as a police officer prior to June 2012 (Oates Depo. Tr. at 14:7-17).  Indeed, asking a commander with no first-hand knowledge of Mancini's ability to perform his job duties to assess Mancini's abilities would be no different than if Clements asked a custodian or a secretary at the Police Department to make a recommendation of service points for Mancini.

### b.  Clements does not know what criteria the command staff utilized in assessing candidates

Clements reliance on the commanders' subjective assessment of Mancini's work performance further strengthens Mancini's argument that Defendant has not met its burden of proof under the second prong of McDonnell-Douglas when considering that Clements had no clue about the specific criteria the command staff were utilizing.  Clements testified:

> Q. Well, what did the command staff and supervisors, what factors do they consider in assessing overall performance?
> **A. Not sure individually.**
> Q. Did you ever have a discussion amongst the command staff and supervisors at one of these meetings, This is the criteria we need to evaluate these candidates on when awarding service points, so that there is a uniform way of awarding them?

A. We had many conversations surrounding that particular point. We, at the time of this awarding of service points, we had never nailed down exactly what that was going to be.

(Clements Depo. Tr. Vol. II at 88:16-89-7).

c. **Clements cannot explain why he settled on awarding Mancini a "0" as opposed to some of the other recommended scores such as a "1" or a "2."**

Clements testified that he relied on the recommended scores of the command staff, which were: 1-three, 2-two's, 1-one, and 3-zeros (Clements Depo. Tr. Vol. II at 70:5-71:10). As such, Clements had three other options other than awarding Mancini a "0." Clements further testified that he placed more emphasis on the recommendations of the commanders that were going to be supervising Mancini as a Lieutenant, specifically Verdi, Lepre, Lapatin, and Campbell (id.), who recommended Mancini receive a 1, 0, 2, and 2, respectively (Ex. 7). Yet only one of these four commanders recommended Mancini receive a "0." If Clements placed more emphasis on these four commanders' recommendations, and only one recommended a "0," why did Clements settle on the "0" as opposed to a 1 or 2, which would have resulted in Mancini's promotion? Once again, Clements has failed to explain specifically how he arrived at his subjective assessment of Mancini.

2. **Defendants have not met their burden of producing evidence of alleged negative comments made about Mancini at the June 2012 meeting of the Command Staff — that Mancini had a bad attitude, was not a team player, did not work well with his peers, did not request overtime, and did not attend community events.**

Clements claims that some commanders made negative comments about Mancini at the June 2012 Command Staff meeting — he had a bad attitude, he was not a team player, he did not get along well with his peers, he did not request overtime, and he did not attend community events. However, true to form, Clements could not remember any specifics details about what was said, who made the comments or the context within which the comments were made.

Clements claims George Stamatakos stated Mancini had a bad attitude, but Clements did not provide any specific details regarding the factual basis for Stamatakos' underlying claim or the factual basis for anyone else's opinion (Clements Depos. Tr. Vol. II at 73:10-15) ("Q.  Did George Stamatakos point to any specific conduct by Mark, Mark Mancini that he thought was evidence that he wasn't a team player? A. Not that I can recall."); (Id. at 84:17-85:1) ("Q. None of the folks that were present at that meeting to award chief points in 2012 can give you any specific examples of why they thought Mark Mancini was not a team player, right?  A. There were lengthy conversations. I don't recall specifically what was said. These meetings last an ho-r, hour and-a.-half. We're speaking about 22 names. Again, there is a lot of conversation. Specifically I don't recall what was said even on some of the other candidates.").

Clements claimed someone at the meeting claimed Mancini just came to work and left, did not work over overtime unless he was forced to, and did not attend community events.  However, when pressed for details, Clements could not remember specifics and conceded that the alleged comments did not factor into his decision to award him a zero:

Q. I believe last week you testified that somebody said Mancini just comes to work and leaves; do you remember that?
**A. Yes.**

Q. Who said that?
**A. I don't know who said that.**

Q In what context did the person say it in?
**A. In the context that, you know, I believe the general conversation is a lot of these guys will go to community events on the weekend or will work overtime for community events. Others come to work, they do their shift. Unless forced for overtime, they're gone.**

