UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                  )
MARK MANCINI,                     )
                                  )
         Plaintiff,               )
                                  )
v.                                )    C.A. No. 13-092 WES
                                  )
CITY OF PROVIDENCE, by and through )
its Treasurer, James J. Lombardi, )
III,                              )
                                  )
         Defendant.               )
_____)
```

## OPINION AND ORDER

William E. Smith, Chief Judge.

Before the Court are Plaintiff Mark Mancini's Motion for Summary Judgment and Defendant City of Providence's Cross-Motion for Summary Judgment.[1] After considering the evidence and arguments presented by the parties, for the reasons set forth herein, Plaintiff's motion is DENIED and Defendant's motion is GRANTED.

I. Background[2]

Plaintiff Mark Mancini was, at all relevant times, a Sergeant in the Providence Police Department ("PPD"), and an employee of

---

[1] Pl.'s Mot. for Partial Summ. J. against Def. City of Providence on the Issue of Liability on Counts I, II, III, and IV of the Compl. ("Pl. Mot."), ECF No. 86; Def.'s Obj. to Pl.'s Mot. for Summ. J. & Cross-Mot. for Summ. J. ("Def. Mot."), ECF No. 85.

[2] The following facts are undisputed, unless otherwise noted. Where there are factual disputes, the Court views the facts in the light most favorable to Plaintiff. See Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 312 (1st Cir. 2016).

the Defendant City of Providence ("the City").[3] On November 15, 2010, Mancini injured his right knee while chasing a suspect in the line of duty.[4] As a result of Mancini's injury, he was placed on "injured on duty" ("IOD") status and was out of work until May 2011.[5] When Mancini returned to work, he was placed on "light duty" status.[6] In August 2011, the PPD terminated his light duty status, and by September 2, 2011, as a result of a directive from his employer, Mancini filed for accidental disability benefits with the City.[7] On June 27, 2012, the City denied Mancini's application for an accidental disability pension.[8] After Mancini was denied the pension, the City refused to allow him to return to work on light duty status.[9]

---

[3] Compl. ¶ 14, ECF No. 1; Def.'s Answer ¶ 14, ECF No. 7.

[4] Pl.[] Mark Mancini's Statement of Undisputed Facts ("Pl.'s SUF") ¶ 7, ECF No. 88; Def.'s Statement of Undisputed Facts ("Def.'s SUF") ¶ 1, ECF No. 84.

[5] Pl.'s Statement of Disputed Facts ("Pl.'s SDF") ¶¶ 2, ECF No. 92; Def.'s SUF ¶ 2.

[6] Pl.'s SDF ¶ 3; Def.'s SUF ¶ 3.

[7] Pl.'s SUF ¶ 14 ("Mancini applied for work-related disability benefits after being told that if he did not submit the application, the Department would do it on his behalf."); Def.'s SUF ¶ 4; see also Excerpted Depo. Tr. Mark Mancini vol. II ("Mancini Depo. vol. II") 26:16-27:15, ECF. No. 87-2; Aff. of Mark Mancini ("Mancini Aff.") ¶ 16, ECF No. 86-3.

[8] Pl.'s SDF ¶ 4; Def.'s SUF ¶ 4.

[9] Mancini Aff. ¶ 17.

On May 3, 2012, Mancini learned of the June 2012 Lieutenant's Promotional Examination (the "Lieutenant's exam").[10] The promotional process for attaining the rank of lieutenant was governed by the Collective Bargaining Agreement ("CBA") between the City and the police union.[11] According to the CBA, the criteria for selecting a lieutenant were as follows: (1) 0-85 points for his or her score on a 100-question written examination; (2) 0-5 points for his or her level of education; (3) 0-5 points for his or her level of seniority; and (4) 0-5 points for his or her service.[12] The top five individuals who took the Lieutenant's exam would be eligible for promotion.[13] On June 16, 2012, Mancini took

---

[10] Compl. ¶ 35; Answer ¶ 35.

[11] Def.'s SUF ¶ 6; Pl.'s SDF ¶ 6.

[12] Def.'s SUF ¶ 7; Pl.'s SDF ¶ 7.