Q. Did Mark Mancini get a zero because he didn't participate in community events?
**A. Specifically, no.**

Q. Did Mark Mancini get a zero because he didn't request overtime?
**A. Specifically, no.**
(Id. at 85:6-24).

### 3. Clements' own interactions with Mancini as his supervisor: (a) Mancini's alleged badmouthing of the Administration when he was replaced in Homeland Security; and (b) the 2000 transgression

### (a) Mancini's alleged badmouthing of the Administration when he was replaced in Homeland Security

Clements' first supervised Mancini in 1994 when Mancini first entered the police force (Clements Depo. Tr. Vol. I at 50:2-7). Clements testified he had no problems with Mancini, he never disciplined him, and he believed Mancini's work performance met his legitimate expectations (Id. at 50:14-53:1).

Clements supervised Mancini again in 2008 or 2009 when Mancini worked in Homeland Security (Id.). Again, Clements had no problems with Mancini, never disciplined him, and believed that Mancini's work performance met his legitimate expectations (Id.).

Nonetheless, Clements tried desperately to prove Mancini had a bad attitude by puffing-up Mancini's reaction to his being replaced in Homeland Security in June 2008 (Ex. 15: Personnel Order, June 30, 2008). Mancini was originally transferred to Homeland Security to replace Sergeant Kenneth Vinacco ("Vinacco"), who left the position due to a military leave. When Vinacco returned from military leave, he was reassigned to his former position, and unfortunately, Mancini was the odd man out (Id.). Mancini was understandably disappointed and vented his frustrations to Clements, his direct supervisor, like most employees would do under similar circumstances. Clements morphed Mancini's disappointment with the personnel move as "badmouthing the Administration," but when pressed for details, Clements could not remember any specifics of what Mancini said about the Administration. In the end, Clements conceded that Mancini was merely venting his frustrations:

> Q. So it sounds like you're lumping in negative attitude and not being a team player with the negative comments he made about the administration when he was replaced by Vinacco, correct?
> MR. MCHUGH: Objection to form.

**A. Correct.**

Q. Okay. I think I asked if he ever engaged in insubordination. You said yes, he was badmouthing people. Now you say that he came to his supervisor to complain about being replaced. Is it your testimony that that constitutes insubordination?
**A. No.**

Q. Do you want to take that back? Do you still consider that to be insubordination?
**A. I would say it certainly could be perceived to be insubordinate, to be badmouthing the Chief and Deputy Chief.**

Q. Is it fair to say he was coming to you to vent his frustrations?
**A. Yes.**

Q. You don't consider that to be insubordination, do you?
**A. I could. I didn't take it to the next level, but I certainly could have.**

Q. You didn't discipline him for that?
**A. No.**
(Clements Depo. Tr. Vol. I at 56:9-57:3).

Importantly, Clements conceded he did not award Mancini a "0" because of this incident.

Q. Did you give him a zero because he complained about the administration?
**A. No.**
(Clements Depo. Tr. Vol. II at 78:3-5).

### (b) The 2000 Transgression

Clements also made a passing reference about a transgression in which Mancini was involved in 2000 for which he was investigated by Internal Affairs. Mancini was never discipline for this transgression and Clements did not award him a zero because of this incident ("Q. So did you give him, Mark Mancini, a zero because of that transgression in 2000?  A. No.") (Id. at 77:1-3).

## II.   NO REASONABLE JURY COULD FIND THAT MANCINI'S PERFORMANCE OF HIS ASSIGNED DUTIES JUSTIFIED AN AWARD OF A ZERO FOR SERVICE POINTS.

The CBA provides that the service category pertains to the candidate's overall performance as a police officer (Ex. 3). Letters of commendation, and memoranda of merit received as wells as unused sick time may be considered (Id.) And while it is true the CBA allows Clements to award a candidate service points at his discretion, an award of service points cannot be irrational. Otherwise, it would lead

to absurd results and defeat the purpose of the promotional exam process, thereby rendering the CBA meaningless.  Indeed, if Chief Clements could do as he pleases and award a candidate a low score because the candidate is a New York Yankees fan, for example, there would be no need for a CBA or the promotional exam process currently in place, which exists presumably to ensure fairness and to eliminate cronyism (and discrimination) in promotions.