[13] See Def.'s SUF ¶ 14. Once a candidate is deemed "eligible for promotion," his or her name is placed on a promotional list from which all positions are filled until all candidates were promoted, unless their names were removed for cause. See Collective Bargaining Agreement ("CBA"), Art. IV, sec. 2, 3(B), Ex. 3 to Pl.'s Mot., ECF No. 86-2 (noting that, under the CBA, the City was required "at all times [to] maintain promotional lists for all positions required either by ordinance or by [the CBA] to be filled in accordance with" the CBA, and that after the promotional examination is administered, "the highest ranking candidates necessary to fill the slots on the promotional list" are assigned to the list); see also Lieutenant's Promotional Examination Results, Ex. 8 to Pl.'s Mot., ECF No. 86-2 (noting that the Lieutenant's Eligibility List issued on July 6, 2012 "shall remain in effect until all of the candidates thereon have been promoted, or unless their name(s) are removed for cause").

the exam and received a total score of "88.2," ranking him seventh of the sixteen sergeants who took the exam and taking him out of the running for promotion to the rank of lieutenant.[14] At the time of the exam, Mancini was the only promotional candidate on IOD status.[15]

The portion of the exam at issue here is the score Mancini received for the "service section" of the exam, where Mancini scored a "0" out of a possible "5" points.[16] The service section was graded by the Chief of Police, Colonel Hugh T. Clements, Jr.[17] Under the CBA, Clements was required to exercise his sole discretion to evaluate and rate a promotional candidate's overall work performance.[18] In evaluating a candidate, the Chief of Police typically considered letters of commendation, memoranda of merit received, and other factors to determine a candidate's service points. Had Mancini received at least "1" point in the service

---

[14] Pl.'s SDF ¶¶ 12–13; Def.'s SDF ¶¶ 12–13.

[15] Pl.'s SUF ¶ 13; Def.'s Suppl. Answer to Pl.'s Second Set of Ints., Ex. 6 to Pl.'s Mot., ECF 86-2.

[16] Pl.'s SUF ¶ 16; Def.'s SUF ¶ 12.

[17] Def.'s SUF ¶¶ 7–11, 15; Pl.'s SDF ¶¶ 7–11, 15; Clements Depo. Tr. vol. I 99:10–100:9, Ex. B to Def.'s SUF, ECF No. 84-2.

[18] Def.'s SUF ¶¶ 8–10; Pl.'s SDF ¶¶ 8–10.

section, he would have tied with the fifth highest test taker and been eligible for promotion to lieutenant based on his seniority.[19]

Mancini filed the instant suit against the City and Clements for employment discrimination in failing to promote him to lieutenant because of his disability, or in the alternative, his record of disability.[20] Defendant Clements was dismissed from the lawsuit after a decision by the Rhode Island Supreme Court, on a certified question from this Court, that there is no individual liability under Section 28-5-7(6) of the Rhode Island Fair Employment Practices Act ("FEPA"). See generally Mancini v. City of Providence, 155 A.3d 159 (R.I. 2017). (This matter was stayed for a considerable amount of time while the certified question was under advisement with the Rhode Island Supreme Court.)

Mancini has charged the City with four counts of unlawful discrimination including violations of the Rhode Island Civil Rights Act of 1990, Rhode Island Fair Employment Practices Act, Americans with Disabilities Act, and Civil Rights of Peoples with Disabilities Act.[21]

---

[19] Def.'s SUF ¶ 14; Pl.'s SDF ¶ 14; see also CBA, Art. IV at 15-36; Lieutenant's Promotional Examination Results, Ex. 8 to Pl.'s Mot., ECF No. 86-2.

[20] See generally Compl.

[21] See generally id.

II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court views "the facts in the light most favorable to the non-moving party." Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 312 (1st Cir. 2016) (quoting Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999)). That said, "a nonmovant cannot rely 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Id. at 313 (quoting Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir. 2014)). Ultimately, "a plaintiff's ability to survive summary judgment depends on his ability to muster facts sufficient to support an inference of discrimination." Id. (quoting Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007)). Where, as here, there are cross-motions for summary judgment, this "simply require[s] [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004)

(quoting <u>Wightman v. Springfield Terminal Ry.</u>, 100 F.3d 228, 230 (1st Cir. 1996)).