Here, it is inconceivable that a jury could find that Mancini's overall performance as a police officer did not meet his employer's legitimate expectations.  To put it bluntly, it is not possible.  Indeed, Mancini's most recent performance evaluation issued to him on March 28, 2011 before he went out on Injured on Duty Status, rated his overall work performance as "Exceptional," for the time period May 2010 to December 2010 (Ex. 10) — the highest possible rating the Providence Police Department can give a police officer. [3]  The performance evaluation defines Exceptional as:

> **Level of performance rarely achieved by others.  Assignments and responsibilities are being accomplished at the highest possible level of performance.  Employee is producing results exceptionally above the normal expectations of the job.**

(Id. at 6).

Furthermore, of the fifty-one (51) categories for which Mancini received a rating, he received the two highest possible ratings, "Exceptional" and "Above Average," in 39 categories and 12 categories, respectively (Id.).  Mancini did not receive one rating in either of the two lowest categories: "Meets Standard" or "Requires Improvement" (Id.).  Furthermore, Mancini's immediate supervisor, Alyssa DeAndrade wrote in the performance evaluation:  "Mark is an exceptional supervisor." (Id. at 4).  Indeed, Clements concedes that DeAndrade was in the best position to evaluate Mancini's work performance (Clements Depos. Tr. Vol. II at 24:2-9) ("Q:  Would you agree with me that a lieutenant has the most interaction and ability to observe a sergeant in the performance of their duties? . . . As opposed to the majors and captains above them? . . . A. Yes.").

---

[3] On February 26, 2012, Mancini received a performance evaluation after this one for the calendar year 2011, but he received a "Not Applicable" ("N/A") in each category since he was out on IOD status for 2011 (Ex. 16).

Importantly, Clements signed the performance evaluation on April 22, 2011 under the section "Command Staff Review," (Ex. 10 at 5) approximately (14) fourteen months before he awarded Mancini the lowest score of all twenty-two (22) police officers who signed up for the exam.

## A. LIEUTENANT ALYSA DEANDRADE'S FIRST-HAND EXPERIENCE AS MANCINI'S SUPERVISOR

Lieutenant DeAndrade testified that when she received a promotion to Lieutenant, she asked Mancini to bid into her district because of their "great working relationship" when they worked together as Sergeants and because she loved his "work ethic" (DeAndrade Depo. Tr. at 21-22). Lieutenant DeAndrade referred to Mancini as "reliable" and a "fantastic supervisor" and that she needed someone who could "step into her shoes" when she was she was not going to be there (Id.). DeAndrade testified that Mancini has all of the qualities to be an effective police officer such as having common sense, being self-initiated, being able to be in the field without direct supervision, being reliable, and being dependable (Id. at 24). DeAndrade testified that Mancini has all of the qualities to be an effective supervisor such as being objective; the ability to put people's personalities aside and not be afraid to address an issue when they see it, hold guys accountable; to be reliable, dependable; available to their supervisor, and again the same, to be able to think independently, to be able to address an issue they see before it becomes a problem (Id. at 24-25).

Lieutenant DeAndrade testified that she never heard anyone say anything negative about Mancini's abilities as a police officer or anyone claim Mancini had a bad attitude or was not a team player (Id. at 27). Lieutenant DeAndrade testified that she believes Mancini is an above average police officer and that he would make an effective Lieutenant (Id.). Finally, Lieutenant DeAndrade testified that Clements never asked her for a recommendation of service points for Mancini (Id. at 32).

B.      MONTE MONTEIRO'S FIRST-HAND EXPERIENCE AS MANCINI'S SUPERVISOR

Monteiro testified that when a position opened his department, Homeland Security, he selected Mancini for the position because he "liked his demeanor, his professionalism" (Monteiro Depos Tr. at 22) and because he was a "senior guy that the troops would respect and follow orders for"(Id.).  Monteiro testified that Mancini has all of the qualities to be an effective police officer including trustworthiness, desire to protect and serve, ability to get along with other officers, and the ability to work with minimal coaching or instruction (Id. at 23-24).  Monteiro also testified that Mancini was an "excellent" supervisor, describing how Mancini commanded respect from his subordinates, who trusted him and complied with his instructions and requests (Id. 27-28).  Finally, Monteiro testified that Mancini was "upbeat" and could not remember any instances of him complaining or making derogatory comments (Id. at 34).