III. Discussion

In employment discrimination cases based on disparate treatment, the Court applies the three-part burden-shifting paradigm set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973).[22] At the outset, a plaintiff must establish a prima facie case of discrimination. <u>Rathbun v. Autozone, Inc.</u>, 361 F.3d 62, 71 (1st Cir. 2004) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802). In the failure-to-promote context, to establish a prima facie case, the plaintiff must show he "(i) is a member of a protected class who (ii) was qualified for an open position for which [he] applied, but (iii) was rejected (iv) in favor of someone possessing similar qualifications." <u>Id.</u> (citing <u>Gu v. Boston Police Dep't</u>, 312 F.3d 6, 11 (1st Cir. 2002); <u>see also</u> <u>McGary</u>, 47 A.3d at 280 (recognizing that "[t]he burden placed on the complainant at this stage is not especially onerous"). If the plaintiff establishes a prima facie case, a presumption of

---

[22] <u>See also</u> <u>McGarry v. Pielech</u>, 47 A.3d 271, 280 (R.I. 2012). While the Court would typically apply Rhode Island law to Plaintiff's state law claims, Rhode Island looks to the <u>McDonnell Douglas</u> paradigm because of the Rhode Island Supreme Court's reliance on federal jurisprudence under Title VII of the Civil Rights Act of 1964 ("Title VII") for "enlightenment and guidance" in interpreting FEPA, the state analogue to Title VII. <u>Weeks v. 735 Putnam Pike Operations, LLC</u>, 85 A.3d 1147, 1156 n.11 (R.I. 2014) (noting that the Rhode Island Supreme Court historically has looked to federal precedent in the process of construing FEPA).

discrimination arises, and "[t]he burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision(s)." Rathbun, 361 F.3d at 71; McGarry, 47 A.3d at 280. An "employer need only produce competent evidence, taken as true, to enable a rational factfinder to conclude there existed a nondiscriminatory reason for the challenged employment action." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 6 (1st Cir. 2000) (quotation omitted).   At this juncture, "[t]he burdens of proof and production fall squarely upon the plaintiff to demonstrate that the defendant's tendered explanation is only a pretext and that discrimination was the true motive underlying the [promotion] decision." McGarry, 47 A.3d at 280-81. "The core inquiry in such disparate treatment cases is whether the defendant intentionally discriminated against the plaintiff because of [his alleged disability]."  Rathbun, 361 F.3d at 71 (citing Cumpiano v. Banco Santander, 902 F.2d 148, 153 (1st Cir. 1990))(emphasis added).

   A. Mancini's Prima Facie Case of Discrimination

     1. Disability

     Mancini argues that at the time of the Lieutenant's exam he was a member of a protected class because he had a disability

within the meaning of the law.[23] The City counters that Mancini was not a member of a protected class because he did not have a disability within the meaning of the law.[24]

There are three ways a person may be covered by the Americans with Disabilities Act ("ADA"); the ADA defines disability as follows:

> The term "disability" means, with respect to an individual—
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).

Mancini asserts that he had a disability as defined in subsection (1)(A), that is, he had a physical or mental impairment that substantially limits a major life activity.[25] In order to qualify for coverage, however, Mancini must provide competent evidence to demonstrate this fact. The Equal Employment Opportunity Commission ("EEOC") defines a physical or mental impairment as follows:

---

[23] Mem. of Law in Supp. of Pl.'s Mot. for Partial Summ. J. against Def. City of Providence on the Issue of Liability on Counts I, II, III, and IV of the Compl. ("Pl.'s Mem.") 18, ECF No. 86-1.

[24] Def.'s Mem. of Law in Supp. of Def.'s Obj. to Pl.'s Mot. for Summ. J. and in Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Mem.") 19, ECF No. 85-1.

[25] Pl.'s Mem. 18-19.

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

Further, EEOC regulations state that "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."
Id. § 1630.2(j)(1)(ii). But that

[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

Id.

Lastly, the ADA defines major life activities as:

major life activities include, but are not limited to, caring for oneself, performing mutual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing learning, reading, concentrating, thinking, communicating, and working.