III.    NO REASONABLE JURY COULD FIND THAT MANCINI WAS THE LEAST QUALIFIED FOR
        THE POSITION OF LIEUTENANT AS COMPARED TO THE OTHER TWENTY-TWO
        CANDIDATES WHO SIGNED UP FOR THE PROMOTIONAL EXAM.

Mancini was the only police officer who signed up for the June 2012 Lieutenants Exam who received a "0" for service points (Ex. 8).  The second lowest score was a 3.5, given to only two police officers (Id.).  Clements testified that Mancini was the worst performing police officer of all the candidates who took the June 2012 Lieutenants Exam (Clements Depo. Tr. Vol. I at 108:1-5). However, despite this baseless assertion, Defendant cannot explain with specific clarity why Mancini received a zero.  Defendant also cannot explain why other candidates, who were not on IOD status at the time of the exam, received higher scores than Mancini, particularly Gregory Sion (4.5), Andrew Scanlon (4), Steven Courville (3.5), and Richard Fernandes (4).

### Police Officer Gregory Sion

Sion received a "4" for service points while Mancini received a "0" (Ex. 8).  Therefore, Defendant must concede that, in June 2012, it perceived Sion to be more qualified than Mancini for the position of Lieutenant.  Yet on September 19, 2011, a mere nine (9) months prior to Sion receiving a 4 for service points, he was disciplined severely because he discharged his firearm in the line of duty and failed to report it (Sion" failed to engage in effective pre-event planning, preparation, and strategy surrounding an incident that occurred on July 6, 2011 and failed to provide relevant and critical information regarding the discharge of his weapon during the incident.") (Ex. 17: Disciplinary Action Against Gregory Sion, dated September 19, 2011). Conversely, Mancini's previous discipline was 12 years earlier (2000), for trading assigned details in excess of three times in a six week period.

Scion was suspended for ten (10) days without pay as a result of his misconduct. (Ex. 17) Scion was also transferred from the elite Narcotics and Organized Crime Unit to the less-prestigious Uniform Division Patrol Bureau, where basically all rookie police officers start their careers (Id.). However, most importantly, Scion was placed on "Rank Probation" for one year, meaning that if he committed any further infractions within twelve months, he would have been demoted from Sergeant to Patrolman (Id.).  Thus, at the time Scion was awarded a 4 for service points, he was at risk of being demoted.

Mancini's overall performance rating of "Exceptional" in a written performance evaluation was also superior to Scion's who received an "Above Average" overall performance rating in March 2012 (Ex. 18: Providence Police Department, Supervisor Performance Evaluation, Gregory Sion, dated March 20, 2012).  In his evaluation, Scion was criticized for using "poor judgment regarding the reporting of the discharge of his firearm." (Id.).  Unlike Mancini, Sion was not on IOD status at the

time of the June 2012 Lieutenants Promotional Exam.  As such, no reasonable jury could find that Mancini was less-qualified than Sion to be a Lieutenant.

### Police Officer Andrew Scanlon

Likewise, Police Officer Scanlon somehow was awarded a four for service points despite receiving an unremarkable, overall performance rating of "Meets Standard" only five months before the June 2012 Lieutenants Promotional Exam (Ex. 19: Providence Police Department, Supervisor Performance Evaluation, Andrew Scanlon, dated January 27, 2012).  If Scanlon's pedestrian "Meets Standard" rating earned him a "4," then how is it possible that Mancini's "Exceptional" rating earned him a zero?  Unlike Mancini, Scanlon was not on IOD status at the time of the June 2012 Lieutenants Exam.

Scanlon also had a citizen's complaint against him in 2001 (Ex. 20:  Internal Affairs Memo re: Officer Andrew Scanlon, dated April 6, 2001).  And while this citizen's complaint occurred many years prior to the June 2012 Lieutenants Exam, it raised serious questions about Scanlon's fitness as a police officer and as a potential supervisor.  In the citizen's complaint, it was alleged that Scanlon in patrolling a certain neighborhood looked the other way when it came to enforcing violations of the law such that the neighbors referred to him as "Officer Friendly" (Id.).  The citizen alleged that when Scanlon heard that his conduct was being questioned, he confronted one of the citizens in a threatening manner (Id.).  Scanlon was investigated by Internal Affairs, and was punished by being put on desk duties for five (5) nights (Id.).  As such, no reasonable jury could find that Scanlon was more qualified than Mancini to be a Lieutenant.