42 U.S.C. § 12102(2)(A).

In support of his position that he had a physical impairment that substantially limited one or more of his major life

10

activities, the only evidence that Mancini has submitted to the Court is his own affidavit, prepared for purposes of moving for summary judgment.[26] In the affidavit, Mancini states the following: "At the time I sat for the June 2012 Lieutenant['s] Exam, my physical impairment substantially limited my ability to stand, walk, bend, lift, and work as compared to the average member in society."[27] In order to survive summary judgment, an affidavit must be factually specific to give rise to a genuine issue of material fact. See A.J. Amer Agency, Inc. v. Astonish Results, LLC, No. 12-351S, 2014 WL 3496964, at *12 (D.R.I. July 11, 2014) (citing Fleet Nat'l Bank v. H&D Entm't, Inc., 96 F.3d 532, 540 (1st Cir. 1996)). Mancini's self-serving affidavit misses the mark by a wide margin. The First Circuit has consistently rejected conclusory affidavits that lack factual specificity and merely parrot the legal conclusions required by the cause of action at the summary judgment stage. See Garcia-Gonzalez v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014) (quoting Nieves-Romero v. United States, 715 F.3d 375, 378 (1st Cir. 2013)) (explaining that "[c]onclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative will not suffice to ward off a properly supported summary judgment motion"); see

---

[26] See generally Mancini Aff.

[27] Id. at ¶ 14.

also <u>Fleet Nat'l Bank</u>, 96 F.3d at 540 (disregarding an affidavit containing only conclusory assertions and lacking dates, names, or actual statements); <u>Felkins v. City of Lakewood</u>, 774 F.3d 647, 652 (10th Cir. 2014) (holding that a self-serving affidavit was admissible insofar as it described the plaintiff's "injuries and symptoms, such as pain and difficulties walking, standing, and lifting," but inadmissible "insofar as they diagnose her condition . . . or state how that condition causes limitations on major life activities") (citing <u>James River Ins. Co. v. Rapid Funding, LLC</u>, 658 F.3d 1207, 1214 (10th Cir. 2011)); <u>Russell v. Phillips 66 Company</u>, 687 Fed. App'x 748, 753-54 (10th Cir. 2017) (holding former employee's affidavit stating medication taken for depression caused insomnia not admissible to establish depression limited major life activity of sleeping); <u>Giusti Negron v. Scotiabank De Puerto Rico</u>, 260 F. Supp. 2d 403, 411 (D.P.R. 2003) (finding conclusory affidavit statement alone insufficient to support a finding of discriminatory atmosphere at summary judgment stage).

Moreover, while Mancini is correct that Congress has made it easier to establish a disability within the meaning of the law, by enacting the ADA Amendments Act of 2008 ("ADAAA"), Mancini still fails to establish a disability under the more liberal standard.[28]

---

[28] <u>See</u> Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. 1-2, ECF No. 93. The ADAAA states that the definition of disability

Indeed, the First Circuit in a post-ADAAA case stated that "[e]vidence of a medical diagnosis of impairment, standing alone, is insufficient to prove a disability," but rather, "[w]hat is required is evidence showing that the impairment limits [a] particular plaintiff to a substantial extent." Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 187 (1st Cir. 2011). Here, the only evidence of a medical diagnosis is Mancini's self-serving affidavit, which states that a doctor diagnosed him with "chondromalacia of the right knee" but that his "workplace injury improved . . . ."[29] The affidavit further mimics the text of the ADA and EEOC regulations, averring that Mancini's "physical impairment substantially limited [his] ability to stand, walk, bend, lift, and work as compared to the average member in society."[30] At best, this statement is hearsay, and at worst, it is wholly inadequate on its face; indeed, the record contains no admissible evidence that there was a connection between any diagnosis and the claimed physical limitations. For these reasons, Mancini has failed to demonstrate that he has a disability within the meaning of the ADA and the related state laws.

---

is to be construed "in favor of broad coverage of individuals . . . to the maximum extent permitted" by the law. 42 U.S.C. § 12102(4)(A).

[29] Mancini Aff. ¶ 8, 12.

[30] Id. ¶ 14.

Mancini makes an alternative argument, that he was disabled within the meaning of the law because he had a record of a physical impairment, but this fares no better. The EEOC regulation states that "[a]n individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). Plaintiff asserts that because he was on IOD status at the time of the promotional exam and because he was directed by the City to apply for an accidental disability pension, "defendant[] must be charged with the contemporaneous belief that both plaintiff had a disability and that his disability was so severe that it was sufficient to warrant seeking a disability retirement."[31] Knowledge that Mancini was on IOD status or that he had a pending disability retirement application, without more, however, does not establish that the City misclassified Mancini as having a physical impairment substantially limiting one or more of his major life activities. See 29 C.F.R. § 1630.2(k)(1). As the First Circuit has noted, "[a] plaintiff claiming that he is 'regarded' as disabled cannot merely show that his employer perceived him as somehow disabled; rather, he must prove that the employer regarded him as disabled within the meaning of the ADA." Bailey v. Georgia-Pacific Corp., 306 F.3d

---

[31] Pl.'s Mem. 20.