### Police Officer Steven Courville

Courville received two forms of discipline in 2009, three years prior to being awarded a 3.5 for service points.  On April 3, 2009, Courville received a verbal warning for using police resources inappropriately when he requested and received a police escort for his sister's wedding (Ex. 21:

Steve Courville — Police Escort, dated April 3, 2009).   Later the same year, on September 2, 2009,

Courville received a written warning as the result of a civilian complaint (Ex. 22:  Disciplinary Action

— Violations of Rules and Regulations, CC2008-045, dated September 2, 2009).

### Police Officers Richard Fernandes and Pao Yang

Mancini's overall performance rating of "Exceptional" in a written performance evaluation

was also superior to Fernandes' and Yang's, both of whom received an "Above Average" overall

performance rating in March 2012 (Ex. 23: Providence Police Department, Supervisor Performance

Evaluation, Richard Fernandes, dated January 23, 2012) (Ex. 24: Providence Police Department,

Supervisor Performance Evaluation, Pao Yang, dated February 3, 2012).   Yet both police officers

received substantially higher service points awards than did Mancini — a 4 for Fernandes and a 3.5

for Yang (Ex. 8).   Furthermore, Alyssa DeAndrade had an opportunity to supervise both Yang and

Mancini perform their job duties as Sergeants, and she claims that Mancini is "a much better

supervisor" than Yang. (DeAndrade Depos. Tr. at 46:19-25).

IV.   **NO REASONABLE JURY COULD FIND THAT IN 2012, DEFENDANT HAD LEGITIMATE, NON-DISCRIMINATORY REASONS TO AWARD MANCINI THE LOWEST POSSIBLE AMOUNT OF SERVICE POINTS, A "0," WHEN TWO YEARS EARLIER IN 2010, IT HAD AWARDED MANCINI THE HIGHEST POSSIBLE AMOUNT OF SERVICE POINTS, A "5," FOR THE SAME PROMOTIONAL EXAM, AND THREE YEARS LATER IN 2015 IT AWARDED HIM A "4."**

In 2010, Mancini took the Lieutenant's Promotional and was awarded a "5" for service

points by Colonel Esserman, the Chief of Police at the time.   However, Clements testified that at the

time of the 2010 Lieutenant's Exam, Clements was a Major, and he recommended Mancini receive a

"5" for service points (Clements Depo. Tr. Vol. II at 108:17-110:2).   Yet a mere two years later, for

some mind-boggling reason, Clements had a change of heart and awarded Mancini a "0," the lowest

amount possible.   The evidence-on-the-record is devoid of anything in Mancini's work performance

that could logically, reasonably or rationally explain this precipitous drop — no discipline, no

misconduct, no bad performance reviews, no civilian complaints, and no abuse of sick time. Indeed, the only noteworthy event that occurred from 2010 to 2012 is that Mancini became disabled because of an injury suffered in the line-of-duty and was forced to file accidental disability against his wishes.  Nothing else happened.  Once again, Clements has failed to explain the mystery surrounding his subjective assessment of Mancini.  As such, no jury could find that Defendant had legitimate non-discriminatory reasons to award Mancini a "0" when two years earlier it had awarded him a "5" for the same promotional exam.

Likewise, Clements cannot explain with sufficient clarity the reasons why Mancini received a "4" for service points on the 2015 Lieutenants Exam (Id. at 110:3-111:7).

## CONCLUSION

For the reasons previously stated, Plaintiff Mark Mancini respectfully requests this Honorable Court grant his Motion for Partial Summary Judgment Against the City of Providence on the Issue of Liability on Counts I, II, III, and IV of the Complaint.

> MARK MANCINI
> By His Attorney,
>
> /s/Mark P. Gagliardi
> Mark P. Gagliardi (#6819)
> LAW OFFICE OF MARK P. GAGLIARDI, LLC
> 120 Wayland Avenue, Suite 7
> Providence, RI 02906
> (401) 277-2030
> (401) 277-2021 (fax)
> mark@markgagliardilaw.net

Dated:  May 26, 2017

## CERTIFICATION

I hereby certify that on this 26**th** day of May, 20**17**, I filed electronically this document with the Clerk of the U.S. District Court for the District of Rhode Island and, therefore, all counsel-of-record has received notice electronically.

/s/Mark P. Gagliardi