1162, 1169 (1st Cir. 2002) (citing Giordano v. City of New York, 274 F.3d 740, 748 (2d Cir. 2001)).  In other words, the "regarded as" prong (42 U.S.C. § 12102(1)(C)) is not merely a catch-all clause for plaintiffs who cannot show an actual disability within the meaning of the law, but who believe that the employer harbored some kind of subjective bad intent.  It requires the same level of specificity and evidentiary showing as a claim under § 12102(1)(A). Accordingly, because both of Mancini's disability theories fall flat, Mancini has failed to establish a prima facie case of disability discrimination.

B. The City's Rebuttal of Mancini's Prima Facie Case

Even if the Court assumes that Mancini could establish that he was disabled, he still has not mustered enough evidence in his favor to survive the City's motion for summary judgment.  Assuming for purposes of this analysis that Mancini is disabled, he otherwise has met the less than onerous burden of showing he was qualified for the position and did not receive it.  See 29 C.F.R. § 1630.2(m); see also Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991) (explaining that the burden on a complainant in establishing a prima facie case is "not onerous") (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1982)). The burden then shifts to the City to produce evidence sufficient to rebut the presumption of discrimination. Burdine, 450 U.S. at 254. "[T]he prima facie case 'raises an inference of discrimination

only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" Id. (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).  "The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Id. Here, the burden placed on a defendant is one of production, and not one of persuasion. Mesnick, 950 F.2d at 823. In order to satisfy its burden, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." Burdine, 450 U.S. at 255. "Once such a reason emerges, the inference raised by the prima facie case dissolves, and the last transfer of burdens occurs." Mesnick, 950 F.2d at 823 (internal citations omitted). Finally, the plaintiff is tasked with demonstrating "unassisted by the original inference of discrimination, that the employer's proffered reason is actually a pretext for discrimination of the type alleged." Id. (citations omitted). This can be accomplished through direct evidence, or "[t]here are many veins of circumstantial evidence that may be mined by a plaintiff to this end." Id. at 824. On a motion for summary judgment, one must keep in mind that, "so long as the employer's proffered reason is facially adequate to constitute a legitimate, nondiscriminatory justification for the

employer's actions, the trial court's focus in deciding a Rule 56 motion must be on the ultimate question, not on the artificial striations of the burden-shifting framework." Id. at 825. As Judge Selya explained: "in a case where the first two steps of the McDonnell Douglas pavane have been satisfactorily choreographed, a plaintiff must offer some minimally sufficient evidence, direct or indirect, both of pretext and of the employer's discriminatory animus to prevail in the face of a properly drawn Rule 56 motion." Id. It is on this final point that Plaintiff again fails to defeat the City's motion for summary judgment.

The City has presented ample evidence of nondiscriminatory reasons for Mancini's award of service points. Specifically, the City cites to Clements's deposition in which Clements articulated the following reasons for Mancini's service points score: (1) heavy reliance on the recommendations of the command staff; (2) the fact that Mancini was applying for a promotion to lieutenant — a position entailing far greater leadership, responsibility, and external engagements than the rank of sergeant; and (3) the fact that Clements and his command staff were looking to make the award of service points more meaningful.[32]

With this proffer, the City has met its burden of production. The nondiscriminatory reasons proffered by the City are similar to

---

[32] Def.'s Mem. 7-9 (citing Clements Depo. vol. II 71:25-72:5, 97:22—98:7; Clements Depo. vol. I 102:2-14).

other reasons articulated by defendant-employers that courts have found sufficient. See, e.g., McKay v. U.S. Dep't of Transp., 340 F.3d 695, 700 (8th Cir. 2003) (deeming employer's justification legitimate and nondiscriminatory where it selected an arguably less qualified candidate due to her "superior communication skills evidenced in an interview process"); Mesnick, 950 F.2d at 828-29 (affirming grant of summary judgment in favor of employer where employer purported to take adverse employment action against employee based on his insubordination and hostility); see also Burdine, 450 U.S. at 254 (explaining "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons"). Additionally, the City's nondiscriminatory reasons are distinguishable from reasons that courts have rejected as insufficient. See Alvarado v. Texas Rangers, 492 F.3d 606, 616-17 (5th Cir. 2007) (finding candidate's failure to score among the top ten candidates in the promotion and selection process insufficient nondiscriminatory reason proffered by the defendant-employer because the employer failed to provide any evidence of or explanation for why the other candidates scored higher); Iadimarco v. Runyon, 190 F.3d 151, 166-67 (3d Cir. 1999) (rejecting the defendant-employer's proffered explanation that the plaintiff was not promoted because he was not "the right person for the job"); Patrick v. Ridge, 394 F.3d 311, 317 (5th Cir. 2004) (rejecting the

defendant-employer's proffered explanation that the plaintiff was not sufficiently suited for his job).

In his deposition, Colonel Clements stated that the award of service points to Mancini was consistent with, and the product of, an established process that Clements employed when awarding service points to promotional candidates.[33] According to his testimony, Clements would meet with members of his command staff to discuss the appropriate award of service points for each promotional candidate prior to the administration of a promotional exam.[34] At these meetings, promotional candidates were evaluated, and after discussion of a candidate's qualifications, members of the command staff had the opportunity to recommend a service points score.[35] At the meeting prior to the administration of the June exam, Clements received seven recommendations for Mancini's service points score: "3," "0," "2," "1," "0," "0," and "2."[36] Clements testified that he relied on all of the score sheets

---

[33] Clements Depo. Tr. vol. I 73:11-20, ECF. No. 84-2.

[34] Id. 84:5-9.

[35] Id. 92:3-14.

[36] Major Keith Tucker recommended a three. Clements Depo Tr. vol. II 46:18-20, ECF No. 84-2. Deputy Chief Thomas Oates recommended a zero. Id. 47:4-6. Captain David Lapatin recommended a two. Id. 55:11-15. Major Tom Verdi recommended a one. Id. 58:13-15. Major Frank Colon recommended a zero. Id. 63:12-14. Captain Robert Lepre recommended a zero. Id. 64:8-22. Captain William Campbell recommended a two. Id. 66:15-67:12.

submitted by his command staff and that he was alarmed by the number of low scores that Mancini had received.[37] Further, Clements explained that at the meeting, some members of the command staff conveyed feelings that Mancini had a negative or poor attitude and that he was not a team player.[38] Clements's testimony described the conversation around the room, in conjunction with the command staff's actual recommendations, as "glaring"; in other words, Clements found the command staff's recommendations and comments to be glaringly less favorable to Mancini than the other candidates they discussed.[39]

After describing his reliance on his command staff's recommendations, Clements distinguished between the qualities of a sergeant and those of a lieutenant as a means of illustrating Mancini's unsuitableness for the rank of lieutenant.[40] Clements explained that a "[l]ieutenant is responsible for the entire operations in that community; in essence, the mini police chief for that geographical area."[41] Clements also described that the police department is "counting on someone ascending to the rank of

---

[37] Clements Depo. Tr. vol. II 119:25-120:4.

[38] Clements Depo. Tr. vol. I 97:18-21.

[39] Id. 102:2-14.

[40] Id. 30:13-19.

[41] Clements Depo. Tr. vol. II 11:14-12:4.

lieutenant to carry the ball and to speak for the Office of the Chief of Police or the department when he's out there on a shift."[42] Further, in order to fulfill these responsibilities, Clements expressed that the police department was "looking for people that become way more engaged with the work staff, with the community, and to present a positive direction . . . ."[43] In contrast, Clements described Mancini as an individual who "comes into work, does the job and [then] leaves."[44]

Lastly, Clements explained that Mancini received a "0" because the command staff was looking to make the award of service points more meaningful. In explaining the rationale behind the change, Clements explained that the rank of sergeant, as compared to the rank of lieutenant, is "a lesser rank. So not as much weight would be given to certain areas of leadership ability, because it's a different type of leadership. It's a more confined leadership."[45]

The City's proffered nondiscriminatory reason, as articulated by Clements's deposition, is more than sufficient to satisfy Defendant's burden of production. Although members of the PPD, and

---

[42] Id. 92:21–93:2.

[43] Clements Depo. Tr. vol. I 104:7-13.

[44] Id. 104:7-8.

[45] Clements Depo. Tr. vol. II 92:3-6.

the parties before the Court, share diverse opinions about whether Mancini was qualified for the lieutenant position, the burden on the City "is one of production, not persuasion; it 'can involve no credibility assessment.'" See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) ("the burden-of-production necessarily precedes the credibility-assessment stage")). Accordingly, the Court concludes that the City has satisfied its burden of production and has rebutted the presumption of discrimination generated by Mancini's prima facie case.

Although employment discrimination imposes a burden of production on employers, the burden of persuasion always remains with the employee. Burdine, 450 U.S. at 256. The plaintiff "must have the opportunity to demonstrate that the proffered reason[s] [were] not the true reasons for the employment decision." Id. "This burden now merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Id. The plaintiff may prevail by "persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. Alternatively, "the trier may infer the ultimate fact of discrimination from the components of the plaintiff's prima facie showing combined with compelling proof of the pretextual nature of the employer's

explanation." Rathbun, 361 F.3d at 72; see also Mesnick, 950 F.2d at 825. So the question for the Court is whether Mancini has marshalled enough evidence to demonstrate that there is a material issue of disputed fact as to the claim of pretext that needs to be resolved by a jury.

Mancini presents several arguments in his attempt to show that the City intentionally discriminated against him because of his alleged disability. Plaintiff's arguments, read in conjunction with each other, state his theory that genuine issues of material fact remain as to whether (1) Mancini's performance of his assigned duties justified an award of "0" service points; (2) Mancini was the least qualified for the position of lieutenant as compared to the other promotional candidates; and (3) Clements had legitimate, nondiscriminatory reasons to award Mancini a "0," when two years earlier in 2010, Clements had recommended Mancini a "5" for the same promotional exam, and three years later awarded him a "4."[46]

Plaintiff's arguments are insufficient to create a genuine issue of material fact as to whether the City intentionally discriminated against him. See Garcia-Gonzalez, 761 F.3d at 87 (noting that a genuine issue of material fact "must be built on a solid foundation -- a foundation constructed from materials of evidentiary quality.") (quoting Nieves-Romero, 715 F.3d at 378).

---

[46] Pl.'s Mem. 10-11.

When boiled down, Plaintiff's argument is simply that a reasonable jury will not believe Colonel Clements and instead it would be compelled to find Mancini more qualified than the other candidates. But this theory does no more than beg the question. Plaintiff's burden is to show some evidence of intentional discrimination, i.e., that the City's proffered reasons are pretextual. Although Mancini presents a colorable argument that his service points score of "0" was unfair, he presents no evidence to establish a relationship between his score and his alleged disability. While direct evidence of intentional discrimination is not necessary for Mancini to overcome his burden of persuasion, Mancini has failed to provide the "compelling proof of the pretextual nature of the employer's explanations[s]" necessary for a reasonable jury to infer a fact of discrimination. See Rathbun, 361 F.3d at 72; see also Mesnick, 950 F.2d at 825 (explaining that a "plaintiff must offer some minimally sufficient evidence, direct or indirect, both of pretext and of the employer's discriminatory animus to prevail in the face of a properly drawn Rule 56 motion." (emphasis added)). Not only is there no evidence of pretext or animus, the evidence that is in the record shows that, during the 2012 Sergeant's Promotional Exam, eleven candidates were on IOD status, and every candidate with such status was awarded a "5" or a "4" on the

service points section by Clements.[47] It defies reason that Clements would penalize Mancini for his alleged disability as he sought a promotion to the rank of lieutenant, while Clements simultaneously disregarded that fact for other officers seeking a promotion to the rank of sergeant. One may be able to infer that Clements thought Mancini undeserving, or perhaps disliked him for one reason or another – but such inferences are of no consequence. Plaintiff's argument as to pretext rests ultimately on speculation, not evidence, and therefore must fail.

III. Conclusion

For the reasons discussed above, Plaintiff's Motion for Summary Judgment (ECF No. 86) is DENIED and Defendant's Cross-Motion for Summary Judgment (ECF No. 85) is GRANTED.

IT IS SO ORDERED.

William E. Smith
Chief Judge
Date: October 10, 2017

---

[47] See Def. City of Providence's Supp. Answer to Pl.'s Second Set of Inter., Ex. 6 to Pl.'s Mot., ECF No. 86-2; Def.'s Mem. 23-24; Award of Service Points for the 2012 Sergeant's Exam, Ex. E to Def.'s Mot., ECF No. 85-6.